No. 22-2289

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PHILLIP ALIG; SARA J. ALIG; ROXANNE SHEA; DANIEL V. SHEA,
*Plaintiffs-Appellees*,

v.

ROCKET MORTGAGE, LLC, f/k/a Quicken Loans Inc.; AMROCK, LLC, f/k/a
Title Source, Inc., d/b/a Title Source Inc. of West Virginia, Inc.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of West Virginia, No. 5:12-cv-114, 5:12-cv-115 (Bailey, J.)

### JOINT APPENDIX
### VOLUME II OF III, PAGES JA458-JA820

Deepak Gupta
Gregory A. Beck
Linnet Davis-Stermitz
GUPTA WESSLER PLLC
2001 K St. NW, Suite 850 N.
Washington, DC 20006
Tel.: +1 202 888 1741

Jonathan R. Marshall
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Tel.: +1 304 340 2295

*Counsel for Plaintiffs-Appellees*

May 17, 2023

William M. Jay
Thomas M. Hefferon
Brooks R. Brown
Jaime A. Santos
Keith Levenberg
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Tel.:  +1 202 346 4000

Edwina B. Clarke
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA  02210
Tel.:  +1 617 570 1000

*Counsel for Defendants-Appellants*

*Additional Counsel Listed on Inside Cover*

Patricia M. Kipnis
BAILEY & GLASSER LLP
923 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002
Tel.: +1 215 274 9420

Jason E. Causey
BORDAS & BORDAS, PLLC
1358 National Road
Wheeling, WV 26003

*Counsel for Plaintiffs-Appellees*

Helgi C. Walker
Jesenka Mrdjenovic
Andrew G.I. Kilberg
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: +1 202 955 8500

Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.: +1 213 229 7000

*\*Admitted only in New York and Virginia;
not admitted in the District of Columbia.
Practicing under the supervision of counsel
admitted in the District of Columbia.*

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

## Volume I of III

| Date Filed | Docket No. | Docket Text | Appx. Page |
|---|---|---|---|
|  |  | Docket, Northern District of West Virginia, Nos. 5:12cv114, 5:12cv115 | JA1 |
| 07/23/2012 | 1 | Notice of Removal | JA43 |
| 07/23/2012 | 1-1 | First Amended Complaint | JA55 |
| 07/17/2015 | 79 | Plaintiffs' Brief in Opposition to Motion for Partial Judgment on the Pleadings of Defendants Quicken Loans and Title Source | JA118 |
| 07/17/2015 | 81 | Plaintiffs' Memorandum of Law in Opposition to Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations | JA151 |
| 10/15/2015 | 105 | Order Denying Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations | JA186 |
| 10/15/2015 | 107 | Order Denying in Part and Granting in Part Defendants Quicken Loans Inc. and Title Source, Inc.'s Motion for Partial Judgment on the Pleadings | JA208 |
| 3/15/2016 | 168 | Stipulation | JA216 |
| 03/18/2016 | 174 | Defendants Quicken Loans Inc. and Title Source, Inc.'s Motion for Summary Judgment | JA220 |
| 03/18/2016 |  | Select Exhibits to Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion for Summary Judgment |  |
|  | 174-13 | Exhibit 13: Broeksmit Declaration (Excerpted) | JA224 |

|  | 174-16 | Exhibit 16: Uniform Appraisal Report – 1971 Highland Land | JA261 |
|---|---|---|---|
|  | 174-22 | Exhibit 22: Deposition Transcript of Philip Jackson, February 24, 2016 (Excerpted) | JA277 |
|  | 174-23 | Exhibit 23: Deposition Transcript of Jordan Petkovski, October 27, 2015 (Excerpted) | JA287 |
|  | 174-26 | Exhibit 26: Deposition Transcript of 30(b)(6) Witness John S. Brenan, December 17, 2015 (Excerpted) | JA304 |
|  | 174-27 | Exhibit 27: Uniform Standards of Professional Appraisal Practice 2008-2009 (USPAP) | JA316 |
| 3/18/2016 | 175 | Defendants' Memorandum in Support of Motion Summary Judgment (without exhibits) | JA324 |
| 04/15/2016 | 193 | Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification (Excerpted) | JA373 |
| 04/15/2016 | 193-7 | Exhibit G: Deposition Transcript of 30(b)(6) Witness John S. Brenan, December 17, 2015 (Excerpted) | JA406 |
| 04/20/2016 |  | Select Exhibits to Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment |  |
|  | 200-1 | Exhibit 1: Declaration of Jenna Randall | JA413 |
|  | 200-2 | Exhibit 2: Deposition Transcript of Troy Sneddon, January 21, 2016 (Excerpted) | JA418 |
|  | 200-3 | Exhibit 3: Deposition Transcript of John S. Brenan, December 17, 2015 (Excerpted) | JA425 |
|  | 200-4 | Exhibit 4: Deposition Transcript of Richard Hyett, December 8, 2015 (Excerpted) | JA437 |

|  | 200-5 | Exhibit 5: Deposition Transcript of Dewey V. Guida, January 12, 2016 (Excerpted) | JA447 |
| --- | --- | --- | --- |

## Volume II of III

| 04/20/2016 |  | Select Exhibits to Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment |  |
| --- | --- | --- | --- |
|  | 200-8 | Exhibit 8: Deposition Transcript of Phillip Jackson, February 24, 2016 (Excerpted) | JA458 |
|  | 200-9 | Exhibit 9: Deposition Transcript of Jody Hill, January 11, 2016 (Excerpted) | JA466 |
|  | 200-10 | Exhibit 10: Declaration of Jordan Petkovski | JA477 |
|  | 200-13 | Exhibit 13: Interest Rate Disclosure – Locked Rate Version and Deposit Agreement (Excerpted) | JA482 |
| 5/19/2016 | 222 | Partial Dismissal Order | JA490 |
| 06/02/2016 | 227 | Order Resolving Motions | JA492 |
| 08/25/2016 | 243 | Order Denying Motions for Reconsideration and for Oral Argument | JA554 |
| 02/24/2017 | 266 | Quicken Loans and Title Source's Motion for Modification of Orders as to Status Conference | JA575 |
| 03/30/2017 | 277 | Status Conference Transcript | JA593 |
| 04/13/2017 |  | Deposition of Kristine Hughes, April 13, 2017 (Excerpted) | JA612 |
| 4/24/2017 | 294 | Stipulation | JA626 |

| 04/24/2017 | 295 | Select Exhibits to Defendants' Motion and Incorporated Memorandum for Leave to File Materials Under Seal | |
| | | Exhibit 29 to Exhibit N: Charleston Gazette-Mail "Recipe for foreclosure," September 30, 2007 | JA630 |
| 05/02/2017 | 310 | Order Granting in Part and Denying in Part Plaintiffs' Motion to Exclude Witnesses and Documents at Damages Hearing | JA636 |
| 05/08/2017 | | Select Appendix to Defendants' Motion to Decertify the Class | |
| | 324-2 | Appendix 7: Declaration of William Clark | JA645 |
| 06/05/2017 | 341 | Plaintiffs' Response in Opposition to Defendants' Motion to Decertify the Class (Excerpted) | JA651 |
| 07/11/2017 | 353 | Second Order Resolving Motions and Awarding Class-wide Statutory Damages | JA687 |
| 08/03/2017 | 358 | Joint Motion for Approval of Proposed Class Notice | JA761 |
| 08/21/2017 | 363 | Order Denying Defendants' Motion to Amend Order Awarding Class-wide Statutory Damages | JA769 |
| 01/10/2018 | 370 | Report on Discovery and Scheduling Matters | JA774 |
| 03/12/2018 | 414 | Joint Status Report | JA781 |
| 09/21/2018 | 426 | Joint Status Report | JA787 |
| 12/10/2018 | 432 | Joint Status Report | JA793 |
| 12/14/2018 | 433 | Judgment | JA799 |
| 01/10/2019 | 435 | Defendants' Notice of Appeal | JA803 |

| 11/28/2022 | 453 | Order on the Issue of Standing | JA806 |
| 12/12/2022 | 456 | Order Reinstating Original Judgment | JA816 |
| 12/19/2022 | 457 | Notice of Appeal | JA818 |

## Volume III of III – *SEALED APPENDIX*

| Date Filed | Docket No. | Docket Text | Appx. Page |
|---|---|---|---|
| 03/04/2016 | 166-2 | Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification (Excerpted) | JA821 |
| 03/04/2016 | 169 | Plaintiffs' Motion for Class Certification (Excerpted) | JA831 |
| 03/18/2016 | 173-1 | Plaintiffs' Motion for Partial Summary Judgment | JA835 |
| 03/18/2016 | 173-2 | Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment (Excerpted) | JA839 |
| | | Exhibit B: Deposition Transcript of Dewey Guida, January 12, 2016 (Excerpted) | JA852 |
| | | Exhibit C: Loan Journal Notes | JA862 |
| | | Exhibit D: *Brown v. Quicken Loans*, C.A. No. 08-C-36: Trial Testimony (Direct, Cross, and Redirect Examination) Transcript of Michael Lyon (Excerpted) | JA894 |
| | | Exhibit I: Email from Clint Bonkowski to Heather Lovier, December 13, 2007 | JA897 |
| | | Exhibit J: Deposition Transcript of Jennifer Randall, October 21, 2015 (Excerpted) | JA899 |

| | | | |
|---|---|---|---|
| | | Exhibit K: Deposition Transcript of Ronald Rankin, October 27, 2015 (Excerpted) | JA910 |
| | | Exhibit L: Appraisal Order Form | JA917 |
| | | Exhibit M: Quicken Loans Spreadsheet of Estimated Values | JA919 |
| | | Exhibit U: Mortgagee Letter 96-26 and authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner (May 21, 1996) (Excerpted) | JA1044 |
| | | Exhibit V: Letter from OCC to K. Kaiser, Chairman of The Appraisal Standards Board (July 28, 1999) | JA1048 |
| | | Exhibit W: Memorandum Opinion and Order (Findings of Fact and Conclusions of Law, February 25, 2010) (Excerpted) | JA1051 |
| | | Exhibit X: Deposition Transcript of Michael Lee Lyon, July 31, 2008 (Excerpted) | JA1078 |
| 04/29/2016 | 206 | Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment (Document #175) (Excerpted) | JA1083 |
| 04/29/2016 | 206-1 | Exhibit D: Deposition Transcript of Philip Alig, December 9, 2015 (Excerpted) | JA1100 |
| | 206-1 | Exhibit D: Deposition Transcript of Daniel Vincent Shea, December 4, 2015 (Excerpted) | JA1104 |
| | 206-5 | Exhibit CC: Uniform Residential Appraisal Report, 1971 Highland Lane (Excerpted) | JA1108 |
| | 206-6 | Exhibit EE: Deposition Transcript of James L. Brown, March 2, 2016 (Excerpted) | JA1109 |

| | 206-6 | Exhibit FF: Uniform Residential Appraisal Report, 21 Ridgewood Avenue (Excerpted) | JA1111 |
|---|---|---|---|
| | 206-7 | Exhibit JJ: Deposition Transcript of 30(b)(6) Witness John S. Brenan, December 17, 2015 (Excerpted) | JA1112 |
| 05/06/2016 | 212-1 | Plaintiffs' Reply Memorandum in Support of Their Motion for Partial Summary Judgment (Excerpted) | JA1116 |
| | | Exhibit 10: Deposition Testimony of Jordan Petkovski, October 27, 2015 (Excerpted) | JA1124 |
| | | Exhibit 15: Appraisal of 51461 Jennifer Lane, Suite 217, Saint Clairsville, Belmont Cnty., OH 43950 | JA1127 |
| 04/24/2017 | 293 | Plaintiffs' Brief on Class-wide Statutory Penalties and Motion for Summary Judgment on Class-wide Contract Damages (Excerpted) | JA1134 |
| 04/24/2017 | 293-1 | Exhibit C to Plaintiffs' Brief on Class-wide Statutory Penalties and Motion for Summary Judgment on Class-wide Contract Damages: Opinion and Order, June 17, 2013 (Excerpted) | JA1140 |
| 04/24/2017 | 295 | Select Exhibits to Defendants' Motion and Incorporated Memorandum for Leave to File Materials Under Seal | |
| | | Exhibit M: Declaration of Aaron Weller | JA1165 |
| | 299 | Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Summary Judgment on Class-wide Contract Damages (Excerpted) | JA1178 |
| 05/08/2017 | 324-2 | Select Appendices and Exhibits to Defendants' Motion to Decertify the Class | |
| | | Appendix 1: Declaration of Yvonne W. Chan | JA1182 |

| | | Exhibit 1: Loan File Summaries | JA1187 |
|---|---|---|---|
| | | Exhibit 2: Loan File Summaries | JA1237 |
| | | Exhibit 3: Gary and Saundra Ensminger Loan Journal Notes | JA1255 |
| | | Exhibit 6: Ronald and Karen Bane Loan Journal Notes | JA1258 |
| | | Exhibit 9: Excerpt of the Sheas' 2006 Loan File | JA1262 |
| | | Exhibit 10: Excerpt of the Sheas' 2008 Loan File | JA1264 |
| | | Exhibit 12: The Aligs' Interest Rate Disclosure (Not Locked) and Deposit Agreement | JA1266 |
| | | Appendix 3: Declaration of Aaron Judy | JA1268 |
| | | Appendix 4: Declaration of Rebecca Stephens | JA1275 |
| | | Appendix 5: Declaration of Amy Courtney | JA1281 |
| 05/09/2017 | 336 | Transcript of Evidentiary Hearing held on May 9, 2017 (Excerpted): Direct and Cross-Examination Testimony of Amy Bishop and Direct, Cross-Examination, and Redirect Testimony of William Banfield | JA1294 |

# Exhibit 8

Jackson, Phillip                                February 24, 2016

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WHEELING DIVISION

- - -

PHILIP ALIG, SARA J.          )   CIVIL DIVISION
ALIG, ROXANNE SHEA and        )
DANIEL V. SHEA,               )   No. 5:12CV114
individually and on           )
behalf of a class of          )   VIDEO DEPOSITION OF
persons,                      )   PHILLIP JACKSON
                              )   February 24, 2016
          Plaintiffs,         )
                              )   Called on behalf of
     vs.                      )   Defendants
                              )   Quicken Loans and
QUICKEN LOANS, INC.,          )   Title Source
TITLE SOURCE, INC.,           )
DEWEY V. GUIDA,               )   Counsel of record for
APPRAISALS UNLIMITED,         )   this Party:
INC., and RICHARD             )
HYETT,                        )   Jason E. Manning, Esq.
                              )   TROUTMAN SANDERS, LLP
          Defendants.         )   222 Central Park Avenue
                              )   Virginia Beach, VA 23462
                              )   757-687-7564
                              )

- - -

2

 1              DEPOSITION OF PHILLIP JACKSON, a witness

 2    herein, called by the Defendants, Quicken Loans and

 3    Title Source, taken pursuant to the Federal Rules of

 4    Civil Procedure, by and before Kathy D. Landock, a

 5    Registered Merit Reporter, Certified Realtime

 6    Reporter and a Notary Public in and for the State of

 7    West Virginia, at the law offices of Bordas & Bordas,

 8    PLLC, 1358 National Road, Wheeling, WV 26003, on

 9    Wednesday, February 24, 2016 at 9:23 a.m.

10

11    COUNSEL PRESENT:

12    For the Plaintiffs:
              Jason E. Causey, Esquire
13            BORDAS & BORDAS, PLLC
              1358 National Road
14            Wheeling, WV 26003
              T. 304-242-8410
15            E. Jason@bordaslaw.com

16
      For the Defendants, Quicken Loans
17    and Title Source (Via Phone Conference):
              Jason E. Manning, Esquire
18            TROUTMAN SANDERS, LLP
              222 Central Park Avenue
19            Suite 2000
              Virginia Beach, VA 23462
20            T. 757-687-7564
              E. jason.manning@troutmansanders.com
21

22

23

24

25

Jackson, Phillip                                    February 24, 2016

3

```
 1     COUNSEL PRESENT (Cont.):

 2
       For the Defendant, Richard Hyett:
 3             Karen E. Kahle, Esquire
               STEPTOE & JOHNSON
 4             1233 Main Street, Suite 3000
               Wheeling, WV 26003
 5             T. 304-231-0444
               E. karen.kahle@steptoe-johnson.com
 6

 7
       ALSO PRESENT:
 8
               Adam Morgan, Videographer
 9

10

11                     -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 15 of 374

Jackson, Phillip                                      February 24, 2016

43

1    client is the lender or the broker, that means that

2    you're giving that information to the bank, and it's

3    not for the purpose of the borrower; right?

4            MR. CAUSEY:  Note an objection.

5            THE WITNESS:  The bank is the client.  It's

6    my understanding that the borrower is usually the one

7    that pays for it and they usually end up with a copy,

8    but it's for the bank, it's not for the buyer or the

9    borrower.

10   BY MR. MANNING:

11       Q.   In your experience, do borrowers ever tell

12   you what they think their property's worth?

13       A.   **Sometimes.  That's usually a question that I**

14   **don't ask, but everybody's got an opinion of their**

15   **own property, the value of their own property.**

16       Q.   So when you've encountered borrowers that

17   give you an opinion of value, how do you respond to

18   that?

19       A.   **Depends on what the appraisal is for, but I**

20   **think everybody has an opinion, and all these**

21   **opinions are indications of value.  And our job is to**

22   **come up with our own opinion of value.  But you know,**

23   **it's the more indications of value that you can**

24   **consider, I think the better the appraisal is going**

25   **to be.**

Jackson, Phillip                           February 24, 2016

44

1      Q.   So for example, a borrower gives you what
2    they think it's worth, that may prompt to you ask
3    some additional questions; right, like why do you
4    think that?
5      **A.   I would assume so, yes.**
6      Q.   That's because it's relevant data, you want
7    to make sure you know as much as possible to get an
8    accurate value?
9          MR. CAUSEY:  Just object, object to form.
10   BY MR. MANNING:
11     Q.   I didn't hear your answer, Mr. Jackson.
12     **A.   I don't have an answer.  You know, I think**
13   **you have to look at as much as you can to do the best**
14   **job you can and be as close to the market value, you**
15   **know, that you can be.**
16     Q.   Okay.  So is it fair to say that you would
17   consider the borrower's opinion of value, you just
18   wouldn't let it influence you; right?
19          MR. CAUSEY:  Note an objection.
20          THE WITNESS:  It depends on what the
21   appraisal assignment is.  If the borrower's opinion
22   of value is based on what he paid for the house six
23   months ago, then certainly it would enter into our
24   thinking.
25          If it was based on his idea of what houses

Jackson, Phillip                           February 24, 2016

45

1   are worth in a different neighborhood of the town,

2   then I probably wouldn't give it any credence at all.

3   BY MR. MANNING:

4       Q.   Right.  It really just depends on why.  So

5   you would want to know -- well, for example, I think

6   my property is worth more than my neighbor's, and you

7   know what the neighborhood bears as the appraiser;

8   right?

9       A.   **Well, hopefully I would do the research and**

10  **discover what the neighborhood value range is.**

11      Q.   So if a borrower said yeah, I think my

12  property is worth X and it's higher than the

13  neighborhood, that may prompt you to say, okay well,

14  tell me why.  And you find out he's put in like

15  heated floors in the bathroom, that would be

16  relevant; correct?

17      A.   **I suspect, yes, sir.**

18      Q.   That's why it is potentially useful for you

19  to know what the borrower thinks, you're just not

20  going to let it influence you?

21      A.   **Well, we try not to let it influence us.**

22      Q.   There's nothing that would require you to

23  turn down an assignment just because you were given

24  an estimate of value by the borrower; right?

25      A.   **I don't think so there's a yes or no answer**

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 18 of 374

Jackson, Phillip                                    February 24, 2016

167

```
 1   STATE OF WEST VIRGINIA        )
                                    ) SS
 2   COUNTY OF OHIO                 )

 3

 4                    CERTIFICATE

 5        I, Kathy D. Landock, a Notary Public in and
     for the State of West Virginia, do hereby certify
 6   that the witness, PHILLIP JACKSON, was by me first
     duly sworn to testify the truth, the whole truth, and
 7   nothing but the truth; that the foregoing deposition
     was taken at the time and place stated herein; and
 8   that the said deposition was recorded
     stenographically by me and then reduced to
 9   typewriting under my direction, and constitutes a
     true record of the testimony given by said witness,
10   all to the best of my skill and ability.

11        I further certify that I am not a relative,
     employee or attorney of any of the parties, or a
12   relative or employee of either counsel, and that I am
     in no way interested directly or indirectly in this
13   action.

14        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 7th day of
15   March, 2016.

16

17

                  Kathy D. Landock, Notary Public
18                Certified Realtime Reporter

19

20   My Commission Expires:
     May 19,2023
21

22

23

24

25
```

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

**JA465**

# Exhibit 9

Hill, Jody                                              January 11, 2016

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

Wheeling Division

-----

PHILIP ALIG, SARA J. ALIG,   ) CIVIL ACTION

ROXANNE SHEA and DANIEL V.   ) No. 5:12cv114 (lead)

SHEA, Individually and on    ) No. 5:12cv115

behalf of a class of         )

persons,                     ) Videotaped Deposition

                             ) of JODY HILL

        Plaintiffs,          )

                             ) Filed on behalf

        vs.                  ) of the Defendants

                             )

QUICKEN LOANS INC., TITLE    ) Counsel of Record for

SOURCE, INC., DEWEY V.       ) this Party:

GUIDA, APPRAISALS            )

UNLIMITED, INC., and         ) Jason E. Manning, Esq.

RICHARD HYETT,               ) TROUTMAN SANDERS LLP

                             ) 222 Central Park Avenue

        Defendants.          ) Suite 2000

                             ) Virginia Beach, VA 23462

-----

Monday, January 11, 2016

-----

Hill, Jody                                          January 11, 2016

2

```
 1              VIDEOTAPED DEPOSITION OF JODY HILL

 2       a witness herein, called by the Defendants for

 3       examination, taken pursuant to the West Virginia

 4       Rules of Civil Procedure, by and before Constance

 5       Lee, a Registered Professional Reporter and a

 6       Notary Public in and for the State of West

 7       Virginia, at the law offices of Bordas & Bordas,

 8       PLLC, 106 East Main Street, St. Clairsville, OH, on

 9       Monday, January 11, 2016, at 11:15 a.m.

10                         -----

11       COUNSEL PRESENT:

12       For the Plaintiffs:

13            Jason E. Causey, Esq.

14            BORDAS & BORDAS, PLLC

15            1358 National Road

16            Wheeling, West Virginia 26003

17            jason@bordaslaw.com

18            (304) 242-8410

19                 and

20            Sandra Henson Kinney

21            BAILEY & GLASSER LLP

22            209 Capitol Street

23            Charleston, West Virginia 25301

24            skinney@baileyglasser.com

25            (304) 345-6555
```

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 22 of 374

Hill, Jody                                                January 11, 2016

3

1      For the Defendants Quicken Loan Inc.

2      and Title Source, Inc.:

3             Jason E. Manning, Esq.

4             TROUTMAN SANDERS LLP

5             222 Central Park Avenue, Suite 2000

6             Virginia Beach, Virginia 23462

7             jason.manning@troutmansanders.com

8             (757) 687-7564

9

10     For the Defendant Richard Hyett:

11            Karen E. Kahle

12            STEPTOE & JOHNSON PLLC

13            P.O.  Box 751

14            Wheeling, West Virginia 26003

15            karen.kahle@steptoe-johnson.com

16            (304) 231-0441

17

18     ALSO PRESENT:

19     Scott Almendinger, videographer

20     Richard Hyett

21

22

23

24

25

USCA4 Appeal: 22-2289     Doc: 34-2     Filed: 05/17/2023     Pg: 23 of 374

Hill, Jody                                           January 11, 2016

9

1   and I know where these come from.  And there is --

2   there's an area where you can ask appropriately,

3   and there's an area where you're asking her to

4   violate something she can't do, and so we'll see

5   how it goes.

6     BY MS. KAHLE:

7         Q.    What is your current profession?

8         **A.    I'm a licensed residential real estate**

9   **appraiser.**

10        Q.    And how long have you been in that

11  profession?

12        **A.    22 years.**

13        Q.    What's your current business address?

14        **A.    143 High Street, St. Clairsville, Ohio.**

15        Q.    And how long have you been at that

16  address?

17        **A.    32 years.**

18        Q.    So you've been a licensed appraiser --

19  residential real estate appraiser for, I think you

20  said, 22 years, but you've been at that address for

21  32.  So let me ask you:  For the first ten years that

22  you were there, what was the nature of the business?

23        **A.    It's my home.**

24        Q.    Okay.  Okay.  What states are you

25  qualified to perform appraisals in?

USCA4 Appeal: 22-2289     Doc: 34-2     Filed: 05/17/2023     Pg: 24 of 374

Hill, Jody                                          January 11, 2016

                                                                100

1    look at, is the denials.  And if that would be in a

2    denial pile, that the customer was denied the loan

3    because I told them that their house wouldn't

4    appraise, you know, it wouldn't be in their best

5    interest to move forward; that would not be a good

6    idea for a banker.

7         Q.    So as a banker, if -- let's say I come in

8    and I say, I would like a $100,000 loan.

9         A.    Uh-huh.

10        Q.    I've got liens on the property in excess

11   of $100,000.  The property, I think, is probably only

12   worth 100,000.  Would you tell me to go ahead and get

13   an appraisal anyway?

14        A.    I probably would say, okay, Joe, let's

15   see where we're at.

16        Q.    Uh-huh.

17        A.    Because you might be wrong; it may be

18   higher.  Or you may fall through the cracks.

19        Q.    Let's take it from the appraiser's

20   standpoint.

21        A.    Okay.

22        Q.    As an -- I know that there's been a

23   number of different companies that you've done

24   appraisals for.  Were there ever orders that you

25   received that included an applicant's estimated value,

Hill, Jody                                          January 11, 2016

101

1   what the borrower thought the property might be worth?

2       A.   Have I received them?

3       Q.   Yes.

4       A.   Absolutely.

5       Q.   Was there a particular time frame in your

6   experience that that was common practice in the

7   industry?

8       A.   Oh, estimating years back, I would say

9   that kind of triggered in 2005.  2005 --

10      Q.   Uh-huh.

11      A.   -- it started kind of happening.

12      Q.   And then from 2005, how long did that

13  practice of receiving applicants' estimated values in

14  appraisal order forms continue, in your experience?

15      A.   Oh, they still happen today.

16      Q.   Okay.  So roughly -- I know it's an

17  approximate time period -- around 2005 to the present,

18  you're still doing appraisals in which an appraisal

19  order form will include an applicant's estimated

20  value?

21      A.   Yes, I receive them.

22      Q.   When you receive them, are you able, like

23  the borrower telling you what they thought the

24  property was worth, to just disregard it?

25      A.   I decline it.

USCA4 Appeal: 22-2289     Doc: 34-2     Filed: 05/17/2023     Pg: 26 of 374

Hill, Jody                                                    January 11, 2016

107

 1          A.      No.

 2          Q.      Prior to that Fannie Mae guideline you've

 3   referred to, was there a period in time in which you

 4   would accept appraisal order forms with an applicant's

 5   estimated value in it?

 6          A.      Yes, uh-huh.  Way back.

 7          Q.      Right.  Prior to whenever that guideline

 8   went into effect?

 9          A.      Right.  It was way back.  I mean, it

10   happened way back.

11          Q.      But you don't recall a year of that

12   guideline?

13          A.      15, 20 years ago, maybe, you might

14   have gotten orders with that -- those numbers on

15   them.

16          Q.      Okay.  So prior to the Fannie Mae

17   guideline with the instruction that, in your opinion,

18   would have stopped you from taking that assignment --

19          A.      Uh-huh.

20          Q.      -- it was common assignment to receive an

21   appraisal order form within an applicant's estimated

22   value, and you would be fine doing it?

23          A.      Way back, sure.

24          Q.      Okay.  Is that consistent with your

25   testimony that you can disregard that information and

Hill, Jody                                              January 11, 2016

108

1    not be influenced by it?

2          A.    I personally am not influenced by any

3    numbers at all.  It's just my opinion to don't look

4    at them, don't hear them, wipe it out of your mind

5    and just do not accept the assignment if it's in

6    written form, because it has to be part of your

7    work file.

8          Q.    But prior to the Fannie Mae guideline,

9    you would accept the assignment --

10         A.    Oh, sure.

11         Q.    -- and do the work; you would just

12   disregard the number?

13         A.    Right, right.

14         Q.    And because you have the professional

15   independence to do that and, you know, the moral code

16   to do that, you didn't have difficulty performing that

17   analysis; right?

18         A.    Back then.

19         Q.    Prior to the Fannie Mae guideline?

20         A.    Correct.

21         Q.    Okay.  It would be similar to receiving

22   information from a borrower on-site, even today, where

23   you would just disregard that information?

24         A.    Correct.

25         Q.    And regardless of whether that

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 28 of 374

Hill, Jody                                              January 11, 2016

109

1    information is received from whom or when, you still

2    have the obligation as the appraiser to perform an

3    independent, unbiased appraisal; right?

4         A.    Right.

5         Q.    So you left Steel Valley Bank in 1995,

6    and then you decided, I'm going to become an

7    appraiser.  So now take me forward from there.  What

8    did you do to follow through on your decision to

9    become an appraiser?

10        A.    Well, the first thing I did was I went

11   and took the classes.  I got the education.

12        Q.    Uh-huh.

13        A.    Then you have to look for someone who

14   will sponsor you, so I did.  I found someone that

15   would sponsor me.  And I worked as an apprentice

16   for about a year and a half, maybe two years, as an

17   apprentice.  And then I took my licensing test.

18        Q.    Who was your sponsor?

19        A.    Robert Yoblinski.

20        Q.    And I see Yoblinski on your resume here.

21   You list that you were an apprentice appraiser with

22   Yoblinski Appraisals from 1995 to 1997.

23        A.    Close, yes.

24        Q.    Those are approximate years?

25        A.    Exactly.

Hill, Jody                                                      January 11, 2016

253

```
1     STATE OF WEST VIRGINIA)
      COUNTY OF OHIO        )
2

3          I, Constance Lee, Registered
      Professional Reporter and Notary Public in and for
4     the State of West Virginia, do hereby certify that
      the witness was by me first duly sworn to testify
5     the truth, the whole truth, and nothing but the
      truth; that the foregoing deposition was taken at
6     the time and place stated herein; and that the said
      deposition was recorded stenographically by me and
7     then reduced to typewriting under my direction, and
      constitutes a true record of the testimony given by
8     said witness, all to the best of my skill and
      ability.
9
           I further certify that the inspection,
10    reading and signing of said deposition were not
      waived by counsel for the respective parties and by
11    the witness and if after 30 days the transcript has
      not been signed by said witness that the witness
12    received notification and has failed to respond and
      the deposition may then be used as though signed.
13
           I further certify that I am not a
14    relative, or employee of either counsel, and that I
      am in no way interested, directly or indirectly, in
15    this action.

16         IN WITNESS WHEREOF, I have hereunto set
      my hand and affixed my seal of office this 19th day
17    of January, 2016.

18

19    --------------------------------

20    Constance Lee, RPR, RSA, CSR(IL)

21

22

23

24

25
```

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

**JA476**

# Exhibit 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### Wheeling Division

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a call of persons,**

      **Plaintiffs,**

    **v.**                             **Civil Action No. 5:12cv114**
                                          **The Honorable John Preston Bailey**

**QUICKEN LOANS, INC.,**
**TITLE SOURCE, INC.**
**DEWEY V. GUIDA,**
**APPRAISALS UNLIMITED, INC., and**
**RICHARD HYETT,**

      **Defendants.**

### <u>DECLARATION OF JORDAN PETKOVSKI</u>

I, Jordan Petkovski, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am an adult over the age of nineteen years old and of sound mind. I am a resident of Michigan and am competent to testify as to all statements in this declaration, which I am making by my own free will.

2.    I am employed with Title Source, Inc. ("Title Source") as Vice President and Chief Appraiser and I am authorized to make this declaration on behalf of Title Source.

3.    The statements herein are based on my personal knowledge and/or business records of Title Source, which are created and maintained in the ordinary course of business.

4.    Title Source provides appraisal ordering and loan settlement services for mortgage lenders. Title Source is not a lender, broker, or mortgage loan originator.

**JA478**

5.      As an appraisal management company ("AMC"), Title Source arranges for appraisals of properties to be secured by loans to ensure adequate collateral for the lender.  Title Source contracts with a licensed, independent appraiser, experienced in the area where the subject property is located.  Title Source uses an automated appraisal ordering system, known as collateral management system ("CMS"), provided by a third party vendor, to ensure that appraisers selected are qualified, competent and eligible, based on the appraiser's availability and experience.  Title Source also uses a third party software, called Appraisal Port, to transmit information to appraisers through a secure channel.  This ensures that information exchanged between Title Source and the appraiser is not accessible to any third party, including the lender.

6.      As is standard in the industry, Quicken Loans asks prospective borrowers how much they believe their home is worth (the "applicant's estimated value") during the application process for refinance transactions.  The applicant's estimated value is passed from Quicken Loans to Title Source, along with the loan attributes and borrower information.

7.      Prior to 2009, Title Source included the applicant's estimated value on appraisal engagement letters sent to appraisers for refinance transactions.  There was no statute or rule that prohibited this practice, which was standard in the industry at that time.  The estimated value was informational and was intended to provide the appraiser with another data point relevant to the appraisal process, representing the owner's assessment of his property.   The applicant's estimated value was not a "target value" or a "predetermined value" and was not intended to influence appraisers or suggest the true market value in any manner.

8.      Effective May 1, 2009, Freddie Mac enacted the Home Valuation Code of Conduct ("HVCC"), which prohibited – for the first time – providing the applicant's estimated

2

**JA479**

value to appraisers.   Title Source removed the applicant's estimated value from appraisal engagement letters well before the effective date of the HVCC.

9.      Once Title Source receives the appraisal back from an appraiser through Appraisal Port, Title Source reviews the appraisal for completeness.  If complete, the appraisal is passed to Quicken Loans for appraisal underwriting.   Title Source relies on the appraiser to complete the appraisal independently, accurately, and in compliance with the Uniform Standards of Professional Appraisal Practices ("USPAP").

10.     In this case, Title Source was retained by Quicken Loans to order the appraisals for all of the named Plaintiffs' loans.  Title Source arranged for the appraisals of Plaintiffs' properties in compliance with the same independent process described in paragraph 5 above.

11.     For the Shea 2006 loans, Title Source obtained an appraisal from Dewey Guida, who determined the market value to be $151,000.  Mr. Guida was provided with the sale price of the property, in accordance with USPAP guidelines.   No applicant's estimated value was provided to Mr. Guida for the Shea 2006 transaction.

12.     In 2008, Title Source arranged for an appraisal from Richard Hyett for the Sheas' refinance transaction.   Title Source included the Sheas' estimated value of $175,000 on the appraisal engagement letter sent to Mr. Hyett.  Mr. Hyett appraised the Sheas' property for $158,000, nearly $20,000 *less* than the estimated value provided by the borrowers.

13.     For the Alig 2007 loan, Title Source obtained an appraisal from Dewey Guida, who appraised the property at $125,500.  Title Source included the Aligs' estimated value of $129,000 on the appraisal engagement letter sent to Mr. Guida.

3

14.    In 2011, Title Source arranged for an appraisal from Lucas Johnson, who determined the market value to be $115,000.  No applicant's estimated value was provided to Mr. Johnson for the Alig 2011 transaction.

15.    In accordance with its policies and procedures, Title Source reviewed and approved the origination appraisals for Plaintiffs' loans.


I have read this declaration consisting of four (4) pages and affirm that the statements herein are based upon my own personal knowledge.  I declare, under penalty of perjury under the laws of the United States of America, that the foregoing statements are true and correct.


March   17 , 2016                                              _____
                                                                                    Jordan Petkovski


4

**JA481**

# Exhibit 13

MAR-13-2006 MON 03:54 PM Quicken Loans     FAX NO. 7348055691     P. 07

Case 5:12-cv-00114-JPB-JPM   Document 200-13   Filed 04/20/16   Page 2 of 8   PageID #:

MAR-13-2006 MON 11:14 AM Quicken Loans     4512   FAX NO. 7348055691     P. 10

2ND LOAN

4593048735p

## INTEREST RATE DISCLOSURE - (Floating Rate Version) and DEPOSIT AGREEMENT

Borrower(s) Roxanne Shea     Date March 13, 2006

Property Address     Loan Program Advantage Second 30/15 Piggybac

City _____ State WV Zip \_\_\_\_\_     Mortgage Type/Term 360 mos

Escrow/Impound Account Yes \_\_\_\_ No XXX

You have applied for a mortgage loan from Quicken Loans Inc. ("Lender"). Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. You agree to cooperate in the application process (including submitting all required documentation in a timely manner) and if needed, to help get the information Lender needs from third parties such as your bank, employer, current mortgage company, etc. In addition, you agree to notify Lender of any changes in any information submitted in connection with your application.

Lender's objective is to have your application fully processed, underwritten and approved on or before your anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to the following: the untimely receipt of an acceptable appraisal; the untimely receipt of required documentation; your existing home not selling; matters disclosed by a title commitment or survey; any other matters beyond Lender's reasonable control.

### INTEREST RATE FLOAT DISCLOSURE

You have chosen not to "lock" the interest rate on the above loan program. This means that your interest rate is not guaranteed for any period of time and is subject to change without advance notice. Interest rates are unpredictable and Lender is not responsible for forecasting future rates. It's your responsibility to keep informed of changes in Lender's interest rates. Any references to interest rates and loan discount fees in other application documents such as your Good Faith Estimate are only estimates.

At any time during the application process, however, you can contact Lender and choose to lock an interest rate that is in effect at that time. A request to lock must be confirmed in writing by Lender. Locking an interest rate means your rate is protected from market changes from the date of the lock until the earlier of the closing of your loan or your lock expiration date. Please note, interest rate lock periods generally do not exceed 45 days; therefore, a request to lock must be within 45 days of your anticipated closing date. If you do not request to lock an interest rate prior to closing, your rate will be Lender's rate in effect at closing.

### DEPOSIT AGREEMENT

With your deposit of $0.00 , you authorize Lender to begin processing your loan application and advance out-of-pocket expenses on your behalf. You authorize Lender to charge this deposit amount to your credit card. Lender will not accept a check or cash.

If your application is approved: At the closing, Lender will credit the amount of your deposit on your closing statement toward the cost of your appraisal and credit report. Any additional money will be credited to other closing costs. If your application is denied or withdrawn for any reason, Lender will refund your deposit less the cost of your appraisal and/or credit report.

### THIS AGREEMENT IS NOT A COMMITMENT TO LEND BY LENDER OR AN UNDERWRITING APPROVAL OF YOUR LOAN APPLICATION.

By signing below, you acknowledge your understanding and agreement with the terms stated in this agreement.

Lender Representative Michael Lyon     Roxanne Shea

894561746

QUICKEN001303
(Alig-Shea)
CONFIDENTIAL - PERSONAL INFORMATION

3216912280

## INTEREST RATE DISCLOSURE - (Not Locked) and DEPOSIT AGREEMENT

Borrower(s) Roxanne Shea and Daniel V Shea                Date  June 26, 2008

Property Address 21 Ridgewood Ave                         Loan Program FHA - 30 yr Fixed

City  Wheeling          State  WV    Zip 26003            Mortgage Type/Term 360 mos

Escrow/Impound Account: Yes  XXX   No

You have applied for a mortgage loan from      Quicken Loans Inc.      ("Lender"). Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. You agree to cooperate in the application process (including submitting all required documentation in a timely manner) and if needed, to help get the information Lender needs from third parties such as your bank, employer, current mortgage company, etc. In addition, you agree to notify Lender of any changes in any information submitted in connection with your application.

Lender's objective is to have your application fully processed, underwritten and approved on or before your anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to the following: the untimely receipt of an acceptable appraisal; the untimely receipt of required documentation; your existing home not selling; matters disclosed by a title commitment or survey; any other matters beyond Lender's reasonable control.

### INTEREST RATE FLOAT DISCLOSURE

You have chosen **not** to "lock" the interest rate on the above loan program. This means that your interest rate is not guaranteed for any period of time and is subject to change without advance notice. Interest rates are unpredictable and Lender is not responsible for forecasting future rates. It's your responsibility to keep informed of changes in Lender's interest rates. Any references to interest rates and loan discount fees in other application documents such as your Good Faith Estimate are only estimates.

At any time during the application process, however, you can contact Lender and choose to lock an interest rate that is in effect at that time. A request to lock must be confirmed in writing by Lender. Locking an interest rate means your rate is protected from market changes from the date of the lock until the earlier of the closing of your loan or your lock expiration date. Please note, interest rate lock periods generally do not exceed 45 days, therefore, a request to lock must be within 45 days of your anticipated closing date. If you do not request to lock an interest rate prior to closing, your rate will be Lender's rate in effect at closing.

### DEPOSIT AGREEMENT

With your deposit of $ 300.00        , you authorize Lender to begin processing your loan application and advance out-of-pocket expenses on your behalf. You authorize Lender to charge this deposit amount to your credit card. Lender will not accept a check or cash. The last five digits of the credit card number are 02979.

If your application is approved: At the closing, Lender will credit the amount of your deposit on your closing statement toward the cost of your appraisal and credit report. Any additional money will be credited to other closing costs. If your application is denied or withdrawn for any reason: Lender will refund your deposit less the cost of your appraisal and/or credit report.

### THIS AGREEMENT IS NOT A COMMITMENT TO LEND BY LENDER OR AN UNDERWRITING APPROVAL OF YOUR LOAN APPLICATION.

By signing below, you acknowledge your understanding and agreement with the terms stated in this agreement.

Lender Representative Michael Saleh

E-SIGNed 06/26/2008 by
    Roxanne Shea
Roxanne Shea

E-SIGNed 06/26/2008 by
    Daniel Shea
Daniel V Shea

q03216912280 0204 060 0101

2027402068

2008/11 ftdp2.pcl

QUICKEN001594
(Alig-Shea)
CONFIDENTIAL - PERSONAL INFORMATION

**JA484**

## INTEREST RATE DISCLOSURE - (Locked Rate Version) and DEPOSIT AGREEMENT

Borrower(s) Roxanne Shea and Daniel V Shea                    Date  July 7, 2008

Property Address 21 Ridgewood Ave                             Loan Program FHA - 30 yr Fixed

City Wheeling              State WV    Zip 26003              Mortgage Type/Term 360 mos

Escrow/Impound Account: Yes XXX  No ____

### DISCLOSURE

You have applied for a mortgage loan from        Quicken Loans Inc.        ("Lender"). This document discloses your locked interest rate and any loan discount fee that you may have elected to pay. Please note, any references to interest rates and loan discount fees in other application documents such as your Good Faith Estimate are only estimates.

Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. You agree to cooperate in the application process (including submitting all required documentation in a timely manner) and if needed, to help get the information Lender needs from third parties such as your bank, employer, current mortgage company, etc. In addition, you agree to notify Lender of any changes in any information submitted in connection with your application

Lender's objective is to have your application fully processed and closed on or before the lock expiration date and/or anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to the following: the untimely receipt of an acceptable appraisal; the untimely receipt of required documentation; your existing home not selling; matters disclosed by a title commitment or survey; any other matters beyond Lender's reasonable control

---

**INTEREST RATE LOCK AGREEMENT**    You have chosen to "Lock" your interest rate at.      6.625%%
                                     With a loan discount fee of      0.000% ($ 0.00       )
                                     Your loan Amount is $    155,295.00
                                     Lock Expiration Date:    08/04/2008

You have requested that the above interest rate and loan discount fee (if any) be locked from the date of this Interest Rate Disclosure until the Lock Expiration Date. Locking an interest rate means your rate is protected from market changes until the closing of your loan or until your Locked Expiration Date - whichever comes first.

Lender will honor these terms if (1) Lender receives the items requested in the application documents by 07/07/2008 and (2) your application is approved and your loan is closed on or before your Lock Expiration Date. Please be aware that if Lender does not receive the requested items by   07/07/2008 . your locked rate will automatically expire.

It's possible that Lender's interest rates may fall between the date of this Interest Rate Disclosure and your Lock Expiration Date. If this happens, you're still required to close at your locked rate  If for any reason you can't close on or before your Lock Expiration Date, you'll be required to close at the **higher** of your locked rate or Lender's then current rate.

Your locked rate is valid only for the above property address, loan amount and loan program  If you choose to purchase or refinance a different property, switch loan programs, change your point structure, extend your lock or change your loan amount, you must re-lock at the **higher** of your original locked rate or Lender's then current rate.

### DEPOSIT AGREEMENT

With your deposit of $ 300.00        , you authorize Lender to begin processing your loan application and advance out-of-pocket expenses on your behalf to obtain an appraisal and/or credit report. You authorize Lender to charge this deposit amount to your credit card. Lender will not accept a check or cash. The last five digits of the credit card number are 02979

If your application is approved, at the closing, Lender will credit the amount of your deposit on your closing statement toward the cost of your appraisal and credit report. Any additional money will be credited to other closing costs. If your application is denied or withdrawn for any reason, Lender will refund your deposit less the cost of an appraisal and/or credit report.

---

**NEITHER THIS AGREEMENT NOR THE LOCKING OF AN INTEREST RATE IS A COMMITMENT TO LEND BY LENDER OR AN UNDERWRITING APPROVAL OF YOUR LOAN.**

By signing below, you acknowledge your understanding and agreement with the terms as stated herein.

_____              _____
Lender Representative Michael Saleh            Roxanne Shea

                                              _____
                                              Daniel V. Shea

2028006982
2005/11  Ikqp2.qcl

QUICKEN001625
(Alig-Shea)
CONFIDENTIAL - PERSONAL INFORMATION

3214765966

## INTEREST RATE DISCLOSURE - (Not Locked) and DEPOSIT AGREEMENT

Borrower(s) Phillip Alig and Sara Alig                    Date  December 7, 2007

Property Address 19/1 Highland Ln                         Loan Program 30 yr Fixed

City Wheeling                State WV    Zip 26003         Mortgage Type/Term 360 mos

Escrow/Impound Account: Yes  XXX    No

You have applied for a mortgage loan from      Quicken Loans Inc.      ("Lender"). Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. You agree to cooperate in the application process (including submitting all required documentation in a timely manner) and if needed, to help get the information Lender needs from third parties such as your bank, employer, current mortgage company, etc. In addition, you agree to notify Lender of any changes in any information submitted in connection with your application.

Lender's objective is to have your application fully processed, underwritten and approved on or before your anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to the following: the untimely receipt of an acceptable appraisal; the untimely receipt of required documentation; your existing home not selling; matters disclosed by a title commitment or survey; any other matters beyond Lender's reasonable control.

### INTEREST RATE FLOAT DISCLOSURE

You have chosen **not** to "lock" the interest rate on the above loan program. This means that your interest rate is not guaranteed for any period of time and is subject to change without advance notice. Interest rates are unpredictable and Lender is not responsible for forecasting future rates. It's your responsibility to keep informed of changes in Lender's interest rates. Any references to interest rates and loan discount fees in other application documents such as your Good Faith Estimate are only estimates.

At any time during the application process, however, you can contact Lender and choose to lock an interest rate that is in effect at that time. A request to lock must be confirmed in writing by Lender. Locking an interest rate means your rate is protected from market changes from the date of the lock until the earlier of the closing of your loan or your lock expiration date. Please note, interest rate lock periods generally do not exceed 45 days. therefore, a request to lock must be within 45 days of your anticipated closing date. If you do not request to lock an interest rate prior to closing, your rate will be Lender's rate in effect at closing.

### DEPOSIT AGREEMENT

With your deposit of $ 500.00      , you authorize Lender to begin processing your loan application and advance out-of-pocket expenses on your behalf. You authorize Lender to charge this deposit amount to your credit card. Lender will not accept a check or cash. The last five digits of the credit card number are 11003.

If your application is approved: At the closing, Lender will credit the amount of your deposit on your closing statement toward the cost of your appraisal and credit report. Any additional money will be credited to other closing costs. If your application is denied or withdrawn for any reason: Lender will refund your deposit less the cost of your appraisal and/or credit report.

**THIS AGREEMENT IS NOT A COMMITMENT TO LEND BY LENDER OR AN UNDERWRITING APPROVAL OF YOUR LOAN APPLICATION.**

By signing below, you acknowledge your understanding and agreement with the terms stated in this agreement.

Lender Representative Carl Andrews

E-SIGNed 12/07/2007 by
Phillip Alig

Phillip Alig

Sara Alig

1749248408

2005/11 ffd02.pcl

**JA486**

3225755968

## INTEREST RATE DISCLOSURE - (Locked Rate Version)

Borrower(s) Phillip A. Alig and Sara J. Alig _____        Date  November 24, 2010 _____

Property Address 1971 Highland Ln _____          Loan Program FHA - 30 yr fixed

City Wheeling _____ State WV ___ Zip 26003 ____           Mortgage Type/Term 360 mos

Escrow/Impound Account Yes XXX No _____

**DISCLOSURE**

You have applied for a mortgage loan from     Quicken Loans Inc.     ("Lender")  This document discloses your locked interest rate and any loan discount fee that you may have elected to pay. Please note, any references to interest rates and loan discount fees in other application documents such as your Good Faith Estimate are only estimates.

Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. You agree to cooperate in the application process (including submitting all required documentation in a timely manner) and if needed, to help get the information Lender needs from third parties such as your bank, employer, current mortgage company, etc. In addition, you agree to notify Lender of any changes in any information submitted in connection with your application.

Lender's objective is to have your application fully processed and closed on or before the lock expiration date and/or anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to the following: the untimely receipt of an acceptable appraisal; the untimely receipt of required documentation; your existing home not selling; matters disclosed by a title commitment or survey; any other matters beyond Lender's reasonable control.

**INTEREST RATE LOCK AGREEMENT**  You have chosen to "Lock" your interest rate at  4.500        %
                                      With a loan discount fee of  0.000  % ($ 0.00        )
                                      Your Loan Amount is: $   113,524.00
                                      Lock Expiration Date:   12/27/2010

You have requested that the above interest rate and loan discount fee (if any) be locked from the date of this Interest Rate Disclosure until the Lock Expiration Date  Locking an interest rate means your rate is protected from market changes until the closing of your loan or until your Locked Expiration Date - whichever comes first.

Lender will honor these terms if (1) Lender receives the items requested in the application documents by 11/18/2010 and (2) your application is approved and your loan is closed on or before your Lock Expiration Date. Please be aware that if Lender does not receive the requested items by 11/18/2010, your locked rate will automatically expire.

It's possible that Lender's interest rates may fall between the date of this Interest Rate Disclosure and your Lock Expiration Date  If this happens, you're still required to close at your locked rate  If for any reason you can't close on or before your Lock Expiration Date, you'll be required to close at the **higher** of your locked rate or Lender's then current rate.

Your locked rate is valid only for the above property address, loan amount and loan program  If you choose to purchase or refinance a different property, switch loan programs, change your point structure, extend your lock or change your loan amount, you must re-lock at the **higher** of your original locked rate or Lender's then current rate.

The interest rate is locked at    4.500%

**NEITHER THIS AGREEMENT NOR THE LOCKING OF AN INTEREST RATE IS A COMMITMENT TO LEND BY LENDER OR AN UNDERWRITING APPROVAL OF YOUR LOAN.**

By signing below, you acknowledge your understanding and agreement with the terms as stated herein

Lender Representative Brad Shiffman

Phillip A. Alig

Sara J. Alig

21852899-0

QUICKEN000411
(Alig-Shea)
CONFIDENTIAL - PERSONAL INFORMATION

## INTEREST RATE DISCLOSURE - (Locked Rate Version)

Borrower(s) Phillip A. Alig and Sara J. Alig          Date December 13, 2010

Property Address 1971 Highland Ln          Loan Program FHA - 30 yr Fixed

City Wheeling          State WV          Zip 26003          Mortgage Type/Term 360 mos

Escrow/Impound Account: Yes XXX  No _____

### DISCLOSURE

You have applied for a mortgage loan from        Quicken Loans Inc.        ("Lender"). This document discloses your locked interest rate and any loan discount fee that you may have elected to pay. Please note, any references to interest rates and loan discount fees in other application documents such as your Good Faith Estimate are only estimates.

Lender will begin processing your application (which may include ordering an appraisal, credit report, title commitment and other necessary items) immediately upon the submission of your application and deposit. You agree to cooperate in the application process (including submitting all required documentation in a timely manner) and if needed, to help get the information Lender needs from third parties such as your bank, employer, current mortgage company, etc. In addition, you agree to notify Lender of any changes in any information submitted in connection with your application.

Lender's objective is to have your application fully processed and closed on or before the lock expiration date and/or anticipated closing date. However, please note that some parts of this process aren't under Lender's control. For instance, Lender can't be responsible for delays in loan approval or closing due to the following: the untimely receipt of an acceptable appraisal; the untimely receipt of required documentation; your existing home not selling; matters disclosed by a title commitment or survey; any other matters beyond Lender's reasonable control.

### INTEREST RATE LOCK AGREEMENT

You have chosen to "Lock" your interest rate at:  4.500          %
With a loan discount fee of  0.000  %  ($ 0.00          )
Your Loan Amount is: $     113,010.00
Lock Expiration Date:     12/27/2010

You have requested that the above interest rate and loan discount fee (if any) be locked from the date of this Interest Rate Disclosure until the Lock Expiration Date. Locking an interest rate means your rate is protected from market changes until the closing of your loan or until your Lock Expiration Date - whichever comes first.

Lender will honor these terms if (1) Lender receives the items requested in the application documents by 11/18/2010 and (2) your application is approved and your loan is closed on or before your Lock Expiration Date. Please be aware that if Lender does not receive the requested items by  11/18/2010 , your locked rate will automatically expire.

It's possible that Lender's interest rates may fall between the date of this Interest Rate Disclosure and your Lock Expiration Date. If this happens, you're still required to close at your locked rate. If for any reason you can't close on or before your Lock Expiration Date, you'll be required to close at the **higher** of your locked rate or Lender's then current rate.

Your locked rate is valid only for the above property address, loan amount and loan program. If you choose to purchase or refinance a different property, switch loan programs, change your point structure, extend your lock or change your loan amount, you must re-lock at the **higher** of your original locked rate or Lender's then current rate.

The interest rate is locked at    4.500%

**NEITHER THIS AGREEMENT NOR THE LOCKING OF AN INTEREST RATE IS A COMMITMENT TO LEND BY LENDER OR AN UNDERWRITING APPROVAL OF YOUR LOAN.**

By signing below, you acknowledge your understanding and agreement with the terms as stated herein.

Lender Representative Brad Shiffman

E-SIGNed 12/13/2010 by
Phillip Alig

E-SIGNed 12/13/2010 by
Sara Alig

QUICKEN000438
(Alig-Shea)
CONFIDENTIAL - PERSONAL INFORMATION

**JA488**

Case 5:12-cv-00114-JPB-JPM   Document 200-13   Filed 04/20/16   Page 8 of 8   PageID #: 4518



**DEPOSIT AGREEMENT**                                    3225755968

Date: December 13, 2010
Client(s): Phillip A. Alig and Sara J. Alig

Property Address: 1971 Highland Ln
                  Wheeling, WV 26003

As part of the loan application process at      Quicken Loans Inc.     ("Lender"), we require
you to give us a good faith deposit. Your deposit acts as a commitment for us to do business together.
We will use your deposit to cover the cost to process your application and pay for services from outside
companies such as your credit report, appraisal and title work. In order to process your application
quickly and efficiently, this work (and the expenses) will begin immediately after receiving your
application. In doing so, we rely on your commitment to continue the loan process. Therefore, you
cannot cancel or rescind this deposit agreement.

Your deposit may or may not be refundable, depending on the status of your loan.

**When you close your loan with us,** your deposit is fully credited to your closing costs. The credit will
be reflected on your closing statement.

**If your application is denied or withdrawn,** for any reason, we will refund your deposit minus the
actual cost of your appraisal and credit report.

**Deposit Agreement**
With your deposit of $750.00 , you authorize Lender to charge this deposit amount to your credit card.
The last five digits of the credit card number are 65986 . You also authorize Lender to begin processing
your loan application and advance out-of-pocket expenses on your behalf to obtain an appraisal and
credit report. Cash, checks and money orders are not acceptable.

By signing below, you acknowledge your understanding and agreement with the terms stated in this
Deposit Agreement.

E-SIGNed 12/13/2010 by
Phillip Alig
p A. Alig                 Date

E-SIGNed 12/13/2010 by
Sara Alig
. Alig                 Date

Date                                           Date

Lender: Quicken Loans Inc.
Lender Representative: Brad Shiffman

2189289374
2009r12   depagm1 pcl

QUICKEN000442
(Alig-Shea)
CONFIDENTIAL - PERSONAL INFORMATION

**JA489**

Pg: 43 of 374

Filed: 05/17/2023

Doc: 34-2

USCA4 Appeal: 22-2289

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
Individually and on behalf of a class of persons,

        **Plaintiffs,**

        v.                       **Civil Action No. 5:12cv114 (lead)**
                                   **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC.,**              **Honorable John Preston Bailey**
**TITLE SOURCE, INC. and**
**RICHARD HYETT,**

        **Defendants.**

PARTIAL DISMISSAL ORDER

      On this day came Plaintiffs Daniel and Roxanne Shea by counsel, and also came Defendant Richard Hyett, by counsel, and advised this Court that all matters in controversy between them have been amicably SETTLED and RESOLVED. Based upon the foregoing, the parties jointly requested dismissal, with prejudice, of all claims against Richard Hyett, including any and all direct claims, cross-claims, counter-claims and/or third party claims which have been or could be asserted against Richard Hyett in this matter.

      Finding good cause, the Court hereby ORDERS that any and all direct claims, cross-claims, counter-claims and/or third party claims which have been or could be asserted against Richard Hyett in this matter are hereby DISMISSED, WITH PREJUDICE and stricken from the Docket.

      ENTERED THIS ____19th____ DAY OF ____MAY____, 2016.

**JA490**

JOHN P. BAILEY
DISTRICT COURT JUDGE

Approved and submitted for entry by:


_____/s/ Karen Kahle_____
Karen Kahle
*Counsel for Richard Hyett*


_____/s/ Jason Causey_____
Jason Causey
*Counsel for Plaintiffs*

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 44 of 374

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**


**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE**
**SHEA** and **DANIEL V. SHEA**, individually
and on behalf of a class of persons,

               Plaintiffs,

       v.                                  **Civil Action No. 5:12-CV-114**
                                                     Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE,**
**INC.**, dba Title Source Inc. of West Virginia,
Incorporated,

               Defendants.


<u>**ORDER RESOLVING MOTIONS**</u>

     Pending before this Court are the following motions:

     1.     Plaintiffs' Motion for Class Certification [Doc. 169];

     2.     Defendant Hyett's Motion for Summary Judgment [Doc. 172];

     3.     Plaintiffs' Motion for Partial Summary Judgment [Doc. 173-1];

     4.     Motion for Summary Judgment [Doc. 174];

     5.     Defendants Quicken Loans Inc.' and Title Source, Inc.'s Motion to Exclude

the Opinions and Testimony of Plaintiffs' Experts, Matthew Curtin, Pursuant to Rule 702

and ***Daubert*** [Doc. 176];

     6.     Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion to Exclude

the Opinions and Testimony of Plaintiffs' Expert, Stephen McGurl, Pursuant to Rule 702

and ***Daubert*** [Doc. 178];

7.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence of Appraisers Petition [Doc. 201];

8.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence or Argument Related to The Home Valuation Code of Conduct or Dodd Frank Act [Doc. 203];

9.      Plaintiffs' Motion to Strike Portions of the Declaration of Sherry Dukic which Are Inconsistent with Deposition Testimony [Doc. 209].

### Hyett's Motion for Summary Judgment

This Court finds it appropriate to first address the defendants' motions for summary judgment, for the reason that, if granted, the remaining motions may be mooted.   In response to the Motion filed by defendant Richard Hyett [Doc. 172], the plaintiffs state that the Sheas and Mr. Hyett have reached a settlement of all claims and request that the Court deny the Motion as moot [Doc. 196].  Inasmuch as the motion does appear to be moot, this Court will deny the Motion as moot and, by separate order, has dismissed the claims against defendant Hyett.

### Quicken and Title Source's Motion for Summary Judgment

**I.      Providing a Value to an Appraiser**

The Motion filed by Quicken Loans and Title Source, Inc. are not so easily resolved. In their motion, the remaining defendants contend that under ***McFarland v. Wells Fargo Bank***, 810 F.3d 273 (4th Cir. 2016), the plaintiffs' claims are no longer viable.  The defendants argue that providing the appraiser with the prospective borrowers' own opinion as to property value is not unconscionable as a matter of law and in no way constitutes an

2

attempt to influence the appraiser's opinion. The defendants also posit that under **McFarland** unconscionable inducement requires a higher standard of proof of fraud.

This Court views this Motion as a rehash of the arguments made in connection with Defendants Quicken Loans Inc. and Title Source, Inc.'s Motion for Partial Judgment on the Pleadings [Doc. 72] and Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations [Doc. 74], with the exception of the arguments that the information conveyed to the appraisers was the *borrowers'* estimate of value and that **McFarland** altered the landscape.

In response to the previous motions, this Court noted that the Fourth Circuit succinctly summarized the plaintiffs' allegations as follows:

> Plaintiffs complain that Quicken Loans originated unlawful loans in West Virginia and that Defendant Appraisers, which includes both the named appraisers and the unnamed class of appraisers, were complicit in the scheme. Plaintiffs allege that, before Defendant Appraisers conducted an appraisal, Quicken Loans would furnish them with a suggested appraisal value. Then, after purportedly conducting the appraisal, Defendant Appraisers arrived at the same appraisal value as the suggested appraisal value. The problem with that scheme, according to Plaintiffs, is that the borrower would then close on a loan that was underwater from the beginning.

*Quicken Loans v. Alig*, 737 F.3d 960, 963 (4th Cir. 2013).

Other courts have discerned the problem with the practice of providing a "target number" to an appraiser:

> Appraisals are, essentially, an estimate of a property's market value as of a

given date.  A central component of all residential appraisals is the selection of comparable properties with which to assess the value of the subject property ("comparables").   Appraisers are supposed to select the best comparables—which typically means the geographically closest properties with the most similar characteristics, such as lot size, house size, style, and number of bathrooms—that have been the subject of sales transactions within the past year.  Appraisers also consider market conditions, including housing supply and demand in the property's neighborhood.

. . .

While accuracy and good faith should be the watchwords of appraisers, it is easy for appraisers to inflate their appraisals through their selection and analysis of comparables.  For instance, an appraiser can choose a comparable from a nicer neighborhood, ignore key features of a comparable's sales price, such as thousands of dollars of assistance with closing costs or escrowed repair funds that are not associated with the value of the property, or ignore more recent comparables that reflect a local market's turn for the worse.  An appraiser might also mislabel the number of stories in a comparable, or fail to follow up on evidence that a property had been flipped, raising doubt about the sales price's reflection of market value.  For these reasons, the URAR [Uniform Residential Appraisal Report] is supposed to include sufficient information about each selected comparable and its relevant characteristics to permit meaningful review.

Appraisers may inflate their appraisals because of pressure from loan

officers.  An officer may mention the desired appraisal value he is seeking, ask for the appraiser to call back if she cannot hit a specific value, or send out appraisal assignments to multiple appraisers with the explanation that the assignment will be given to the first one who can find the target value. Appraisers can be made to understand that their ability to receive future assignments depends upon delivery of the desired results.

During the overheated housing market at issue here, residential appraisers felt intense pressure to inflate appraisals.  Defendants' appraisal expert, Hedden, observed that such pressure was simply part of what appraisers were faced with "on a regular basis." Defendants' appraiser witnesses acknowledged that they and other appraisers with whom they worked experienced pressure to provide "predetermined appraisal values."

In a national survey of appraisers conducted in late 2006, 90% of the participating appraisers indicated that they felt some level of "uncomfortable pressure" to adjust property valuations.  This was an increase of 35% from a survey conducted three years earlier.

*Fed. Housing Fin. Agency v. Nomure Holding America, Inc.*, 104 F.Supp.3d 441 (S.D. N.Y. 2015).

In *Spears v. Wash. Mut., Inc.*, 2009 WL 605835 (N.D. Cal. March 9, 2009), the Court noted the allegations of the complaint:

Plaintiffs bring this class action on behalf of all consumers in California who received home loans from WMB on or after June 1, 2006 with appraisals

obtained through EA or LSI.  According to the first amended complaint, home purchases in the United States have traditionally been financed through a third-party lender who retains a security interest in the property until the loan is repaid.  In order to ensure that the secured lender will recoup the value of the loan if the borrower defaults, the lender generally requires that the property be professionally appraised.  Plaintiffs allege that in June of 2006 WMB, with EA and LSI, began a scheme to inflate the appraised values of homes receiving loans in order to sell the aggregated security interests in the financial markets at inflated prices.  According to the complaint, banks like WMB changed from a business model in which they held the mortgage loans until repaid to one where they sold the loans to financial institutions.  This "paradigm shift" created an incentive for the bank to seek higher appraisals in higher volume.

The complaint describes a scheme in which WMB allegedly conspired to inflate the appraised value of property underlying their mortgage loans.  In 2006 WMB retained EA and LSI to administer WMB's appraisal program.  EA and LSI have since performed almost all of WMB's appraisals, and WMB's borrowers have become EA and LSI's largest source of business.  WMB created a list of "preferred appraisers," selected by WMB's origination staff, that it requested to perform appraisals for WMB borrowers.

2009 WL 605385, at *1.

In the trial court case in **Brown v. Quicken Loans, Inc.**, Ohio County Circuit Court No. 08-C-36, Judge Recht issued his findings of fact and conclusions of law [Doc. 15-1].

6

**JA497**

With respect to the appraisal issue, Judge Recht found: (1) that the appraisal was conducted by Mr. Guida, who was formerly a defendant in this case; (2) that at the time the assignment was made, the defendants provided Guida with an estimated value of the property; (3) that there was no legitimate purpose being served by providing the appraiser with an estimated value of the property; (4) that the estimated value given to the appraiser was $262,500, nearly $200,000 more than the highest sale in the applicable area; (5) that Guida appraised the property at $181,700; (6) that the property was retrospectively appraised at $46,000; and (7) that the appraisal gave the plaintiff a false sense as to her ability to repay the loan.

Judge Recht found that, as a matter of law, the loan was induced by unconscionable conduct due to, inter alia, negligently conducting the appraisal review and failing to realize the highly inflated appraisal. The Judge also found that the loan contained unconscionable terms, including being based upon an appraisal of $181,700 when the proper fair market value was $46,000.

On appeal, the West Virginia Supreme Court of Appeals found that based upon the appraisal and other factors, the trial court was correct in finding unconscionability. The Court did reverse a portion of the remedy imposed by the Judge. *Quicken Loans, Inc. v. Brown*, 230 W.Va. 306, 737 S.E.2d 640 (2012). Syllabus Point 3 to the decision states:

3.   "'The legislature in enacting the West Virginia Consumer Credit and Protection Act, W.Va. Code 46A–1–101 *et seq.*, in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act. To further this purpose the legislature, by the express

language of W.Va. Code, 46A–5–101(1), created a cause of action for consumers and imposed civil liability on creditors who include unconscionable terms that violate W.Va. Code, 46A–2–121 in consumer agreements." Syl. pt. 2, ***U.S. Life Credit Corp. v. Wilson***, 171 W.Va. 538, 301 S.E.2d 169 (1982).' Syl. pt. 1, ***Orlando v. Finance One of West Virginia, Inc.,*** 179 W.Va. 447, 369 S.E.2d 882 (1988)." Syl. Pt. 3, ***Arnold v. United Companies Lending Corp.,*** 204 W.Va. 229, 511 S.E.2d 854 (1998), *overruled, in part, on other grounds,* ***Dan Ryan Builders, Inc. v. Nelson***, 230 W.Va. 281, 737 S.E.2d 550 (2012).

230 W.Va. 306, 737 S.E.2d at 644.

The fact pattern in ***Herrod v. First Republic Mortgage Corp.***, 218 W.Va. 611, 625 S.E.2d 373 (2005) is similar. According to the West Virginia Supreme Court, "[f]ollowing the home visit, the loan brokers prepared an appraisal request form on which Mr. Young provided two figures suggesting alternative values of $118,000 and $137,000 for the Herrod home. The form was transmitted by facsimile to Mr. Jack Weaver who worked for a real estate appraisal company known as Craddock's Last Stand in Parkersburg, West Virginia. Purportedly, there was an arrangement between Mr. Weaver and First Security whereby Mr. Weaver would provide inflated appraisals in connection with loans being pursued by First Security. When the appraisal report came back, the Herrod home was valued at $118,000." 218 W.Va. at 614, 625 S.E.2d at 376.

The Court added in footnote 11 that "[t]he arrangement purportedly involved the use of two figures on the appraisal request form; one being a "deal breaker" and the other a so-

8
**JA499**

called "Christmas figure." Mr. Weaver would instruct one of his appraisers to inspect the property and then someone in the home office would complete the report by providing the comparables necessary to obtain the value sought by the loan broker.

Similarly, in *Carroll v. JPMorgan Chase Bank, N.A.*, 2013 WL 17328, *1 (S.D. W.Va. Jan. 16, 2013) (Copenhaver, J), the plaintiff alleged that the defendant "solicited Plaintiff and her husband to refinance their home, and in connection therewith Aegis intentionally obtained an inflated appraisal—as was its practice—which wrongfully valued the home to be worth at least $290,000."

In *Hatcher v. Bank of America*, 2013 WL 1776091, * 1 & 4 (S.D. W.Va. April 25, 2013) (Copenhaver, J), the defendant is alleged to have arranged for an appraisal with an inflated suggested value in excess of the property's true value, as was its normal procedure.

Chief Judge Chambers of the Southern District of West Virginia also refused to dismiss a claim of unconscionability where the allegations included the overvaluation of plaintiff's home. *Petty v. Countrywide Home Loans, Inc.*, 2013 WL 1837932, *4 (S.D. W.Va. May 1, 2013). In accord is *Heavener v. Quicken Loans, Inc.*, 2013 WL 2444596 (N.D. W.Va. June 5, 2013) (Groh, CJ).

In its Order Denying Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations [Doc. 105], this Court noted that the then state of West Virginia law required a finding of both substantive and procedural unconscionability, but noted that certain members of the Court were questioning whether both were required. The Fourth Circuit, in *McFarland*, resolved the issue finding that only procedural **or** substantive

unconscionability is required.

This Court finds that the estimated value may have been provided by the borrower is a distinction without a difference. According to Quicken, when a borrower applied for a loan, information was entered into Quicken's loan origination system, including an estimated home value, for purposes of developing a loan proposal. [Doc. 206-1, Exh. A, Lyon Dep.]. The estimated value, along with a borrower's contact information, would be uploaded into Quicken's computer system AMP and then sent automatically to Quicken's sister company, TSI. [Doc. 206-1, Exh. B, Randall Dep. & Exh. C, Rankin Dep.]. TSI in turn would use this information, including the estimate of value, to generate an appraisal request form. [Doc. 206-1, Exh. C, Rankin Dep.]. The request form along with the estimated value would be passed to the appraiser selected from a pre-approved list of appraisers through a proprietary internet based system, known as Appraisal Port. [Doc. 206-1, Exh. C, Rankin Dep. & Exh. A, Lyon Dep.].

It is actually unclear who really provided the estimated value. For example, both the Aligs and Sheas denied having provided such a figure to the lender. [Doc. 206-1, Exh. D., Alig Dep. & Exh. E, Shea Dep.]; *see also* [Doc. 206-2, Exh. F., Mem. of Op. & Order in **Brown v. Quicken Loans** (Findings of Fact & Conclusions of Law) (Feb. 25, 2010) at ¶ 18 ("It is unclear as to who provided the Anticipated Property Value."); [Doc. 206-2, Exh. G, Lyon Trial Testimony Vol. 5 (Oct. 9, 2009) at 84:15-85:4 ("I do not know if [the applicant's estimated value] came from [the consumer] or came from [Quicken's mortgage banker])].

While the factual issue of who really supplied the estimated value to the appraiser might be sufficient in and of itself to defeat the defendants' motion for summary judgment,

10

**JA501**

for the purposes of this order, the Court will accept that the value was supplied to Quicken by the borrower.

A borrower's estimated value is not materially or logically distinguishable from a "target appraisal value" or "predetermined value". This Court is not aware of any industry source or other authority that has drawn such a distinction. In fact, John Brenan, the corporate designee for the Appraisal Foundation, actually testified that one of the *functions* of a borrower's estimated value *was* to serve as a "target value". [Doc. 193-7 at 231:3-234:12.]

No matter who supplied the estimated value, this Court cannot imagine any logical basis for sending an estimated value to the appraiser other than to influence his or her opinion.

This is supported by e-mails written by Quicken's executives that were uncovered by the Department of Justice in a recent investigation of Quicken, one of which stated:

FNMA [Fannie Mae] is being dragged into a lawsuit in the state of New York over lender pressure on appraisals. I don't think the media and any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers questioning their appraised values.

[Doc. 206-2, Exh. I, Email from C. Bonkowski to H. Lovier, cc: M. Lyon (Dec. 13, 2007)].

In another e-mail uncovered by the Department of Justice, senior management at Quicken acknowledged in November of 2007 that its sister company, TSI, was receiving "a lot of calls from appraisers stating that they can't reach our requested value." Senior management's directive was to simply ask the appraisers "for the max increase available."

[Doc. 206-2, Exh. J, Email from D. Thomas to E. Czyzak, *et. al.*, cc: D. Wright (Nov. 27, 2007)].

The defendant appraiser in ***Quicken Loans v. Brown***, 230 W.Va. 306, 737 S.E.2d 640 (2012), and former defendant here, Dewey Guida, recently conceded after surrendering his appraisal license that Quicken was regularly and actively attempting to influence his appraisals. Appraiser Guida testified on January 12, 2016, that any time his appraised value came in lower than the owner's estimated value, he received a telephone call from TSI asking that he change his figures. [Doc. 169-2, Guida Dep. at 44:2-8]. Guida went on to characterize the providing of an "owner's estimated value" as a "tip-off" [Doc. 169-2 at 40, 42-45, 104-105, 107-109]. This same scenario played out in the Alig 2007 loan, where Guida acquiesced to the requested value increase that was needed to qualify that loan. [Doc. 169-2 at 95:7-96:18, 99:5-100:18].

After an amendment to statute made Ohio's Consumer Sales Act applicable to mortgage lenders effective January 1, 2007, the Ohio Attorney General's office wasted no time and filed a number of lawsuits targeting the practice of lenders and brokers influencing appraisers by placing a "borrower's estimated value" on the appraisal order. Ohio courts uniformly concluded that the act of providing an estimated value for a property in connection with a mortgage loan is an unconscionable act or practice in violation of Ohio law because it is an attempt to improperly influence the appraiser's independent judgment. *See, e.g.,* ***State ex rel. Dann v. Premiere Service Mortgage Corp.***, Case No. CV-2007-06-2173 (Butler Cty. Apr. 30, 2008); ***State ex rel. Rogers v. Ace Mortgage Funding, LLC***, Case No. A0705054 (Hamilton Cty. Sept. 23, 2008); ***State ex rel. Cordray v. First Ohio***

*Banc & Lending, Inc.*, Case No. 07-CV-259 (Belmont Cty. Nov. 24, 2009); *State ex rel. Cordray v. Apex Mortgage Services, LLC*, Case No. 07-CV-261 (Belmont Cty. Mar. 10, 2009), [collectively Doc. 206-3, Exh. O].

It is undisputed that Quicken did not inform borrowers of its appraisal practices. TSI's third party software, Appraisal Port, is designed to "ensure[] that information exchanged between [TSI] and the appraiser is *not accessible to any third party*." [Doc. 206-2, Exh. K, Petkovski Decl. at ¶ 5 (emphasis added)].  Moreover, Quicken did not produce a single appraisal request form and discarded them after providing the form to the appraiser. [Doc. 206-2, Exh. L, Petkovski Dep. at 59:18-60:8].

Quicken first contends that passing an "applicant's estimated value" on appraisal engagement letters was not improper.   However, in February, 2010, Judge Recht concluded in an Ohio County, West Virginia case styled *Brown v. Quicken Loans Inc.*, Civ. Action No. 08-C-36, that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property.  The only purpose could be to inflate the true value of the property."  [Doc. 206-2, Exh. F]. This finding supported multiple liability conclusions. *See also*, *Herrod v. First Republic Mortgage Corp.*, 218 W.Va. 611, 617-618, 625 S.E.2d 373, 379-380 (2005) (reversing a trial court's grant of summary judgment to a mortgage lender where an appraiser was provided with an estimated value).

Efforts to regulate this practice go back more than 20 years.  For  example, in 1996, the Federal Housing Commissioner issued appraisal standards to be followed in all HUD-approved mortgage transactions.  Under these standards, the appraiser was required to certify that the appraisal was not "based on a requested minimum valuation, [or] a specific

13

valuation or range of values."[1]   In 2005, all the major federal agencies with lending oversight joined in and issued an "Interagency Statement," advising in pertinent part: "the information provided [to the appraiser] should not unduly influence the appraiser *or in any way suggest* the property's value."[2]  (Emphasis added).

Quicken argues that USPAP does not forbid the practice.  Quicken ignores the fact that USPAP does not apply to lenders.   Lending standards regarding appraiser independence are separate and stronger than standards set by the appraisal industry. [Doc. 206-7, pp. 13-21, Exh. JJ, Brenan Dep. at Dep. at 280:15-281:8; 290:8-292:4 (agreeing lender restrictions pertaining to estimated values go "beyond what USPAP requires.")].

John Brenan **did not** endorse the use of estimated values under USPAP.  Instead, he acknowledged that estimated values are potentially a problem and can be used by the lender as a means to provide a target figure. (*Id.* at 233:5-235:16).  If a lender provided an estimated value, the appraiser was advised in Advisory Opinion 19 of USPAP [*See* Doc. 206-7, pp. 23-28, Exh. KK] to communicate directly with the lender to insure a full understanding that the appraiser was not "hitting a target" figure.  *Id.*  The better practice, however, and the one insuring the appraiser's independence, was to remove the estimate

---

[1][Doc. 206-7, Exh. LL, pp. 30-32, Mortgagee Letter 96-26, dated May 21, 1996 and authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner].

[2]  Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, National Credit Union Administration, Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions, March 22, 2005.  Available at http://www.occ.gov/news-issuances/bulletins/2005/bulletin-2005-6a.pdf.

entirely.  [*See* id. at 241:20-242:18].

While several of the appraisers that testified in this matter denied giving in to the attempts of Quicken and other lenders at influencing them, even the defendant appraisers agree an applicant's estimated value is not a relevant data point.  In fact, the testifying appraisers distanced themselves from such figures as taboo and all agreed that this information is in no way necessary to performing an appraisal. [*See, e.g.*, Doc. 206-5, Exh. Y, Guida Dep. at 107:23-108:7; Doc. 206-7, Exh. II, Hyett Dep. at 353:7-21; 355:4-11 (figure was not relevant and serves no purpose); Doc. 206-3, Exh. N, Sneddon Dep. at 181:13-182:25 (estimated values on order forms are "inappropriate," and Advisory Opinion 19 tells appraisers that they are "delving into" a "dangerous area" and "there might be a problem" with such a form).]  Plaintiffs' appraisal expert, John Kelly, testified that USPAP required him to refuse assignments that contained an estimated value.  [Doc. 206-3, Exh. M, Kelly Dep. at 69:6-15*; see also* Doc. 206-7, Exh. MM, Lyon Dep. at 52:15 – 53:6 (agreeing estimated values were not necessary)].  In addition, appraisers like Jody Hill, who only worked for local lenders such as Wesbanco Bank and Main Street Bank, were not subject to such a practice.  [Doc. 206-6, Exh. FF, Hill Dep. at 14:19-15:6, 100:22-103:23.]

Quicken next attempts to argue that unconscionability is equivalent to fraudulent inducement and requires proof by clear and convincing evidence.  The **McFarland** Court declined to make that finding, nor did the legislature choose to equate the two concepts.  Quicken further contends that it took no affirmative acts to deceive plaintiffs or conceal any material facts from them or that its failure to disclose this practice caused plaintiffs to enter into the loan contracts.  This Court cannot agree.  Quicken "affirmatively" passed on the estimated values to TSI, who in turn passed them to appraisers, while failing to disclose this

conduct from plaintiffs. Finally, Quicken erroneously argues that there is no remedy for this conduct.

W.Va. Code § 46A-2-121 broadly addresses the subject of unconscionability in consumer contracts. Both the plain language of the statute and the courts interpreting the statute are clear that W.Va. Code § 46A-2-121 recognizes two species of unconscionability, general unconscionability and inducement by unconscionable conduct. Importantly, the inducement by unconscionable conduct claim is predicated solely on the process leading up to contract formation and entirely independent of any showing of substantive unconscionability. *McFarland*, 810 F.3d at 283.

In *McFarland*, like here, plaintiff alleged that the defendant lender had inflated his home appraisal. 810 F.3d at 277. However, as counsel for Wells Fargo repeatedly stressed:[1]

> There is no evidence whatsoever that the appraisal was "fraudulent" or that the appraiser was provided with an estimated value. Nor is there evidence that Wells Fargo or U.S. Bank had any knowledge that the appraisal was anything other than a bona fide appraisal on which they could rely. In short, this case does not involve the sort of unscrupulous conduct the West Virginia legislature sought to prevent by enacting the WVCCPA.

Appellee Br. in *McFarland* (Appeal No. 14-2126, Doc. 33 at 26.)

The Fourth Circuit was also persuaded by the West Virginia Supreme Court's decision in *Quicken Loans I*, *supra*, where the court "sustained findings of

---

[1] The defendants here are represented by the same counsel.

16

JA507

'unconscionability in the inducement' based entirely on conduct predating acceptance of the contract and allegations going to the fairness of the process, without regard to substantive unconscionability: a 'false promise' of refinancing, the sudden introduction of a balloon payment at closing, a negligently conducted appraisal review, and other similar factors." 810 F.3d at 284 (citing *Quicken I,* 230 W.Va. 323-324, 737 S.E.2d at 657-58). The Court further noted that unconscionable inducement was not equivalent to procedural unconscionability and should turn on a defendant's misconduct, such as "affirmative representations," and "active deceit." 810 F.3d at 286. The Court left "to West Virginia law the precise contours of an unconscionable inducement claim". *Id.*

According to Quicken, "the Fourth Circuit equated unconscionable inducement with fraudulent inducement." [Doc. 175, at 18.] Ignoring most of *McFarland's* analysis, Quicken simply leaps to the conclusion that an unconscionable inducement claim under W.Va. Code § 46A-2-121 is nothing more than a straw man for fraud.

This Court does not understand *McFarland* the same way. First of all, *McFarland* makes it clear that it is the conduct of the lender that is relevant, rather than the status of the plaintiff. 810 F.3d at 286. The conduct forming the basis of the claim here is passing a tip off figure to an appraiser without a borrower's knowledge or consent. *McFarland* did not delve deeply into the nature of unconscionable conduct, leaving that process to West Virginia's courts. However, we can gain some understanding of what unconscionable conduct means through the facts of the *Brown* and *McFarland* cases.

In *Brown,* the plaintiffs alleged that the lender, Quicken, engaged in a pattern of unconscionable conduct with the intent of inducing them into accepting an underwater

17

**JA508**

mortgage loan.  The West Virginia Supreme Court agreed:

> With regard to unconscionability in the inducement, the circuit court in the present case concluded that the unconscionable conduct of Quicken included "[t]he false promise of refinancing; [i]ntroducing a balloon payment feature at closing; [f]ailing to properly disclose the balloon payment; [f]alsely representing that the plaintiffs were buying the interest rate down; and [n]egligently conducting the appraisal review and failing to realize the highly inflated appraisal from Guida[.]"

230 W.Va. at 323, 737 S.E.2d at 657.

The Supreme Court affirmed, concluding that "there is no merit to Quicken's contention that it did not violate West Virginia Code 46A-2-121 in this regard."  230 W.Va. at 324, 737 S.E.2d at 658.  Thus, the Court expressly found that Quicken's conduct before and during the closing was unconscionable in nature.

Quicken's conduct in *Brown* fell into two broad categories—false statements and withholding facts from the plaintiffs.  *McFarland* did not attempt to precisely define unconscionable inducement, but it did expressly identify two of the potential hallmarks of unconscionable conduct, misrepresentations and deceit.  *McFarland* did not define unconscionable inducement to mean fraud.  In fact, the lender in *McFarland* specifically argued that "unconscionable inducement requires a heightened showing akin to fraud" in arguing against certification of plaintiff's question regarding an unconscionable inducement claim.  (Appeal 14-2126, Def. Opp. to Pl. Motion to Certify Questions, Doc. No. 65-1 at 8 (Nov. 23, 2015)).  *McFarland* apparently rejected the invitation to equate unconscionable

inducement with fraud, and the word "fraud" never appears in its discussion of the unconscionable inducement issue.   Instead, *McFarland* offers misrepresentation and deceit as examples of conduct that could constitute unconscionable inducement--examples drawn from the facts of the *Brown* case itself.

Quicken points to a footnote in *Mt. State College v. Holsinger*, 230 W.Va. 678, 742 S.E.2d 94 (2013), for the proposition that unconscionable inducement can be equated to fraudulent conduct.  It is settled that "language in a footnote generally should be considered obiter dicta and that if [the West Virginia Supreme Court of Appeals] is to create a new point of law, it will do so in a syllabus point and not in a footnote. "  *Valentine v. Sugar Rock, Inc.,* 234 W.Va. 526, 532, 766 S.E.2d 785, 791 (2014) (quotation omitted). Unconscionable inducement could, of course, be satisfied by demonstrating fraudulent conduct, but that is not to say that this case stands for the proposition that only fraudulent conduct will satisfy the unconscionability standard.

The facts here supporting a finding of unconscionable conduct, as in *Brown,* are simple and clear.  Quicken influenced the appraisers to meet a passed on value, and it did so while failing to disclose the practice to plaintiffs.  The CCPA must be liberally construed so as to effect its remedial purposes. *Barr v. NCB Mgmt. Servs., Inc.,* 227 W.Va. 507, 711 S.E.2d 577 (2011).  It makes no sense to extend the CCPA in the fashion proposed by Quicken so as to limit borrowers' rights to those that already exist at common law.  There is ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs' loans.

Quicken's conduct here also falls within the two examples, misrepresentation and/or

deceit, of unconscionable conduct given by *McFarland*.  Deceit is by its nature broad in scope and would encompass Quicken's conduct in the instant matter.  Deceit is defined as "a fraudulent or deceptive misrepresentation, artifice, or device used by one or more persons to deceive or trick another."  Black's Law Dictionary (5th Ed. 1979).  Deceit, then, would not only cover Quicken's attempts to prejudice or influence appraisers but also Quicken's withholding of such practice from borrowers.  As it did in the *Brown* case, Quicken possessed knowledge of the true facts of the Aligs' loan, namely that it was actively attempting to compromise the appraisal process.  Specifically, pressure was being brought to bear on the appraiser, who was expected to meet or exceed a target figure that Quicken itself had provided not once but twice (in the case of the Aligs).  By concealing these facts, Quicken meant to "deceive or trick" the plaintiffs.  Quicken's conduct was therefore unconscionable even if the definition of unconscionability was limited to the two examples given by *McFarland*.

We see this in *Brown's* treatment of the balloon note. Quicken did not secrete the balloon note or say anything at the closing to deflect the borrower's attention from it. Instead, the balloon note simply appeared within the settlement package that was presented to the borrowers for signing.  Quicken knew it was there.  The borrowers did not know what they were walking into.  As *Brown* noted, "fraud is the concealment of truth just as much as it is the utterance of a falsehood." 230 W.Va. at 320, 737 S.E.2d at 654. Nothing further was required to prove that the loan was, in fact, unconscionably induced as a result of concealing the balloon note.

The same logic applies here.  To repeat, Quicken had full knowledge of its practice

of providing estimated values to its appraisers for purposes of influencing their appraisals. Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers. Quicken knew these facts. The plaintiffs did not. Under the analytical framework of both *McFarland* and *Brown,* this constituted unconscionable inducement.

        Defendants set up four additional arguments why their conduct is not actionable. First, defendants argue there is no proof their unconscionable conduct actually induced the plaintiffs to enter into their loan agreements. It is important to again note the statutory language. A violation exists when "the agreement or transaction . . . [has been] induced by unconscionable conduct." W.Va. Code § 46A-2-121. The focus is plainly on the lender or creditor's conduct. The statute says nothing of the consumer's state of mind. If the "transaction" itself is induced or furthered by the lender's unconscionable conduct, that is enough for a violation.

    Apparently, Quicken is not taking the extreme position that there is no remedy for conduct that is unconscionable *per se.* Indeed, Quicken acknowledges in its Memorandum in Support of Summary Judgment that a practice that is illegal would be *per se* unconscionable. [Doc. 175 at n. 18 (citing *Dijkstra v. Carenbauer,* 2014 WL 791140 (N.D. W.Va. Feb. 26, 2014)]. In *Dijkstra,* this Court granted summary judgment to the plaintiff and found the closing of a loan without an attorney present to be unconscionable *per se* on account of West Virginia common law and an opinion of the Committee on Unauthorized Practice of Law. *Dijkstra,* 2014 WL 791140, at **4-5. The plaintiffs here are asking the Court to do what it did in *Dijkstra*: to find that based on West Virginia common law and

other persuasive authority identified above the lender's practices constitute unconscionable inducement.

Under West Virginia law there is no requirement to show reliance in claims involving concealment. Logically, it would be impossible to even make such a showing: How can anyone prove that they relied on a fact that was concealed from their knowledge? Even the higher standard for fraudulent concealment would not require proof of reliance, but instead involves only "concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Livingston v. K-Mart Corp.,* 32 F.Supp.2d 369, 374 (S.D. W.Va. 1998) (Haden, J.) citing *Pocahontas Min. Co. Ltd. P'ship v. Oxy USA, Inc.,* 202 W.Va. 169, 175, 503 S.E.2d 258, 264 (1998) (in turn explaining that "[o]bviously, one who is defrauded [by fraudulent concealment] cannot possibly take any affirmative action to indicate reliance, since he knows nothing of the deception"); *see also Adair v. EQT Prod. Co.,* 2013 WL 5429882, at *39 (W.D. Va. Sept. 5, 2013) ("the doctrine of fraudulent concealment does not focus on the actions or knowledge of the plaintiffs, but on the actions of the defendant.").

Quicken's second argument is that "appraisals are obtained for the benefit of the lender, not the borrower." [Doc. 175, at 22]. In other words, as borrowers, plaintiffs were not justified in relying on the appraisal because it was obtained by the bank and for the bank. This is not borne out by the record. Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater." The certification by the appraisers here explicitly states that others, including the borrower, can rely on the appraisal and its figures. In November 2005,

Fannie Mae explained that the certification appearing on all of its appraisal forms was revised to reflect the fact that borrowers "should be able to rely on the accuracy of an appraisal report prepared by a state-licensed or state-certified appraiser and the appraiser should be held accountable for the quality of that appraisal because their reliance is customary and reasonable."  [Doc. 206-7, Exh. NN at 3].  Finally, it should be noted this court itself addressed the same issue in a prior order, finding that the plaintiffs' negligence claim against one of the appraisers, i.e., Hyett, was viable because the plaintiffs were justified in relying on the appraisal he prepared.  [Doc. 61].

Quicken's third argument is that it took no "affirmative action" with respect to concealing the passing of the estimated value.  But in the same paragraph, it acknowledges that Quicken passed the estimated value on to TSI, who, in turn, included the estimated value on the appraiser engagement letters.  [Doc. 175, at 20-21].  In fact, TSI's third party software, Appraisal Port, is designed to "ensure[] that information exchanged between [TSI] and the appraiser is not accessible to any third party, including the lender."  [Doc. 206-2, Exh. K, Petkovski Decl. at ¶ 5].

Quicken's fourth argument is that the plaintiffs did not suffer any damage or detriment.  Specifically, Quicken argues that plaintiffs must show that plaintiffs and other class members were actually harmed by this practice by receiving an upside down mortgage.  This standard is contrary to the stated purpose of this claim, which is to provide a cause of action in situations where damages in the form of a substantively unconscionable loan are not present.  For that reason, the WVCCPA provides that a person who has been subjected to unconscionable conduct may recover actual damages and the right to recover of $1,000 per violation.  West Virginia Code § 46A-5-101.  *See* Syl. pt. 2,

23

**JA514**

***Vanderbilt Mortg. & Fin., Inc. v. Cole***, 230 W.Va. 505, 740 S.E.2d 562 (2013) ("under W.Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages."). Actual damages are therefore not a necessary component of the claim. In this respect this case is no different from ***Dijkstra***, where this Court did not require plaintiff to prove that each individual class member had suffered actual damages due to a witness only closing.

The defendants are also not entitled to summary judgment on the plaintiffs' contract claims. West Virginia law implies in every commercial contract a covenant requiring the parties to act in good faith. *See, e.g.*, ***Barn-Chestnut, Inc. v. CFM Dev. Corp.***, 193 W.Va. 565, 572, 457 S.E.2d 502 (1995). The duty of good faith imposes real obligations that are grounded in honest dealing and compliance with standards of commercial reasonableness: "The test of good faith in a commercial setting is…honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." ***Barn-Chestnut***, 193 W.Va. at 572, 457 S.E.2d at 509 (interior quotes omitted).

The plaintiffs and Quicken executed a contract at the beginning of the loan application process known as an "Interest Rate Disclosure and Deposit Agreement." [Doc. 206-5, Exh. X]. Quicken argues that no part of the contract imposes any obligation on Quicken to obtain an acceptable appraisal. Under the language of the contract, Quicken undertakes to "[o]btain an appraisal." At the end of the process the lender must make a proper accounting of the deposit and credit it "toward the cost of your appraisal."

The agreement also specifically refers to an "acceptable" appraisal. This language is significant. What exactly is an "acceptable" appraisal? Because the contract is silent on

the subject, it must, under settled law, be interpreted against the lender and in favor of the borrower.  *See, e.g.*, ***Auber v. Jellen***, 196 W.Va. 168, 469 S.E.2d 104 (1996) (ambiguous contract provisions, "especially those having the qualities of a contract of adhesion," must be construed against the drafter).  Furthermore, because this involves how Quicken must perform under the contract, the implied covenant also comes into play.

All of this demonstrates that the agreement in question is meant to facilitate the loan application process by having the lender, Quicken, obtain an "acceptable" appraisal, which, at a minimum, would require Quicken to deal honestly with its borrowers and in keeping with the prevailing standards of reasonableness.  Quicken has admitted that the borrower has an expectation of a fair, unbiased, and reasonable proposal.  [Doc. 206-1, Exh. B, Randall II Dep. at 99:18-100:5].  In refusing to dismiss this Count in its October 2015 Order, this Court stated: "What is clear is that the plaintiffs each deposited a sum of money with Quicken, and, in turn, Quicken agreed to obtain an appraisal of the property and process the loan application.  This Court finds that it was a necessary corollary of obtaining an appraisal that the defendant would obtain a fair, valid and reasonable appraisal of the property."  (Order Denying in Part & Granting in Part Motion for Partial Summ. J. at 7) [Doc. 107].

Inasmuch as providing a target figure to an appraiser is a practice that is universally condemned and serves no legitimate purpose, an appraisal obtained by that process cannot conceivably be an "acceptable" one.  Nor could an appraisal obtained by such a scheme be fair, valid or reasonable.  Furthermore, withholding knowledge of the true nature of the appraisal violates Quicken's duty to deal honestly.

According to Quicken, however, the language requiring an "acceptable" appraisal "appears in the disclosure portion of the document. Under no plausible construction can this language be read as a promise by Quicken Loans to do anything." [Doc. 175, at 25]. The language is clearly contractual in nature--it imposes specific duties that must be fulfilled in connection with the deposit and the processing of the appraisal. For example, the lender undertakes to "begin processing your application…immediately upon the submission of your application and deposit." The borrower "agree[s] to cooperate in the application process." In addition, the borrower "agree[s] to notify lender of any changes in any information submitted." These are not disclosures; they are part and parcel of the contractual undertaking.

Quicken also tries to dismiss the reference to an "acceptable" appraisal, claiming that "receipt of an acceptable appraisal clearly means an appraisal acceptable *to the lender,* not the borrower, to support the loan." [Doc. 175, at 25 (emphasis in original)]. But this is nothing more than Quicken's own, self-serving interpretation. The contract itself is silent. Any appraisal Quicken obtained was intended for the benefit of both the lender and the borrower.

The Motion will be denied as to this issue.

## II.    Flat Fee for Courier Services

The plaintiffs also claim that the imposition of a flat rate for courier fees is excessive and therefore unconscionable. Title Source charged plaintiffs a $45 flat fee for express mail and courier services provided in connection with the closings. [Docs. 174-12, 174-17 & 174-20]. The express mail/courier fee was not paid directly to any third party because

it is charged for services provided by multiple entities.  [Doc. 174-28, ¶ 6].  Defendants claim to have set the $45 fee after conducting a market analysis to determine what other lenders in the industry charged for similar services and the average number and cost of services provided per transaction.  [Doc. 174-28].

The $45 fee compensates defendants for express mail and courier services actually performed, including, but not limited to: (i) mailing the executed closing package back to Title Source via next day air delivery; (ii) sending via overnight delivery or wiring the payoffs for the borrower's preexisting mortgage(s), third party debts, judgments, liens, taxes, homeowner's insurance, and/or cash-out proceeds to the borrower; (iii) delivering the executed deed of trust to the county for recording; and (iv) employee time in tracking deliveries, preparing documents for mailing, and scanning in executed documents.  [Doc. 174-28, ¶ 7; Doc. 174-13, Exh. A at 11].

The number and type of services provided to each borrower – which is not known until after closing – varies based on the borrowers' individual circumstances.  [Doc. 174-13, ¶ 3-4, Exh. A at 12-13].

For UPS services, Title Source receives a monthly discount that fluctuates based on volume for that month.  [Doc. 174-31, p. Dep. 32].  Plaintiffs' expert, Stephen McGurl, admitted that the exact cost of UPS services, without the end-of-month discount, is more than double the amount of the discounted charge.  [Doc. 174-32, 134-35].  In other words, had Title Source charged the exact UPS fee at the time of the shipments, plaintiffs would likely have paid well over $45.

The express mail/courier fee of $45 is disclosed to borrowers before closing on the good faith estimate (GFE) and again on the HUD-1 settlement statement.  [Doc. 174-28,

¶ 5; Exhs. 12, 17, 20.].  Plaintiffs received and signed these documents, agreeing to the fee in advance of closing.  [Id.].  None of the plaintiffs questioned or disputed the fee.

Plaintiffs do not dispute that Title Source *actually provided* courier services to plaintiffs in connection with their loan closings and disbursements.  The evidence shows that Title Source arranged for at least four express mail/courier services for each of the plaintiffs' loans, including sending the return package, deed of trust to the county for recording, payoffs for liens, and cash to borrowers.  [Doc. 175, at 20]. In addition, Title Source employees provided services in connection with these deliveries, such as printing labels, tracking packages and confirming delivery. [Doc. 174, at 19]. Plaintiffs have presented no evidence that the $45 fee is anything other than reasonable in light of the services actually provided by Title Source.

Likewise, plaintiffs do not dispute that it is impossible to know, prior to closing, exactly what charges will be incurred for express mail/courier services.  One may not know the exact cost of mailing something in advance – it depends on the service used, the number of packages, the size of the packages, the weight of the packages, the locations to which the packages are mailed, and other pricing considerations.  Given the impossibility of determining costs before closing, it is standard in the industry – and permitted by RESPA – to charge a flat fee for express mail/courier services.  *See, e.g.,* ***Price v. Landsafe Credit, Inc.***, 2006 WL 3791391 *7 (S.D. Ga. Dec. 22, 2006) ("Courts have rejected challenges to the reasonableness of flat-fee price structures, even though cross-subsidization between customers is inherent in such an arrangement.").

Plaintiffs rely upon *Dijkstra v. Carenbauer,* 2014 WL 791140 (N.D. W.Va. Feb. 26, 2014) to support their claim.  In *Dijkstra*, however, the amount of the notary's fee was set by statute.  There is no comparable statute in this case.

This Court will grant summary judgment on this claim.

### Class Certification

With regard to the issue of class certification, the plaintiff seeks certification of two classes.  This Court's ruling on the issue of courier fees obviates the need for the second class.  With respect to the first class, plaintiff seeks a class defined as follows:

All West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

According to plaintiffs, this case is ideally suited for class certification because it will allow resolution of distilled factual and legal issues through this superior mechanism. Presenting the legal issues on behalf of a class will allow the Court to determine, in one fell swoop on a class wide basis whether it is unlawful in West Virginia for a lender to provide appraisers with target figures.  Plaintiffs' class certification proposal thus allows for the "consolidation of recurring common issues" which "make up the heart of Plaintiffs' case," *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 426 (4th Cir. 2003) (quoting *Central Wesleyan v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993)), and are therefore ideal for resolution through the class action mechanism.

29

**JA520**

"A district court 'has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001), quoting *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). "[P]laintiffs bear the burden . . . of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden . . .." *Thorn v. Jefferson-Pilot Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006), quoting *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004).

In an action such as this, class certification may be granted only if the plaintiff satisfies the requirements of numerosity, commonality, typicality, representativeness, predominance, and superiority of Rule 23(a)[2] and (b)(3)[3] are met. *Lienhart*, 255 F.3d at

---

[2]  Rule 23(a) provides:

**(a) Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1)  the class is so numerous that joinder of all members is impracticable;
(2)  there are questions of law or fact common to the class;
(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)  the representative parties will fairly and adequately protect the interests of the class.


[3] Rule 23(b)(3) provides:

**(b)  Types of Class Actions**.  A class action may be maintained if Rule 23(a) is satisfied and if:
(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
    (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

146.

"[N]umerosity requires that a class be so large that 'joinder of all members is impracticable.' Fed.R.Civ.P. 23(a)(1).  Commonality requires that 'there are questions of law or fact common to the class.' Fed.R.Civ.P. 23(a)(2).  The common questions must be dispositive and over-shadow other issues." *Id.*, citing *Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir. 1990).  "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions.'" *Id.*, at n.4, quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997).

"Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.' *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982) (internal quotation marks omitted).  Representativeness requires that the class representatives 'will fairly and adequately protect the interests of the class.' Fed.R.Civ.P. 23(a)(4). . . . [T]he final three requirements of Rule 23(a) 'tend to merge, with commonality and typicality "serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."' *Broussard v. Meineke*

---

(C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D)  the likely difficulties in managing a class action.

*Discount Muffler Shops, Inc.,* 155 F.3d 331, 337 (4th Cir. 1998) (quoting *Falcon,* 457 U.S. at 157 n. 13)." *Id.* at 146-47.

"In contrast to actions under Rule 23(b)(1) and (b)(2), Rule 23(b)(3) actions are '[f]ramed for situations in which class-action treatment is not clearly called for,' but 'may nevertheless be convenient and desirable.' *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997) (internal quotation marks omitted). In addition to the four Rule 23(a) requirements, Rule 23(b)(3) actions such as this one must meet two requirements: predominance and superiority. Predominance requires that '[common] questions of law or fact ... predominate over any questions affecting only individual members.' Fed.R.Civ.P. 23(b)(3). The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' *Amchem,* 521 U.S. at 623. Superiority requires that a class action be 'superior to other methods for the fair and efficient adjudication of the controversy.' Fed.R.Civ.P. 23(b)(3)." *Id.* at 147.

Plaintiffs are asking this Court to determine whether passing an owner's estimate of value constitutes unconscionable conduct under West Virginia Code § 46A-2-121. [Doc. 1-1, p. 5, Count IV]. Plaintiffs also ask this Court to address whether Quicken breached the parties' contracts by depriving plaintiffs and Class Members of the benefit of their bargain –specifically, of a fair and unbiased appraisal – based on the alleged improper appraiser influence. [Id., Count VII].

These questions present common legal issues which this Court already had occasion to analyze earlier in this order and earlier in this litigation in the context of denying Quicken's motion to strike class allegations. [*See* Doc. 105, Order Denying Def. Motion to

Strike Class Allegations (Oct. 15, 2015)].  In that Order, this Court observed that other courts have discerned the problem with Quicken's practice of providing a "target number" to the appraiser in connection with the loan, and discussed several decisions under West Virginia law regarding claims for inflated appraisals.  [Doc. 105, at 7-13].

It was not the first time this Court had an opportunity to study appraisal influence. In a similar case, this Court recognized the plausible "inference" created when a bank provides appraisers with suggested or estimated values of homes:

> Taken as true, these allegations create an inference that [lenders'] practice
> of providing estimated values of homes was for the purpose of influencing the
> appraiser's independent judgment. It certainly is plausible that an appraiser
> would seek to meet a client's suggested outcome in order to receive future
> business from the client.

[Doc. 169-12, ***DiLoreti v. Countrywide Home Loans, Inc.,*** No. 5:14-cv-76 (N.D. W.Va. Nov. 14, 2014), Order Granting Bank Defendants' Motion in Part and Denying in Part and Denying Funari's Motion for Judgment on the Pleadings, at 7].

Plaintiffs propose that if this Court finds that passing estimated values to appraisers does constitute unconscionable conduct or a breach of contract, the case will then proceed to Phase II.  During Phase II, plaintiffs propose to ask the Court to address whether a statutory penalty should be awarded for any violation of the WVCCPA, and if so, in what amount.  Under West Virginia Code § 46A-5-101, a Court may award a statutory penalty if it finds that the defendants engaged in "unconscionable conduct."  Plaintiffs also ask the Court to address whether a refund of the appraisal fees paid by class members is warranted under the CCPA or due to the breach of contract.

Finally, in Phase III, plaintiffs suggest that the Court address any individualized questions and permit class members who believe they have additional individual damages due to defendants' conduct to present those damages.  Trial courts have great discretion to conduct and manage litigation in an efficient and equitable manner.  Manual for Comp. Litig., at Introduction,10.13 (4th ed. 2005).  Particularly in the context of a class action, Rule 23 "allows district courts to devise imaginative solutions to problems created by… [determining] individual damages issues."  *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *see also* *In re Scientific Atlantic Inc., Sec. Litig.,* 571 F.Supp.2d 1315, 1343 (N.D. Ga. 2007) (quoting *Carnegie* for this proposition and certifying class upon finding, "even if the Court ultimately concludes that aggregate damages models are not sufficiently reliable for use in this case, the Court is convinced that other viable alternatives exist to address any individual damages issues that may arise.").  Accepted methods of assessing the individual issues relating to class members include:

> (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Id*. (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir. 2001)).

This Court used a similar process to resolve a similar class action in ***Dijkstra v. Carenbauer,*** No. 5:11-cv-152 (N.D. W.Va.). Specifically, in ***Dijkstra***, the Court made liability findings on the class claims and awarded statutory and disgorgement damages on a class-wide basis, and then allowed for individual class members to come forward with any claims of actual damages beyond those compensable on a class-wide basis. [***Dijkstra*** Orders at Docs. 210 & 242]. The defendant in ***Dijkstra*** filed two separate petitions for appeal, challenging this Court's certification decisions. Both were rejected. (*See* U.S.C.A. Case No. 13-107, petition denied Feb. 6, 2013 [***Dijkstra*** Doc. 129]; U.S.C.A. Case No. 14-386, petition denied July 31, 2014 [***Dijkstra*** Doc. 256]).

## I.    Numerosity:

"Rule 23(a)(1) requires that the class be of sufficient size that joinder of all members is 'impracticable.' In determining whether joinder is impracticable, a court should analyze the factual circumstances of the case rather than relying on numbers alone. ***Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,*** 375 F.2d 648 (4th Cir. 1967). Factors to be considered are 'the estimated size of the class, the geographic diversity of class members, the difficulty of identifying class members, and the negative impact of judicial economy if individual suits were required.' ***Christman v. American Cyanamid Co.,*** 92 F.R.D. 441, 451 (N.D. W.Va. 1981); ***McGlothlin v. Connors,*** 142 F.R.D. 626, 632 (W.D. Va. 1992)." ***In re Serzone Prods. Liab. Litig.***, 231 F.R.D. 221, 237 (S.D. W.Va. 2005) (Goodwin, J.).

"Impracticable does not mean impossible." ***Hewlett v. Premier Salons, Int'l, Inc.***, 185 F.R.D. 211, 215 (D. Md. 1997) (Chasanow, J.)(quoting ***Robidoux v. Celani***, 987 F.2d

35

**JA526**

931, 935 (2d Cir. 1993)).  "When a class is extremely large, the numbers alone may allow

the court to presume impracticability of joinder.  *Buford v. H & R Block, Inc.,* 168 F.R.D.

340, 348 (S.D. Ga. 1996) (citing *Finnan v. L.F. Rothschild & Co., Inc.,* 726 F.Supp. 460,

465 (S.D. N.Y. 1989); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill. 1986)). There

is no bright line test for determining numerosity; the determination rests on the court's

practical judgment in light of the particular facts of the case. *Id.* (citing *Deutschman v.*

*Beneficial Corp.,* 132 F.R.D. 359, 371 (D. Del. 1990))."  *Id.*

There is no set minimum number of potential class members that fulfills the

numerosity requirement.  *See Holsey v. Armour & Co.,* 743 F.2d 199, 217 (4th Cir. 1984)

(citing *Kelley v. Norfolk & Western Ry. Co.,* 584 F.2d 34 (4th Cir. 1978)).  However,

where the class numbers twenty-five or more, joinder is usually impracticable.  *Cypress*

*v. Newport News General & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir.

1967) (eighteen class members sufficient).

Quicken has already admitted that, based on the allegations in the First Amended

Complaint, "the number of members of all proposed plaintiff classes well exceeds 100."

[Doc. 1].  The numerosity requirement is therefore satisfied.

## II.    **Commonality**:

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact

common to the class."  Rule 23(b)(3) requires that questions of law or fact common to the

class predominate over any questions affecting only individual members.  The Fourth

Circuit has held that "[i]n a class action brought under Rule 23(b)(3), the 'commonality'

requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent

Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions.'" ***Lienhart v. Dryvit Sys., Inc.***, 255 F.3d 138, 147 n. 4 (4th Cir. 2001)(quoting ***Amchem***, 521 U.S. at 609). Because this is a class action brought under Rule 23(b)(3), this Court will analyze the two factors together in the predominance section of this opinion. *See* ***In re LifeUSA Holding Inc.,*** 242 F.3d 136, 144 (3d Cir. 2001) (analyzing the two factors together).

III.    **Typicality**:

"To satisfy the typicality requirement under Rule 23(a)(3), the 'claims or defenses of the representative parties [must be] typical of the claims or defenses of the class.' *Fed.R.Civ.P.* 23(a)(3). 'A sufficient nexus is established [to show typicality] if the claims or defenses of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theory.' ***In re Terazosin Hydrochloride Antitrust Litig.,*** 220 F.R.D. 672, 686 (S.D. Fla. 2004) (quoting ***Kornberg v. Carnival Cruise Lines, Inc.,*** 741 F.2d 1332, 1337 (11th Cir. 1984)); *see also* ***In re Diet Drugs,*** 2000 WL 1222042 at *43 (E.D. Pa. Aug. 28, 2000). The class representatives and class members need not have suffered identical injuries or damages. ***United Broth. of Carpenters v. Phoenix Assoc., Inc.,*** 152 F.R.D. 518, 522 (S.D. W.Va. 1994); *see also* ***Mick v. Ravenswood Aluminum Corp.,*** 178 F.R.D. 90, 92 (S.D. W.Va. 1998)." ***In re Serzone Prods. Liab. Litig.***, 231 F.R.D. 221, 238 (S.D. W.Va. 2005) (Goodwin, J.).

"The typicality requirement has been observed to be a redundant criterion, and some courts have expressed doubt as to its utility. ***Buford,*** 168 F.R.D. at 350 (citing ***Sanders v. Robinson Humphrey/American Express, Inc.,*** 634 F.Supp. 1048, 1056 (N.D. Ga.

1986), *aff'd in part, rev'd in part on other grounds sub nom.*, **Kirkpatrick v. J.C. Bradford & Co.,** 827 F.2d 718 (11th Cir. 1987), *cert. denied,* 485 U.S. 959 (1988)).  Some courts treat typicality as overlapping with commonality, *see* **Zapata [v. IBP, Inc.**], 167 F.R.D. at 160; *cf. Falcon,* 457 U.S. at 157 n. 13 (noting that typicality and commonality 'tend to merge'); other courts equate typicality with adequacy of representation.  **Buford,** 168 F.R.D. at 350 (citing **Alfus v. Pyramid Technology Corp.,** 764 F.Supp. 598, 606 (N.D. Cal. 1991)). Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.  **Zapata,** 167 F.R.D. at 160 (citing 1 *Newberg on Class Actions* § 3.13).  A plaintiff's claim may differ factually and still be typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' **Id.** (quoting 1 *Newberg on Class Actions* § 3.13).  So long as the plaintiffs and the class have an interest in prevailing in similar legal claims, then the typicality requirement is satisfied.  **Buford,** 168 F.R.D. at 351 (citing **Meyer v. Citizens and Southern Nat'l Bank,** 106 F.R.D. 356, 361 (M.D. Ga. 1985)).  The existence of certain defenses available against plaintiffs that may not be available against other class members has been held not to preclude a finding of typicality. *See* **id.** (citing **International Molders' and Allied Workers' Local Union No. 164 v. Nelson,** 102 F.R.D. 457, 463 (N.D. Cal. 1983)).  The burden of showing typicality is not meant to be an onerous one, but it does require more than general conclusions and allegations that unnamed individuals have suffered discrimination. **Kernan,** 1990 WL 289505, at *3 (citing **Paxton v. Union Nat'l Bank,** 688

F.2d 552, 556 (8th Cir. 1982), *cert. denied,* 460 U.S. 1083 (1983)).”  **Hewlett v. Premier Salons, Int'l, Inc.**, 185 F.R.D. 211, 216 (D. Md. 1997) (Chasanow, J.).

In this case, the claims of each of the putative class members arise from the same pattern or practice on the part of the defendants - the provision of a target value to its selected appraiser without the knowledge of the borrower.  This Court finds that the requested class satisfies the typicality requirement.

**IV.    Adequacy of Representation**:

“The final requirement of Rule 23(a) is set forth in subsection (4), which requires that ‘the representative parties will fairly and adequately protect the interests of the class.’ *Fed.R.Civ.P.* 23(a)(4).  This determination requires a two-pronged inquiry: (1) the named plaintiffs must not have interests antagonistic to those of the class; and (2) the plaintiffs' attorneys must be qualified, experienced and generally able to conduct the litigation. **Hewlett v. Premier Salons Int'l, Inc.,** 185 F.R.D. 211, 218 (D. Md. 1997).”  **Serzone**, 231 F.R.D. at 238.

The defendants do not contest plaintiffs’ counsel’s ability to conduct the litigation, nor does this Court.  The defendants have not pointed out any interests that the named plaintiffs have that are antagonistic to the interests of the proposed class.

Accordingly, this Court finds that the named plaintiffs and their counsel are able to fairly and adequately protect the interests of the class.

**V.    Predominance**

The first factor under Rule 23(b)(3) requires that the questions of law or fact common to all class members predominate over questions pertaining to individual

members.  *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. at 239.  Common questions predominate if class-wide adjudication of the common issues will significantly advance the adjudication of the merits of all class members' claims.

"The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Lienhart*, 255 F.3d at 147 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004).

In this case, the issues common to all class members predominate over any individual questions.  There is no dispute that the defendants provided a target value to the appraisers which they selected.  The liability phase of this case presents the following issues, which are common to all potential class members:

(1)    whether defendants' practice of passing owners' estimates of value constitutes unconscionable inducement under the CCPA;

(2)    whether defendants' breached the parties' contracts;

(3)    whether class members are entitled to statutory penalties for each violation of the West Virginia Consumer Credit and Protection Act; and

(4)    whether borrowers should receive a refund of the appraisal fees that they paid.

The common questions discussed above predominate.  To put this into perspective, either it was permissible for Quicken to send appraisal request forms with target numbers or not.  *See Dijkstra v. Carenbauer, supra,* 2014 WL 791140, at *14 (granting affirmative

judgment on class procedural unconscionability claim when defendant lender used non-attorneys to close loans and charged illegal notary fees).

If Quicken violated the law, plaintiffs will ask this Court to award statutory damages and set an amount. These resolutions will largely dispose of this litigation. Surely these determinations are much more straightforward than other certified classes of which the Fourth Circuit has approved. *See, e.g., Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) (vacating district court's decertification of Title VII class of black steelworkers and remanding with instructions to certify the class in light of the "inherent cohesiveness of the class"); *Gray v. Hearst Communs., Inc.*, 444 Fed. Appx. 698, 702 (4th Cir. 2011) (affirming certification of advertisers' class claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices against directory distributors upon finding that "the common question regarding [defendant's] distribution obligation predominates over any individual issues because the putative class members all assert injury from the same action (*i.e.* failure by [defendant] to follow its standard distribution practice), and determination of whether [defendant] breached its standard distribution obligation will resolve in one stroke an issue that is central to the validity of the class members' breach of contract claims"); *Central Wesleyan v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) (affirming conditional certification of a nationwide class of colleges and universities with asbestos in their buildings despite the "daunting number of individual issues", including the ability of each college to prove liability, differing statutes of limitation, differing asbestos products and exposures, present in the case).

Courts nationwide frequently recognize that cases involving fee overcharging are appropriate for class treatment.  See *Mahon v. Chicago Title Ins. Co.,* 296 F.R.D. 63 (D. Conn. 2013) (certifying class of persons overcharged for title insurance in connection with refinance transactions, explaining that "[t]he statutorily filed premium rates must be applied uniformly" and that in "each transaction, (i) the putative class member paid the premium charged/collected by [defendant] in exchange for a title insurance policy; (ii) [defendant] was required by law to charge a premium in accordance with its filed rates; (iii) the putative class member paid the premium charged by [defendant], which was an overcharge; and (iv) the putative class member was damaged by being overcharged for the title insurance); *Spano v. Boeing Co.,* 294 F.R.D. 114 (S.D. Ill. 2013) (certifying ERISA class with various subclasses alleging imposition of excessive fees, noting several times that certification was appropriate because plaintiffs had alleged that all class members had complaints concerning the excessive fees); *Markocki v. Old Republic Nat'l Title Ins. Co.,* 2015 WL 3421401 (E.D. Pa. May 27, 2015) (declining to decertify class claim under Real Estate Settlement Procedures Act where common question was whether defendant split a charge for settlement services not actually performed, and question predominated over any individual issues).

The issues common to the class predominate over any individual issues here.  The central issue is whether passing an estimated value constitutes unconscionable conduct or a breach of the parties' contract.  The Court can award class-wide damages in the form of statutory penalties and a refund of any fees paid.

These common questions are broad and apply to all potential class members. Accordingly, the predominance requirement is met.

## VI.   Superiority

"The superiority test of Rule 23(b)(3) requires the court to find that the class action instrument would be better than, not just equal to, other methods of adjudication.  The four factors listed in this subsection (interest in controlling individual prosecutions, existence of other related litigation, desirability of forum, and manageability) are simply a guideline to help the court determine the benefit of the proposed class action.  Advisory Committee's Notes to Fed.R.Civ.P. 23."  *Hewlett v. Premier Salons, Intern., Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997).

## A.   Interest in controlling individual prosecutions

"The first factor identified in the rule is 'the interest of members of the class in individually controlling the prosecution or defense of separate actions.'   Fed.R.Civ.P. 23(b)(3)(A). 'This factor has received minimal discussion in Rule 23(b)(3) actions.' *Buford*, 168 F.R.D. at 361 (quoting 1 *Newberg on Class Actions* § 4.29).  According to the drafters of the rule:

> The interests of individuals in conducting separate lawsuits may be so strong
> as to call for denial of a class action.  On the other hand, these interests may
> be theoretic[al] rather than practical; the class may have a high degree of
> cohesion and prosecution of the action through representatives would be
> quite unobjectionable, or the amounts at stake for individuals may be so
> small that separate suits would be impracticable.

Advisory Committee's Notes to Fed.R.Civ.P. 23." *Hewlett*, at 220-21.

This case falls into the latter category, considering the likely relatively small potential individual recoveries, and fact that no other cases appear to have been filed.

**B.     Existence of other related litigation**

"Under Rule 23(b)(3)(B), the court should consider the 'extent and nature of any litigation concerning the controversy already commenced by or against members of the class.'  This factor is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits.  7A *Federal Practice and Procedure* § 1780, at pp. 568-69.  'If the court finds that several actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, which is not always feasible, a Rule 23 proceeding only might create one more action. . ..  Moreover, the existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action.  Rather than allowing the class action to go forward, the court may encourage the class members who have instituted the Rule 23(b)(3) action to intervene in the other proceedings.'  *Id.* at 569-70."  *Hewlett*, at 221.

This factor is, in this case, a non-factor, since this Court has been made aware of no other lawsuits against the defendants concerning this issue.

**C.     Desirability of forum**

Rule 23(b)(3)(C) requires the court to evaluate the desirability of concentrating the litigation in a particular forum. Because all of the potential class members are residents of the State of West Virginia, because the class representative and class counsel live here, and because defendant has counsel here, this forum is as good as any.

## D.     Manageability

"The last factor that courts must consider in relation to superiority is the difficulty that may be 'encountered in the management of the class action.' Fed.R.Civ.P. 23(b)(3)(D). 'Of all the superiority factors listed in Rule 23, *manageability* has been the most hotly contested and the most frequent ground for holding that a class action is not superior.' **Buford**, 168 F.R.D. at 363 (quoting 1 *Newberg on Class Actions* § 4.32). Some courts have said, however, '[t]here exists a strong presumption against denying class certification for management reasons.' **Id.** (citing **In re Workers' Compensation**, 130 F.R.D. 99, 110 (D. Minn. 1990); **In re South Central States Bakery Prod. Antitrust Litig.,** 86 F.R.D. 407, 423 (M.D. La. 1980))." **Hewlett**, at 221.

"The manageability inquiry includes consideration of the potential difficulties in identifying and notifying class members of the suit, calculation of individual damages, and distribution of damages. **Six Mexican Workers v. Arizona Citrus Growers**, 904 F.2d 1301, 1304 (9th Cir. 1990); **Maguire v. Sandy Mac, Inc.,** 145 F.R.D. 50, 53 (D. N.J. 1992); **Kernan** [**v. Holiday Universal, Inc.**]*,* 1990 WL 289505 at *7 [D. Md. Aug. 14, 1990]; **In re Folding Carton Antitrust Litig.,** 88 F.R.D. 211, 216 (N.D. Ill. 1980)." **Hewlett,** at 221-22.

In **Gunnells v. Healthplan Servs., Inc.**, 348 F.3d 417 (4th Cir. 2003), the Fourth Circuit stated:

First, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making "the adjudication of [the] matter through a class action ... superior to no adjudication of the matter at all." *See* 5 *Moore's Federal Practice* § 23.48[1] (1997). Thus, class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action. As the Supreme Court put the matter, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." ***Amchem,*** 521 U.S. at 617 (citation omitted).

348 F.3d at 426.

In this case, the plaintiff's claims are easily susceptible to resolution on a classwide basis. The plaintiff has already obtained basic class list information, and Quicken can readily supply additional details regarding the identity of class members.

In the event that the class would become unmanageable, this Court can decertify the class. ***Gunnells v. Healthplan Servs., Inc.***, 348 F.3d at 426 (4th Cir. 2003); ***Central Wesleyan College v. W.R. Grace & Co.***, 6 F.3d 177, 184 (4th Cir. 1993).

Likewise, in the unlikely event that damages issues would require individual inquiry, the damage issues may be bifurcated. "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations. *See* Fed.R.Civ.P. 23 advisory

committee's note (1966 Amendment, subdivision (c)(4)) (noting that Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with 'the members of the class ... thereafter ... required to come in individually and prove the amounts of their respective claims.'); *see also* 5 *Moore's Federal Practice* § 23.23[2] (1997) ('[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality.'). Indeed, '[i]n actions for money damages under Rule 23(b)(3), courts *usually* require individual proof of the amount of damages each member incurred.' *Id.* at § 23.46[2][a] (1997) (emphasis added). When such individualized inquiries are necessary, if 'common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.' ***Id.***" ***Gunnells***, at 427-28.

"Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will *not* defeat class certification. *See* ***Central Wesleyan****,* 6 F.3d at 189; ***Hill v. W. Elec. Co., Inc.,*** 672 F.2d 381, 387 (4th Cir. 1982) ('Bifurcation of ... class action proceedings for hearings on ... damages is now commonplace.'); ***Chisolm v. TranSouth Fin. Corp.,*** 184 F.R.D. 556, 566 (E.D. Va. 1999) (collecting cases)." ***Gunnells***, at 429 (emphasis in original).

Quicken contends that its statute of limitations defense presents a barrier to certification. The statute of limitations for the WVCCPA claims is provided by West Virginia Code § 46A-5-101(1), which states that no action may be brought more than one year after the due date of the last scheduled payment. W.Va. Code § 46A-5-101(1). Both the West Virginia Supreme Court and the Fourth Circuit have confirmed that this means that "the

statute of limitation begins to run on the date under the parties' agreement providing for the final periodic payment of the debt." Syl. pt. 6, *Tribeca Lending Corp. v. McCormick,* 231 W.Va. 455, 745 S.E.2d 493 (2013); *see also* ***Delebreau v. Bayview Loan Serv., LLC,*** 680 F.3d 412, 415 (4th Cir. 2012).   The statute of limitations for the conspiracy claim is determined by the nature of the underlying conduct on which the conspiracy claim is based. Syl. pt. 3, ***Dunn v. Rockwell,*** 225 W.Va. 43, 689 S.E.2d 255 (2009).  Breach of contract claims have a ten year statute of limitations. W.Va. Code § 55-2-6.   The statute of limitations for the RMLA claim is two years from the date of closing.   W.Va. Code § 55-2-12; ***Fluharty v. Quicken Loans, Inc.,*** 2013 WL 5963060 (N.D. W.Va. Nov. 7, 2013). Quicken has presented no compelling reason why the group of class members whose claims fall within any of these statutes of limitation cannot be determined.

Quicken's argument that individualized statute of limitations issues preclude class certification, [Doc. 185 at 17-20], ignores one important truth: while it is plaintiffs' burden to meet the requirements of Rule 23, ***Thorn v. Jefferson-Pilot Life Ins. Co.,*** 445 F.3d 311, 321 (4th Cir. 2006), it is *defendant's burden* to establish a statute of limitations defense. ***Hanshaw v. Wells Fargo Bank,*** 2015 WL 5345439, at fn. 5 (S.D. W.Va. Sept. 11, 2015) (Johnston, J.)(citing ***Burgess v. Infinity Fin. Employment Servs., LLC,*** 2012 WL 399178, at *5 (S.D. W.Va. Feb. 7, 2012)).

It is therefore defendants' burden to demonstrate that any loan in the class is time barred, and Quicken argues that it cannot do so because it sells the mortgage loans after origination and does not have records about them after that time. [Doc. 185 at 19].   None of the cases on which defendants rely, [Id. at 18], present a situation, like here, where a

defendant in a proposed class action failed to produce evidence supporting its own affirmative defense because of its own record keeping practices.  *See, e.g. **Hunter v. Am. Gen. Life & Acc. Ins. Co.**,* 2004 WL 5231631, *12 (D.S.C. Dec. 2, 2004) (individualized statute of limitations issues arose because of questions about when class members had inquiry notice.)

It is not plaintiffs' obligation to discover facts about Quicken's defense.  In the absence of any such evidence, this argument must fail.  *See **Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.**,* 455 F.Supp.2d 399, 425 (D. Md. 2006) (defendant failed to meet burden of proof on statute of limitations defense when it presented insufficient proof of when plaintiff was on notice of alleged tort);  *In re **Falwell**,* 434 B.R. 779, 786 (Bankr. W.D. Va. 2009) (refusing to sustain objection based on statute of limitation when defendant provided no evidence in support.)

In the event defendants produce evidence about the loans, determining which loans fall within the applicable period would ultimately prove to be a ministerial exercise.  Plaintiffs do not dispute that the statute of limitations under § 46A-5-101 is affected by certain circumstances of the loan such as acceleration.  *See, e.g., **Delebreau v. Bayview Loan Serv., LLC**,* 680 F.3d 412, 416 (4th Cir. 2012).  This is a simple task which Quicken could perform, but has not.  For example, electronic information exists from Fannie and Freddie on defaults, accelerations, discharges, and payoffs.  Defendants did not ask for this information [Doc. 193-12, at 50:2-18), but it could be used to identify and match with those loans.  Similar information is held by MERS.  [Id. at 54:8-17].  Moreover, the bulk of its loans were sold to Countrywide, JP Morgan, Bank of America or Wells Fargo.  [Id. at

49:15-25].  Quicken could certainly request or subpoena records from these entities.

Quicken has not availed itself of these readily available sources.  Further, all the deeds of

trust were recorded, so determining whether the statutes of limitation are affected by early

repayment or foreclosure is simply a matter of searching public records to identify those

loans that have not been either paid and released or foreclosed upon one year prior to the

filing of the Complaint.

According to plaintiffs, this exercise is what the parties successfully performed in

*Dijkstra*.  In that case, the Court certified the class after requesting and receiving briefing

specifically on the statute of limitations issue.  After certification and judgment, the parties

worked collaboratively to identify which class members' loans fit into the certified class

definitions based on the limitation period.  Like Quicken here, the defendant in *Dijkstra* was

an internet lender, and that defendant, LendingTree, in the same position as Quicken, was

able to perform this ministerial task.

Finally, even if the defendants could present evidence regarding the class loans,

plaintiffs have demonstrated that the practice of passing on estimated values to appraisers

was unknown and not disclosed by defendants to borrowers, therefore tolling the statute.

This was precisely the case last year in a Third Circuit decision affirming class certification.

*In re Comm. Bank of N. Va. Mortg. Lending Prac. Litig.,* 795 F.3d 380, 400-405 (3d Cir.

2015).  In *Community Bank,* the defendant argued that equitable tolling was a "highly

individualized inquiry that is not susceptible to common proof" and that "inquiries about

equitable tolling" would predominate. 795 F.3d at 400.  The court disagreed, finding that

plaintiffs had shown an "independent act of concealment with respect to each loan"

**JA541**

because material facts had been misrepresented in the HUD-1 settlement statements used in closing the loans of each class member. *Id*. at 402. The court therefore found that common issues predominated over individual issues as to whether applicable statutes of limitation on class members' claims were equitably tolled due to concealment. *Id*. at 403; *see also **In re Urethane Antitrust Litig.,*** 251 F.R.D. 629, 639-40 (D. Kan. 2008) (predominance and superiority requirements satisfied upon allegations that manufacturers engaged in a horizontal price-fixing conspiracy when key issues of antitrust impact and fraudulent concealment were susceptible to common proof on a class-wide basis.) As in ***Community Bank,*** plaintiffs and the class members assert a common theory of concealment which would uniformly toll all of their claims.

Because this Court can easily determine whether the discovery rule applies class-wide to toll class members' claims, defendant's statute of limitations argument presents no barrier to certification. *See **Hamilton v. Pilgrim's Pride Corp.,*** 314 F.Supp.2d 630, 635 (N.D. W.Va. 2004) (under West Virginia law, the discovery rule tolls the statute of limitation until a claimant knows or by reasonable diligence should know that he has been injured and who is responsible).

This was the conclusion of the Southern District of California in ***Cohen v. Trump,*** 303 F.R.D. 376, 387 (S.D. Cal. 2014). In ***Cohen,*** the court granted class certification of mail and wire fraud claims based on advertising for a real-estate investment seminar, over defendant Trump's arguments that individualized determinations on statute of limitations defense would be necessary. The plaintiff had countered that the action was a "prototypical case where a statute of limitations defense does not undermine class certification because

all of the facts that Trump claims satisfy the discovery rule are the same as to all Class members." 303 F.R.D. at 387. The court agreed and recognized that discovery facts "apply to nearly all of the putative class members and constitute common proof" regarding discovery of alleged injury. *Id.; see also **Kennedy v. United Healthcare of Ohio, Inc.,*** 206 F.R.D. 191, 199 (S.D. Ohio 2002) (finding superiority and manageability satisfied and certifying class when evidence of discovery of claim "may be amenable to a common proffer.").

Rule 23(g) requires that a court certifying a class also appoint class counsel. The Rule directs a court to consider several factors, including "[t]he work counsel has done in identifying or investigating potential claims in the action; [c]ounsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; [c]ounsel's knowledge of the applicable law; and [t]he resources counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(C)(i).

Proposed class counsel are qualified and able to represent the class. Bailey & Glasser in particular is well-versed in class action litigation. [*See* Doc. 169-16]. Jason Causey and the attorneys of Bordas & Bordas are also experienced consumer class action litigators. [*Id.*].

For the reasons stated above, Plaintiffs' Motion for Class Certification [Doc. 169] will be granted. This Court will conditionally certify the following class:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and
>
> for whom Quicken obtained appraisals through an appraisal request form that
>
> included an estimate of value of the subject property.

**Plaintiffs' Motion for Partial Summary Judgment**

In their Motion, the plaintiffs seek summary judgment on the following issues:

(1)    whether the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was unconscionable inducement under W.Va. Code § 46A-2-121 (Count IV);

(2)    whether the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was a breach of the implied covenant contained in Quicken's contract with the borrower (Count VII);

(3)    whether Quicken's routine assessment of $45 courier fees which did not reflect the actual cost of the services provided constitutes unauthorized charges under the West Virginia Consumer Credit and Protection Act ("WVCCPA") and West Virginia Residential Mortgage Lender, Broker and Servicer Act ("RMLA") such that affirmative summary judgment on Counts III (RMLA), and VI (Unauthorized Charges) is warranted; and

(4)    whether Defendants Quicken and TSI acted in concert to perform these acts such that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy claim (Count I).

This Court will not reiterate and rehash the law and facts discussed above.  With respect to the following this Court finds that, unless otherwise stated, there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law.

1.      This Court finds that the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was unconscionable inducement under W.Va. Code § 46A-2-121;

2.      This Court finds that the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was a breach of the implied covenant of good faith and fair dealing contained in Quicken's contract with the borrowers;

3.      This Court finds that Quicken's routine assessment of $45 courier fees which did not reflect the exact, actual cost of the services provided does not constitute an unauthorized charge under the West Virginia Consumer Credit and Protection Act ("WVCCPA") and West Virginia Residential Mortgage Lender, Broker and Servicer Act ("RMLA"); and

4.      This court finds that defendants Quicken and TSI acted in concert to perform the acts above such that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy claim (Count I).

This Court has not heretofore discussed the conspiracy aspect of this case.  A civil conspiracy is:

> a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose not in itself unlawful, by unlawful means.  The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

*Dixon v. Am. Indus. Leasing Co.*, 162 W.Va. 832, 253 S.E.2d 150, 152 (1979).  "At its most fundamental level, a civil conspiracy is 'a combination to commit a tort.'"  *Wolfe v.*

54
**JA545**

*Tackett*, 2009 WL 973442, at *6 (S.D. W.Va. Apr. 9, 2009) (Copenhaver, J.)(quoting *Kessel v. Leavitt*, 204 W.Va. 95, 511 S.E.2d 720, 753 (1998)).

The undisputed evidence shows that Quicken and TSI consistently acted in concert to accomplish their unlawful purposes of providing appraisers with estimated values. Quicken's testimony is that when a borrower applied for a loan, information, including an owners' estimate of value would be generated.  [Doc. 173-11 at 20:25-21:12].  This information, along with a borrower's contact information, would be uploaded into Quicken's computer system, AMP, and then sent automatically to Quicken's sister company, TSI. [Doc. 173-11 at 30:5-11]; *see also* [Doc. 173-12 at 17:9-17].  TSI testified that it would in turn use this information, including the owners' estimate of value, to generate an appraisal request form. [Doc. 173-12 at 32:17-23].  The request form along with the owners' estimate of value would be passed to the appraiser selected by TSI to perform this practice.  [Id.]. The scheme of passing estimated values to appraisers thus involved the concerted efforts of both defendants, which happen to be owned by the same parent company.  [*See* Doc. 173-26 at 60:2-8].

While conspiracy claims against parent and child companies are generally not permitted under federal antitrust law, *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984), that holding is limited to the Sherman Act.  *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 225 W.Va. 178, 185, 690 S.E.2d 587, 594 (2009).

Moreover, there is no prohibition on claims for conspiracy between or among "sister" or related companies like Quicken and TSI.  *See In re Ray Dobbins Lincoln-Mercury, Inc.,* 604 F.Supp. 203, 205 (W.D. Va. 1984), *judgment aff'd*, 813 F.2d 402 (4th Cir. 1985)

(finding "*Copperweld* is of no effect" as to conspiracy alleged between two subsidiaries and refusing to dismiss conspiracy claim against defendants with common parent); *Christou v. Beatport, LLC*, 849 F.Supp. 2d 1055, 1073 (D. Col. 2012) (refusing to dismiss conspiracy claim against "related entities" with "some common ownership").

### Defendants' Motions to Exclude the Opinions and Testimony of Matthew Curtin and Stephen McGurl

The defendants have moved to exclude the opinions and testimony of plaintiffs' expert witnesses Matthew Curtin and Stephen McGurl. This Court did not rely upon the opinions of either witness in deciding the issues before it. In light of the above rulings, it would appear to the Court that the Motions are moot.

### Defendants' Motion *In Limine* to Exclude Evidence of Appraisers Petition

In the above Motion, the defendants seek to exclude as not relevant an "Appraisers Petition" signed by a number of appraisers and sent to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council. The defendants argue that it is plain from the face of the Appraisers Petition that it has nothing to do with the owner's or applicant's estimate of value. Rather, the petition refers only to various categories of "pressure" that involve withholding business or refusing to pay or employ appraisers. The defendants note that the Appraisers Petition does not even mention the owner's estimate of value, let alone complain that the practice of providing such an estimate is one of the ways in which lenders are "pressuring" appraisers.

In the 2000s, a petition was posted online at AppraisersForum.com, a general website for real estate appraisers. The petition was signed by over 11,000 appraisers from across the country including one of the Plaintiffs' experts, Troy Sneddon. Eventually, the

signed petition was provided to the Appraisal Subcommittee of the Federal Financial Institution Examination Council and other federal and state regulatory agencies.

The petition expressed concern over an ongoing "problem" within the mortgage industry--i.e., lenders "who, as a normal course of business, [were] apply[ing] pressure on appraisers to hit or exceed a predetermined value."   Among other things, lenders threatened to refuse payment, withhold future business, or even blacklist appraisers for failing to inflate their appraisals so as to meet or exceed the lender's target figure.  As a result, the independent judgment of appraisers was being compromised.  Furthermore, the appraisers contended that homeowners were being damaged by purchasing overvalued homes and the economy as a whole faced the prospect of "great financial loss."  The appraisers signing the petition urged regulators to "hold…lenders responsible" for this misconduct and to provide for an appropriate penalty.

As noted above, in a similar case, this Court recognized the plausible "inference" created when a bank provides appraisers with suggested or estimated values of homes:

> Taken as true, these allegations create an inference that [lenders'] practice of providing estimated values of homes was for the purpose of influencing the appraiser's independent judgment. It certainly is plausible that an appraiser would seek to meet a client's suggested outcome in order to receive future business from the client.

[Doc. 169-12, ***DiLoreti v. Countrywide Home Loans, Inc.,*** No. 5:14-cv-76 (N.D. W.Va. Nov. 14, 2014), Order Granting Bank Defendants' Motion in Part and Denying in Part and Denying Funari's Motion for Judgment on the Pleadings, at 7].

The petition is relevant to demonstrate that in fact pressure was being placed on appraisers to meet target values.  Rule 401 of the Federal Rules of Evidence establishes a broad, liberal test for relevancy.  Professor Cleckley has noted that "[d]eterminations of relevancy…are based on the presence of a nexus, that is, a relationship between the evidence offered for admission and a fact or issue of consequence to the case."  F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* §4-1(E)(3).  The test for relevancy, in essence, is one of probability: "[W]hether a reasonable person, with some experience in the everyday world, would believe that this piece of evidence *might* be helpful in determining the falsity or truth of any material fact."  *Id.*, at §4-1(C) (emphasis in original).  Moreover, the Fourth Circuit recognizes that industry standard evidence is relevant.  *See, e.g., **Advo-System. Inc. v. Maxway Corp.,*** 37 F.3d 1044, 1048 (4th Cir. 1994) ("ordinary business terms" analysis requires reference to prevailing industry standards); ***Reed v. Tiffin Motor Homes, Inc.,*** 697 F.2d 1192, 1196 (4th Cir. 1982) (industry standards are relevant to show reasonableness of design).

Here, the petition is relevant to show that appraisers understood the deleterious effects of providing any kind of target value. Indeed, the petition acknowledges that influencing appraisers was inappropriate under industry standards because it stripped appraisers of their independent judgment and resulted in a dishonest and potentially harmful process.  Furthermore, the petition is relevant because it confirms that the practice of using target figures was widely, if not universally, condemned.  For these reasons, the petition is both relevant and admissible, and defendants' motion will be denied.

**Defendants' Motion *In Limine* to Exclude Evidence or Argument**
**Related to The Home Valuation Code of Conduct or Dodd-Frank Act**

58

**JA549**

In this Motion, the defendants seek to exclude as not relevant evidence concerning the Home Valuation Code of Conduct ("HVCC") or the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") on the basis that the HVCC went into effect in May 2009 and that Title Source made changes to its appraisal request forms for the specific purpose of complying with the HVCC. Dodd-Frank was not enacted until July 21, 2010 – by which time it had been more than a year since Title Source had stopped including the owner's estimate of value on appraisal engagement letters. In addition, defendants argue that Dodd-Frank does not address the owner's estimate of value.

The plaintiffs reply that they are not attempting to show that the defendants violated HVCC or Dodd-Frank, rather the plaintiffs contend that the fact that certain actions are prohibited by these remedial provisions is evidence of unconscionable conduct. With the passage of Dodd-Frank in 2010, enforcement against appraiser influence finally came. *See* 15 U.S.C. § 1639e (2010). Federal guidelines interpreting the Dodd-Frank Act expressly prohibit a lender from "[c]ommunicating a predetermined, expected, or qualifying estimate of value, or a loan amount or target loan-to-value ratio to an appraiser or person performing an evaluation." 75 Fed. Reg. 77450, 77457 (2010).

In addition, the provisions of HVCC and Dodd-Frank refute the position taken by defendants that there is some difference between sending the "owner's estimate of value" to an appraiser as opposed to a "target value." The HVCC prohibits lenders and their appraisal management companies from "providing to an appraiser an anticipated, estimated, encouraged, or desired value for a subject property or a proposed or target amount to be loaned to the borrower."

Moreover, TSI has acknowledged that Dodd Frank banned this practice. [Doc. 211-3, Petkovski Dep. at 96:13-97:17]. Specifically, TSI's representative testified that TSI's "Dodd-Frank Compliance and Non-Influence Certificate" states that TSI does not provide estimated values, loan amounts, or loan-to-value ratios to the appraiser, and prohibits appraiser communications with the lender-client and borrower property owner, in order to be "consistent with elements of Dodd-Frank."

For these reasons, defendants' motion will be denied.

### Plaintiffs' Motion to Strike Portions of the of Sherry Dukic Declaration

The plaintiffs have moved to strike portions of the Sherry Dukic Declaration which are inconsistent with her deposition testimony. While this Court did rely upon portions of Ms. Dukic's declaration in ruling on the pending motions, the Court did not rely upon the portions of the declaration which the plaintiffs seek to have stricken. Furthermore, in light of this Court's ruling on the issue of courier fees, this declaration will no longer be relevant. Accordingly, the Motion will de denied as moot.

### Conclusion

For the reasons stated above:

1.      Defendant Hyett's Motion for Summary Judgment [**Doc. 172**] is **DENIED AS MOOT**;

2.      The Motion for Summary Judgment filed by Quicken and TSI, Inc. [**Doc. 174**] is **DENIED IN PART AND GRANTED IN PART**.  The claim related to providing a value to the appraiser will go forward.  The claim regarding courier fees is dismissed;

3.      Plaintiffs' Motion for Class Certification [**Doc. 169**] is **GRANTED**.  This Court will conditionally certify the following class:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

4.      Plaintiffs' Motion for Partial Summary Judgment [**Doc. 173-1**] is **GRANTED IN PART AND DENIED IN PART**.  Specifically:

> A.      This Court finds that the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was unconscionable inducement under W.Va. Code § 46A-2-121;

> B.      This Court finds that the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was a breach of the implied covenant of good faith and fair dealing contained in Quicken's contract with the borrowers;

> C.       This Court finds that Quicken's routine assessment of $45 courier fees which did not reflect the exact, actual cost of the services provided does not constitute an unauthorized charge under the West Virginia Consumer Credit and Protection Act ("WVCCPA") and West Virginia Residential Mortgage Lender, Broker and Servicer Act ("RMLA"); and

D.      This court finds that defendants Quicken and TSI acted in concert to perform the acts above such that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy claim (Count I).

5.      Defendants Quicken Loans Inc.' and Title Source, Inc.'s Motion to Exclude the Opinions and Testimony of Plaintiffs' Experts, Matthew Curtin, Pursuant to Rule 702 and *Daubert* [**Doc. 176**] is **DENIED AS MOOT**;

6.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion to Exclude the Opinions and Testimony of Plaintiffs' Expert, Stephen McGurl, Pursuant to Rule 702 and *Daubert* [**Doc. 178**] is **DENIED AS MOOT**;

7.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence of Appraisers Petition [**Doc. 201**] is **DENIED**;

8.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence or Argument Related to The Home Valuation Code of Conduct or Dodd Frank Act [**Doc. 203**] is **DENIED**;

9.      Plaintiffs' Motion to Strike Portions of the Declaration of Sherry Dukic which Are Inconsistent with Deposition Testimony [**Doc. 209**] is **DENIED AS MOOT**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**:  June 2, 2016.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

62

**JA553**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**


**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE**
**SHEA** and **DANIEL V. SHEA**, individually
and on behalf of a class of persons,

               Plaintiffs,

       v.                                **Civil Action No. 5:12-CV-114**
                                               Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE,**
**INC.**, dba Title Source Inc. of West Virginia,
Incorporated,

               Defendants.


**ORDER DENYING MOTIONS FOR**
**RECONSIDERATION AND FOR ORAL ARGUMENT**

     Pending before this Court are defendants' Motion for Reconsideration of June 2,

2016 Order Resolving Motions [Doc. 230] and Defendants Quicken Loans, Inc. and Title

Source, Inc.'s Motion for Hearing on Motion for Reconsideration [Doc. 242].  The first

motion has been fully briefed and is ripe for decision.

     The gist of this action was succinctly summarized by the United States Court of

Appeals for the Fourth Circuit as follows:

     Plaintiffs complain that Quicken Loans originated unlawful loans in West

     Virginia and that Defendant Appraisers, which includes both the named

     appraisers and the unnamed class of appraisers, were complicit in the

     scheme.  Plaintiffs allege that, before Defendant Appraisers conducted an

1

**JA554**

appraisal, Quicken Loans would furnish them with a suggested appraisal value.    Then, after purportedly conducting the appraisal, Defendant Appraisers arrived at the same appraisal value as the suggested appraisal value.    The problem with that scheme, according to Plaintiffs, is that the borrower would then close on a loan that was underwater from the beginning.

*Quicken Loans v. Alig*, 737 F.3d 960, 963 (4th Cir. 2013).

The recent procedural history of this case includes the following:

1.      On March 4, 2016, the plaintiffs filed Plaintiffs' Motion for Class Certification [Doc. 169];

2.      On March 18, 2016, the plaintiffs filed Plaintiffs' Motion for Partial Summary Judgment [Doc. 173-1];

3.      On the same date, defendants filed Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion for Summary Judgment [Doc. 174];

4.      On June 2, 2016, this Court issued its Order Resolving Motions [Doc. 227], which, *inter alia*:

    A.      Denied in part and granted in part the Motion for Summary Judgment filed by Quicken and TSI [Doc. 174], holding that the claim related to providing a value to the appraiser will go forward.    The claim regarding courier fees is dismissed;

    B.      Granted the Plaintiffs' Motion for Class Certification [Doc. 169] and conditionally certified a class;

    C.      Granted in part and denied in part Plaintiffs' Motion for Partial Summary Judgment [Doc. 173-1].   The Court found that the act of sending

2

JA555

an estimated or "target" value to an appraiser in connection with a real estate

mortgage loan refinancing was unconscionable inducement under W.Va.

Code § 46A-2-121;  that the act of sending an estimated or "target" value to

an appraiser in connection with a real estate mortgage loan refinancing was

a breach of the implied covenant of good faith and fair dealing contained in

Quicken's contract with the borrowers;  that Quicken's routine assessment

of $45 courier fees which did not reflect the exact, actual cost of the services

provided does not constitute an unauthorized charge under the West Virginia

Consumer Credit and Protection Act ("WVCCPA") and West Virginia

Residential Mortgage Lender, Broker and Servicer Act ("RMLA"); and that

defendants Quicken and TSI acted in concert to perform the acts above such

that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy

claim (Count 1).

5.      On June 16, 2016, the defendants filed a petition with the Fourth Circuit

seeking leave to appeal the class certification pursuant to Federal Rule of Civil Procedure

23(f) [Doc. 229];

6.      On June 30, 2016, the defendants filed the pending Motion for

Reconsideration of June 2, 2016 Order Resolving Motions [Doc. 230];

7.      On July 6, 2016, the defendants filed a Motion to Certify June 2, 2016 Order

for Interlocutory Appeal [Doc. 232];

8.      By Order entered July 11, 2016, this Court denied the defendants' Motion to

Certify June 2, 2016 Order for Interlocutory Appeal [Doc. 234];

9.      By Order entered July 12, 2016, the Fourth Circuit denied the petition for

3

permission to appeal [Doc. 237]; and

      10.     On August 18, 2016, the defendants filed the pending Defendants Quicken Loans, Inc. and Title Source, Inc.'s Motion for Hearing on Motion for Reconsideration [Doc. 242].

      With respect to the Motion to Reconsider, Rule 54(b) provides that an interlocutory, non-dispositive order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see also* Fed. R. Civ. P. 23(c)(1)(C) (an order granting or denying class certification "may be altered or amended before final judgment"). Although the Fourth Circuit has not articulated a specific standard under Rule 54(b), it has held that "[m]otions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." ***Am. Canoe Ass'n v. Murphy Farms, Inc.***, 326 F.3d 505, 514 (4th Cir. 2003).

      Nonetheless, many courts in the Fourth Circuit "have appropriately considered [the] factors" governing reconsideration of final judgments "in guiding the exercise of their discretion under Rule 54(b)." ***Southern Coal Corp. v. IEG Pty, Ltd.***, 2016 WL 393954, at *2-3 (E.D. Va. Jan. 29, 2016). "The Fourth Circuit has recognized three grounds for amending a judgment: '(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.'" ***Norfolk S. Ry. Co. v. Nat'l Union Fire Ins. of Pittsburgh, PA***, 999 F.Supp.2d 906, 919 (S.D. W.Va. 2014) (quoting ***Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.***, 148 F.3d 396, 403 (4th Cir. 1998)).

Granting a motion for reconsideration is "an extraordinary remedy which should be used sparingly." ***Pac. Ins. Co. v. Am. Nat'l Fire Ins., Co.,*** 148 F.3d 396, 403 (4th Cir. 1998).

In their Motion, the defendants raise several claims of error constituting manifest injustice:

1.    The Court failed to consider the parties' motions for summary judgment separately and, as a result, failed to apply the correct standard in ruling on Plaintiffs' Motion for Partial Summary Judgment.   ***Rossignol v. Voorhaar***, 316 F.3d 516, 523 (4th Cir. 2003);

2.    The Court wrongly ignored numerous admissible facts in the record demonstrating that genuine issues of material fact exist with respect to plaintiffs' claims for unconscionable inducement and breach of contract;

3.    The Court violated the rule against one-way intervention by ruling on the merits of Plaintiffs' claims before notice to the class; and

4.    The Court failed to acknowledge that causation is a necessary element of unconscionable inducement.

**I.    The Court applied the appropriate summary judgment standard**

Quicken begins by arguing that the Court erred in its handling of the summary judgment motions.  Citing ***Rossignol v. Voorhaar***, 316 F.3d 516 (4th Cir. 2003), Quicken says that when considering cross motions for summary judgment the court must consider each motion separately and must apply the standards of Rule 56 to each motion separately.  This Court has no quarrel with ***Rossignol***.  Quicken, however, fails to identify

a violation of *Rossignol's* guidelines.

Quicken cites language in the order where the Court, for the sake of brevity, indicates that it would not "rehash" the law or the facts after having fully recited them.  From this, and nothing more, Quicken alleges a *Rossignol* violation.  In fact, the most Quicken says is that it merely "appears" a violation occurred. [Doc. 231, at 5].

In fact, this Court, after reviewing all of the evidence and submissions, found **as a matter of law**, that the provision of an estimated value to an appraiser is unconscionable conduct.  Having ruled upon this issue as a matter of law, there was no reason to restate all of the facts in the same order.

## II.    The Court properly concluded that no genuine issues of fact existed regarding Plaintiffs' unconscionable inducement and breach-of-contract claims

Under this heading, Quicken argues that there were genuine issues of fact precluding summary judgment.  First of all, Quicken's repeated argument that the Court decided "jury questions" is intrinsically flawed.  The statute expressly states that unconscionability is resolved "as a matter of law" by "the court," not by the jury.  W.Va. Code § 46A-2-121.

Quicken summarizes a list of alleged "facts" in the record that were "flatly ignor[ed]" by the Court in its summary judgment order. [Doc. 231, at 7].  This Court did not ignore anything.  To the contrary, many of Quicken's so-called facts were simply irrelevant, incomplete, misstated, or directly contradicted by Quicken's own, internal documentation.

Quicken persists in its argument that an estimated value is a perfectly benign piece of information and not a "target" value.  In making this argument, however, Quicken closes its eyes to the avalanche of proof to the contrary.  This Court carefully reviewed this proof

6

**JA559**

in its summary judgment order.

First of all, an estimated value does not come into the appraiser's hands by way of the borrower.  The value is conveyed on the appraisal order form, which is prepared by Quicken's sister company, TSI.  Tellingly, the appraisers are members of a preselected panel and ranked by Quicken. [Doc. 212, Exh. 1, Lyon Dep. at 38:7-23] (rankings are in part dependent on whether follow up with appraiser is necessary, which would include value appeals).  The appraiser also knows when he receives the order that if he comes up short, he will receive a call from TSI asking him to reconsider his value. [Id., Exh. 3, Guida Dep. at 44:2-8 & Exh. 2, Bonkowski email].  In this regard, the Court specifically cited Dewey Guida's testimony and noted the presence of this exact same fact pattern in the context of the Aligs' 2007 loan.  Furthermore, Guida repeatedly acknowledged that the estimated value was provided to the appraiser as a "tip-off" regarding the value required for making the loan. [Doc. 227, at 12].

In an effort to conjure a factual issue Quicken has selectively quoted from the depositions of Hyett and Guida.  Quicken suggests that it believed providing an appraiser with an estimated value was proper and potentially useful. [Doc. 231, at 8].  This Court, however, found that *all* of the appraisers—including Hyett and Guida—testified that a borrower's "estimated value is not a relevant data point" for appraisal purposes.  More than that, all of them "distanced themselves from [estimated values] as taboo" and agreed that "this information is in no way necessary to performing an appraisal." [Doc. 227, at 15].  This is supported by the record.  Indeed, as the Court pointed out, the appraisers who testified confirmed that estimated values were indeed targets, had no bona-fide purpose and/or were unnecessary to the appraiser process. [Doc. 227, at 11].  (*See e.g.*, [Doc. 212, Exh.

7

**JA560**

7, Kelly Dep. at 65:24-66:23 & 67:13-20] (opining there was no legitimate use for this practice and the purpose was to influence appraisers); [Doc. 212, Exh. 3, Guida Dep. at 108:18-109:23] (same); [Doc. 212, Exh. 8, Hill Dep. at 97:12-21, 100:22-101:25, 103:24-104:25] (declining orders that included estimated values); [Doc. 212, Exh. 20, Hyett Dep. Vol II. at 352:13-353:25 & 355:4-11] (these figures were not relevant and served no purpose); [Doc. 212, Exh. 17, Brenan Dep. at 222:17-223:7] (confirming there is no reason an appraiser would need an estimated value to complete an appraisal); [Doc. 212, Exh. 9, Sneddon Dep. at 185:12-186:17] (discussing the abuse he took when he did not hit an estimated value).

Moreover, and contrary to the suggestions made in Quicken's brief, John Brenan did not support its view of estimated values. Quicken repeats its earlier argument that sending estimated values did not violate USPAP, and cites Brenan as support. But Brenan acknowledged that estimated values are potentially a problem and can be used by the lender as a means to provide a target figure. [Doc. 212, Exh. 17 at 233:5—235:16.] As Brenan explained, if a lender provided an estimated value, the appraiser was advised in Advisory Opinion 19 of USPAP [*see* Doc. 199, Exh. KK] to communicate directly with the lender to insure a full understanding that the appraiser was not "hitting a target" figure. *Id.* The better practice, however, and the one insuring the appraiser's independence, was to remove the estimate entirely. [See id. at 241:20-242:18.]

As it did before, Quicken also cites the declaration and report of its expert, Jay Goldman, for the proposition that an estimated value provides some benefit to an appraiser. [Doc. 231, at 8]. This testimony is directly at odds with prior testimony Mr. Goldman offered on this exact same subject. On August 23, 2011 in a matter styled

*Crislip v. Bank of America*, Brooke County, West Virginia Civil Action No. 10-C-9, Mr. Goldman testified, under oath, that an estimated value actually has no benefit to the appraiser:

> Q.    An estimated value, a suggested appraised value, is that in any way
>
>         beneficial or necessary to the appraiser?
>
> A.    I don't think so.
>
> . . .
>
> Q.    Is receiving that number necessary in any way for the appraiser to
>
>         complete his duty?
>
> A.    I don't think so.

[Doc. 212, Exh. 19, Goldman Dep, at 52:12-14, 57:9-12.]

Mr. Goldman's new and self-serving opinion to the contrary was properly disregarded by the court.  *See, e.g.*, *Alba v. Merrill Lynch & Co.,* 198 Fed. Appx. 288, 300 (4th Cir. 2006) ("It is well recognized that a plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with earlier deposition testimony"); *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.")

Beyond the testimony of the appraisers, the Court cited other, objective sources of proof supporting its finding that estimated values are, in fact, illegal tip-offs.  Among other things, the Court cited a series of lawsuits filed by the Ohio Attorney General specifically targeting this practice.  In response to these lawsuits, Ohio courts have uniformly

concluded that the act of providing the borrower's estimated value for a property in connection with a mortgage loan is an unconscionable act or practice because it is an attempt to improperly influence the appraiser's independent judgment. [Doc. 227, at 12-13]. *See, e.g.*, ***State ex rel. Dann v. Premiere Service Mortgage Corp.***, Case No. CV-2007-06-2173 (Butler Cty. Apr. 30, 2008); ***State ex rel. Rogers v. Ace Mortgage Funding, LLC***, Case No. A0705054 (Hamilton Cty. Sept. 23, 2008); ***State ex rel. Cordray v. First Ohio Banc & Lending, Inc.***, Case No. 07-CV-259 (Belmont Cty. Nov. 24, 2009); ***State ex rel. Cordray v. Apex Mortgage Services, LLC***, Case No. 07-CV-261(Belmont Cty. Mar. 10, 2009).  These cases are additional proof that estimated values are intended to prevent appraisers from exercising their independent judgment.

In addition, this Court traced the regulatory history, which also recognizes that estimated values serve to jeopardize the appraiser's independence.  As the Court noted, efforts to regulate this practice go back more than twenty years beginning with appraisal standards issued in 1996 by the Federal Housing Commissioner, which were applicable to all HUD-approved mortgage transactions.  The appraiser was actually required to disclaim any influence by certifying that the appraisal was not "based on a requested minimum valuation, [or] a specific valuation or range of values."  In 2005, an "Interagency Statement" was issued advising that "the information provided [to the appraiser] should not unduly influence the appraiser ***or in any way suggest*** the property's value."

Furthermore, West Virginia cases have specifically condemned the practice.  In its summary judgment opinion, this Court cited Judge Recht's order in ***Brown v. Quicken Loans Inc.***, Civil Action No. 08-C-36, where he concluded that "[n]o legitimate purpose is

10

**JA563**

served by providing an appraiser with an estimated value of a property.  The only purpose could be to inflate the true value of the property" and held the practice to be unconscionable as a matter of law.  *See also*, *Herrod v. First Republic Mortgage Corp.*, 218 W.Va. 611, 617-618, 625 S.E.2d 373, 379-380 (2005) (reversing a trial court's grant of summary judgment to a mortgage lender where an appraiser was provided with an estimated value). [Doc. 227, at 13].

Quicken's motive in sending estimated values to appraisers was confirmed by one of its own corporate officers and designees, Michael Lee Lyon, who during the *Brown v. Quicken* trial conceded that the practice was meant to "give an appraiser an ability to see what they are going to potentially look at the property at." [Doc. 199 Exh. H, Lyon Trial Testimony Vol. 5 (Oct. 9, 2009) at 69:25-70:7].  In plain English, Quicken was providing its appraisers with a target figure.

This is consistent with e-mails written by Quicken's executives. Again, this was explicitly cited by the Court in its summary judgment order.  The emails were uncovered as part of a Department of Justice investigation.  In one such email, Quicken admitted that it actually had a "team" whose role was to "push back" on appraisers who were unwilling to meet Quicken's targets:  "FNMA [Fannie Mae] is being dragged into a lawsuit in the state of New York over lender pressure on appraisals.  I don't think the media and any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers questioning their appraised values." [Doc. 199 Exh. I, Email from C. Bonkowski to H. Lovier, cc: M. Lyon (Dec. 13, 2007)].

Another damning e-mail cited by the Court shows that in November 2007, TSI was

receiving "a lot of calls from appraisers stating that they can't reach our requested value." The directive from Quicken's senior management's was to simply ask the appraisers "for the max increase available." [Doc. 199 Exh. J, Email from D. Thomas to E. Czyzak, *et. al.*, (Nov. 27, 2007)].  Clearly, these emails demonstrate the purpose behind Quicken's practice of sending estimated values.  Thus, Quicken's own, internal documents establish beyond question that estimated values were, in fact, provided as "targets" that its appraisers were expected to meet. [Doc. 227, at 21].

All of this evidence, taken together, supports the Court's finding regarding Quicken's use of target figures to undermine appraiser independence in an effort to obtain inflated home values.

Next, Quicken complains that the Court erred when it disregarded proof of Quicken's "intent in providing the estimated value to appraisers." [Doc. 231, at 9].  Quicken then cites snippets from two depositions and the ***Brown v. Quicken*** trial in an effort to prove that its intent was perfectly innocent—i.e., to provide the appraisers with an additional "data point" bearing on the home's value. *Id.*

However, the unconscionability statute imposes no requirement that a plaintiff prove intent.  *See* W.Va. Code § 46A-2-121.  Even if there were such a requirement, plaintiffs offered ample proof that Quicken intended to influence its appraisers through its practice of providing tipoffs.  Aside from all of the objective, third-party proof, including the regulatory history and the opinion of each and every testifying appraiser, there are also documents generated by Quicken itself.  These emails pull back the curtain and let us take a look inside Quicken's boardroom.  Providing an estimated value was only the beginning of Quicken's campaign to pressure appraisers.  Quicken actually organized a team for the

12

**JA565**

express purpose of responding to recalcitrant appraisers, insisting that they meet Quicken's figure or come as close as possible. This clear and explicit proof is all the more potent because it is against Quicken's interest, and it cannot be overcome by vague assertions to the contrary.

Quicken also criticizes the Court's causation ruling. In this regard, Quicken does not attack the Court's finding that it committed a breach but, rather, that its breach caused harm to the plaintiffs. Specifically, Quicken argues that the Court "impermissibly failed to require plaintiffs to demonstrate any causation or damages—necessary elements of their breach claim." [Doc. 231, at 11.] Quicken accuses the Court in its introduction of applying "overruled" law in *EQT Prod. Co. v. Adair,* 764 F.3d 347, 370 (4th Cir. 2014). This point appears to be abandoned in the body of the brief, and for good reason. The 2016 decision in *McFarland v. Wells Fargo Bank, N.A.,* 810 F.3d 273 (4th Cir. 2016) made clear that it is a defendant's conduct that matters for an unconscionable inducement claim. *Adair* was concerned with fraudulent concealment, not unconscionable concealment, and does not affect the present analysis.

This Court carefully analyzed the breach-of-contract issues, noting that Quicken's "Interest Rate Disclosure and Deposit Agreement" contained a definite promise that Quicken would obtain an "acceptable" appraisal on the borrower's behalf. Because the contract was silent, the Court interpreted this obligation in light of "the prevailing standards of reasonableness" in the lending industry. Even Quicken acknowledged that the borrower was entitled to "a fair, unbiased, and reasonable" appraisal. The Court agreed:

Inasmuch as providing a target figure to an appraiser is a practice that is

13

**JA566**

universally condemned and serves no legitimate purpose, an appraisal

obtained by that process cannot conceivably be an "acceptable" one.  Nor

could an appraisal obtained by such a scheme be fair, valid or reasonable.

Furthermore, withholding knowledge of the true nature of the appraisal

violates Quicken's duty to deal honestly.

[Doc. 227, at 25].

Quicken objects to this part of the Order, citing testimony from Hyett and Guida that

they were not influenced by Quicken's target figures.  But even accepting their conclusory

and self-serving testimony as true does not in any way diminish the harm suffered by the

plaintiffs.

The Court was emphatic that any appraisal must be obtained through a fair process

in keeping with industry standards.  The use of target figures, as the Court explicitly found,

is "universally condemned" and has "no legitimate purpose." [Doc. 227, at 25].  Thus, the

plaintiffs failed to receive the benefit of their bargain—a fair, valid and reasonable appraisal.

Even worse, of course, is the fact that Quicken itself—which was contractually obligated

to promote the borrower's interest— was actually promoting *its own* interest to the

borrower's detriment and then concealing this fact from the borrower.  As a consequence,

no appraisal obtained by means of that process could conceivably pass any test of fairness.

It was a scheme and a sham.  Because Quicken utterly failed to perform its contractual

obligation, the plaintiffs have lost their appraisal fee and, at a minimum, would be entitled

to recovery of that fee.  Furthermore, the grossly inequitable nature of Quicken's conduct

might also entitle the Plaintiffs to rescission, restitution, and other equitable remedies.  *See,*

*e.g.,* ***Herrod v. First Republic Mortgage Corp.,*** 218 W.Va. 611, 625-26, 625 S.E.2d 373,

14

JA567

387–88 (2005) ("A party that is misled as to the essential terms of a contract does not technically agree to the contract, as no assent to its terms has been formulated due to the misrepresentation"); ***Prudential Ins. Co. of America v. Couch***, 180 W.Va. 210, 214, 376 S.E.2d 104, 108 (1988) (restitution is available whenever "the party who received the money has no basis for retaining it ... [and] has received money…to which he was not entitled.").

As the Court noted in its Order, the issue of damages is reserved for future decision. Obviously, if a claimant wishes to seek actual damages, he will be required to prove causation by a preponderance of the evidence.

### III.    Quicken waived the one-way intervention rule

The defendants claim that the simultaneous grant of Plaintiffs' Motion for Summary Judgment and Motion for Class Certification was premature and violated the rule against one-way intervention, [Doc. 231, p. 12] citing, *inter alia*, ***Costello v. BeavEx, Inc.***, 810 F.3d 1045 (7th Cir. 2016).

"[T]he rule against 'one-way intervention,' . . . 'bars potential class members from waiting on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, intervening to take advantage of the judgment,' while only the named plaintiff would be bound by a judgment in favor of the defendant. ***Amati v. City of Woodstock***, 176 F.3d 952, 957 (7th Cir.), *cert. denied*, 528 U.S. 985 (1999).  To foreclose that possibility, Congress in 1966 amended Rule 23 in a number of respects, including the addition of 'opt out' procedures, with the aim of ensuring that 'a person's decision whether to be bound by the judgment [in a class action]—like the court's decision whether to certify

15

**JA568**

the class—would come well in advance of the decision on the merits.' ***Premier Elec. Const. Co. v. National Elec. Contractors Ass'n, Inc.,*** 814 F.2d 358, 362 (7th Cir. 1987). *See also* ***Becherer v. Merrill Lynch, Pierce, Fenner, and Smith, Inc.,*** 193 F.3d 415, 429 (6th Cir. 1999) (Congress's 1966 revisions to Rule 23 were designed to end one-way intervention) (Moore, C.J., concurring);  Advisory Committee Notes to 1966 Amendments to Rule 23 ("Under ... subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or nonclass action, and in the former case the judgment, whether or not favorable, will include the class").  Defendants contend that by seeking a judgment on the merits simultaneously with class certification, and prior to notice being sent to class members, class counsel effectively prevented the Court's summary judgment ruling from inuring to the benefit of the class as a whole." ***Mendez v. The Radec Corp.***, 260 F.R.D. 38, 44 (W.D. N.Y. 2009).

In ***Costello***, relied upon by defendants, the Seventh Circuit cited with approval ***Peritz v. Liberty Loan Corp.***, 523 F.2d 349, 354 (7th Cir. 1975) and quoted "Inasmuch as the plaintiffs here did not seek certification, and in fact affirmatively sought resolution on the merits prior to certification **in the face of objections by the defendants**, they have themselves effectively precluded any class certification in this case." 810 F.3d at 1057-58 (Emphasis added).

In this case, the defendants made no objection to the schedule established by this Court.  Rather they lay in wait, hoping for a simultaneous decision on the motions or a decision that ruled upon the motion for summary judgment first.  This constitutes a waiver of any objection to the ruling.

In **Mendez**, *supra*, the Court noted:

Courts have held that in general, issues relating to class certification should be decided before a decision on the merits is rendered. *See, e.g.,* **Bertrand v. Maram**, 495 F.3d 452, 455 (7th Cir. 2007) ("Class-action status must be granted (or denied) early ... to clarify who will be bound by the decision"); **Schwarzschild v. Tse**, 69 F.3d 293, 296 (9th Cir. 1995) (Rule 23 "clearly contemplates that the notice requirement will be met *before* the parties are aware of the district court's judgment on the merits"); *see also* **Philip Morris Inc. v. National Asbestos Workers Medical Fund**, 214 F.3d 132, 135 (2d Cir. 2000) (stating that "it is 'difficult to imagine cases in which it is appropriate to defer class certification until after decision on the merits' ") (quoting **Bieneman v. Chicago**, 838 F.2d 962, 964 (7th Cir. 1988) (per curiam)).

There are exceptions to that general principle, however. For example, there is authority that a defendant can waive any objection to a decision on the merits prior to, or simultaneous with, a decision on class certification. *See, e.g.,* **Ahne v. Allis–Chalmers Corp.,** 102 F.R.D. 147, 151 (E.D. Wis. 1984) ("the courts have carved out a limited exception for those defendants willing to forego the protections attendant on early determination of the class issue"). Such a waiver may be express, *see, e.g.,* **Rivell v. Private Healthcare Systems, Inc.,** 2007 WL 1221315, at *3 (S.D. Ga. Apr. 20, 2007) ("In this case, Defendants expressly waive any invocation on such protection"

of the rule against one-way intervention), *vacated on other grounds and remanded,* 520 F.3d 1308 (11th Cir. 2008), or implied, such as where the *defendant* moves for summary judgment prior to class certification.

260 F.R.D. 38, 44–45.

In ***Mendez***, the Court held:

I conclude that defendants have waived any objections to the procedure that was followed here, and therefore to any argument that the class should be decertified on that basis.  Just as the rule against one-way intervention "bars potential class members from waiting on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, intervening to take advantage of the judgment," ***Amati,*** 176 F.3d at 957, so too defendants should not be permitted to wait and see how the Court will rule on plaintiff's summary judgment and Rule 23 class certification motions (as well as on defendant's motion to decertify the FLSA collective action, which was decided at the same time), and then, after the Court rules against defendants, belatedly seek to decertify the class on the ground that the Court should never have followed that procedure in the first place.  *See **Waste Mgmt. Holdings, Inc. v. Mowbray***, 208 F.3d 288, 299 n. 7 (1st Cir. 2000) (describing as "unorthodox" the district court's entry of partial summary judgment for named plaintiff prior to granting class certification, but stating that because defendant did not directly challenge that timing, Court of Appeals would "not pass upon the appropriateness of delaying a class

18

certification ruling until after acting upon an individual plaintiff's summary judgment motion"); *see also* ***Buchanan v. Consolidated Stores Corp.,*** 217 F.R.D. 178, 185 (D. Md. 2003) (denying defendants' motion to strike class allegations, which was based on plaintiffs' delay in moving for class certification, where, "[a]t no point during the course of the litigation did Defendants raise any concerns about the timing of the class certification motion"); ***Williams v. Lane,*** 129 F.R.D. 636, 648 (N.D. Ill. 1990) (concluding that defendants had waived protections of rule against one-way intervention where, "[i]nstead of insisting on prejudgment notice, defendants sat on their hands hoping to obtain a favorable judgment on the merits," and not until court had ruled in favor of plaintiffs did defendants invoke the one-way intervention rule; adding that "[t]here is not the slightest doubt that defendants would have made no such protestations had the liability judgment come out differently").

260 F.R.D. 38, 45–46.

In accord with the holding in ***Mendez*** that a party may waive the one-way intervention rule by failing to object is ***Hyman v. First Union Corp.***, 982 F.Supp. 8, 11 (D.D.C. 1997), in which Judge Lamberth held that "defendants have implicitly waived this right. In fact, both parties cooperated with this court, without raising any objections or concerns, so that the summary judgment papers would be ripe at the same time the court would be considering the class certification issues. *See* ***Caraluzzi v. Prudential Securities, Inc.,*** 824 F.Supp. 1206, 1210 (N.D. Ill. 1993) ('[I]t is relevant that neither party

has objected to nor raised concerns about this court's consideration of defendant's motion to dismiss before deciding the issue of class certification.').”

In Wright, Miller, Kane, Marcus, Spencer & Steinman, 7B Fed. Prac. & Proc. Civ. § 1798 (3d ed.), the authors state that "a party wishing to challenge the validity of maintaining the action under Rule 23 should move for a determination under Rule 23(c)(1) that a class action is unwarranted."  Of course, in this case the defendants did move to strike the plaintiffs' class allegations [Doc. 74], which this Court denied on October 15, 2015 [Doc. 105].  In addition, the defendants moved for partial judgment on the pleadings, (before filing the motion to strike class allegations, the Court might add) [Doc. 72], which was denied by this Court on October 21, 2015 [Doc. 105].  It appears to this Court that the defendants' late crying about the one-way intervention rule is simply a tactical ploy.

For the reasons stated above, defendants' Motion for Reconsideration of June 2, 2016 Order Resolving Motions [**Doc. 230**] is **DENIED**.

Defendants have also filed Defendants Quicken Loans, Inc. and Title Source, Inc.'s Motion for Hearing on Motion for Reconsideration [Doc. 242] seeking oral argument on the reconsideration motion.  This Court having already ruled on Defendants Quicken Loans Inc. and Title Source, Inc.'s Motion for Partial Judgment on the Pleadings [Doc. 72], Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations [Doc. 74], Plaintiffs' Motion for Class Certification [Doc. 169], Plaintiffs' Motion for Partial Summary Judgment [Doc. 173-1]; and defendants' Motion for Summary Judgment [Doc. 174] does not believe that any further discussion is necessary or warranted.  Accordingly, the Defendants Quicken Loans, Inc. and Title Source, Inc.'s Motion for Hearing on Motion for Reconsideration [**Doc.**

**242**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit a copy of this Order to counsel of record herein.

**DATED:** August 25, 2016.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

        **Plaintiffs,**

    **v.**                        **Civil Action No. 5:12cv114 (lead)**
                                      **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**          **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

        **Defendants.**

## QUICKEN LOANS AND TITLE SOURCE'S MOTION FOR MODIFICATION OF ORDER AS TO STATUS CONFERENCE

Defendants Quicken Loans Inc. ("Quicken Loans") and Title Source, Inc. ("Title Source") hereby request clarification and modification of the Court's November 22, 2016 Order as to Status Conference on the Motion for Entry of a Scheduling Order (ECF No. 248, the "Order").  In its Order, the Court set a damages trial for April 20, 2017, to rule on statutory penalties under the West Virginia Consumer Credit Protection Act ("CCPA") and the return of appraisal fees under the CCPA and for breach of contract.

As set forth below, Defendants expect that the damages trial will last several days, as both the determination of a statutory penalty and the question of contract damages will require the Court to hear evidence and argument on issues that have not yet been decided in this case. Further, any determination of contract or actual damages must be made by a jury, as Defendants have a right to a jury trial on these issues.  There are also other issues that must be decided by a jury, including statute of limitations.  In addition, all compensatory damages must be decided before the Court makes its determination as to the amount of a statutory penalty, because due

process requires that the penalty bear a reasonable relationship to the harm caused, and the amount of harm cannot be determined until all claims for compensatory damages in this case (both class-wide and individual) have been decided.

Therefore, Defendants request that the Court amend its Order as follows:

1.  Begin an estimated four-day jury trial on April 20, 2017, to determine class-wide CCPA and breach of contract claims for return of appraisal fees;

2.  Schedule a jury trial on the Aligs' and Sheas' remaining claims, as well as any individual claims asserted by other class members; and

3.  At the conclusion of all class-wide and individual trials on damages, schedule an evidentiary hearing where the parties can present evidence on issues that are specific to the determination of the statutory penalty, after which the Court will determine a penalty award, taking into account all of the evidence that has been presented in the hearing, as well as evidence presented during the jury trials on the class-wide and individual damages claims.

In addition, Defendants request that they be permitted to conduct targeted class discovery on the issues of harm and causation that will be critical to the determination of damages and penalties, as well as targeted discovery relevant to the statute of limitations, so that they can adequately prepare for the remaining proceedings in this case.  Defendants conferred with Plaintiffs' counsel on this issue and a consensus could not be reached.  Accordingly, Defendants seek the Court's permission to engage in such targeted class discovery.

**ARGUMENT**

**I.  THE DETERMINATION OF DAMAGES AND STATUTORY PENALTIES WILL INVOLVE EVIDENCE RELATING TO INTENT, KNOWLEDGE, AND HARM.**

While the Court's summary judgment ruling addressed the issue of CCPA liability, the factors that are relevant to the determination of a statutory penalty have not yet been decided. Defendants expect that the evidence will show that there are no grounds to award any penalty in this case.

First, courts have held that "[t]he amount of a penalty should have a direct relationship to the egregiousness of the violation." *Clements v. HSBC Auto Fin., Inc.*, No. 5:09-cv-00086, 2011 WL 2976558, at *7 (S.D. W. Va. July 21, 2011) (awarding lower penalty for defendant's first 40 calls to plaintiff, because the evidence did not establish that the defendant had "the intent to annoy, abuse and oppress"). Thus, courts that have awarded higher penalties have done so only after finding that the defendants acted with an intent to harm, or with knowledge that their conduct was clearly prohibited by law. *See Figgatt v. Green Tree Servicing, LLC*, No. 10-C-930, 2012 WL 8895246, at *3 (W. Va. Cir. Ct. Aug. 23, 2012) (awarding maximum penalty after finding that "the [d]efendant was clearly aware of the prohibition against such communications and the evidence established that the [d]efendant had a pattern and practice of violating *West Virginia Code* § 45A-2-128(e)."); *Vanderbilt Mortg. & Fin., Inc. v. Cole*, No. 10-C-574-2, 2011 WL 9697521, at *3 (W. Va. Cir. Ct. Aug. 15, 2011) (awarding maximum penalty where counterclaim-defendant acted with "complete disregard" for the counterclaim-plaintiff's rights, and conveyed "disrespect, saying 'We know what the law is in the State of West Virginia, but we do not have to follow it'"), *aff'd*, 230 W. Va. 505, 516, 740 S.E.2d 562, 573 (2013).

In this case, Plaintiffs have indicated that they will be seeking a higher penalty, but they will not be able to prove any basis for imposing such a penalty because the Defendants did not

3

**JA577**

act with intent to harm, nor did they think that their conduct was in violation of West Virginia

law.  Providing a borrower's estimated value to an appraiser was standard industry practice until

the Home Valuation Code of Conduct ("HVCC") became effective in May 2009 (and

Defendants had ceased this practice prior to that date).  There was no indication that this practice

was prohibited in West Virginia prior to the HVCC.  Plaintiffs have cited to Ohio cases to argue

that the practice was unlawful, but Ohio does not dictate West Virginia law.  Further, the fact

that Defendants changed their practices in Ohio based on their understanding of that state's law,

and then did so in West Virginia and the rest of the country with the adoption of the HVCC,

underscores Defendants' belief that their conduct was not in violation of West Virginia law—

whenever there was a change in the law, Defendants immediately complied with it.

Further, the evidence will show that Quicken Loans and Title Source put numerous

safeguards and processes in place to ensure the independence and objectivity of the appraisal

process.  For example, Quicken Loans had no contact with appraisers, appraisal orders were

assigned automatically based on appraisers' geography, availability, and quality of work (e.g.,

turnaround time) and with no input by Quicken Loans, and appraisers were paid upon the

completion of their report, regardless of the value they reached.  The evidence will also show

that Defendants' business interests would have been harmed if appraisals had been inflated.

In addition, although a statutory penalty award is not conditioned on a finding of actual

damages, the amount of harm caused to a plaintiff is still a relevant consideration in determining

the appropriate penalty.  Courts routinely award lower penalties where there is no evidence of

harm to the plaintiff.  *See, e.g.*, *Kidd v. I.C. Sys., Inc.*, No. 10-C-541-H, 2014 WL 847692, at *6

(W. Va. Cir. Ct. Jan. 30, 2014) (awarding lower penalty for telephone calls that were placed, but

not heard or received by plaintiffs); *Endicott v. Hager*, No. 98-C-1839, 2000 WL 35542409, at

*2 (W. Va. Cir. Aug. 25, 2000) (awarding lower penalty because plaintiffs were not "unduly harmed" by defendant's conduct).  Further, civil penalties under the CCPA "tak[e] on both compensatory and punitive characteristics." *Vanderbilt*, 230 W. Va. at 512, 740 S.E.2d at 569. Just like punitive damages, civil penalties under the CCPA are "limited by the requirements of due process." *Id.* at 512, 569.  Those due process requirements include a requirement that "[p]unitive damages should bear a reasonable relationship to the potential harm caused by the defendant's actions and that generally means that punitive damages must bear a reasonable relationship to actual damages because compensatory damages provide a reasonable measure of likely harm." *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 658, 667, 413 S.E.2d 897, 908 (1991).

Plaintiffs will be unable to prove any harm to support a penalty.  Appraisals are intended to protect the lender, not the borrower, and Defendants had incentives to not inflate the value of the collateral securing the class members' loans, as doing so would have been to the detriment of Quicken Loans, not the borrowers.  Plaintiffs cannot prove any actual harm when the appraisals allowed borrowers to obtain loans that conferred benefits such as lower monthly payments, lower interest rates, and the consolidation of debt.  Thus, any statutory penalty that is awarded in this case must bear a "reasonable relationship" to the absence of any harm caused by the Defendant's conduct.[1]

---

[1]    At the very least, the requirements of due process limit any statutory penalties to five times the amount of compensatory damages because there was no intent to cause any harm.  *See Quicken Loans, Inc. v. Brown*, 236 W. Va. 12, 40, 777 S.E.2d 581, 609 (2014) (quoting Syllabus Point 15, *TXO Prod. Corp. v. Alliance Res. Corp*, 187 W. Va. 457, 461, 419 S.E.2d 870, 874 (1992)) ("The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1."), *aff'd* 509 U.S. 443 (1993).

Plaintiffs' inability to prove harm also undercuts their request to have the Court "address whether a refund of the appraisal fees paid by class members is warranted under the CCPA or due to the breach of contract."  ECF No. 227, at 33.  These claims similarly place the burden on Plaintiffs to prove the existence of damages that they allege were caused by breach of contract, and, for the CCPA, that "actual damages" resulted from the Defendants' conduct.  It is not enough for Plaintiffs to simply say that the contract was breached; they must also prove that the breach resulted in some injury.  Plaintiffs will be unable to make this showing.

II.   **DAMAGES SHOULD BE DETERMINED BY A JURY BEFORE THE COURT AWARDS ANY STATUTORY PENALTY**

   A.   **Defendants Are Entitled To a Jury Trial on Plaintiffs' Request For the Return of Appraisal Fees**

Plaintiffs have asked the Court "to address whether a refund of the appraisal fees paid by class members is warranted under the CCPA or due to the breach of contract."  ECF No. 227, at 33.  Both of these claims fall squarely within the Seventh Amendment right to a jury.

Plaintiffs' request for the return of appraisal fees is a claim for actual damages under the CCPA.  Plaintiffs' theory is that class members should not have paid fees for appraisals that were obtained through an act—the sending of an estimated value—that the Court has determined to be unconscionable inducement under W.Va. Code § 46A-2-121.  In other words, Plaintiffs allege that class members were harmed by their payment of appraisal fees, and they want the Court to remedy that harm by returning all appraisal fees that were paid.  This is a request for "actual damages" under W.Va. Code § 46A-5-101, which permits only two types of remedies: actual damages, and a statutory penalty.  While the determination of the statutory penalty is a question for the Court, any award of actual damages must be made by a jury.  *See Curtis v. Loether*, 415 U.S. 189, 194 (1974) (Seventh Amendment right to a jury "does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and

remedies, enforceable in an action for damages in the ordinary courts of law," where plaintiff sought money damages under statute); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 49 (1989) (right to jury trial in fraudulent conveyance action, where plaintiff "sued for . . . money payments of ascertained and definite amounts"); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 824, 832-33 (4th Cir. 1994) (right to a jury trial where statute created a cause of action for compensatory damages).

Similarly, Defendants have a right to a jury trial on Plaintiffs' contract claim.  *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 476-78 (1962) (right to a jury trial in an action for breach of contract and money damages); *WEGCO, Inc. v. Griffin Servs., Inc.*, 19 F. App'x 68, 73 (4th Cir. 2001) (district court violated defendant's constitutional right to a jury when it supplemented a jury's damages award with its own damages findings in a breach of contract case).  The Court has granted partial summary judgment on the issue of whether the contract had been breached, but the remaining elements of causation and damages must be determined by a jury.  *See WEGCO*, 19 F. App'x at 73.  Further, Plaintiffs cannot undermine Defendants' jury trial rights by characterizing their contract damages as "restitution" or "disgorgement," as the Supreme Court has made clear that where a plaintiff seeks "to obtain a judgment imposing a . . . personal liability upon the defendant to pay a sum of money," restitution is a legal remedy which carries a right to a jury trial.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002); *see also F.D.I.C. v. Marine Midland Realty Credit Corp.*, 17 F.3d 715, 717, 721 (4th Cir. 1994) (finding right to jury trial where plaintiff sought legal remedy of money damages, including refund of payments in breach of contract action).

Plaintiffs have indicated that they oppose a jury trial on the return of appraisal fees because they believe this issue can be addressed by the Court based on briefing, as it was in

*Dijkstra v. Carenbauer*, No. 5:11-cv-152, 2014 WL 12594132 (N.D. W.Va. July 16, 2014).  In

*Dijkstra*, however, there was no contract claim, and the parties agreed to have the issue decided

on the briefs.  In this case, Defendants are invoking their right to have a jury decide contract

damages and monetary damages, and this determination involves disputed issues of fact that

cannot be determined by the Court.  Plaintiffs cannot meet their burden of proving contract

damages by simply stating that they paid for an appraisal and that the Court found a breach; that

argument goes to breach, not to damages.  The proper measure of damages in cases such as this,

where a party claims that performance did not comply in all respects with the requirements of the

contract, is the difference in value that is proven to be caused by the breach.  *See* Restatement

(Second) of Contracts § 347, Comment b (1981) ("If defective or partial performance is

rendered, the loss in value caused by the breach is equal to the difference between the value that

the performance would have had if there had been no breach and the value of such performance

as was actually rendered.").  Plaintiffs cannot seek to recover their appraisal fees by "undoing"

the contract, as rescission is not appropriate where the parties' situations have changed such that

return to the status quo is impossible (for example, complete rescission in this case would require

the parties to undo the loan transactions).  *See Holderby v. Harvey C. Taylor Co.*, 87 W. Va. 166,

104 S.E. 550, 552 (1920) ("If the situation of the parties has been so changed, by a partial

performance of the contract, or by their making arrangements for carrying it out, or by their

actions taken in reliance upon its expected execution, that they cannot be restored, without loss,

to their former situation, as if the contract had not been made, a rescission cannot be had.").

Rather, Plaintiffs must demonstrate that they were actually harmed and suffered some injury as a

result of a breach of contract, such as by entering into a loan with terms that were less favorable

than they would have been had they gotten the appraisal they contracted for.  *See, e.g., Bd. of*

*Educ., Monongalia Cty., W. Va. v. Mellon-Stuart Co.*, 885 F.2d 864, 1989 WL 106812, at *5 (4th Cir. 1989) (table) (affirming judgment for defendants where witnesses testified that plaintiff did not pay more as a result of defendant using billing system different from the contractually required billing system, as "the method of billing used by appellees did not affect the amounts which the Board was obligated, in any event, to pay and did pay.").

**B.**      **The Statutory Penalty Award Cannot Be Determined Until All Damages Trials Have Been Completed**

Defendants also request that the Court postpone its determination of the statutory penalty until after all damages have been determined (in both class-wide and individual trials).  As discussed above, any statutory penalty must bear a "reasonable relationship" to the actual damages sustained by the members of the class in order to comport with the requirements of due process.  *Garnes*, 186 W. Va. at 667, 413 S.E.2d at 908.  This means that the statutory penalty can only be determined after all remaining damages claims, including claims by individual class members, have been resolved at trial.

The Aligs have asserted the following individual claims which are still outstanding: UDAP (unfair or deceptive acts or practices) (Count II), unconscionable contract (Count IV), breach of contract (Count VII), fraud/intentional misrepresentation (Count IX), and illegal loan (Count X).  The Sheas have asserted individual claims under UDAP (Count II) and for breach of contract (Count VII).  All of these claims (by the Aligs, Sheas, or absent class members), as well as claims for any other actual damages for unconscionable inducement under the CCPA, will need to be determined by a jury.  *See supra* Section II.A.

As a practical matter, this means that the Court cannot decide a statutory penalty until both a class-wide damages jury trial <u>and</u> separate jury trials on the individual damages claims have been held.  This sequence of events allows all damages evidence to be heard before the

Court awards a statutory penalty, which is necessary because the Court cannot determine whether a statutory penalty comports with due process until and unless the amount of compensatory damages has been determined.

### C.   Defendants' Proposed Procedure

Defendants believe that the following procedure is necessary to protect their right to a jury trial on any determination of monetary damages, and also to ensure that the Court has the benefit of all relevant information regarding actual damages before it makes any determination regarding a statutory penalty award.

First, a damages trial should be held before a jury (beginning on April 20, 2017) to address whether the return of appraisal fees under the CCPA or for breach of contract is warranted. At this trial, Defendants anticipate presenting evidence concerning the lack of any evidence of actual damages under the CCPA, as well as evidence to show that Plaintiffs did not suffer any damages resulting from a breach of contract.

The jury will also be asked to decide whether certain class members' claims are barred by the statute of limitations. Defendants will present evidence that some class loans were discharged more than one year before the lawsuit was filed, at which point the burden shifts to the Plaintiffs to demonstrate that the statute was tolled. *Blyler v. Matkovich*, No. 14-0760, 2015 WL 7628843, at *4 (W. Va. Nov. 23, 2015) ("Once the defendant shows that the plaintiff has not filed his or her complaint within the applicable statute of limitations, the plaintiff has the burden of showing an exception to the statute," such as the discovery rule (quoting *Worley v. Beckley Mech., Inc.*, 220 W.Va. 633, 638 n.7, 648 S.E.2d 620, 625 n.7 (2007))). The tolling inquiry is typically a question of fact for the factfinder. *Dunn v. Rockwell*, 225 W. Va. 43, 46, 689 S.E.2d 255, 258 (2009). In this case, the question of whether the class members who did not file their claims within the limitations period knew or reasonably should have known about the basis for

their claims is a question for the jury.  *See DiLoreti v. Countrywide Home Loans, Inc.*, No. 5:14-cv-0076, ECF No. 85 at 6 (N.D.W. Va. Feb. 25, 2015) (Bailey, J.) ("[W]hether the plaintiffs can successfully invoke the discovery rule 'generally involve[s] questions of material fact'" (*quoting Dunn*, 255 W. Va. at 46, 689 S.E.2d at 258)); *Robinson v. Quicken Loans Inc.*, 988 F. Supp. 2d 615, 628 (S.D.W. Va. 2013) (noting that "[t]he reasonableness of Plaintiff's lack of inspection . . . is most appropriately a question of fact to be resolved by the fact-finder").  Defendants expect that this trial on contract/CCPA damages and statute of limitations will take approximately four days.

Second, after the conclusion of that trial, there will be individual jury trials conducted to resolve the Aligs' and Sheas' individual claims, as well as claims raised by any other class member.[2]  Defendants expect that the trial on the Aligs' and Sheas' individual claims will last two to three days, and that the trials for other individual claims will last from several hours to several days, depending on the number and nature of claims asserted.

Third, at the conclusion of all damages trials (regardless of the order in which they are conducted), there should be an evidentiary hearing to determine the appropriate amount of a statutory penalty.  At this hearing, the parties can present additional evidence concerning the appropriateness of a statutory penalty, including evidence concerning Defendants' good faith and lack of intent to violate the law, and the Court's penalty award may take into account any of the evidence presented at the hearing, as well as any evidence that was presented during the damages trials.

---

[2]    Alternatively, the individual trials could be conducted first, prior to the trial on class-wide CCPA and breach of contract damages—what is important is that all of the damages trials are conducted before the statutory penalty is decided.

JA585

III.    **DEFENDANTS SHOULD HAVE THE OPPORTUNITY TO CONDUCT TARGETED CLASS DISCOVERY NOW THAT A CLASS HAS BEEN CERTIFIED**

In addition, Defendants request the opportunity to conduct limited class discovery on certain targeted issues.  Class-wide discovery could not have been conducted prior to the certification of a class, as the only plaintiffs in the case at that time were the Aligs and the Sheas. They, and their counsel, could not have responded to discovery on behalf of any other class member.  Further, discovery beyond issues of certification would not have been appropriate before the class was certified.  *See Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. Westinghouse Elec. Corp.*, 25 Fed. R. Serv. 2d 126, 1977 WL 15508, at *8 (N.D.W. Va. 1977) ("The Court will allow further discovery after a class, if any, is properly certified."); *Witten v. A.H. Smith & Co.*, 785 F.2d 306, 1986 WL 217559, at *4 n.6 (4th Cir. 1986) (table) ("It has been held, however, that, prior to class certification, discovery should be limited to issues of certification; only after the certification has been granted will wide-ranging discovery be countenanced.").

However, now that the Court has certified a class of plaintiffs, Defendants should have the opportunity to conduct targeted written discovery, focused on the key issues in the case: whether the individual class members' appraisals were inflated because the appraisers were provided with the borrowers' estimated values, and whether the individual class members suffered any harm as a result of this practice.  The Court has ordered Defendants to produce information as to the total amount of appraisal fees, but Defendants have not had the opportunity to seek any discovery that is available only from the class members themselves, and that is directly relevant to the calculation of class damages in this case.  Therefore, Defendants request that Plaintiffs be ordered to respond to the interrogatories and requests for admission attached hereto as Exhibits 1 and 2, which are being served concurrently with this motion.

These interrogatories and requests for admission are limited to the areas of causation, damages, and statute of limitations, which are highly relevant to the remaining issues in this case. For example, whether there are any class members who do not claim that their appraisal exceeded the market value of their home, or whether there are any class members who did not receive a loan for greater than the alleged market value of their home, goes directly to the issue of harm that the Court must consider in determining the amount of a statutory penalty award. *See supra* Section II.B; *see also Schwartz v. Celestial Seasonings, Inc.*, 185 F.R.D. 313, 317-18, 320 (D. Colo. 1999) (allowing questionnaire to class members on issues of reliance and damages, as reliance or causation was "a necessary component of Plaintiffs' claims" and a preliminary assessment of individual damages "would aid in calculating the entire class' damages"). Similarly, the jury will be asked to decide whether the claims of any class members are barred by the statute of limitations. *See supra* Section II.C.

These targeted discovery requests are far more limited and far less burdensome than the class discovery permitted by courts in other cases, which have allowed discovery to be served on each individual class member, rather than just on the class representatives. *See Schwartz*, 185 F.R.D. at 320 (allowing questionnaire relating to damages and reliance issues to be sent to all potential class members); *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 287 (D. Minn. 1996) (allowing discovery questionnaires on mitigation issues); *United States v. Trucking Emp'rs, Inc.*, 72 F.R.D. 101, 104-05 (D.D.C. 1976) (allowing plaintiffs to serve interrogatories on class defendants); *Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005-06 (7th Cir. 1971) (affirming dismissal of absent class members who did not respond to court authorized discovery related to liability); *see also Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1329-30 (N.D. Ill. 1991) (allowing discovery of a representative sample of class plaintiffs to

determine total damages); *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, No. 10-4372, 2012 WL 4357433, at *2, 5-6 (D. Minn. Sept. 24, 2012), *aff'd*, 2012 WL 5862839 (D. Minn. Nov. 19, 2012) (allowing limited depositions of particular absent class plaintiffs after having allowed interrogatories that "focus[ed] on breaking the causal chain" on absent class plaintiffs).

Here, Defendants are simply looking to serve interrogatories and requests for admission that can be answered on behalf of the class as a whole. *See* Exhibits 1 and 2. If the class representatives are unwilling or unable to respond to such discovery, the Court can order individual class member discovery as an alternative. *See City of Farmington Hills*, 2012 WL 4357433, at *1 (noting three-prong test for determining whether to take discovery of absent class members: "(1) whether the information requested is relevant to the decision of common questions; (2) whether the discovery requests are tendered in good faith and are not unduly burdensome; *and (3) whether the information is not available from the class representative*" (emphasis added)).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and modify its November 22, 2016 Order to permit Defendants to conduct targeted written discovery, and adopt Defendants' proposed procedure for resolving the remaining claims in this case. In the alternative, Defendants request the opportunity to address these scheduling issues at a status conference.

Dated: February 24, 2017                    Respectfully submitted,

                                            **QUICKEN LOANS INC. and**
                                            **TITLE SOURCE, INC.**


                                            By: */s/ Joseph F. Savage, Jr.*_____


Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone:  (617) 570-1000
Facsimile:  (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com


Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone:  (202) 346-2000
Facsimile:  (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com


Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com


John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
TROUTMAN SANDERS LLP

222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,

        Plaintiffs,

        v.                         Civil Action No. 5:12cv114
                                       The Honorable John Preston Bailey

QUICKEN LOANS INC., and
TITLE SOURCE, INC.

        Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February, 2017, I electronically filed this Certificate of Service for Defendants Quicken Loans Inc. and Title Source, Inc.'s foregoing Motion for Modification of Order as to Status Conference with the Clerk of the Court using the CM/ECF system, and I further certify that a true and correct copy of the document has been sent via email and via First Class U.S. Mail to the following counsel of record:

**Counsel for Plaintiffs**
Jason E. Causey
James G. Bordas, Jr.
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
E-mail: jbordas@bordaslaw.com
E-mail: jason@bordaslaw.com

John W. Barrett
Jonathan R. Marshall
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com

17
**JA591**

_/s/ Joseph F. Savage, Jr._

18

1

```
 1                   UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF WEST VIRGINIA

 3                            - - -

 4   PHILLIP ALIG, et al.,

 5              Plaintiffs,

 6              VS.            CIVIL ACTION NO.  5:12-cv-114

 7   QUICKEN LOANS INC., et al.,

 8              Defendants.

 9                            - - -

10        Proceedings had in the status conference hearing of the

11   above-styled action on March 30, 2017, before Honorable John

12   Preston Bailey, Judge, at Wheeling, West Virginia.

13                            - - -

14         APPEARANCES:

15         On behalf of the Plaintiffs:

16                 Jonathan Marshall, Esq.
                   Bailey & Glasser LLP
17                 209 Capitol Street
                   Charleston, West Virginia  25301
18                 (304) 340-2287

19                     and

20                 Jason E. Causey, Esq.
                   Bordas & Bordas PLLC
21                 1358 National Road
                   Wheeling, West Virginia  26003
22                 (304) 242-8410

23

24

25   (Appearances continued on next page)
```

**JA593**

```
 1          APPEARANCES CONTINUED:

 2

 3          On behalf of the Defendants:

 4                  Joseph F. Savage, Esq.
                    Yvonne W. Chan, Esq.
 5                  Thomas M. Hefferon, Esq.
                    Goodwin Procter, LLP
 6                  100 Northern Avenue
                    Boston, Massachusetts 02210
 7                  (617) 570-1000

 8                      and

 9                  John C. Lynch, Esq.
                    Troutman Sanders LLP
10                  222 Central Park Avenue, Suite 2000
                    Virginia Beach, Virginia  23462
11                  (757) 687-7564

12

13
     Proceedings recorded utilizing realtime translation.
14   Transcript produced by computer-aided transcription.

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings in open court, March 30, 2017, 2:07 p.m.)

2              THE COURT:  I would ask the clerk to call the case,

3    please.

4              THE CLERK:  This is the case of Phillip Alig, et al.,

5    versus Quicken Loans Inc., et al.  Civil Action Number

6    5:12-cv-114.

7              Will the parties please note their appearance for the

8    record.

9              MR. MARSHALL:  Jonathan Marshall and Jason Causey on

10   behalf of the plaintiff class.

11             MR. SAVAGE:  Your Honor, it's Joseph Savage.  I'm

12   here with my colleague, Yvonne Chan, from Goodwin Procter on

13   behalf of TSI and Quicken Loans.  Also John Lynch from Troutman

14   Sanders on behalf of TSI and Quicken Loans.

15             Can I introduce the others that are with me, Your

16   Honor?

17             THE COURT:  Sure.

18             MR. SAVAGE:  So there's two client representatives

19   present, Shawn Solon at Quicken Loans, and Ms. Bertus from TSI;

20   and my colleague, Tom Hefferon, is with us.

21             THE COURT:  All right.  I actually have two motions

22   pending.  The request for a telephone status conference I guess

23   is already taken care of.  It didn't end up being a telephonic

24   status conference, but we're here for a status conference.

25             So we have Quicken Loans' motion for modification of

 1   order.  Do you want to be heard?

 2          MR. SAVAGE:  Yes, briefly, Your Honor.  We reached

 3   the point where we're approaching the April 20th date that you

 4   set.  And we realize that the probably inevitable order of

 5   events need to be here that we have to resolve the breach of

 6   contract claim damages so that you're in a position to assess

 7   egregiousness or harm on the Consumer Protection statute.  So

 8   that seems to put things in a different order than, for

 9   example, was agreed to in *Dijkstra*.  And I think that's

10   probably where that order came from.  It probably made sense in

11   that case, given the position that Lending Tree was in of the

12   egregiousness of that conduct and where that was going to go.

13          We feel like we're in a different position, Your

14   Honor, in that you've got a decision on egregiousness and harm

15   that you'll have to make on the statutory issue, but that you

16   need the benefit of understanding that egregiousness and harm

17   by resolving the contract and the individual plaintiff claims

18   before that.

19          Then the belated is the request for the very targeted

20   discovery, which I guess we can address later if that's

21   helpful.

22          THE COURT:  All right.  I've carefully gone over all

23   of this.  The determination of the statutory penalties under

24   the Consumer Protection Act does involve evidence of intent,

25   knowledge and harm.  And the amount of penalty to be imposed by

1   the Court should have a relationship to the egregiousness of

2   the violation.  However, this Court believes that the

3   egregiousness of the violation is something the Court considers

4   based upon the actions of Quicken Loans and TSI.  Therefore, I

5   will permit the defendants to present, I'll say for right now,

6   two witnesses on the issue of their policies.  And there's

7   arguments made about how careful they are and that's fine, I'll

8   be glad to hear that.

9          The defendants make the argument that any statutory

10  penalty must bear a reasonable relationship to the actual harm.

11  I think that's wrong.  I think the *Vanderbilt* case settles that

12  issue.

13         In a footnote, the defendants argue that that's

14  limited to five times the actual harm.  That's under *Garnes*,

15  which is a punitive damages case.  And that was in the *Brown*

16  case where the Court was considering damages for common law

17  fraud, not damages for a violation of the Consumer Protection

18  Act.  These are not punitive damages.  It's a statutory civil

19  penalty.  While there may be somewhat of a punitive element to

20  it, they are not to be determined under the same standard as

21  punitive damages.

22         The issue of a jury demand on whether the return of

23  the appraisal fees is a request for which there will be a jury,

24  this Court disagrees.  It's a request for equitable relief.

25  The return of payments or the disgorgement of payments is an

1    equitable form of relief.  And that's backed up by both the

2    *Sivolella* case, S-i-v-o-l-e-l-l-a, out of New Jersey in 2013;

3    and the *Gerald Moore and Sons* case out of the Eastern District

4    of Virginia in 1996.  The defendants have cited *Curtis versus*

5    *Loether,* L-o-e-t-h-e-r, 1974, U.S. Supreme Court case, but it

6    specifically does not apply to cases requiring the defendant to

7    disgorge funds wrongfully withheld from the plaintiff.  It does

8    not apply to equitable restitution.

9         The defendants argue that we can't have a statutory

10   penalty imposed until the damages trial has been completed.

11   Again, this Court disagrees.  I think that argument rests on

12   the faulty premise that the statutory penalties have to bear a

13   reasonable relationship to the harm.

14        On the issue of discovery, we had -- first of all,

15   this case has been pending for almost five years now.  We had a

16   hearing on November 17th.  At that time it was determined what

17   the defendant's really wanted was time to prepare and marshal

18   their evidence.  And there was no need for discovery.  But they

19   wanted 150 days to prepare.  And this Court gave them 150 days.

20        Now less than two months before the hearing, they

21   want massive discovery.  You can call it targeted, but that's a

22   lot of discovery.  In addition, I don't think the information

23   sought is relevant for this hearing under the way this Court

24   has interpreted the rules or the rulings and the law concerning

25   the statutory damages.

1          Now, with regard to the issue of statute of

2    limitations, the burden's on the defendant.  If the defendant

3    can bring evidence that the class member had actual knowledge

4    that the defendant sent an estimate of value to the appraiser

5    and that no payments were made within one year before

6    June 15th, 2012, I'll boot them.  In the absence of that

7    evidence, it's not an issue.

8          Now, there's allegedly a reference made in documents

9    to a list of witnesses, I did not receive it, that the

10   defendants want to call.  Who do we have?

11         MR. SAVAGE:  Well, we haven't got quite that far yet,

12   Your Honor, but I can whittle it down.  We did our required

13   supplement of our disclosure of people with knowledge.

14         We have nine witnesses that we think are appropriate

15   for the hearing, Your Honor.  I'll kind of break them down into

16   the compliance category, would be Kristine Hughes from TSI.

17         THE COURT:  Wait a minute.  Okay.

18         MR. SAVAGE:  Amy Bishop, who's in the general

19   counsel's office of Quicken Loans.  Mr. Isenstadt, Jeff

20   Isenstadt, who is the CEO of TSI.  And A.J Ureel, who is over

21   from TSI, who can also testify to the role in compliance of the

22   FNC people that provide the --oh, A.J.'s at Q -- I'm sorry, but

23   can testify to the role of the compliance efforts by FNC that

24   provides the software that does what we did.

25         Under the folks that would talk about implementing

1  these compliance issues and reinforcing the business model at

2  Quicken Loans, which does not benefit from inflated appraisals,

3  would be Mike Lyon, Cliff Bonkowski, Mike Saleh, S-a-l-e-h,

4  Scott Young, and William Banfield.  We're confident we can do

5  those in the two days that the Court's --

6          THE COURT:  You got one day.  And it looks to me like

7  a lot of these people are going to be repetitive.

8          MR. SAVAGE:  TSI -- there's two defendants, Your

9  Honor, they're not going to be repetitive with each other.

10         THE COURT:  We have two TSI guys on compliance.  And

11 then who does Mike Lyon work for?

12         MR. SAVAGE:  Mike Lyon is the QL guy that can give

13 you the start to finish of how they operationalize the system.

14 But if you want me to do -- I can cut the thing to five and do

15 affidavits of the rest, if that makes sense.  Preserving my

16 objection and all that.

17         THE COURT:  All right.  Mr. Marshall.

18         MR. MARSHALL:  I hate to interject, Your Honor, but

19 the real issue with this is none of these people were disclosed

20 before March 10th.  We haven't taken any depositions of any of

21 these people.  These are totally new witnesses talking about

22 issues of compliance and policies and procedures where we've

23 already taken depositions.  Where we already asked all of these

24 questions during the five years that this case was pending.

25         Actually, a couple of people he just mentioned aren't

1   even on the list, on the new 26(a)(1) disclosure that they

2   sent.  I mean, essentially we're being sandbagged with these --

3   a list of a totally new cast of characters, we haven't had a

4   chance to depose any of them.

5           It's fundamentally unfair the way they have

6   approached this.  You know, less than a month we get a list,

7   before we've got to submit briefs on these issues, we've got a

8   whole new cast of characters.  Again, it's not a situation

9   where somebody they previously disclosed, we had an opportunity

10  to depose.  These are new people.

11          And I can supply the Court with a list that shows who

12  they disclosed, who we were able to depose, and now this new

13  list of characters.  Again, these are issues, compliance,

14  policies and procedures, reasonableness, what they tried to do.

15  These are things that we extensively conducted discovery on in

16  the prior duration.  I understand maybe they don't like the old

17  witnesses, but we already have testimony on all of these

18  issues.

19          MR. SAVAGE:  That's not quite right, Your Honor.  For

20  example, they say, sweeping, we didn't depose any of these

21  people.  They deposed Mr. Banfield.  I mean, you refer to

22  Mr. Lyon and Mr. Bonkowski in your summary judgment order.

23  Ms. Bishop is listed as the compliance person in the documents

24  and they deposed her in another case.  There's no surprises

25  here.  This narrow list, we've come up with five people.

1    There's going to be zero surprise to the plaintiff here.

2          THE COURT:  Who are the five you're talking about?

3          MR. SAVAGE:  Well, if I have to do it on the fly, I

4    will do it.  Ms. Hughes, Ms. Bishop.

5          THE COURT:  Wait just a minute.  Let's do them one at

6    a time.  Hughes, did you say Ms. Hughes?

7          MR. SAVAGE:  Kristine Hughes at TSI.

8          THE COURT:  Has she been deposed?

9          MR. MARSHALL:  No, she hasn't, Judge.

10          THE COURT:  Has her name been disclosed before?

11          MR. MARSHALL:  She was never disclosed.

12          MR. SAVAGE:  It's in the discovery materials.

13          MR. MARSHALL:  Your Honor, she was never disclosed in

14    the 26(a)(1) disclosure as somebody who had --

15          THE COURT:  She's out.  Who's next?

16          MR. SAVAGE:  That was an overstatement.  We filed the

17    recent 26(a)(1) disclosures.

18          MR. MARSHALL:  Less than a month ago.

19          MR. SAVAGE:  But a month ago, or whatever it is.

20          MR. MARSHALL:  She was never disclosed.

21          THE COURT:  Was she on that disclosure?

22          MR. MARSHALL:  She was on that disclosure,

23    March 10th, 2017.

24          MR. SAVAGE:  All of these people are on that

25    disclosure, Your Honor.

1          THE COURT:  All of them are on that disclosure?

2          MR. SAVAGE:  Yes, the ones I've read out to you.

3          THE COURT:  All right.  Who else is in the five?

4          MR. SAVAGE:  Mr. Banfield.  Ms. Bishop.

5          THE COURT:  Has Banfield been deposed?

6          MR. SAVAGE:  He was the 30(b)(6).

7          MR. MARSHALL:  Yes, Mr. Banfield has been deposed.

8          THE COURT:  All right.  Who's next?

9          MR. SAVAGE:  Ms. Bishop.

10         MR. MARSHALL:  She was never disclosed previously and

11    also never deposed.

12         THE COURT:  All right.  She's a March 10?

13         MR. MARSHALL:  Yes.

14         MR. SAVAGE:  Your Honor, she's in the materials as

15    the compliance person.  What happened here is the class got

16    certified, where now egregiousness is put into play.  We've got

17    people who are going to say in good faith we looked at West

18    Virginia law, we didn't see this issue.  We might have made a

19    mistake, we might have blew it 17 years ago, but we tried.

20         I think the Court's entitled to hear that, when

21    they've got the burden of proof to move the needle off the $100

22    minimum, or whatever the minimum is here.  So I think it's not

23    going to take that long.  We're severely compromised if we

24    can't get the right facts in front of the Court to make that

25    decision.

12

1                    THE COURT:  Who's's next?

2                    MR. SAVAGE:  A.J. Ureel.

3                    THE COURT:  Spell that for me?

4                    MR. SAVAGE:  U-r-e-e-l.

5                    MR. MARSHALL:  Never disclosed.

6                    MR. SAVAGE:  Same issue.

7                    THE COURT:  March 10 disclosure?

8                    MR. MARSHALL:  Yes.

9                    MR. SAVAGE:  March 10.

10                   THE COURT:  All right.

11                   MR. SAVAGE:  And then Clint Bonkowski, who is one of

12   the folks you referred to in the summary judgment ruling.

13                   THE COURT:  Deposed?

14                   MR. MARSHALL:  Never deposed, not disclosed.

15                   MR. SAVAGE:  Disclosed in March.

16                   THE COURT:  Mr. Marshall, do you want to depose him?

17                   MR. MARSHALL:  If they're going to be called, Your

18   Honor, I would like the opportunity to depose them.  I believe

19   that the record is replete with evidence already about how they

20   complied with the law and how none of this harms anybody and

21   how their policies were sufficient.

22                   It seems very duplicative to me about what they've

23   already done and the witnesses they've already disclosed.

24                   THE COURT:  Where is Ms. Hughes located?

25                   MR. SAVAGE:  All these folks are in Detroit, Your

1    Honor.

2            THE COURT:  How long do you need to depose them,

3    Mr. Marshall?

4            MR. MARSHALL:  Realistically, we would need probably

5    to coordinate schedules, a couple of weeks to get it done.

6    Because I assume that -- there's another issue where we've had

7    over a thousand pages of documents that have just been dumped

8    on us, too.  And so a matter of a few weeks to try to get those

9    all done.  One week.

10           THE COURT:  Oh, I'm sorry.  I meant, how long do you

11   need?  Do you think a half a day for --

12           MR. MARSHALL:  I see, yeah.  Yeah, yeah.  Yeah, we --

13   we can probably knock these out in a couple of days, two or

14   three days.

15           THE COURT:  All right.

16           MR. MARSHALL:  Not a couple of weeks, that would be a

17   long deposition.

18           MR. SAVAGE:  But they should take all the time they

19   need.  We're good with that.

20           THE COURT:  Oh, I'm sure you are.  But you're going

21   to be paying their expenses to do it.  All right.  I'll leave

22   the dates for you all to work out.  But those people are to be

23   made available, all in a two-day period.  And you pay the

24   expenses for them to go do it.

25               In the alternative, actually until you said they were

1  all in the same town, I was going to make you put them all in

2  Charleston.  But since they are all in Detroit, that's probably

3  more efficient for you to take them to Detroit than it is to

4  bring those people to Charleston.

5        MR. SAVAGE:  We'll work it out with them, Your Honor.

6  That's fine.

7        THE COURT:  All right.  The only other thing is,

8  having read all of these cases that were cited, the Court is

9  emboldened with what it can do.  And I am going to grant

10 summary judgment on the return of the appraisal fees.  So the

11 only thing we'll be talking about on the 20th will be

12 egregiousness of the violations.

13       MR. SAVAGE:  Well, I would like to be heard briefly,

14 Your Honor.  If only talking to another forum or whatever, but

15 it seems to me that it's just -- under West Virginia law, as I

16 read all the cases and whatnot, there's got to be a breach,

17 there's got to be causation; and then as a result of this bad

18 appraisal, some harm had to befall the people.

19       THE COURT:  The harm is they paid for an appraisal

20 that wasn't a valid appraisal.

21       MR. SAVAGE:  First of all, the record doesn't show

22 that across the board.  Like what do you do with the

23 circumstance, Your Honor, where even if a borrower's estimated

24 value was provided, that they got the exact same appraisal --

25       THE COURT:  Even if they got the same appraisal, it's

1    still not a valid appraisal.  The guy was following what he was

2    told.

3              MR. SAVAGE:  And we say it's not a valid appraisal,

4    and that is why you were able to reach a conclusion on breach.

5    Because that is the issue that they breached.  Now you move to

6    causation and you say harm.  Even if it wasn't a valid

7    appraisal, if everything else turned out identical, there's no

8    harm.  You can't grant --

9              THE COURT:  The harm is they paid for an appraisal

10   that had no value.

11             MR. SAVAGE:  No, they paid for an appraisal that got

12   them the loan that they would have gotten with an appropriate

13   appraisal.  So they got exactly what they paid for.

14             THE COURT:  Okay.  You made your point.

15             MR. SAVAGE:  That's fine.  Thank you.

16             MR. MARSHALL:  There is one other related issue.  And

17   that is we've got a brief due on April 6th and another brief

18   due a week later.  We're working on that now, obviously.  It's

19   a bit of a moving target with these new witnesses.  And I want

20   to move this case, I want to move the class, move the case.  I

21   know the Court wants to move the case.

22             I don't know how to -- you know, since we would be

23   taking these depositions maybe at the same period of time where

24   I'm trying to finish briefs.  I don't know if the Court would

25   be amenable to some period of time to allow us to get these

 1    depositions taken, at least some adjustment to the briefing

 2    schedule to take care of that.

 3                THE COURT:  Let's see.  Right now we're at the 6th

 4    and the 13th.

 5                MR. MARSHALL:  Yes, Your Honor.

 6                THE COURT:  How about the 10th and the 17th?  If you

 7    want me to read these things.

 8                MR. MARSHALL:  Yeah, ostensibly.

 9                MR. SAVAGE:  We want you to actually --

10                MR. MARSHALL:  Would the Court be amenable to -- I

11    want to be able to actually edit and review the briefs instead

12    of making sure we actually get the deposition testimony.  It

13    often takes the court reporter a day or two to even get the

14    thing transcribed.

15                I don't know if the Court would be willing to

16    maybe -- if we could have the hearing perhaps in the middle of

17    May, if that would disrupt the Court's schedule?

18                MR. SAVAGE:  We don't object, Your Honor, if that

19    makes this process work.

20                THE COURT:  Get the book.

21                MR. SAVAGE:  If I might, on another point?  I know I

22    obviously was not persuasive on the contract summary judgment

23    issue, but we never got a chance to brief that issue.  And, you

24    know, there is the off chance that our briefing would be more

25    persuasive than I was here on the fly.  I really think we're

1    entitled to brief a summary judgment ruling.

2              THE COURT:  Let's see what we're moving.  Let's see

3    where we're going.  How about May 9?

4              MR. SAVAGE:  That works, Your Honor.

5              MR. MARSHALL:  Works for me, Your Honor.

6              THE COURT:  All right.  We'll do it on May 9.  So now

7    that you have all this time, how about briefs on the 24th and

8    May 1st.  And I'll take back what I said for now.  And you've

9    got the uphill fight of convincing me that I spoke hastily.

10             MR. SAVAGE:  Thank you for the opportunity, Your

11   Honor, we appreciate it.

12             MR. MARSHALL:  Your Honor, in terms of this new

13   document production, I would hope that we could leave the

14   documents alone.  I understand that the Court is allowing

15   them -- we're going to depose these five new witnesses.

16             THE COURT:  Four.

17             MR. MARSHALL:  Four.

18             THE COURT:  You've already deposed one.

19             MR. MARSHALL:  I'm hoping that this is now the box

20   and that's what we're working with.

21             THE COURT:  This is the box.

22             MR. MARSHALL:  Okay.

23             MR. SAVAGE:  It feels like a box, Your Honor.

24             THE COURT:  Anything else?

25             MR. MARSHALL:  No, Your Honor.

 1              MR. SAVAGE:  We're fine, Your Honor.  Thank you.

 2    Appreciate it.

 3              THE COURT:  Let's start at 9:00.

 4              MR. SAVAGE:  Earlier if you want.

 5              MR. MARSHALL:  Sure, that works, Your Honor.

 6              THE COURT:  Okay.

 7

 8                         - - -

 9              PROCEEDINGS CONCLUDED AT 2:34 P.M.

10                         - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      C E R T I F I C A T E

2              I, Linda S. Mullen, Registered Diplomate Reporter,

3    Certified Realtime Reporter and Official Reporter of the United

4    States District Court for the Northern District of West

5    Virginia, do hereby certify that the foregoing is a true and

6    correct transcript of the proceedings had in the above-styled

7    action on March 30, 2017, as reported by me in stenotypy.

8              I certify that the transcript fees and format comply

9    with those prescribed by the Court and the Judicial Conference

10   of the United States.

11             Given under my hand this 30th day of March, 2017.

12                           /s/ Linda S. Mullen
                             Linda S. Mullen, RDR, CRR
13                           Official Reporter, United States
                             District Court for the Northern
14                           District of West Virginia

15

16

17

18

19

20

21

22

23

24

25
```

KRISTINE HUGHES - April 13, 2017

```
1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
3
4   PHILLIP ALIG, SARA J. ALIG,
5   ROXANNE SHEA, and DANIEL V. SHEA,
6   individually and on behalf of a class of persons,
7                    Plaintiffs,
8        -vs-                    Civil Action No. 5:12-CV-114
9                                Civil Action No. 5:12-CV-115
10  QUICKEN LOANS, INC., and
11  TITLE SOURCE, INC.,
12                    Defendants.
13  _____/
14
15
16       THE VIDEO DEPOSITION OF KRISTINE HUGHES
17       Taken at 660 Woodward Avenue, Suite 2290
18       Detroit, Michigan
19       Commencing at 9:19 a.m.
20       Thursday, April 13, 2017
21       Before Trisha Cameron, RDR, RMR, CRR, RPR, CSR
22
23
24
25
```

Realtime Reporters, LLC
schedulerealtime@gmail.com  304-344-8463

**JA612**

```
 1    APPEARANCES:
 2    MR. JASON CAUSEY
 3    Bordas & Bordas
 4    1358 National Road
 5    Wheeling, West Virginia  26003
 6    (304) 242-8410
 7         Appearing on behalf of the plaintiffs.
 8
 9    MR. JONATHAN R. MARSHALL (via telephone)
10    Bailey & Glasser, LLP
11    209 Capitol Street
12    Charleston, West Virginia  25301
13    (304) 345-6555
14    jmarshall@baileyglasser.com
15         Appearing on behalf of the plaintiffs.
16
17    MR. JOSEPH F. SAVAGE
18    Goodwin Procter, LLP
19    100 Northern Avenue
20    Boston, Massachusetts  02210
21    (617) 570-1204
22    jsavage@goodwinlaw.com
23         Appearing on behalf of Quicken Loans, TSI,
24         and the witness.
25  (Appearances continued on page 3.)
```

Realtime Reporters, LLC
schedulerealtime@gmail.com  304-344-8463

**JA613**

1   MS. LAURA BERTUS

2   Title Source

3   662 Woodward Avenue

4   Detroit, Michigan  48226

5   (313) 338-0424

6        Appearing on behalf of Title Source.

7

8   MR. SHAWN SOLON

9   Quicken Loans

10  1050 Woodward Avenue

11  Detroit, Michigan  48226

12  (313) 373-3812

13       Appearing on behalf of Quicken Loans.

14

15  ALSO PRESENT:  Steve Alfonsi, videographer.

16

17

18

19

20

21

22

23

24

25

```
1                       I N D E X

2

3   WITNESS:  KRISTINE HUGHES                    PAGE

4

5   EXAMINATION BY MR. CAUSEY                        7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    E X H I B I T S

2                                                    PAGE

3    (None offered.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USCA4 Appeal: 22-2289    Doc: 34-2        Filed: 05/17/2023      Pg: 169 of 374

JA616

```
1   Detroit, Michigan
2   Thursday, April 13, 2017
3   About 9:19 a.m.
4                        *   *   *
5        VIDEOGRAPHER:  This is the videotaped
6   deposition of Kristine Hughes taken by the plaintiff in
7   the matter of Phillip Alig versus Quicken Loans, et al,
8   Civil Action No. 5:12-CV-114 and 5:12-CV-115 in the
9   United States District Court for the Northern District
10  of West Virginia, held at the offices of Honigman
11  Miller on this 13th day of April, 2017.
12       My name is Steve Alfonsi and I am the legal
13  video specialist.  The court reporter is Trisha
14  Cameron.  We are now on the record.  The time is
15  approximately 9:19 a.m.
16       Would counsel please introduce yourselves and
17  who you represent.
18       MR. CAUSEY:  Jason Causey for the plaintiffs
19  Aligs and the class.
20       MR. SAVAGE:  Joseph Savage.  I represent
21  Quicken Loans, TSI, and Kristine Hughes.
22       MS. BERTUS:  Laura Bertus, in-house counsel
23  for Title Source.
24       MR. SOLON:  Shawn Solon, in-house counsel for
25  Quicken Loans.
```

```
 1   BY MR. CAUSEY:
 2   Q.  Are there specific topics that you believe you may be
 3       asked to testify about?
 4   A.  I don't know that either.
 5   Q.  Okay.  Were you involved in any of the decisionmaking
 6       on whether to include estimated values in order forms,
 7       either at your time at Quicken or your time at TSI?
 8   A.  I was told what to put on the order forms.
 9   Q.  By who?
10   A.  From Quicken Loans when I was reporting with Quicken
11       Loans.
12   Q.  When you say reporting, what do you mean?
13   A.  Well, when I was employed there.
14   Q.  Okay.  So Mr. Lyons would have told you what to put on
15       the order form?
16   A.  Correct.
17   Q.  So you were told, I'm sure, address, name, all the
18       information the appraiser needs, right?  Correct?
19   A.  Correct.
20   Q.  And I've got some order forms if we need to look at
21       them.  But -- and then you were told the estimated
22       value as well, right?  You were told to put the
23       estimated value on there too, correct?
24   A.  It was transmitted over to us.
25   Q.  Okay.  And you were told to include it, right?
```

Realtime Reporters, LLC
schedulerealtime@gmail.com  304-344-8463

**JA618**

```
 1    A.    Yes.
 2    Q.    All right.  So there's a difference between being told
 3          what to do.  Which, of course, we all have a boss.  I
 4          have a boss.  Everyone in this room have a boss, I
 5          assume.
 6                    MR. CAUSEY:  You don't?
 7                    MR. SAVAGE:  I've got partners.
 8                    MR. CAUSEY:  There you go.  You might have a
 9          wife.
10                    MR. SAVAGE:  Don't have one.
11                    MR. CAUSEY:  Really?  All right.  We can talk
12          about that later.  So --
13                    MR. SAVAGE:  I doubt it.
14                    MR. CAUSEY:  Probably right.
15    BY MR. CAUSEY:
16    Q.    All right.  All right.  Where am I going with this?
17                    MR. SAVAGE:  I think you were drawing a
18          distinction between having a boss and being a boss.
19    BY MR. CAUSEY:
20    Q.    Right.  So you were told to put -- what to put on the
21          order form.  We covered that.  Now, were you involved
22          in any of the decisionmaking function about what to put
23          on the order form?
24    A.    No.
25    Q.    Okay.  So the -- what to put on the order form was
```

```
 1         decided while you were at Quicken by Mike Lyons and
 2         maybe some other people in his group, right?
 3   A.    Correct.
 4   Q.    All right.  Were you ever asked for your opinion as to
 5         what to put on the order form prior to 2009?
 6   A.    No.
 7   Q.    Okay.  Did you ever -- you weren't asked.  But did you
 8         ever give your opinion as to what should be on the
 9         order form prior to 2009?
10   A.    No.  Order forms are static.  They're general.
11   Q.    All right.  You agree with me that the address of the
12         property being appraised is something that is necessary
13         on the order form, right?
14   A.    Yes.
15   Q.    Phone number of the borrower, so the appraiser can
16         contact them is something that's necessary on the order
17         form, right?
18   A.    Yes.
19   Q.    The borrower's name is something necessary on the order
20         form?
21   A.    Yes.
22   Q.    I think you also agree with me that the estimated value
23         is not necessary to perform an appraisal.
24   A.    It's not necessary to perform, but it is necessary to
25         assign it.
```

```
 1   Q.   Okay.  Explain that to me.
 2   A.   So your -- when we assign an order, it gets assigned to
 3        an appraisal company.  That appraisal company may have
 4        40 or 50 appraisers in the company.  Each appraiser has
 5        a different level of licensing.  And depending on your
 6        level of licensing and your level of confidence,
 7        depends on what product type, what order, what address
 8        you can complete.
 9   Q.   I'm familiar with what you're talking about.  The
10        different state licenses, right?  Correct?
11   A.   There's different levels of state licensing.
12   Q.   There is, right?
13   A.   Yes.
14   Q.   I think in West Virginia, I think -- I could be wrong.
15        But I think it's a million and up on some properties.
16        Does that sound right to you?
17             MR. SAVAGE:  Objection.  Go ahead, if you
18        understand the question.
19             THE WITNESS:  I do understand the question.
20   BY MR. CAUSEY:
21   Q.   There's a million dollar threshold between different
22        licenses in West Virginia.
23   A.   It depends on whether it's a purchase or refinance.
24   Q.   Tell me the thresholds, as you understand them.
25   A.   For a purchase transaction, it's a million dollars or
```

```
 1        higher for a state certified appraiser.  Above a state
 2        certified is a certified general, and they are fine to
 3        complete those also.
 4   Q.   Right.
 5   A.   I do not know whether you have licensed appraisers in
 6        West Virginia or not.
 7   Q.   We do.
 8   A.   Okay.  So they would be below a million.
 9             MR. SAVAGE:  Does that '09 time frame matter
10        to any of these answers?
11             MR. CAUSEY:  No.
12             MR. SAVAGE:  Okay.  We're talking pre-'09?
13             MR. CAUSEY:  Yep.
14   BY MR. CAUSEY:
15   Q.   That's your understanding?
16   A.   Correct.
17   Q.   All right.  So it would be necessary then for you to --
18        for you to assign -- for TSI to assign the appraisal to
19        know what license status the appraiser has, right?
20             MR. SAVAGE:  Objection.
21   BY MR. CAUSEY:
22   Q.   Is that what you're saying?
23   A.   If you're assigning to an individual appraiser.
24   Q.   And you said purchases.  Do you know if refinances has
25        the same million dollar --
```

1   A.   Purchases has -- yes.

2   Q.   Refinances does, right?

3   A.   Yes.

4   Q.   So are there a lot of other ways to go about it than

5        actually putting a borrower's estimated value on the

6        order form --

7                  MR. SAVAGE:  Objection.

8   BY MR. CAUSEY:

9   Q.   -- to go about solving that licensure issue?

10                 MR. SAVAGE:  Objection.

11                 THE WITNESS:  In an automated assigning

12        process, when you're assigning to a company, we don't

13        know who that order is going to.  We know it's going to

14        a company.  So literally it's the company, who's ever

15        accepting those orders on behalf of the company would

16        then distribute it to the appraisers in their company

17        that needs to know this has to go to a state certified,

18        this has to go to a state licensed.

19  BY MR. CAUSEY:

20  Q.   Of course, you could just put less than a million or

21        over a million on the order form, right?

22                 MR. SAVAGE:  Objection.

23  BY MR. CAUSEY:

24  Q.   You don't have to put the exact number on there, right?

25                 MR. SAVAGE:  Objection.

```
 1    BY MR. CAUSEY:
 2    Q.   In fact, have you ever seen order forms that have that
 3         on there, less than a million, over a million?
 4                   MR. SAVAGE:  Objection.
 5                   THE WITNESS:  I have not.
 6    BY MR. CAUSEY:
 7    Q.   You have not.  But you could do that, correct?
 8                   MR. SAVAGE:  Objection.
 9                   THE WITNESS:  If your system was built that
10       way.
11    BY MR. CAUSEY:
12    Q.   All right.  Just make a little software change and 350
13         goes to less than a million, right?
14                   MR. SAVAGE:  Objection.
15                   THE WITNESS:  I can't answer that.
16    BY MR. CAUSEY:
17    Q.   You don't know, right?
18    A.   I don't know.
19    Q.   Another way you could do it, right, is just to rely on
20         the appraiser company.  If they go out to the house and
21         they see it looks like -- it looks like Dan Gilbert's
22         house, then you -- I don't have the license for this
23         thing.
24                   MR. SAVAGE:  Objection.
25
```

```
 1    BY MR. CAUSEY:
 2    Q.   Right?
 3                MR. SAVAGE:  Objection.
 4    BY MR. CAUSEY:
 5    Q.   That's another way to do it, right?
 6                MR. SAVAGE:  Objection.
 7                THE WITNESS:  That would definitely take a
 8         lot of time.
 9    BY MR. CAUSEY:
10    Q.   How many million dollar houses do you think there are
11         in West Virginia?
12                MR. SAVAGE:  Objection.
13                THE WITNESS:  I have no idea.
14    BY MR. CAUSEY:
15    Q.   Would you say there's -- would you say since you've
16         been doing this appraisal business in all these years,
17         how many residential loans does Quicken make over a
18         million dollars?
19                MR. SAVAGE:  Objection.
20                THE WITNESS:  I don't know.
21    BY MR. CAUSEY:
22    Q.   Would you say more of them are less than a million
23         dollars than over a million dollars?
24                MR. SAVAGE:  Objection.
25                THE WITNESS:  I don't know.
```

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

       **Plaintiffs,**

    **v.**                                              Civil Action No. 5:12cv114 (lead)
                                                          Civil Action No. 5:12cv115
**QUICKEN LOANS INC., and**                       Honorable John Preston Bailey
**TITLE SOURCE, INC.**

       **Defendants.**

## <u>STIPULATION</u>

Plaintiffs Philip Alig, Sara J. Alig, Roxanne Shea, and Daniel V. Shea ("Plaintiffs"),

individually and on behalf of a class of persons, by counsel, and Defendants, Quicken Loans Inc.

and Title Source, Inc. ("Defendants"), by counsel, hereby submit this stipulation regarding the

testimony and deposition of Kristine Hughes.

WHEREAS, on or about March 30, 2017, Defendants informed Plaintiffs that they

intended to call Ms. Hughes as a witness at the upcoming trial on classwide penalties (the

"Penalty Trial");

WHEREAS, on March 30, 2017, the Penalty Trial was rescheduled from April 20, 2017

to May 9, 2017, in order to allow time for Plaintiffs to take the depositions of Defendants'

witnesses, including Ms. Hughes;

WHEREAS, Defendants subsequently informed Plaintiffs that Ms. Hughes was

unavailable on May 9, 2017;

WHEREAS, on April 13, 2017, Plaintiffs took the deposition of Kristine Hughes (the "Hughes Deposition");

WHEREAS, on April 17, 2017, Plaintiffs filed a Motion and Integrated Memorandum of Law to Exclude Witnesses and Documents at Damages Hearing (ECF No. 289, the "Motion"), and in that Motion sought to exclude the testimony of Ms. Hughes and two other witnesses.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the undersigned parties, as follows:

1. Pursuant to Fed. R. Civ. P. 32, the Hughes Deposition will be designated and neither party will object to its admissibility for use at the trial scheduled for May 9, 2017 on the basis that live testimony was not offered.

2. Plaintiffs hereby withdraw the portion of Motion which seeks to exclude the testimony of Kristine Hughes.

3. Nothing in this Stipulation shall waive, and the parties hereby expressly preserve, all rights, claims, and defenses.


Dated: April 24, 2017

Respectfully submitted,

**PHILIP ALIG, SARA J. ALIG, ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

By:/s/  ___Jason E. Causey_____

Jason E. Causey
James G. Bordas, Jr.
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
E-mail: jbordas@bordaslaw.com
E-mail: jason@bordaslaw.com

**QUICKEN LOANS INC. and TITLE SOURCE, INC.**

By: /s/ *Joseph F. Savage, Jr.* _____

Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000

2
**JA627**

John W. Barrett
Jonathan R. Marshall
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com
*Counsel for Plaintiffs*

Facsimile:   (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com

Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Title
Source, Inc.*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone:  (202) 346-2000
Facsimile:   (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com

Carrie Goodwin Fenwick (WV Bar No.
7164)
Richard D. Owen (WV Bar No. 2794)
*Counsel for Quicken Loans Inc. and Title
Source, Inc.*
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
*Counsel for Quicken Loans Inc. and Title
Source, Inc.*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail:
jason.manning@troutmansanders.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

        **Plaintiffs,**

        **v.**                                      **Civil Action No. 5:12cv114 (lead)**
                                              **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**                   **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

        **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of April, 2017, I electronically filed this Certificate of Service for Defendants Quicken Loans Inc. and Title Source, Inc.'s and Plaintiffs Philip Alig, Sara J. Alig, Roxanne Shea and Daniel V. Shea, individually and on behalf of a class of persons, foregoing Stipulation Regarding Kristine Hughes' Deposition Testimony  using the CM/ECF system.

                                  /s/ *Joseph F. Savage, Jr.*

# Exhibit 29

4/22/2017                | Recipe for foreclosure: Fraudulent mortgages devastate home-loving West Virginians and fuel national subprime crisis

Welcome **GUEST**

JOBS     CLASSIFIEDS     REAL ESTATE     CARS     TV WEEKLY     CONTESTS     SUBSCRIBE





**A Few Clouds**  **47.0 °F**

HOME     NEWS     BUSINESS     OPINION     SPORTS     LIFE     A&E     OUTDOORS

BLOGS     OBITUARIES     MULTIMEDIA     WEATHER

# Recipe for foreclosure: Fraudulent mortgages devastate home-loving West Virginians and fuel national subprime crisis

September 30, 2007

*"This is an action arising out of a practice known as predatory lending, whereby a mortgage broker, out-of-county appraisers and a national lender act together to exploit unsophisticated consumers by persuading them to enter into high-interest mortgage loans that are not supported by the value of their homes."— from Hager v. Bank of America, in the United States District Court for the Southern District of West Virginia*

Eight years ago, Charleston public interest attorneys Dan Hedges and Bren Pomponio started suing predatory mortgage lenders and brokers."These companies target elderly and low-income West Virginians and talk them into signing fraudulent mortgage loans they can't afford," Hedges said. Their homes are at stake."These are not sophisticated

JA631

borrowers," Pomponio said. Most found themselves up against the financial wall because of job loss, old age, medical bills or some other big expense, he said.Their law firm, Mountain State Justice, has filed about 800 cases on behalf of thousands of West Virginians facing foreclosure. Their clients have contended with bogus appraisals, kickbacks to brokers, misrepresentations and outright lies, illegal fees and other fraudulent practices.These cases connect West Virginia mortgage fraud with this year's Wall Street mortgage foreclosure debacle.Wall Street has staggered under a national explosion of subprime adjustable rate mortgage foreclosures. You can find the beginnings of that blast, Hedges said, in towns like Pineville, Madison, Clay and Charleston.Recent figures suggest the ripple effects:s One in four West Virginians (26 percent) with such mortgages were delinquent in payments in the second quarter of 2007, according to the National Delinquency Survey of the Mortgage Bankers Association.s West Virginia has the second highest delinquency rate in the country for subprime adjustable rate mortgages, according to the MBA survey, second only to Mississippi.s In the first quarter, West Virginia was third, with a 21 percent rate.s One in eight West Virginians with subprime adjustable loans (13.5 percent) faced foreclosure, the MBA reported in September.Since 2001, some of America's biggest out-of-state financial institutions have foreclosed on 5,738 West Virginia homes. The list includes Wells Fargo, Citibank, Bank of America, Wachovia, Chase, Countrywide and others, Hedges and Pomponio say.

Mountain State Justice employees counted those foreclosures in all 55 county courthouses."The number has gone up every year," Hedges said.Those West Virginians took out loans through mortgage brokers in towns such as Glenville, but then their mortgages were sold to out-of-state companies, and sometimes re-sold until they reached national banks and Wall Street firms.Hedges and Pomponio take only mortgage cases with clear evidence of fraud. Their success rate? "We've never lost a case," Hedges said. "These cases are that egregious."He defines success as "getting the loans voided or substantially altered so people can stay in their homes."How does it happen? Many of their clients are elderly or unfamiliar with finance, have limited education, are disabled or can't read well. They are typically confronted with contracts 30 to 50 pages long, with riders that may reverse what the main contract says.Many did not know they had signed subprime "exploding ARMs." Those are adjustable rate mortgages (ARMs) that were immediately being sold out of state, Hedges said. They seldom knew their interest rate would stay constant for two or three years, then explode upward twice a year."If they did know, they'd been told they could automatically refinance, and that did not happen."Nowhere in the contract does it say how much they will have to pay back or how large their payments could be, once the interest starts rising, he said."It's a recipe for foreclosure," he said. Such a mortgage could saddle a person with a $250,000 payback for a $50,000 loan. Predatory lenders often do not give borrowers an

advance estimate and listing of terms, as required by federal law, Hedges said. Often, borrowers don't see the agreement until they're asked to sign it. "The brokers may tell them their agreement says something different than it does," he said. "And these agreements are written in language a sophisticated person would have trouble understanding."Here's a sample: Beginning with the first Change Date, my interest rate will be based on an index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-dominated deposits in the London market (LIBOR) as published in the Wall Street Journal. The most recent index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index.""People trust the mortgage broker to explain it to them, which is a mistake," Hedges said.The broker may get a kickback called a "yield spread," Hedges said. Here's how that works: The lender tells the broker he can make the loan at, say, 8 percent. The broker convinces the borrower to accept 10 percent. Then the broker gets the extra money, and the borrower is stuck with a higher rate."The borrowers seldom know about the yield spread," Hedges said. "That's the problem."How do these loans end up in the possession of Citibank or Chase Manhattan?"The whole thing starts when local brokers and little lenders approach people and say, 'You need to refinance with us. We can get you a better deal,'" Hedges said. "And of course, it isn't a better deal."We've had cases where the broker went door to door like an aluminum siding salesman," he said. "But they mostly do it over the phone or by mail." The usual pitch is: "Bad credit? Don't worry.""The people they target tend to be trusting. They are typically led to believe they can deal with the local company for the life of the loan. They don't realize the local broker is just doing legwork for an out-of-state company in return for a substantial commission."More than half of the Mountain State Justice cases involve appraisal fraud, Hedges said: the lender gets an appraisal that says the property is worth two to four times more than it is."It's illegal in West Virginia and many other states to make a mortgage loan for more than the value of the property," he said, "but many of these lenders have at their beck and call appraisers who are willing to value the property any way the lender requests."Perhaps 15 or 20 of the state's 850 appraisers will do this, Hedges said. "The same appraisers keep cropping up again and again in our cases," he said. "They supply the lender with a bogus appraisal that far exceeds the value of the home, to get the loan up high. We've seen it hundreds, probably thousands of times."The appraisal goes to the lender and broker. The borrower often never sees it, he said.

Predatory lenders often don't exactly follow office procedure. "These loans are closed anywhere," Hedges said. "Dairy Queens and Burger Kings and on the hoods of pickup trucks. Kinko's. We had one closed on the Turnpike."Frequently, a notary shows up in people's homes at night. And when people ask what's in these documents, the notary says, 'I don't know. I was just told to get your signature. Here they are. Sign them if you want the loan.'""And of course, the people believe what they've been told over the phone, and they go ahead and sign."The out-of-state lender "bundles" the new loan with others and sells it to a national bank or lending institution. Banks like Wells Fargo and Citibank use those bundles to guarantee other investment. Pieces of a loan made to an elderly woman in Mullens can end up all over the globe."In recent years, Wall Street firms have displayed an insatiable appetite for these kinds of loans," said Kathleen Keest, lead attorney for the Center for Responsible Lending, based in Durham, N.C. They slice and dice them, mix them with mortgages from Iowa, Mississippi or wherever and use them to back various investments all over the globe, she said."It's so pervasive, it's hard to avoid supporting it," Pomponio said. He and Hedges recently discovered that their own pension fund owns stock in at least one of the national banks they're suing.The Wall Street pipeline is drying up for now, under a wave of foreclosures, lawsuits and negative publicity. Mountain State Justice has sued about 30 national

banks, Hedges said. Their legal argument: Accepting these loans is somewhat like receiving stolen goods. They knew or they should have known.Big banks have their own written standards of ethical procedure and ways to know if loans are fraudulent, Pomponio said.They often use "loan servicing organizations" to collect on the loans. "They try to hide the fact that they're involved in this," Hedges said.'A time bomb'Nobody wants to defend predatory mortgage loans. Joe Ellison, CEO of the West Virginia Bankers Association, said his organization has considered a campaign to educate the public about predatory lending. The National Association of Realtors features "How to Avoid Predatory Lending" advice on their Web site.The whole thing started with good intentions, said mortgage broker John Asseff, owner of Charleston's Solutions One Mortgages. The federal government meant to increase homeownership by making subprime, adjustable-rate mortgages available to risky borrowers, he said. "Is it better to give a subprime loan to a consumer and give them the hope of owning a home? Or is it better to not give them a subprime loan and turn them away from the American dream?" he asked."There's many people who believe it's better to give somebody a chance at homeownership and give them an opportunity to pay for that home on a timely basis."But most people who take out subprime, adjustable-rate loans are not new homeowners, according to Center for Responsible Lending studies. Foreclosures on these loans exceed the number of new homeowners, CRL data show, so home ownership actually decreases."The number of foreclosures on these kinds of mortgages has risen every year in West Virginia," Hedges said. "And it's likely to escalate dramatically in the next few years."One in five Americans who took out a subprime ARM between 1998 and 2006 will lose their homes, CRL predicts. Millions of subprime, adjustable-rate mortgages were issued in 2005 and 2006. Their interest rates have started spiking. About 20 percent will default, CRL predicts.It's a time bomb, Hedges agrees.In June, RealtyTrak, a nationwide online marketplace for foreclosed properties, reported 165,000 new foreclosure filings, more than twice as many as were reported in 2005.Fragmented regulationIronically, West Virginia law forbids adjustable rate loans, said Bob Lamont, general counsel for the state Division of Banking. But during the Reagan administration, Congress passed a law that pre-empts state law in this area."There's a federal law, called The Alternative Mortgage Transaction Parity Act, and that's Congress telling the states: 'We don't care what your law says,'" Lamont said.By federal law, the state cannot regulate out-of-state lenders, national banks and their subsidiaries. So that means the state cannot regulate many of the very outfits that make these fraudulent loans.As of mid-September, 575 lenders were registered to do business in West Virginia. Many are middle-men, companies who provide the loan through the broker, then sell it to a big national company.They are just the lenders the state can regulate. The Division of Banking has no way to know how many others are writing mortgages in West Virginia, Lamont said. "Most of them don't register with us," he said. "They don't have to."West Virginia-chartered banks are almost never involved in fraudulent mortgage cases, both he and Hedges said. Ironically, that makes West Virginians more vulnerable. "People are used to dealing with local bankers who do not routinely lie to them or set up situations where they cannot make payments.""The history of local banking in West Virginia has been the community bank that you can go in and talk with if you need a couple of extra weeks before payday," Pomponio said. "The last thing most local banks want is a foreclosure. They live in the community."There are exceptions. In 1999, the First National Bank of Keystone collapsed, in part because it was buying huge lots of bundled loans to sell to national institutions. State officials could not regulate it or investigate its practices because it was nationally chartered and therefore exempt from state regulation.The two sets of rules give unscrupulous lenders an unfair advantage over state banks, Hedges said. "State banks have lost substantial market share to these outfits," he said.'If it sounds too good to be true ...'Eight file cabinets in Mountain State Justice's Charleston office are

packed with mortgage documents. The two attorneys keep about 130 case files on their computers at any given time, Pomponio said. Some involve dozens of people."But we can't begin to represent all the people who need help," he said.Few West Virginia lawyers will take these complex cases. Fayette countian Renee Waselchalk, for instance, said she approached 10 attorneys in Fayette and Raleigh counties on behalf of her mother before she found Mountain State Justice.Nobody knows how many fraudulent mortgages there are out there. Unless a person takes legal action, Keest said, their problem remains invisible. And people often have trouble getting a lawyer, especially in rural areas. "These can be very complex, time-consuming, expensive cases, especially when you have to go up against lawyers from international banks," Pomponio said.As a public interest firm, they are funded to do that for low-income people, so they don't have to charge them. Few states have such a firm, said Keest, of the Center for Responsible Lending.Most attorneys don't know this kind of mortgage law, said Charleston bankruptcy attorney Andy Nason. "And an attorney who doesn't know how to do a case probably shouldn't take it.""We could keep four to six more attorneys busy at this point," Pomponio said.Ultimately, the public has to become more alert to the dangers of predatory loans, Hedges said."If it sounds too good to be true, it probably is."*To contact Kate Long, use e-mail or call 348-1798.*

≡ Site Navigation

**JA635**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling


**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE SHEA** and **DANIEL V. SHEA**, individually and on behalf of a class of persons,

        Plaintiffs,

    v.

                                    **Civil Action No. 5:12-CV-114**
                                      Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE, INC.**, dba Title Source Inc. of West Virginia, Incorporated,

        Defendants.


**ORDER GRANTING IN PART AND DENYING
IN PART PLAINTIFFS' MOTION TO EXCLUDE
WITNESSES AND DOCUMENTS AT DAMAGES HEARING**

Pending before this Court is Plaintiffs' Motion and Integrated Memorandum of Law to Exclude Witnesses and Documents at Damages Hearing [Doc. 289]. The defendants have filed a response to the Motion, and the Motion is ripe for decision.

In resolving this Motion, the background is extremely important. This litigation effectively commenced on June 15, 2012, when plaintiffs filed an Amended Complaint in the Circuit Court of Ohio County individually and on behalf of a class of West Virginians who obtained mortgage loans through Quicken. The case proceeded through several years of motion practice, a stay, and exchange of discovery. The course of discovery included the exchange of over 15,000 pages of documents and the depositions of twenty-three witnesses. Discovery on all aspects of the case closed on December 29,

1

**JA636**

2015 [Doc. 97].

Plaintiffs subsequently moved for class certification as well as for summary judgment on the class claims. On June 2, 2016, this Court found that Quicken's uniform practice of providing estimated home values to appraisers constitutes unconscionable conduct under the West Virginia Consumer Credit and Protection Act ("WVCCPA") [Doc. 227]. The Court found that Quicken did so while failing to disclose the practice to plaintiffs. The Court recognized that, by "concealing these facts, Quicken deceived the plaintiffs" as understood by the Fourth Circuit in *McFarland v. Wells Fargo Bank*, 810 F.3d 273 (4th Cir. 2016). Moreover, the Court found "ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs' loans." The Court rejected Defendants' argument that appraisals are obtained for the benefit of the lender, not the borrower, [Id. at 22], explaining that Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater."

This Court also made findings as to intent: "To repeat, Quicken had full knowledge of its practice of providing estimated values to its appraisers for purposes of influencing their appraisals. Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers. Quicken knew these facts. The plaintiffs did not. Under the analytical framework of both *McFarland* and *Brown*, this constituted unconscionable inducement." [Id. at 20-21].

The Court also rejected any argument that plaintiffs must show actual harm to

2

**JA637**

recover under the WVCCPA. [Id. at 23]. It explained that Quicken's belief that plaintiffs must show actual harm caused by its conduct to be "contrary to the stated purpose of this claim, which is to provide a cause of action in situations where damages in the form of a substantively unconscionable loan are not present. For that reason, the WVCCPA provides that a person who has been subjected to unconscionable conduct may recover actual damages and the right to recover of $1,000 per violation. West Virginia Code § 46A-5-101. *See* Syl. pt. 2 ***Vanderbilt Mortg. & Fin., Inc. v. Cole***, 230 W.Va. 505, 740 S.E.2d 562 (2013) ('under W. Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages.')." [Id]

As to the breach of contract claim, the Court analyzed the contract into which plaintiffs and Quicken entered in which Quicken undertook to obtain an acceptable appraisal [Id. at 24]. The Court went on to find that an appraisal obtained by the process of providing a target figure to an appraiser is a universally condemned process that serves no legitimate purpose and "cannot conceivably be an 'acceptable' one." [Id. at 25]. Further, "[n]or could an appraisal obtained by such a scheme be fair, valid or reasonable" and "withholding knowledge of the true nature of the appraisal violates Quicken's duty to deal honestly" [Id.].

Finally, this Court also found that the "undisputed evidence shows that Quicken and TSI consistently acted in concert to accomplish their unlawful purposes of providing appraisers with estimated values" and granted affirmative summary judgment on plaintiffs' conspiracy claim [Id. at 54-55].

This Court also analyzed plaintiffs' motion for class certification and, finding all Rule 23 requirements met, certified a class defined as:

All West Virginia citizens who refinanced mortgage loans with Quicken, and

for whom Quicken obtained appraisals through an appraisal request form that

included an estimate of value of the subject property.

[Id. at 61.  In doing so, the Court found that it would be able to "easily determine whether

the discovery rule applies class-wide to toll class members' claims" and that therefore

"defendant's statute of limitations argument presents no barrier to certification¨ [Id. at 51].

Defendants unsuccessfully moved for reconsideration as well as interlocutory appeal

to the Fourth Circuit. [Docs. 243 & 237].

Defendants then moved for entry of a scheduling order, after which the Court held

an in person status conference on November 17, 2016.  As a result of that conference, this

Court issued an Order [Doc. 248] as follows:

• The Court noted that defendants sought additional discovery and that

"defendants also seek to demonstrate that they did not engage in any sort of 'bad

faith' in making a referral to the appraisers" and further "seek to demonstrate that

there was no causal connection between their conduct and a biased appraisal as

to damages;"

• The Court further stated that plaintiffs "contend that defendants are merely

asking for a 'do-over' both on discovery and the merits arguments that they have

already presented thus far" and that plaintiffs had pointed out that "defendants

already have the discovery which they seek, including their lending patterns and

practices, and information about individual class members' loans;"

• As a result, the Court concluded that defendants were simply asking for a

period of time to go through loan information, and allowed defendants a period of

4

JA639

time to go through the loan information already in their possession;

•       The Court set forth the class notice procedures, including that a first class opt-out notice must be sent by December 15, 2016; and that a second notice must be sent "after the Court has ruled on statutory damages and the return of the appraisal fees, so that individual plaintiffs can estimate the amount of monetary compensation that they will receive by opting into or out of the class;"

•       The Court ordered Defendants to provide plaintiffs with information as to the amount of appraisal fees by March 1, 2017;

•       The Court set a hearing as to damages on April 20, 2017, with concurrent memoranda as to class damages to be filed by April 6, 2017.

Despite the fact that discovery was closed, on February 24, 2017, the defendants filed interrogatories and requests for admission on the plaintiffs.  In addition, on March 10, 2017, the defendants filed Second Supplemental Rule 26(a)(1) disclosures, identifying, for the first time, seven new witnesses from Quicken and TSI; two witnesses of a company identified as "FNC, Inc."; "members of the class certified by the Court on June 2, 2016"; four individuals who opted out of the class; the general categories of "West Virginia appraisers and/or individuals who conducted or were otherwise involved in appraisals for the loans in the class certified by the Court on June 2, 2016"; and Quicken and TSI employees generally who had contact with any member of the certified class.  The disclosure also listed many new documents generally, including:

1.      [d]ocuments and information relating to members of the class certified by the Court on June 2, 2016 and the loans they obtained during the class period, including loan files and loan journal notes;

5

2.      records relating to the discharge, modification, acceleration, refinance, surrender, foreclosure, and/or modification of those loans, and public records concerning the class members (e.g., bankruptcy and other public filings);

3.      "Emails and other business records of Defendants which relate to the appraisal ordering and review processes, or to legal and industry requirements and guidelines";

4.      "Publicly-available documents relating to appraisals, appraisal ordering, and appraisal review"; and

5.      "Publicly-available documents relating to the discharge, modification, acceleration, refinance, surrender, foreclosure, and/or modification of loans obtained by members of the class certified by the Court on June 2, 2016, and publicly-available documents relating to the sale of any property securing those loans."

At the hearing on March 30, 2017, this Court directed defendants to limit the number of witnesses to be presented at the hearing to five.  In response, the defendants identified Clint Bonkowski, A.J. Ureel, Kristine Hughes, Amy Bishop and William Banfield as the witnesses to be called.  Four of these witnesses, all but Mr. Banfield, had never been disclosed until March 10, 2017.  Despite the failure of the defendants to timely disclose these potential witnesses, the Court determined to allow the testimony (to the extent relevant) provided that the defendants made the witnesses available for deposition, so that the plaintiffs could discover the witnesses' expected testimony and the areas upon which testimony would be given.

The depositions were taken on April 13 and 14 in Detroit, Michigan.  During the deposition, a portion of the testimony was as follows:

Q.    Do you know where the documents came from?

A.    No.

Q.    Aside from lawyers, did you talk to anybody about the testimony that you're going to provide today?

A.    No.

Q.    So this matter has been set for a damages hearing, and you've been disclosed as a potential witness.  Do you know what your expected testimony will be at that hearing?

A.    No.

Q.    Do you know any of the questions that you'll be asked at that hearing?

A.    No.

Q.    Do you know any of the issues that you'll be asked to address at that hearing?

A.    No.

Q.    Do you know how - do you know if you'll be asked to provide testimony regarding any damages that class members may have suffered?

A.    No, I don't know.

Q.    Do you know why you were asked to testify?

A.    No.

Q.    The loan documents that you reviewed, do you know why you were asked to review those documents?

A.    No.

[Doc. 289-2, p. 24].

7

**JA642**

During the deposition of Mr. Ureel, the following occurred:

Q.      What is going to be your expected testimony at trial?

Mr. Savage (defense counsel):Well, if you know.  If it's something that you know from lawyers, then you don't answer.

A.      I can't answer that.

Q.      What were you - what are you here to talk about?  What knowledge or information do you have to talk about today?

Mr. Savage:  Objection.  He's here to answer your questions.

A.      I'm here to answer your questions.

. . .

Q.      Well, I kind of need to know what I need to ask you.  So you've been designated as a potential witness at a hearing that's going to be held on May 9th.  And I'm trying to figure out - and the whole reason for all of this is to figure out what you intend to say.  So what do you intend to say?

A.      I intend to answer the questions that are posed to me.

. . .

Q.      What do you expect - - what are the types of questions that you expect that you'll answer?

A.      I can't answer that.

[Doc. 289-3, pp. 33-34].

This Court finds this type of gamesmanship to be unacceptable.  This is the type of conduct that the Federal Rules were adopted to prevent and remedy.  The whole purpose of the depositions ordered by the Court was so that the plaintiffs could learn the intended

8
**JA643**

testimony of the late disclosed witnesses and ameliorate the prejudice of having the witnesses disclosed so very late in the proceedings.

For the above reasons, Clint Bonkowski and A.J. Ureel are excluded as witnesses at the hearing on May 9.  The parties have stipulated that Kristine Hughes' deposition may be used at the hearing [Doc. 294].  Accordingly, the Motion is denied to the extent that it sought to exclude the testimony of Ms. Hughes.

With respect to documents to be presented at the hearing, any document that was not disclosed to the plaintiffs by the disclosure of March 10, 2017, or before is excluded.

Accordingly, Plaintiffs' Motion and Integrated Memorandum of Law to Exclude Witnesses and Documents at Damages Hearing [**Doc. 289**] is **GRANTED IN PART AND DENIED IN PART**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record.

**DATED**: May 2, 2017.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

9

JA644

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,

    Plaintiffs,

v.

QUICKEN LOANS INC., and
TITLE SOURCE, INC.

    Defendants.

Civil Action No. 5:12cv114 (lead)
Civil Action No. 5:12cv115
Honorable John Preston Bailey

## DECLARATION OF WILLIAM C. CLARK

I, William C. Clark, hereby declare and state as follows:

1.    My name is William C. Clark. I live at 27 Garden Lane in Morgantown, West Virginia. I make this declaration based on my personal knowledge and experience, and if called as a witness to testify to any of the matters in this declaration, I could and would competently do so.

2.    I have had my mortgage loan with Quicken Loans since building my home. In 2009, I received an email from Quicken Loans offering me the opportunity to lower my monthly payments by refinancing the loan. The new rates they were offering were less than I was currently paying and less than I had seen from other lenders, so I decided to pursue the refinance with Quicken Loans. I also remembered that Quicken Loans had been a pleasure to work with when I took out my original loan. The people I worked with

at Quicken Loans were responsive and helpful and were able to close that loan without the delays and hassles I have experienced with other lenders.

3.    In connection with the refinance, Quicken Loans had an appraiser come to the house to perform an appraisal of the property. I reviewed the appraisal after it was completed and remember thinking that the appraisal was accurate. I showed the appraisal to my son, who is a residential contractor who built my home along with other homes in the area, and my son told me at the time that the appraised value was in line with what he thought it should be. Given his familiarity with my property and with area housing in general, I had (and have) no reason to doubt that he was right about that.

4.    I closed on the refinance loan with Quicken Loans and was again satisfied with the experience. The new loan terms saved me a significant amount of money over the course of the last eight years. Quicken Loans' team members provided pertinent advice about my refinance options, discussed all the loan options with me at length, and helped me decide on the appropriate loan product. I was also impressed with Quicken Loans' attentive and responsive customer service during the process of completing the necessary loan application documents and closing documents. The documents were clearly explained to me and I was given ample opportunity to ask questions. As a result of these experiences, I've recommended Quicken Loans to many people. I am considering moving and if I do, I would use Quicken Loans for my mortgage again.

5.    I was made aware of this lawsuit when I received a notice in the mail informing me that I was a member of the class. The notice stated that I was a member of the class because I refinanced my mortgage loan with Quicken Loans, my home is located in West

2

Virginia, and, in connection with my refinance, Quicken Loans allegedly included an "estimated value" of the property on the appraisal order form. The notice also stated that I could exclude myself from the class by sending a letter to Plaintiffs' counsel stating that I would like to be excluded from this lawsuit. I mailed my opt-out request on December 20, 2016.

6.      I chose to opt out of this lawsuit because I do not believe that I was harmed by my refinance loan and do not believe that it would be just for Plaintiffs to receive the money they are seeking to recover in this lawsuit. I believe I received a fair, unbiased, and accurate appraisal in exchange for the fee I paid for it and that it would not be just to order that fee returned to me. As explained above, I also benefited financially from the refinance loan because it saved me money every month on my loan payments, and I do not believe it would be fair to punish Quicken Loans for providing a loan that saved me so much money. I never owed more on my loan than my home was worth, and I have never missed any payments on my loan.

7.      The appraisal Quicken Loans obtained for my 2009 refinance loan did not affect my decision to refinance or induce me into taking the loan. If I had been told at the time that the appraiser had been provided an estimated value of my property before I took out the loan, it would not have affected my decision to take the loan because I was (and am) satisfied that the appraised value was accurate. If the appraisal had been too low to support the loan, I likely would have requested that Quicken Loans order a new appraisal to confirm that the original appraisal was accurate. My decision to refinance was simply

3

not affected in any way by the appraisal or by any information supplied to the appraiser during the loan application process.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 04 - 21 · , 2017

William C. Clark
William C. Clark

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

        **Plaintiffs,**

     **v.**                                 **Civil Action No. 5:12cv114 (lead)**
                                              **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**            **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

        **Defendants.**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of May, 2017, I electronically filed the foregoing Declaration of William Clark with the Clerk of the Court using the CM/ECF system, and I further certify that a courtesy copy of this document is being sent to the Clerk of the Court via Federal Express. I further certify that a true and correct copy of this document has been sent via email and via First Class U.S. Mail to the following counsel of record:

<u>**Counsel for Plaintiffs**</u>
Jason E. Causey
James G. Bordas, Jr.
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
E-mail: jbordas@bordaslaw.com
E-mail: jason@bordaslaw.com

John W. Barrett
Jonathan R. Marshall
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com

**JA649**

_/s/ Joseph F. Savage, Jr._

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**WHEELING DIVISION**

**PHILLIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA, and**
**DANIEL V. SHEA, individually and on**
behalf of a class of persons,

      **Plaintiffs,**

**v.**                                         **Civil Action No. 5:12-CV-114**
                                                       **Civil Action No. 5:12-CV-115**

**QUICKEN LOANS, INC., and**
**TITLE SOURCE, INC.,**

      **Defendants.**

**Plaintiffs' Response in Opposition to Defendants'**
<u>**Motion to Decertify the Class**</u>

## TABLE OF CONTENTS

Page

Introduction and Background .................................................................................. 1

Standard for Decertification ................................................................................... 8

Argument ............................................................................................................... 10

   I.   The class representatives and each class member have incurred a concrete and particularized injury in fact, and have standing under Spokeo ........................................ 10

   II.   There are no individualized issues as to the contract claim ............................................. 16

   III.   There is no need for individualized evidence to award statutory penalties ..................... 18

   IV.   The Court correctly found that the equitable tolling issue could be resolved on a class-wide basis .............................................................................................................. 23

   V.   The Court's class certification decision was sound and there have been no changes in fact or law to disturb it ......................................................................................... 25

i

**JA652**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archbold v. Wells Fargo Bank, N.A.*,
   No. 3:13-cv-24599 (S.D. W. Va. July 14, 2015) ...................................................21

*Baker v. Castle & Cooke Homes Hawaii*,
   No. 11-00616, 2014 WL 1669158 (D. Haw. 2014) ...............................................24

*Bonett v. Educ. Debt Servs., Inc.*,
   No. 01-6528, 2003 WL 2165827 (E.D. Pa. May 9, 2003) ......................................22

*Bourne v. Mapother & Mapother, P.S.C.*,
   998 F.Supp. 2d 495 (S.D. W. Va. 2014) ...............................................................14

*Brinker v. Chicago Title Ins. Co.*,
   No. 8:10-cv-1199, 2012 WL 1081211 (M.D. Fla. Feb. 9, 2012) ...........................15

*Burke v. Fed. Nat'l Mortg. Assoc.*,
   No. 3:16-153, 2016 WL 4249496 (E.D. Va. Aug. 9, 2016) ...................................14

*Church v. Accretive Health, Inc.*,
   654 Fed. Appx. 990 (11th Cir. 2016) ....................................................................13

*Clements v. HSBC Auto Finance, Inc.*,
   No. 5:09-cv-00086, 2011 WL 2976558 (S.D. W. Va. July 21, 2011) ....................18

*Cleveland v. Policy Mgmt. Sys. Corp.*,
   526 U.S. 795 (1999) ..............................................................................................16

*Cohen v. Trump*,
   303 F.R.D. 376 (S.D. Cal. 2014) ..........................................................................24

*Connor B. v. Patrick*,
   278 F.R.D. 30 (D. Mass. Nov. 10, 2011) ..........................................................9, 10

*Cunningham v. M&T Bank Corp.*,
   814 F.3d 156 (3d Cir. 2016) .................................................................................24

*Daubert v. Nra Grp., LLC*,
   No. 3:15-cv-00718, 2016 WL 4245560 (M.D. Pa. Aug. 11, 2016) .......................14

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ................................................................................19

ii

**JA653**

*Dickens v. GC Servs. Ltd. P'ship*,
    No. 16–cv–00803, 2016 WL 3917530 (M.D. Fla. July 20, 2016)...........................................14

*Diloreti v. Countrywide Home Loans, Inc.*,
    No. 5:14-cv-00076 ....................................................................................................................20

*Dreher v. Experian Info. Solutions, Inc.*,
    856 F.3d 337 (4th Cir. 2017) ...................................................................................................11

*Ealy v. Pinkerton Gov't Servs., Inc.*,
    514 F. App'x 299 (4th Cir. 2013) ............................................................................................19

*Easterling v. Conn. Dep't of Corr.*,
    278 F.R.D. 41 (D. Conn. 2011)................................................................................................10

*Elias v. Ungar's Food Prods.,Inc.*,
    No. 06-cv-2448, 2009 U.S. Dist. LEXIS 74140 (D. N.J. Aug. 20, 2009) ...............................10

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) ............................................................................................24, 25

*Fangman v. Genuine Title*,
    No. RDB-14-0081, 2016 WL 6600509 (D. Md. Nov. 8, 2016)...............................................24

*Garland v. Cohen & Krassner*,
    No. 08-cv-4626, 2011 WL 6010211 (E.D.N.Y. Nov. 29, 2011) .............................................22

*Gen. Tech. Applications, Inc. v. Exro Ltda*,
    388 F.3d 114 (4th Cir. 2004) ...................................................................................................12

*Gulino v. Bd. of Educ. of City School Dist.*,
    No. 96 Civ. 8414(KMW), 2012 WL 6043803 (S.D.N.Y. Dec.5, 2012)..................................10

*Hamilton v. Pilgrim's Pride Corp.*,
    314 F.Supp. 2d 630 (N.D. W. Va. 2004) ................................................................................24

*Harlan v. Transworld Sys., Inc.*,
    302 F.R.D. 319 (E.D. Pa. 2014)...............................................................................................22

*Irvine v. I.C. Sys., Inc.*,
    198 F.Supp. 3d 1232 (D. Colo. 2016)......................................................................................14

*In re J.P. Morgan Chase Cash Balance Litig.*,
    255 F.R.D. 130 (S.D.N.Y. 2009) ...............................................................................................9

*J.S. v. Attica Cent. Sch.*,
    No. 00-cv-513, 2011 U.S. Dist. LEXIS 109676 (W.D.N.Y. Sept. 27, 2011).........................10

iii

**JA654**

*Kemply v. Cashcall, Inc.*,
    No. 08-cv-03174, 2016 WL 1055251 (N.D. Cal. Mar. 16, 2016) ...........................................22

*Kennedy v. United Healthcare of Ohio, Inc.*,
    206 F.R.D. 191 (S.D. Ohio 2002)..............................................................................................24

*Kohen v. Pacific Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ......................................................................................................11

*Krakauer v. Dish Network L.L.C.*,
    168 F.Supp. 3d 843 (M.D.N.C. 2016) ..................................................................................14, 20

*Kubiak v. S.W. Cowboy, Inc.*,
    No. 3:12-cv-1306, 2015 WL 12859422 (M.D. Fla. Mar. 11, 2015).......................................10

*Linehan v. Allianceone Receivables Mgmt., Inc.*,
    No. 15-1012, 2016 WL 4765839 (W.D. Wash. Sept. 13, 2016)............................................13

*Lane v. Bayview Loan Servicing, LLC*,
    No. 15–cv–10446, 2016 WL 3671467 (N.D. Ill. July 11, 2016)............................................14

*Larson v. Trans Union, LLC*,
    201 F.Supp. 2d 1103 (N.D. Cal. 2016) ....................................................................................13

*Lester v. Percudani*,
    217 F.R.D. 345 (M.D. Pa. 2003)..............................................................................................15

*Lewis v. Casey*,
    518 U.S. 343 (1996) (Souter, J., concurring)...........................................................................11

*Macy v. GC Servs. Ltd. P'ship*,
    No. 3:15-cv-819, 2016 WL 5661525 (W.D. Kty. Sept. 29, 2016) .........................................14

*McCamis v. Servis One, Inc.*,
    No. 8:16-1130, 2016 WL 4063403 (M.D. Fla. July 29, 2016) ...............................................14

*Messinger v. Anderson*,
    225 U.S. 436 (1912).....................................................................................................................9

*Mey v. Got Warranty, Inc.*,
    193 F.Supp. 3d 641 (N.D. W. Va. 2016) .................................................................................14

*Milbourne v. JRK Residential Am., LLC*,
    No. 3:12-861, 2016 WL 1071564 (E.D. Va. Mar. 15, 2016)..................................................11

*Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC*,
    198 F.R.D. 503 (N.D. Ill. 2001)...............................................................................................21

*Minter v. Wells Fargo*,
    279 F.R.D. 320 (D. Md. 2012)..................................................................24

*Minter v. Wells Fargo Bank*,
    No. 07-cv-3442, 2013 WL 1795564 (D. Md. Apr. 26, 2013)................8, 9

*Muhammad v. National City Mortgage, Inc.*,
    No. 2:07-0423 (S.D. W. Va. Dec. 19, 2008)..........................................21

*In re NASDAQ Market–Makers Antitrust Lit.*,
    169 F.R.D. 493 (S.D.N.Y.1996) ............................................................24

*Navelski v. Int'l Paper Co.*,
    No. 3:14-cv0445, 2017 WL 2239579 (N.D. Fla. May 21, 2017) .............4

*Neale v. Volvo Cars of North Am., LLC*,
    794 F.3d 353 (3d Cir. 2015).................................................................11

*Parnes v. Mast Prop. Investors, Inc.*,
    776 F. Supp. 792 (S.D.N.Y. 1991)........................................................15

*Prindle v Carrington Mortg. Servs., LLC*,
    No. 3:13-cv-1349, 2016 WL 4369424 (M.D. Fla. Aug. 16, 2016)..........13

*Quinn v. Specialized Loan Servicing, LLC*,
    No. 16-cv-2021, 2016 WL 4264967 (N.D. Ill. Aug. 11, 2016) ...............14

*Ramirez v. Trans Union, LLC*,
    301 F.R.D. 408 (N.D. Cal. 2014) .........................................................19

*Rohrbough v. Wyeth Labs., Inc.*,
    916 F.2d 970 (4th Cir. 1990) ...............................................................16

*Schell v. OXY USA Inc.*,
    No. 07-1258, 2013 WL 4857686 (D. Kan. Sept. 11, 2013)......................9

*Singleton v. Domino's Pizza, LLC*,
    976 F.Supp. 2d 665 (D. Md. 2013) ......................................................22

*Smith v. Velotta*,
    No. 15-0228, 2016 WL 597743 (W. Va. Feb. 12, 2016).......................23

*Soutter v. Equifax Info. Servs., LLC*,
    498 F. App'x 260 (4th Cir. 2012) ...................................................18, 19

*Spokeo v. Robins*,
    136 S. Ct. 1540 (2016).................................................................. *passim*

*Stillmock v. Weis Mkts., Inc.*,
   385 Fed. App'x 267 (4th Cir. 2010) .......................................................................19

*Stinson v. Delta Mgmt. Assocs., Inc.*,
   302 F.R.D. (S.D. Ohio 2014) ...................................................................................22

*Stott v. Haworth*,
   916 F.2d 134 (4th Cir. 1990) .....................................................................................8

*Taddeo v. Am. Invsco Corp.*,
   No. 2:08-cv-01463, 2011 WL 3957392 (D. Nev. Sept. 7, 2011)............................16

*Thomas v FTS USA, LLC*,
   193 F.Supp. 3d 623 (E.D. Va. 2016) .......................................................................14

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (2006)............................................................................................24, 25

*Thurman v. CUNA*,
   836 N.W.2d 611 (S.D. 2013) ...................................................................................24

*Triplett v. Nationstar Mortgage, LLC*,
   No. 3:11-cv-238 (S.D. W. Va. Oct. 16, 2012) ........................................................21

*In re U.S. Foodservice Inc. Pricing Litig.*,
   No. 3:07-md-1894, 2011 WL 6013551 (D. Conn. 2011) ........................................24

*In re Urethane Antitrust Litig.*,
   251 F.R.D. 629 (D. Kan. 2008).................................................................................24

*Vanderbilt Mortg. & Fin., Inc. v. Cole*,
   230 W.Va. 505, 740 S.E.2d 562 (2013)...................................................................21

*Weissman v. Gutworth*,
   No. 2:14-cv-00666, 2015 WL 3384592 (D.N.J. May 26, 2015)..............................21

*Wilson v. Toussie*,
   No. 01-cv-4568, 2008 WL 905903 (E.D.N.Y. Mar. 31, 2008)...............................16

*Woe v. Cuomo*,
   729 F.2d 96 (2d Cir.1984).........................................................................................10

*Zimmerman v. Portfolio Recovery Assocs., LLC*,
   No. 09-c-4602, 2013 WL 1245552 (S.D.N.Y. 2013) ................................................9

**Statutes**

47 U.S.C. § 227(b)(3)(B) .................................................................................................20

vi

**JA657**

West Virginia Code § 46A-2-121 ................................................................15

West Virginia Code § 46A-5-101 ...............................................................15

**Other Authorities**

3 Newberg on Class Actions § 7:37 (5th ed. 2013) .............................1, 8, 11

3 Newberg on Class Actions § 7:47 (4th ed. 2012) .................................1, 9

Federal Rule of Civil Procedure 23(f) ..........................................................9

Hugo Benítez-Silva, Selcuk Eren, Frank Heiland, and Sergi Jiménez-Martín, *How
    well do individuals predict the selling prices of their homes?,* Journal of
    Housing Economics 29 (2015), *available at*
    http://www.sciencedirect.com/science/article/pii/S1051137715000121 .................................5

**Introduction and Background**

Defendants' motion to decertify the class should be denied because it is based on a fundamental misunderstanding of the class claims, and because there have been no "materially changed or clarified circumstances" to warrant this "drastic step" of decertifying a class that was properly certified after thorough consideration. 3 Newberg on Class Actions § 7:47 (4th ed. 2012); 3 Newberg on Class Actions § 7:37 (5th ed. 2013). The class met all the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) when it was certified, and it continues to be a manageable class with predominant common issues today.

<u>The Court's Class Certification and Liability Opinion</u>

One year ago, after years of exhaustive discovery and the exchange of hundreds of pages of briefing, this Court certified a class defined as:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

Order Resolving Motions (ECF No. 227) (June 2, 2016) (hereinafter "Order"). The portion of the Order analyzing class certification was twenty-three pages long and consisted of an exhaustive discussion of each requirement of class certification under Rule 23(a) and (b)(3). In the Order certifying the class, the Court found that:

- The numerosity requirement of Rule 23(a)(1) is satisfied based on Quicken's admission that there are over 100 members of the class. *Id.* at 36.

- The typicality requirement of Rule 23(a)(3) is satisfied because the claims of each of the putative class members arise from the same pattern or practice of the Defendants – the provision of a target value to its selected appraiser without the knowledge of the borrower. *Id.* at 39.

1

**JA659**

- The adequacy requirement of Rule 23(a)(4) is satisfied because the named Plaintiffs and their counsel are able to fairly and adequately protect the interests of the class. *Id.* at 39.

- The commonality requirement of Rule 23(a)(3) and the predominance requirement of Rule 23(b)(3) are satisfied because there is no dispute that the Defendants provided a target value to the appraisers, and there are common liability questions as to all class members, namely:

  (1) whether defendants' practice of passing owners' estimates of value constitutes unconscionable inducement under the CCPA;

  (2) whether defendants breached the parties' contracts;

  (3) whether class members are entitled to statutory penalties for each violation of the West Virginia Consumer Credit and Protection Act; and

  (4) whether borrowers should receive a refund of the appraisal fees that they paid.

- A class action is superior to other methods of adjudication so as to satisfy Rule 23(b)(3), because (1) individual recoveries are likely to be small; (2) all potential class members are residents of West Virginia; and (3) the class action will be manageable because the Plaintiffs' claims are easily susceptible to resolution on a class-wide basis. *Id.* at 46.

- Quicken's statute of limitations defense presents no barrier to certification because it is Quicken's burden to produce evidence of this defense and, should it do so, determining which loans fall within the applicable period "would ultimately prove to be a ministerial exercise." *Id.* at 47-49.

- Finally, the Court found that "even if the defendants could present evidence regarding the class loans, plaintiffs have demonstrated that the practice of passing on estimated values to appraisers was unknown and not disclosed by defendants to borrowers, therefore tolling the statute." *Id.* at 50.

In addition to certifying the class, the Court found that Quicken's practice of passing on estimated values to appraisers in conjunction with Plaintiffs' loans violated the unconscionability provision of the WVCCPA, which states that a violation exists when "the agreement or transaction. . . [has been] induced by unconscionable conduct." Order at 21, citing W. Va. Code § 46A-2-121. The Court rejected Defendants' argument that there is "no proof their unconscionable conduct actually induced the plaintiffs to enter into their loan agreements," and recognized that the "focus is plainly on the lender or creditor's conduct." *Id.* at 21. The Court also rejected Defendants' contention that Plaintiffs did not suffer any damage or detriment, explaining that:

> Specifically, Quicken argues that plaintiffs must show that plaintiffs and other class members were actually harmed by this practice by receiving an upside down mortgage. ***This standard is contrary to the stated purpose of this claim, which is to provide a cause of action in situations where damages in the form of a substantive[e] unconscionable loan are not present***. For that reason, the WVCCPA provides that a person who has been subjected to unconscionable conduct may recover actual damages and the right to recover of $1,000 per violation. West Virginia Code § 46A-5-101. *See* Syl. pt. 2, *Vanderbilt Mortg. & Fin., Inc. v. Cole,* 230 W.Va. 505, 740 S.E.2d 562 (2013) ("under W. Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages."). ***Actual damages are therefore not a necessary component of the claim***. In this respect this case is no different from *Dijkstra,* where this Court did not require plaintiff to prove that each individual class member had suffered actual damages due to a witness only closing.

*Id.* at 23-24 (emphasis added). Unhappy with the certification decision, Defendants unsuccessfully moved for reconsideration of the Order as well as interlocutory appeal to the Fourth Circuit under Federal Rule of Civil Procedure 23(f). (ECF Nos. 243, 237).

<u>Quicken's Motion to Decertify, and the Absence of a Newly Discovered Record</u>

Quicken now moves to decertify the class based primarily on its representation that some of the loans differed from the Aligs' loan in that some loans had appraisals below estimated values; some had loans restricted to accommodate lower-than-expected appraisals; a few class

3

**JA661**

members had loans where the appraised value was supplanted by another value due to a recent sale or listing of the property; and some loans were not underwater or purportedly saved borrowers money. Quicken has been in possession of this information throughout the litigation, and certainly prior to briefing class certification. Yet Quicken states that the Court "gave Defendants time to review the records and data" relating to the class loans, Def. Mem. at 5, as if Quicken could not have done so itself in the years of discovery preceding class certification and liability determinations. *See Navelski v. Int'l Paper Co.,* No. 3:14-cv0445, 2017 WL 2239579, at *1 (N.D. Fla. May 21, 2017) (denying motion to reconsider class certification because defendant only raised argument that could have been raised in initial class certification briefing, and defendant's neglect "does not entitle [d]efendant to raise new arguments that could have been raised at the time of the class certification decision.") The additional time allowed was to prepare for the penalty hearing, not to manufacture class certification arguments that could have been raised years ago when Plaintiffs could still test these assertions through discovery.

Furthermore, what Quicken has developed is greatly exaggerated and misleading. As William Banfield recently acknowledged, the appraisals played a role in all class members' loans even when a different value was used because that value first had to be compared to and exceed the appraised value before it could be accepted.  Banfield Testimony at May 9 Hearing at 177:19-178:8. Many of the individualized loan arguments Quicken raised here were similarly exposed in Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Summary Judgment on Class-Wide Contract Damages (ECF No. 299). Beyond this, Quicken repeatedly relies on class data. It says that nearly half of the class appraisals came in below the estimate value. But what

Quicken does not say is that the average difference between the estimated value and the appraised value was only 2.85% and that it was still able to close all of the class member loans.[1]

Quicken has presented no evidence that contradicts that presented to the Court last year or recited by the Court in its class certification decision: the facts remain that *every class member's loan was supported by an appraisal that was the result of a practice this Court has already found to be unconscionable under West Virginia law*. Therefore, even if it were proper to allow this stale, long-available evidence to alter the Court's certification decision, there is no reason to do so because Quicken's new argument opposing class certification rests entirely on their flawed theory that adjudication of the WVCCPA claims rests on findings of actual harm. Instead, as this Court has consistently recognized, this class action has always been about *Quicken's conduct* under the WVCCPA and the availability of common class-wide penalties for the uniform, common status of having received an unconscionably induced loan.

Quicken misrepresents other aspects of this case as well. First, the Aligs do not "rely on" any testimony or evidence about being underwater to show that Quicken violated WVCCPA in the appraisal procurement process, or breached their contract. Any individualized evidence regarding the Aligs' loan would go only to actual damages, which will be determined in Phase III after the class-wide penalty issues are resolved. Again, as for the class-wide claims which give rise to the class-wide damages and restitution, all evidence is common: it is that Quicken engaged in this conduct the Court has found to violate West Virginia law. The Court need only

---

[1] By comparison, homeowners tend to overestimate their home values by an average of 8%, suggesting that the small variation in values presented by Quicken does in fact demonstrate influence. *See* Hugo Benítez-Silva, Selcuk Eren, Frank Heiland, and Sergi Jiménez-Martín, *How well do individuals predict the selling prices of their homes?*, Journal of Housing Economics 29 (2015) ("Using information on selling prices from the Health and Retirement Study and the American Housing Survey, and after accounting for possible measurement error in reporting and selection regarding those who we observe selling, we find evidence that homeowners overestimate the value of their properties by around 8% with an estimated range between 3.4% and 12.7%"), *available at* http://www.sciencedirect.com/science/article/pii/S1051137715000121.

5

**JA663**

look to its lengthy analysis of the practice of "Providing a Value to an Appraiser," Order at 2-26, to confirm why Quicken's conduct was unconscionable. The Court relied on numerous authorities discussing the importance of appraiser independence, the danger of lender pressure, and ultimately the conclusion that there is "no logical basis for sending an estimated value to the appraiser other than to influence his or her opinion". *Id.* at 11. ***The Court did not condition this finding on the unconscionably induced loan leaving a borrower underwater, or on any finding of individual actual harm whatsoever.*** Rather, the practice itself is unconscionable *per se. Id.* at 21-22.

As Plaintiffs have previously explained in their statutory penalties briefing, even if not fully underwater, an inflated appraisal results in a homeowner's false sense of equity and ability to repay the loan. There is also the potential for harm even when the homeowner communicates a low estimate – should Quicken choose to pass it on. *See* Pls Am. Resp. to Def. Mem. Re Classwide Penalty at 9-10 (ECF No. 313). All of these scenarios show the practice is problematic and why it has been uniformly condemned. But what is most important here is that not one of these appraisals is reliable because the process has been corrupted and the resulting appraisals have been tainted by Quicken's conduct. Quicken cannot un-ring the bell and restore credibility to the process. Much like Barry Bonds' home-runs, all of these appraisals warrant an asterisk noting their unreliability. Certainly Bonds would have hit some home-runs without performance enhancing drugs or he may have had games where he skipped a dose, but every home run he hit during the steroid era is unquestionably tainted. Similarly, every class member has suffered the same injury in fact – an unreliable (whether or not actually inflated) appraisal.

Second, in their focus on actual harm to individual borrowers, Defendants continue to insist that this Court held a "trial" on the issue of damages. Def. Mem. at 2. The Court has been

6

**JA664**

clear that the hearing was simply "an opportunity to allow [Quicken] to demonstrate a lack of egregiousness, because [the Court] was ready to rule and [Quicken] asked for an opportunity to present additional information, which [the Court] granted." May 9, 2017 Transcript at 6:22-25. By misrepresenting the damages hearing in this manner, Quicken attacks the Aligs for seeking "to avoid having to testify at trial." *Id.* This is ludicrous. Both Philip and Sara Alig were deposed, and the Court determined the merits of their claims on motions for summary judgment. The liability stage of these proceedings is over. The Court then ruled that the Aligs could not be called at the damages hearing because Quicken was only permitted five witnesses, and the Aligs – at Quicken's choice – were not listed among them. Instead, the Court allowed Defendants to designate depositions. *Id.* at 5:5-8. In any event, Quicken does not seem to be making a serious attack on the Aligs' adequacy in that it presents no argument on this issue.

Third, Quicken states that "some class members" (the actual number is undefined) did not sign the Interest Rate Disclosure and Deposit Agreement that the Aligs signed, and the breach of which forms the basis of the class contract claim. This argument flies in the face of the stipulation Quicken's counsel executed and filed on March 15, 2016, stating:

> Quicken Loans stipulates that the Interest Rate Disclosures and/or Deposit Agreements for the named Plaintiffs' loans (Quicken 15, 699, 1031, 1625) are representative of the standard deposit agreements used by Quicken Loans from 2002 to the present.

(ECF No. 168). The entire purpose of the stipulation was to confirm that the class contracts were uniform, and Quicken never disputed the existence of common contracts in its briefing on class certification. Quicken's new declaration is akin to a sham affidavit and should not be considered. In any event, any class members who did not have class contracts can be readily excluded from the class, as Quicken has already demonstrated it has the ability to identify those loans.

Fourth, Quicken misrepresents Plaintiffs' arguments in the recent briefing on contract damages. Rather than identifying any individual issues in their reply brief, Plaintiffs demonstrated that Quicken's arguments were both irrelevant to the pertinent issues and flawed. Moreover, Plaintiffs explained how Quicken had only produced small, select portions of its loan files--in some instances less than 10% of the entire file – and that no fair conclusions could be drawn from those documents.[2] Moreover, nothing in the loan files alters the law of the case, i.e. this Court's conclusion that each class member's contract with Quicken was breached by Quicken's conduct in passing on estimated values. Order at 54.

Finally, Quicken throws into the mix the discrete issues, common to any large consumer class action, of potentially time-barred claims, bankruptcy discharges, and deceased borrowers. These issues are consistently found to have no bearing on the class certification determination, and have been separately briefed in conjunction with Defendants' motion for summary judgment as to certain class members (ECF No. 339).

### Standard for Decertification

"In revisiting an earlier certification decision, a court may modify or decertify, but decertification is a drastic step, not to be taken lightly." 3 Newberg on Class Actions § 7:37 (5th ed. 2013). To be sure, an "order granting class certification is not an untouchable determination." *Minter v. Wells Fargo Bank*, No. 07-cv-3442, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013). Indeed, "an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir. 1990). A motion to decertify is not, however, to be treated

---

[2] Similarly, Quicken argues here that on a few occasions the loan principal went down after the refinancing was complete. Def. Mem. at 7. The only logical way this can happen is if the borrower brings enough cash to the table to cover all closing costs of the new loan and to reduce the payoff of the prior loan.  Of course, borrowers can pay down any loan using their own cash.  This argument exemplifies that Quicken has engaged in a campaign of cherry picking loan files and then providing limited information so that it can draw the conclusion it desires.

8

**JA666**

as another bite at the apple in the absence of changed circumstances. As the United States

District Court for the District of Maryland recently observed, "[t]he breadth of this obligation [to

reverse certification if necessary]. . . is tempered by commentary in the Advisory Committee

Notes which provide that altering certification is appropriate 'upon fuller development of the

facts.'" *Minter,* \*2 (citing 1996 Amendment Advisory Committee Notes).

      Courts thus consistently hold that "there must be some development or change in

circumstances to merit revisiting a class certification decision." *In re J.P. Morgan Chase Cash

Balance Litig.*, 255 F.R.D. 130, 133 (S.D.N.Y. 2009) (citing cases). This is consistent with the

law of the case doctrine. *See Messinger v. Anderson*, 225 U.S. 436, 444 (1912) (describing "law

of the case" as "the practice of courts generally to refuse to reopen what has been decided.") As

such, courts should be wary of motions to decertify which simply reargue certification "[i]n the

absence of materially changed or clarified circumstances." 3 Newberg on Class Actions § 7:47

(4th ed. 2012). That new facts or law should support a motion is a widely recognized concept.

*See Zimmerman v. Portfolio Recovery Assocs., LLC,* No. 09-c-4602, 2013 WL 1245552, at \*5

(S.D.N.Y. 2013) (declining to decertify class when there was "no new evidence concerning the

nature of the class members' debts"); *Connor B. v. Patrick*, 278 F.R.D. 30, 35 (D. Mass. Nov.

10, 2011) ("[a]llowing litigants to file a motion to decertify at any time during the litigation, even

when no subsequent case law or new facts have had any impact on the original rationale, would

render Rule 23(f) meaningless."); *Schell v. OXY USA Inc.,* No. 07-1258, 2013 WL 4857686, at

\*4 (D. Kan. Sept. 11, 2013) (denying motion to decertify class after discussing arguments

presented and finding "[a]ll of these circumstances were known by the parties at the time they

briefed the motion for certification. [Defendant] has provided *no new evidence or law* on this

element, so the court finds that the named plaintiffs still meet the adequacy of representation

9

**JA667**

element.") (emphasis added); *Kubiak v. S.W. Cowboy, Inc.*, No. 3:12-cv-1306, 2015 WL 12859422 (M.D. Fla. Mar. 11, 2015) (same); *J.S. v. Attica Cent. Sch.*, No. 00-cv-513, 2011 U.S. Dist. LEXIS 109676, *18 (W.D.N.Y. Sept. 27, 2011) (denying motion to decertify when defendant "fail[ed] to present new facts or legal argument"); *Elias v. Ungar's Food Prods., Inc.*, No. 06-cv-2448, 2009 U.S. Dist. LEXIS 74140, *15 (D. N.J. Aug. 20, 2009) (no decertification because court already rejected proposition "that an individual inquiry would be necessary for each class member"); *Connor B. ex rel. Vigurs v. Patrick,* 278 F.R.D. 30, 34, 36 (D. Mass. 2011) (denying decertification where defendants argued that plaintiffs failed to satisfy the commonality requirement because the argument was "largely identical to the argument this court rejected in its original certification order").

In addition, "[c]ourts faced with a motion to decertify must also take account of the progression of the litigation." *Jermyn v. Best Buy Stores,* 276 F.R.D. 167, 169 (S.D.N.Y. 2011); *see also Woe v. Cuomo,* 729 F.2d 96, 107 (2d Cir.1984) (finding abuse of discretion where district court decertified the class after granting summary judgment in part). "Decertification is an 'extreme step,' particularly at a late stage in the litigation, 'where a potentially proper class exists and can easily be created." *Gulino v. Bd. of Educ. of City School Dist.,* No. 96 Civ. 8414(KMW), 2012 WL 6043803, at *8 (S.D.N.Y. Dec.5, 2012) (quoting *Woe,* 729 F.2d at 107; *see also Easterling v. Conn. Dep't of Corr.,* 278 F.R.D. 41, 42 (D. Conn. 2011) ("[a] court should be wary of revoking a certification order completely at a late stage in the litigation process.")

**Argument**

I.    **The class representatives and each class member have incurred a concrete
       and particularized injury in fact, and have standing under Spokeo**

Quicken's first argument is that some class members did not suffer a "concrete injury" and therefore lack standing under the Supreme Court's decision in *Spokeo v. Robins*, 136 S. Ct.

10

**JA668**

1540 (2016). This argument fails as a matter of law from the outset, as it is well settled that "if a class representative has standing, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing." Alba Conte & Herberg Newberg, *Newberg on Class Actions* § 2:3 (5th ed. ); *see also Dreher v. Experian Info. Solutions, Inc.,* 856 F.3d 337 (4th Cir. 2017) ("In a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiff"), quoting *Beck v. McDonald,* 848 F.3d 262, 269-70 (4th Cir. 2017), citing *Doe v. Obama,* 631 F.3d 157, 160 (4th Cir. 2011); *see also Neale v. Volvo Cars of North Am., LLC,* 794 F.3d 353, 362 (3d Cir. 2015); *Kohen v. Pacific Inv. Mgmt. Co. LLC,* 571 F.3d 672, 676 (7th Cir. 2009); *Milbourne v. JRK Residential Am., LLC,* No. 3:12-861, 2016 WL 1071564, at *6 (E.D. Va. Mar. 15, 2016); *Lewis v. Casey,* 518 U.S. 343, 395 (1996) (Souter, J., concurring).

There is no question that the Aligs have standing to redress the concrete injury incurred by Quicken's conduct. In *Spokeo,* the Supreme Court addressed the injury-in-fact requirement for Article III standing. The Court's decision did not change the law of standing, and Quicken is wrong as to its application here. Instead, the Court confirmed the long-established principle that "standing consists of three elements." *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (May 16, 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* The Court further confirmed that to establish injury in fact—the element primarily at issue in *Spokeo*—a plaintiff must "allege an injury that is both 'concrete' *and* 'particularized.'" *Id.* at 1545 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (emphasis added in *Spokeo*)).

11

**JA669**

According to the Supreme Court, a "particularized" injury "must affect that plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. The Court agreed with the Ninth Circuit that the *Spokeo* plaintiff had suffered a particularized injury because he claimed that the defendant—an alleged credit-reporting agency that had reported false information about him— "violated *his* statutory rights," and his "interests in the handling of his credit information are *individualized rather than collective*." *Id.* (quotation omitted). Further, *Spokeo* confirmed that a "concrete" injury "must actually exist." *Id.* However, a "concrete" injury may also be "intangible." *Id.* at 1549. *Spokeo* indicated two approaches for establishing that an intangible injury is "concrete." "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* First, courts should consider whether an alleged intangible harm "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (citing *Vermont Agency of Nat'l Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)). A plaintiff may therefore demonstrate that she suffered a concrete injury by showing that her injury is analogous to a harm traditionally recognized at common law.

Second, Congress may identify and "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law." *Id.* (citation and internal quotation marks omitted). Congress "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before" because Congress "is well positioned to identify intangible harms that meet minimum Article III requirements." *Id.* Of course, state statutes may also serve to define these injuries. *See Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 118 (4th Cir. 2004) ("In a diversity case,

12

**JA670**

[the court] must consult state law to determine the nature of the litigant's rights and whether he is entitled to assert the claims he makes.").

Courts applying *Spokeo* in consumer credit cases have overwhelmingly found that violations of the FDCPA provide for Article III standing even with violations far less serious than Quicken's conduct here. In one of the Circuit Court decisions to consider the issue, *Church v. Accretive Health, Inc.,* the Eleventh Circuit Court of Appeals found Article III standing when a plaintiff alleged that defendant violated the FDCPA by not including in its debt collection letter certain disclosures required by the Act. *Church v. Accretive Health, Inc.,* 654 Fed. Appx. 990 (11th Cir. 2016). The plaintiff did not allege that she suffered actual damages, but the court found she had "alleged injury to her statutorily-created right to information pursuant to the FDCPA" because that Act "creates a private right of action, which Church seeks to enforce." *Id.* at 994. Importantly, while "the injury may not have resulted in tangible economic or physical harm that courts often expect, the Supreme Court has made clear that an injury need not be tangible to be concrete." *Id.,* citing *Spokeo,* 136 S.Ct. at 1549. "Rather, this injury is one that *Congress has elevated to the status of a legally cognizable injury through the FDCPA,*" and plaintiff therefore satisfied the injury-in-fact requirement. *Id.* (emphasis added).

Courts around the country have held in accord when considering various violations of the FDCPA's debt collection provisions that did not necessarily give rise to actual damages. *See Linehan v. Allianceone Receivables Mgmt., Inc*., No. 15-1012, 2016 WL 4765839, at *7 (W.D. Wash. Sept. 13, 2016) ("The goal of the FDCPA is to protect consumers from certain harmful practices; it logically follows that those practices would themselves constitute a concrete injury"); *Prindle v Carrington Mortg. Servs., LLC*, No. 3:13-cv-1349, 2016 WL 4369424, at *9 (M.D. Fla. Aug. 16, 2016); *Larson v. Trans Union, LLC*, 201 F.Supp. 2d 1103 (N.D. Cal. 2016);

13

**JA671**

*Dickens v. GC Servs. Ltd. P'ship*, No. 16–cv–00803, 2016 WL 3917530, at **1–2 (M.D. Fla. July 20, 2016); *Lane v. Bayview Loan Servicing, LLC*, No. 15–cv–10446, 2016 WL 3671467, at **3–5 (N.D. Ill. July 11, 2016); *Macy v. GC Servs. Ltd. P'ship*, No. 3:15-cv-819, 2016 WL 5661525, at **2-4 (W.D. Kty. Sept. 29, 2016); *Daubert v. Nra Grp., LLC*, No. 3:15-cv-00718, 2016 WL 4245560, at *4 (M.D. Pa. Aug. 11, 2016); *Quinn v. Specialized Loan Servicing, LLC*, No. 16-cv-2021, 2016 WL 4264967, at *5 (N.D. Ill. Aug. 11, 2016); *Irvine v. I.C. Sys., Inc.*, 198 F.Supp. 3d 1232, 1237 (D. Colo. 2016); *McCamis v. Servis One, Inc.*, No. 8:16-1130, 2016 WL 4063403 at *2 (M.D. Fla. July 29, 2016).

Post-*Spokeo* decisions issued within the Fourth Circuit interpreting other consumer protection statutes with statutory damage provisions are no different. For example, courts have found that the annoyance of receiving unwanted telemarketing calls is a sufficiently concrete injury to confer Article III standing. *Mey v. Got Warranty, Inc.,* 193 F.Supp. 3d 641 (N.D. W. Va. 2016); *Krakauer v. Dish Network L.L.C.,* 168 F.Supp. 3d 843 (M.D.N.C. 2016) (declining to decertify classes upon finding class representative's allegations showed a "concrete injury to him and to each class member"). Courts have similarly recognized a right of privacy in one's consumer report under the Fair Credit Reporting Act. *Burke v. Fed. Nat'l Mortg. Assoc.,* No. 3:16-153, 2016 WL 4249496, at *4 (E.D. Va. Aug. 9, 2016), vacated upon parties' settlement and finding of no jurisdiction by 2016 WL 7451624 (Dec. 6, 2016); *Thomas v FTS USA, LLC*, 193 F.Supp. 3d 623, 637 (E.D. Va. 2016).

The West Virginia legislature enacted the WVCCPA to "protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." *Bourne v. Mapother & Mapother, P.S.C.,* 998 F.Supp. 2d 495, 501 (S.D. W. Va. 2014) (quoting *State ex*

*rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516, 523 (1995)). The legislature created a private right of action for violations. W. Va. Code § 46A-5-101. This Court has found that Defendants violated a section of the WVCCPA, §46A-2-121, which prohibits unconscionable inducement of consumer loans, with respect to each class member's loan. Order at 54. In enacting this provision of the WVCCPA, the legislature recognized that West Virginia consumers have the right to consumer loans that are not unconscionably induced. Consistent with the authority above recognizing concrete, particularized harm created by statutory violations far less egregious than Quicken's conduct here, Quicken's violation of this statutorily-created, legally cognizable right creates a concrete harm to the Aligs as class representatives – and indeed as to each class member –sufficient to establish standing for each member of the class.

In addition, Quicken misinterprets this Court's findings when it represents that the Aligs' unconscionability claim relied on any individualized facts. As the Court has already determined when it certified the class, the injury of receiving a tainted, unreliable loan as a result of Quicken's unconscionable conduct does not rely on any appraiser's individual testimony or the facts of any individual loan. Tellingly, Quicken does not cite a single case interpreting *Spokeo,* let alone one in a consumer statute case, alleging common class-wide conduct like that the Court has already found here, and where statutory damages are sought. Instead, Quicken cites pre-*Spokeo* cases where plaintiffs' proof was individualized or where class members sought *actual* damages which necessarily depended on individualized facts.[3] By neglecting to cite a single case

---

[3] *See* cases cited in Def. Mem. at 13-14, i.e. *Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003) (proposed class members alleged injuries that were "economic in nature and consist of the increased mortgage payments and fees that class members must pay allegedly as a result of the inflated home appraisals, the low tax assessments provided before closing, and the incorrect estimated monthly mortgage payments provided before and at closing"); *Brinker v. Chicago Title Ins. Co.*, No. 8:10-cv-1199, 2012 WL 1081211 (M.D. Fla. Feb. 9, 2012) (veracity of any particular appraisal report required individual review); *Parnes v. Mast Prop. Investors, Inc.*, 776 F. Supp. 792, 799-800 (S.D.N.Y. 1991) (refusing to certify fraud claims because there were individualized facts with respect to each of

15

**JA673**

actually interpreting *Spokeo,* Quicken has plainly conceded both that (1) the law of standing has not changed with *Spokeo*; and (2) there has been no new law since this Court's certification decision such that it should be revisited through this motion to decertify. More importantly, Plaintiffs and all class members unquestionably have standing to redress Quicken's unconscionable conduct.

## II. There are no individualized issues as to the contract claim

Defendants first state, in direct contrast to their position throughout this litigation and to their executed stipulation on file with the Court, that not all class members had a contract, and some signed a different agreement from the Deposit Agreement. Def. Mem. at 5. Yet the stipulation Quicken's counsel executed and filed on March 15, 2016, stated:

> Quicken Loans stipulates that the Interest Rate Disclosures and/or Deposit Agreements for the named Plaintiffs' loans (Quicken 15, 699, 1031, 1625) are representative of the standard deposit agreements used by Quicken Loans from 2002 to the present.

(ECF No. 168). This stipulation was submitted during the class certification briefing in order to satisfy this very issue, commonality as to the contract claims, and Quicken has never before questioned whether the contracts were uniform. The declaration contradicting the stipulation filed in March 2016 should thus be stricken because it contradicts evidence Quicken has already submitted in this case.[4] In addition, Defendants' declaration on this point is hopelessly vague in

---

thirty partnerships); *Wilson v. Toussie*, No. 01-cv-4568, 2008 WL 905903, at **4-5 (E.D.N.Y. Mar. 31, 2008) (plaintiffs alleged racially discriminatory housing policies and proposed a class that included purchasers of "homes that were over-appraised," which would require a "fact-intensive determination as to class-membership"); *Taddeo v. Am. Invsco Corp.*, No. 2:08-cv-01463, 2011 WL 3957392, at *5 (D. Nev. Sept. 7, 2011) ("Plaintiffs' fraud claims will require proof" and interactions between plaintiffs and defendants "were dissimilar in many material respects").
[4] While technically applicable to motions for summary judgment, Defendants' conduct here is generally improper under the sham affidavit rule, a firmly established part of Fourth Circuit law. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990). Under the "sham affidavit" rule, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). In this same vein, Quicken continues to provide declarations from witnesses never disclosed, including appraisers Aaron Judy, Rebecca Stephens and C. Allen Carte and its own data analyst Amy Courtney.

that it does not indicate how many class members purportedly did not sign the uniform agreement. At any rate, if the Court were to allow Defendants to present this contradictory evidence now, Defendants have made clear that the elimination of any members of the class who did not sign the common class contract would be a ministerial task.

Defendants next argue, also for the first time, that class members' own performance under the contracts cannot be "presumed on a class basis". Defendants suggest that, if any class member attempted to influence an appraiser, it would constitute a breach of the agreement by the borrower. This argument is frankly illogical. Putting aside the fact that Quicken has never raised such a defense, there is no language in the Deposit Agreement obligating a *borrower* to provide a fair and accurate appraisal; that obligation falls solely on the part of the lender, Quicken. Of course, this makes sense, as it is the lender, not the borrower, who is responsible for hiring the appraiser – and from whom the appraiser can expect repeat business if expectations are met.

Quicken's remaining contract arguments were already addressed by the Court at the March 30, 2017 hearing when the Court found that Plaintiffs' request for equitable relief in the form of the return or disgorgement of payments is simply an equitable form of relief. Mar. 30, 2017 Transcript at 5-6. The issue was also thoroughly briefed in conjunction with Plaintiffs' motion for summary judgment on contract damages, and Plaintiffs incorporate that briefing herein. *See* ECF Nos. 293 (Pls' Br. on Class-wide Statutory Penalties and Motion for Summ. J. on Class-wide Contract Damages); and 299 (Pls' Reply Br. in support of Pls' Motion for Summ. J. on Class-wide Contract Damages). The primary flaw in Quicken's argument is that the Deposit Agreement was a separate, stand-alone contract that was independent from the loan agreements. The status of the loans is irrelevant to the separate contract duty that this Court explained required Quicken to obtain the fair, valid and reasonable appraisals that Plaintiffs and class

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 229 of 374

Case 5:12-cv-00114-JPB-JPM   Document 341   Filed 06/05/17   Page 26 of 36   PageID #: 10197

members bargained (and paid) for but did not receive. Instead, they received unreliable, worthless appraisals and have all been damaged, making restitution appropriate.

In sum, Quicken's position that the Court may not award a refund of the contract fees on a class-wide basis is incorrect, and there are no individualized issues bearing on predominance because this relief may be readily awarded based on class-wide data already available.

### III.    There is no need for individualized evidence to award statutory penalties

Defendants next argue that class-wide statutory penalties cannot be awarded without individualized evidence. However, as the Court has repeatedly recognized, the amount of the award of statutory penalties is dependent on the level of egregiousness of **Quicken's conduct**. *See* Mar. 30, 2017 Transcript at 4:25-5:4 ("[T]he amount of penalty to be imposed by the Court should have a relationship to the egregiousness of the violation. However, this Court believes that the egregiousness of the violation is something the Court considers based upon the actions of Quicken Loans and TSI"; *see also* May 9, 2017 Transcript at 6:22-25; *Clements v. HSBC Auto Finance, Inc.,* No. 5:09-cv-00086, 2011 WL 2976558, at *7 (S.D. W. Va. July 21, 2011) ("The amount of a [WVCCPA] penalty should have a direct relationship to the egregiousness of the violation"). This Court has already considered and Defendants' argument – which is still, and has always been, about actual harm.[5]

Instead, as the Court has properly recognized, statutory damages may be awarded on a class-wide basis here because Quicken's conduct was uniform as to the class. *Souter v. Equifax Info. Servs., LLC,* 498 F. App'x 260 (4th Cir. 2012), a Fair Credit Reporting Act case, is readily distinguishable because that court recognized that the *methods the defendant credit reporting*

---

[5] Defendants attempt to confuse the issues by stating that the "Aligs *do* claim actual damages," Def. Mem. at 21, once again ignoring the posture of this case. Phase II is about the award of uniform, classwide statutory penalties and not the award of any actual damages. **No actual damages are to be awarded on a classwide basis**. Instead, in Phase III, as in *Dijkstra,* the Court may consider the presentation of any class member's evidence as to actual damages. The Court has already recognized the efficiency and propriety of this approach. *See* Order at 33-35.

18

**JA676**

*agency used* to collect credit information from the courts had a significant bearing on individual claims. For example, Equifax used "at least three different means of collecting general district court records during the class period," and Soutter's claims therefore "varie[d] from any potential class plaintiff with a circuit court judgment, and from many potential plaintiffs with general district court judgments," which made proof of whether Equifax's behavior was unreasonable vary case-by-case. In contrast, there is *absolutely no difference in Defendants' conduct here as to the members of the proposed classes*, let alone a meaningful one. In such circumstances, where defendant's conduct is uniform as to the class, certification is appropriate. *See Stillmock v. Weis Mkts., Inc.,* 385 Fed. App'x 267, 273 (4th Cir. 2010) (reversing denial of certification and finding questions of liability predominating because "the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner"); *Ealy v. Pinkerton Gov't Servs., Inc.,* 514 F. App'x 299, 305 (4th Cir. 2013) (same); *Ramirez v. Trans Union, LLC,* 301 F.R.D. 408, 420 (N.D. Cal. 2014) (finding typicality met and finding defendant's reliance on *Soutter* "misplaced" because the *Soutter* court found there were "meaningful differences between her claim and class claims" but that in present case the record showed that defendant's conduct was uniform as to the class). *See also Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006) (typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned.")

Quicken's argument that class members did not necessarily suffer identical harm – even if relevant as a matter of law to this WVCCPA case – would effectively preclude class certification in *any* consumer case. Instead, consumer statutes allow for, and courts award,

uniform class-wide penalties in such cases. For example, the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA") is a federal consumer statute which restricts telephone solicitations and the use of automated telephone equipment. The "Do Not Call" provisions of the TCPA, like the WVCCPA, allow for statutory penalties. 47 U.S.C. § 227(b)(3)(B). In a recent class case, *Krakauer v. Dish Network L.L.C.,* a jury awarded $400 for each call that violated the Do Not Call provisions of the TCPA. 2017 WL 2242952, at *2 (M.D. N.C. May 22, 2017). The district court then trebled that award upon finding that defendants had willfully and knowingly violated the TCPA. *Id.* at *12. In a prior order examining standing under *Spokeo* and denying defendants' motion to decertify the class, the *Krakauer* court recognized that not every class member's experience was the same: "While class members did not necessarily pick up or hear ringing every call at issue in this case, each call created, at a minimum, a *risk* of an invasion of a class member's privacy. *Spokeo* clarified that a "risk of real harm" was enough to show concrete injury." *Krakauer v. Dish Network L.L.C.,* 168 F.Supp. 3d 843, 845 (M.D. N.C. 2016). Here, the Court's liability finding recognizes the class-wide risk that Quicken's unconscionable conduct created, and a class-wide award is consistent with that finding as well as expressly permitted by the statute.

Uniform statutory penalties are also frequently awarded under the WVCCPA, most often in a settlement class context. This Court has awarded class-wide statutory penalties not only in *Dijkstra,* where each class member was subject to the same unconscionable lending practice but not necessarily to the same actual harm, but in *Diloreti v. Countrywide Home Loans, Inc.,* No. 5:14-cv-00076, wherein it approved a class settlement that resolved identical allegations of appraiser influence to those here and wherein class members received the same penalty amount. *See* ECF No. 173 in *Diloreti,* Final Order Approving Settlement (Aug. 24, 2016), attached as

Exhibit A; *see also* Final Orders approving settlements, attached as Exhibit B, in *Archbold v. Wells Fargo Bank, N.A.,* No. 3:13-cv-24599 (S.D. W. Va. July 14, 2015) (approving settlement involving "per loan statutory penalty amount to settlement class members" whose loans were serviced by Wells Fargo and who were assessed and paid attorneys' fees); *Triplett v. Nationstar Mortgage, LLC,* No. 3:11-cv-238 (S.D. W. Va. Oct. 16, 2012) (approving settlement involving class-wide statutory penalties awarded via pro rata distribution to class members charged unlawful late fees and to whom partial payments were returned); *Muhammad v. National City Mortgage, Inc.,* No. 2:07-0423 (S.D. W. Va. Dec. 19, 2008) (same). Moreover, the *Vanderbilt* court itself approved a uniform penalty of $2,250 for each of the ten offensive phone calls at issue in that matter. It did not require an individualized analysis of the harm resulting from each of the discrete calls, because it flatly rejected an effort to import the "reasonable relationship" analysis from punitive damages cases to civil penalties. *Vanderbilt*, 740 S.E.2d at 569. Citing *Vanderbilt*, this Court has already found that any statutory penalty need not bear a reasonable relationship to the actual harm. Mar. 30, 2017 Transcript at 5.

Courts frequently make the same class-wide penalty determinations in FDCPA cases, where statutory damages in class actions are awarded "as the court may allow" but not to exceed $500,000, or 1 per centum of the debt collector's net worth under 15 U.S.C. § 1692k(a)(2)(B). *See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC,* 198 F.R.D. 503, 507 (N.D. Ill. 2001) (certifying FDCPA class, entering summary judgment on liability, and awarding the maximum allowable statutory damages to the class because defendant's "noncompliance here involved thousands of individual violations over several years: it was frequent and persistent. The nature of the noncompliance was blatant."); *Weissman v. Gutworth,* No. 2:14-cv-00666, 2015 WL 3384592 (D.N.J. May 26, 2015) (approving settlement fund in FDCPA case awarding

21

**JA679**

pro rata share to each class member); *Harlan v. Transworld Sys., Inc.,* 302 F.R.D. 319 (E.D. Pa. 2014) (same); *Stinson v. Delta Mgmt. Assocs., Inc.,* 302 F.R.D. (S.D. Ohio 2014) (same); *Garland v. Cohen & Krassner,* No. 08-cv-4626, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (same); *Bonett v. Educ. Debt Servs., Inc.,* No. 01-6528, 2003 WL 2165827 (E.D. Pa. May 9, 2003) (same). *See also Kemply v. Cashcall, Inc.,* No. 08-cv-03174, 2016 WL 1055251, at *16 (N.D. Cal. Mar. 16, 2016) (finding members of certified class entitled to statutory penalty of $500,000 under Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1) because defendant's "noncompliance with the statute was frequent and persistent.") *See also Singleton v. Domino's Pizza, LLC,* 976 F.Supp. 2d 665 (D. Md. 2013) (approving class action settlement agreement in FCRA case involving pro rata distribution of settlement fund).

Finally, Quicken attempts to use the overwhelming evidence of notice regarding the culpability of its conduct to contend that, because it arguably had less notice earlier in the class period, class members whose loans were closed earlier should be entitled to a smaller penalty and that this determination affects predominance. Def. Mem. at 22. This inventive argument once again rests on no legal support, and Plaintiffs again note that this type of argument would effectively preclude any class action where a defendant naturally became more aware of a problem as time went on. As a practical matter, Quicken never changed its conduct in response to *any* of these red flags.

The argument also ignores the Court's findings that indications in law and industry that passing on estimated values was wrong go back more than 20 years, long before the start of the class period in 2004, beginning with the FHC appraisal standards of 1996. Order at 13. Quicken has still has not come forward with any authority demonstrating this practice ever served a bona fide purpose in the industry. The best it can do is cite two sources – Advisory Opinion 19 of

22

**JA680**

USPAP issued in 1999 (discussed by this Court in its Order Resolving all Motions at 14) and the Ameriquest enforcement action by the states attorney generals both acknowledging the substantial problems with this practice and suggesting, at a minimum, a disclaimer, *which Quicken never gave*, is needed to lessen the potential for corruption. The oft cited finding from *Brown* that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property" may have been made in 2010, but it applied to a 2006 loan. The *Brown* court made that finding after listening to six days of trial testimony, including Quicken's executives and its loan level personnel. This Court has reviewed even more testimony and made a similar finding for loans issued from 2004 through 2009. The fact that enforcement and regulatory efforts continued throughout the class period is a distinction without a difference. In any event, if the Court were to determine that Quicken's level of egregiousness varied with respect to different portions of the time period, it could easily award the penalties on a sliding scale.

### IV.   The Court correctly found that the equitable tolling issue could be resolved on a class-wide basis

Quicken's final argument is one the parties have already briefed in conjunction with its recent motion for summary judgment, and Plaintiffs incorporate pages 6-13 of their Response in Opposition to Defendants' Motion for Summary Judgment on Certain Class Loans (ECF No. 339) here. In sum, the Court need not even reach the equitable tolling issue as to any but three class members, because Quicken has not met its burden of proving that any other loans were time-barred. *Smith v. Velotta,* No. 15-0228, 2016 WL 597743, at *3 (W. Va. Feb. 12, 2016).

To the extent that the burden has shifted to any class members to demonstrate that their claims were equitably tolled, the Court was correct to recognize that it "can easily determine whether the discovery rule applies class-wide to toll class members' claims" and that

23

**JA681**

"defendant's statute of limitations argument presents no barrier to certification." Order Resolving

Motions at 51-52, citing *In re Community Bank of N. Va. Mortg. Lending Prac. Litig.,* 795 F.3d

380 (3d Cir. 2015) (common issues predominated over individual issues as to whether applicable

statutes of limitation on class members' claims were equitably tolled due to concealment); *In re*

*Urethane Antitrust Litig.,* 251 F.R.D. 629 (D. Kan. 2008); *Hamilton v. Pilgrim's Pride Corp.,*

314 F.Supp. 2d 630 (N.D. W. Va. 2004); *Cohen v. Trump,* 303 F.R.D. 376 (S.D. Cal. 2014);

*Kennedy v. United Healthcare of Ohio, Inc.,* 206 F.R.D. 191 (S.D. Ohio 2002).  This authority is

consistent with the Fourth Circuit's decision in *Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d

311 (2006), holding that a statute of limitations defense may be resolved on a class-wide basis by

looking to the record when the "defense is so dependent upon facts applicable to the entire class..

. that individual hearings would not be necessary." 445 F.3d at 327; *see also Minter v. Wells*

*Fargo*, 279 F.R.D. 320 (D. Md. 2012); *Fangman v. Genuine Title*, No. RDB-14-0081, 2016 WL

6600509, at *7 (D. Md. Nov. 8,  2016); *Baker v. Castle & Cooke Homes Hawaii*, No. 11-00616,

2014 WL 1669158, at *14 (D. Haw. 2014); *Thurman v. CUNA*, 836 N.W.2d 611, 621 (S.D.

2013); *In re U.S. Foodservice Inc. Pricing Litig.*, No. 3:07-md-1894, 2011 WL 6013551, at *17

(D. Conn. 2011); *In re NASDAQ Market–Makers Antitrust Lit.,* 169 F.R.D. 493, 520

(S.D.N.Y.1996).

      Quicken is therefore incorrect when it suggests that the Third Circuit's decision in

*Cunningham v. M&T Bank Corp.,* 814 F.3d 156 (3d Cir. 2016) or the Fourth Circuit's decision in

*EQT Prod. Co. v. Adair,* 764 F.3d 347 (4th Cir. 2014) foreclose the potential to resolve equitable

tolling on a class-wide basis. *Cunningham* was not a class certification decision but a summary

judgment opinion wherein the court affirmed the district court's decision that a disclosure form

received, signed and dated by each plaintiff had made them aware of their claims. It sheds no

light whatsoever on the equitable tolling analysis as to class claims. The *Adair* court found that the district court had misapplied the doctrine of fraudulent concealment by wholly ignoring the plaintiff's knowledge and actions. 764 F.3d at 370. It cited *Thorn* for the proposition that this inquiry can require individual evidence; it is only fair to refer to *Thorn* for its holding that in cases like this one, where the statute of limitation defense relies on common facts applicable to the entire class, certification is appropriate.

Here, those common facts applicable to the entire class are that Quicken affirmatively kept its conduct hidden from class members, Order at 15-16, and that there is not a single shred of evidence in the record of any class member having actual knowledge about Quicken's practice of tipping off appraisers. The Court was correct to find that the equitable tolling issue presents no barrier to certification, and there have been no changes in the law or factual record presented to warrant decertification of the class.

**V.    The Court's class certification decision was sound and there have been no changes in fact or law to disturb it**

Quicken has presented no new facts or law that contradict or challenge the conclusions this Court reached one year ago, with a fulsome and developed record. The Court was correct then to find that all requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) are met, and that this case is ideally suited for the class action mechanism. Proceedings since certification have only borne this out, and the Court is now well situated to determine class-wide statutory penalties. Accordingly, and for all the reasons set forth above and in Plaintiffs' briefing in support of their motion for class certification, Defendants' motion to decertify the class should be denied.

Dated:  June 5, 2017

**JA683**

Plaintiffs,
By Counsel.


*s/ Patricia M. Kipnis*
Patricia M. Kipnis (WVSB #12896)
Bailey & Glasser LLP
923 Haddonfield Road
Suite 300
Cherry Hill, New Jersey 08002
(856) 324-8219

John W. Barrett (WVSB #7289)
Jonathan R. Marshall (WVSB #10580)
Sandra Henson Kinney (WVSB #6329)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile

- and-

Jason E. Causey (WBSB #9482)
James G. Bordas, Jr. (WVSB #409)
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
(304) 242-8410


26

**JA684**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

### WHEELING DIVISION

**PHILLIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA, and**
**DANIEL V. SHEA, individually and on**
**behalf of a class of persons,**

       **Plaintiffs,**

**v.**                                                    **Civil Action No. 5:12-CV-114**
                                                          **Civil Action No. 5:12-CV-115**

**QUICKEN LOANS, INC., and**
**TITLE SOURCE, INC.,**

       **Defendants.**

### Certificate of Service

      I hereby certify that on this 5th day of June, 2017, **Plaintiffs' Response in Opposition to Defendants' Motion to Decertify the Class** was served on counsel of record through the CM/ECF System, which will notify the following CM/ECF participants:


Carrie G. Fenwick
Joseph M. Ward
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301

Joseph F. Savage
Yvonne W. Chan *pro hac vice*
Goodwin Proctor LLP
100 Northern Ave.
Boston, MA 02210

Brooks R. Brown *pro hac vice*
Thomas M. Hefferon *pro hac vice*
Goodwin Proctor LLP
901 New York Ave., N. W.
Washington, D.C. 20001
*Counsel for Quicken Loans, Inc. and Title Source, Inc.*


**JA685**

John C. Lynch
Jason E. Manning
Troutman Sanders LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
*Counsel for Defendants, Quicken Loans Inc.*

*s/ Patricia M. Kipnis*
Patricia M. Kipnis (WVSB #12896)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

FILED

JUL 11 2017

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE
SHEA** and **DANIEL V. SHEA**, individually
and on behalf of a class of persons,

Plaintiffs,

v.

**QUICKEN LOANS INC.**, and **TITLE SOURCE,
INC.**, dba Title Source Inc. of West Virginia,
Incorporated,

Defendants.

Civil Action No. 5:12-CV-114
Judge Bailey

**SECOND ORDER RESOLVING MOTIONS AND
AWARDING CLASS-WIDE STATUTORY DAMAGES**

Pending before this Court are the following motions:

1.      Plaintiffs' Brief on Class-wide Statutory Penalties and Motion for Summary
Judgment on Class-wide Contract Damages [Doc. 293-1];

2.      Defendant's (*sic*) Motion for Summary Judgment on Certain Class Loans
[Doc. 298-3];

3.      Defendants' Motion in Limine and Memorandum of Law to Exclude Prior
Testimony of Michael Lyon [Doc. 301];

4.      Plaintiffs' Motion in Limine to Preclude Witnesses at Damages Hearing, and
Memorandum in Support [Doc. 311];

5.      Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs'

1

**JA687**

Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 312];

6.      Quicken Loans and Title Source's Combined Motions in Limine and Memoranda of Law to Exclude Documents Cited in Plaintiffs' Summary Judgment Briefing and Damages Briefing [Doc. 325]; and

7.      Defendant's (*sic*) Motion to Decertify the Class [Doc. 327].

Before addressing the merits of the various motions, it would be beneficial to recount a portion of the history of this case.  This litigation effectively commenced on June 15, 2012, when plaintiffs filed an Amended Complaint in the Circuit Court of Ohio County individually and on behalf of a class of West Virginians who obtained mortgage loans through Quicken.  The case proceeded through several years of motion practice, a stay, and exchange of discovery.  The course of discovery included the exchange of over 15,000 pages of documents and the depositions of twenty-three witnesses.  Discovery on all aspects of the case closed on December 29, 2015 [Doc. 97].

Plaintiffs subsequently moved for class certification as well as for summary judgment on the class claims.  On June 2, 2016, this Court found that Quicken's uniform practice of providing estimated home values to appraisers constitutes unconscionable conduct under the West Virginia Consumer Credit and Protection Act ("WVCCPA") [Doc. 227].  The Court found that Quicken did so while failing to disclose the practice to plaintiffs. The Court recognized that, by "concealing these facts, Quicken deceived the plaintiffs" as understood by the Fourth Circuit in ***McFarland v. Wells Fargo Bank***, 810 F.3d 273 (4th Cir. 2016).  Moreover, the Court found "ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs'

2

loans."  The Court rejected Defendants' argument that appraisals are obtained for the benefit of the lender, not the borrower, [Id. at 22], explaining that Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater."

This Court also made findings as to intent: "To repeat, Quicken had full knowledge of its practice of providing estimated values to its appraisers for purposes of influencing their appraisals.  Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers.  Quicken knew these facts.  The plaintiffs did not.  Under the analytical framework of both *McFarland* and *Brown*, this constituted unconscionable inducement." [Id. at 20-21].

The Court also rejected any argument that plaintiffs must show actual harm to recover under the WVCCPA. [Id. at 23].  It explained that Quicken's belief that plaintiffs must show actual harm caused by its conduct to be "contrary to the stated purpose of this claim, which is to provide a cause of action in situations where damages in the form of a substantively unconscionable loan are not present.  For that reason, the WVCCPA provides that a person who has been subjected to unconscionable conduct may recover actual damages and the right to recover of $1,000 per violation.  West Virginia Code § 46A-5-101.  *See* Syl. pt. 2 *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 740 S.E.2d 562 (2013) ('under W. Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages.')." [Id].

As to the breach of contract claim, the Court analyzed the contract into which plaintiffs and Quicken entered in which Quicken undertook to obtain an acceptable

3

appraisal [Id. at 24].  The Court went on to find that an appraisal obtained by the process of providing a target figure to an appraiser is a universally condemned process that serves no legitimate purpose and "cannot conceivably be an 'acceptable' one." [Id. at 25].  Further, "[n]or could an appraisal obtained by such a scheme be fair, valid or reasonable" and "withholding knowledge of the true nature of the appraisal violates Quicken's duty to deal honestly" [Id.].

Finally, this Court also found that the "undisputed evidence shows that Quicken and TSI consistently acted in concert to accomplish their unlawful purposes of providing appraisers with estimated values" and granted affirmative summary judgment on plaintiffs' conspiracy claim [Id. at 54-55].

This Court also analyzed plaintiffs' motion for class certification and, finding all Rule 23 requirements met, certified a class defined as:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

[Id. at 61].  In doing so, the Court found that it would be able to "easily determine whether the discovery rule applies class-wide to toll class members' claims" and that therefore "defendant's statute of limitations argument presents no barrier to certification" [Id. at 51].

Defendants unsuccessfully moved for reconsideration as well as interlocutory appeal to the Fourth Circuit. [Docs. 243 & 237].

Defendants then moved for entry of a scheduling order, after which the Court held an in person status conference on November 17, 2016.  As a result of that conference, this Court issued an Order [Doc. 248] as follows:

4

**JA690**

• The Court noted that defendants sought additional discovery and that "defendants also seek to demonstrate that they did not engage in any sort of 'bad faith' in making a referral to the appraisers" and further "seek to demonstrate that there was no causal connection between their conduct and a biased appraisal as to damages;"

• The Court further stated that plaintiffs "contend that defendants are merely asking for a 'do-over' both on discovery and the merits arguments that they have already presented thus far" and that plaintiffs had pointed out that "defendants already have the discovery which they seek, including their lending patterns and practices, and information about individual class members' loans;"

• As a result, the Court concluded that defendants were simply asking for a period of time to go through their own loan information and glean statistical and anecdotal evidence to support their positions as well as to obtain an expert witness, and allowed defendants a period of time to go through the loan information already in their possession;

• The Court set forth the class notice procedures, including that a first class opt-out notice must be sent by December 15, 2016; and that a second notice must be sent "after the Court has ruled on statutory damages and the return of the appraisal fees, so that individual plaintiffs can estimate the amount of monetary compensation that they will receive by opting into or out of the class;"

• The Court ordered Defendants to provide plaintiffs with information as to the amount of appraisal fees by March 1, 2017;

• The Court set a hearing as to damages on April 20, 2017, with concurrent

5

**JA691**

memoranda as to class damages to be filed by April 6, 2017, understanding that if the defendants desired to call a witness on the issue of egregiousness, the Court would hear the testimony.

In January of this year, the defendants retained additional counsel, who seems determined to obtain a "do-over" of virtually every ruling in this case. On February 24, 2017, the defendants filed Quicken Loans and Title Source's Motion for Modification of Order as to Status Conference [Doc. 266]. In that motion, the defendants argue that the damages "trial" would last several days, that the issue of contract damages must be heard by a jury, that all compensatory damages had to be decided before the Court could make its determination as to the statutory penalty, and requesting the re-opening of discovery.

Despite the fact that discovery was closed, on February 24, 2017, the defendants filed interrogatories and requests for admission on the plaintiffs. In addition, on March 10, 2017, the defendants filed Second Supplemental Rule 26(a)(1) disclosures, identifying, for the first time, seven new witnesses from Quicken and TSI; two witnesses of a company identified as "FNC, Inc."; "members of the class certified by the Court on June 2, 2016"; four individuals who opted out of the class; the general categories of "West Virginia appraisers and/or individuals who conducted or were otherwise involved in appraisals for the loans in the class certified by the Court on June 2, 2016"; and Quicken and TSI employees generally who had contact with any member of the certified class. The disclosure also listed many new documents generally, including:

1.      [d]ocuments and information relating to members of the class certified by the Court on June 2, 2016 and the loans they obtained during the class period, including loan files and loan journal notes;

6

**JA692**

2.      records relating to the discharge, modification, acceleration, refinance, surrender, foreclosure, and/or modification of those loans, and public records concerning the class members (e.g., bankruptcy and other public filings);

3.      "Emails and other business records of Defendants which relate to the appraisal ordering and review processes, or to legal and industry requirements and guidelines";

4.      "Publicly-available documents relating to appraisals, appraisal ordering, and appraisal review"; and

5.      "Publicly-available documents relating to the discharge, modification, acceleration, refinance, surrender, foreclosure, and/or modification of loans obtained by members of the class certified by the Court on June 2, 2016, and publicly-available documents relating to the sale of any property securing those loans."

On March 30, 2017, the parties again appeared for a status conference and to address Quicken Loans and Title Source's Motion for Modification of Order as to Status Conference [Doc. 266]. Again the defendants reiterated that they wished an opportunity to present evidence on egregiousness and on the issue of harm to the class members, as well as a request for "very targeted" discovery. The Court stated as follows:

All right. I've carefully gone over all of this. The determination of the statutory penalties under the Consumer Protection Act does involve evidence of intent, knowledge and harm. And the amount of penalty to be imposed by the Court should have a relationship to the egregiousness of the violation. However, this Court believes that the egregiousness of the violation is something the Court considers based upon the actions of Quicken Loans and TSI.

7

JA693

Therefore, I will permit the defendants to present, I'll say for right now, two witnesses on the issue of their policies.  And there's arguments made about how careful they are and that's fine, I'll be glad to hear that.

The defendants make the argument that any statutory penalty must bear a reasonable relationship to the actual harm.  I think that's wrong.  I think the *Vanderbilt* case[1] settles that issue.

In a footnote, the defendants argue that that's limited to five times the actual harm.  That's under *Garnes*,[2] which is a punitive damages case.  And that was in the *Brown*[3] case where the Court was considering damages for common law fraud, not damages for a violation of the Consumer Protection Act.  These are not punitive damages.  It's a statutory civil  penalty.  While there may be somewhat of a punitive element to it, they are not to be determined under the same standard as punitive damages.

The issue of a jury demand on whether the return of the appraisal fees is a request for which there will be a jury, this Court disagrees.  It's a request for equitable relief.  The return of payments or the disgorgement of payments is an equitable form of relief.  And that's backed up by both the

--------------------------------------------------

[1] *Vanderbilt Mortgage & Finance, Inc. v. Cole*, 230 W.Va. 505, 740 S.E.2d 562 (2013) ("under W. Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages.").

[2] *Garnes v. Fleming Landfill, Inc.*, 186 W. Va. 658, 667, 413 S.E.2d 897, 908 (1991).

[3] *Quicken Loans, Inc. v. Brown*, 236 W. Va. 12, 40, 777 S.E.2d 581, 609 (2014).

8

*Sivolella*[4] case, S-i-v-o-l-e-l-l-a, out of New Jersey in 2013; and the ***Gerald***

***Moore and Sons***[5] case out of the Eastern District of Virginia in 1996. The

defendants have cited ***Curtis versus Loether***, L-o-e-t-h-e-r, 1974, U.S.

Supreme Court case,[6] but it specifically does not apply to cases requiring the

defendant to disgorge funds wrongfully withheld from the plaintiff. It does not

apply to equitable restitution.

      The defendants argue that we can't have a statutory penalty imposed

until the damages trial has been completed. Again, this Court disagrees. I

think that argument rests on the faulty premise that the statutory penalties

have to bear a reasonable relationship to the harm.

      On the issue of discovery, we had -- first of all, this case has been

pending for almost five years now. We had a hearing on November 17th.

At that time it was determined what the defendant's really wanted was time

---

[4] ***Sivolella v. AXA Equitable Funds Mgmt., LLC***, 2013 WL 4096239, at **5-6 (D. N.J. July 3, 2013) (finding that because plaintiffs were seeking disgorgement of the fees they were charged, they were not seeking "some funds" … "but rather ***the*** funds allegedly charged and retained by Defendants, and therefore, "Plaintiffs' claim is for equitable restitution and, as a result, not triable to a jury"), citing ***Nat'l Sec. Sys., Inc. v. Iola***, 700 F.3d 65, 101 (3d Cir. 2012) ("It is undisputed that restitution of ill-gotten commissions is an equitable remedy."); ***Hanwha Azdel, Inc. v. C&D Zodiac, Inc.***, 2013 WL 3989147, at *2 (W.D. Va. Aug. 2, 2013) (a claim for disgorgement of specific profits and to prevent unjust enrichment constitutes equitable restitution and would be a remedy imposed "if at all, by the court and no[t] by the jury.").

[5] ***Gerald M. Moore & Son, Inc. v. Drewry & Assocs., Inc.***, 945 F.Supp. 117, 120 (E.D. Va. 1996), citing ***Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co.***, 249 U.S. 134 (1919).

[6] ***Curtis v. Loether***, 415 U.S. 189, 194 (1974) ("Nor is there any sense in which the award here can be viewed as requiring the defendant to disgorge funds wrongfully withheld from the plaintiff.").

9

**JA695**

to prepare and marshal their evidence. And there was no need for discovery. But they wanted 150 days to prepare. And this Court gave them 150 days. Now less than two months before the hearing, they want massive discovery. You can call it targeted, but that's a lot of discovery. In addition, I don't think the information sought is relevant for this hearing under the way this Court has interpreted the rules or the rulings and the law concerning the statutory damages.

Now, with regard to the issue of statute of limitations, the burden's on the defendant. If the defendant can bring evidence that the class member had actual knowledge that the defendant sent an estimate of value to the appraiser and that no payments were made within one year before June 15th, 2012, I'll boot them. In the absence of that evidence, it's not an issue.

Transcript of Proceedings, March 30, 2017 [Doc. 277, pp. 4-7, (footnotes added)].

During the March 30 hearing, there was a discussion of witnesses and exhibits. The defendants indicated that they wished to call nine witnesses. The Court indicated that nine witnesses appeared to be excessive and repetitive. The defendants countered that they could reduce the number of live witnesses to five and present affidavits of the remaining four. It is important to note that at no time did the defendants request an opportunity to cross examine or challenge any of the witnesses or documents which were already in the record. Furthermore, the defendants' willingness to submit affidavits discloses that, contrary to their present position, the defendants were well aware that the hearing was not intended to be a full hearing, but rather an opportunity for the defendants to present additional evidence on the issue of egregiousness.

10

JA696

The defendants identified Clint Bonkowski, A.J. Ureel, Kristine Hughes, Amy Bishop and William Banfield as the five live witnesses to be called.  Four of these witnesses, all but Mr. Banfield, had never been disclosed until March 10, 2017.  Despite the failure of the defendants to timely disclose these potential witnesses, the Court determined to allow the testimony (to the extent relevant) provided that the defendants made the witnesses available for deposition, so that the plaintiffs could discover the witnesses' expected testimony and the areas upon which testimony would be given.

The depositions were taken on April 13 and 14 in Detroit, Michigan.  During the deposition, a portion of the testimony was as follows:

Q. Do you know where the documents came from?

A. No.

Q. Aside from lawyers, did you talk to anybody about the testimony that you're going to provide today?

A. No.

Q. So this matter has been set for a damages hearing, and you've been disclosed as a potential witness. Do you know what your expected testimony will be at that hearing?

A. No.

Q. Do you know any of the questions that you'll be asked at that hearing?

A. No.

Q. Do you know any of the issues that you'll be asked to address at that hearing?

A. No.

11

Q.    Do you know how - do you know if you'll be asked to provide testimony regarding any damages that class members may have suffered?

A.    No, I don't know.

Q.    Do you know why you were asked to testify?

A.    No.

Q.    The loan documents that you reviewed, do you know why you were asked to review those documents?

A.    No.

[Doc. 289-2, p. 24].

During the deposition of Mr. Ureel, the following occurred:

Q.    What is going to be your expected testimony at trial?

Mr. Savage (defense counsel):    Well, if you know. If it's something that you know from lawyers, then you don't answer.

A.    I can't answer that.

Q.    What were you - what are you here to talk about? What knowledge or information do you have to talk about today?

Mr. Savage: Objection. He's here to answer your questions.

A.    I'm here to answer your questions.

. . .

Q.    Well, I kind of need to know what I need to ask you. So you've been designated as a potential witness at a hearing that's going to be held on May 9th.  And I'm trying to figure out - and the whole reason for all of this is to figure out what you intend to say. So what do you intend to say?

12

**JA698**

> A.    I intend to answer the questions that are posed to me.
>
> . . .
>
> Q.    What do you expect - - what are the types of questions that you expect that
>
> you'll answer?
>
> A.    I can't answer that.

[Doc. 289-3, pp. 33-34].

This Court found this type of gamesmanship to be unacceptable, being the type of conduct that the Federal Rules were adopted to prevent and remedy. The whole purpose of the depositions ordered by the Court was so that the plaintiffs could have learned the intended testimony of the late disclosed witnesses and ameliorate the prejudice of having the witnesses disclosed so very late in the proceedings.

For those reasons, this Court excluded Clint Bonkowski and A.J. Ureel as witnesses at the hearing on May 9. The parties had stipulated that Kristine Hughes' deposition may be used at the hearing [Doc. 294].

With respect to documents to be presented at the hearing, any document that was not disclosed to the plaintiffs by the disclosure of March 10, 2017, or before was excluded. *See* Order Granting in Part and Denying in Part Plaintiffs' Motion to Exclude Witnesses and Documents at Damages Hearing [Doc. 310].

**I.    Defendants' Motion in Limine and Memorandum of Law to Exclude Prior Testimony of Michael Lyon [Doc. 301]**

Prior to the May 9 hearing, the defendants filed Defendants' Motion in Limine and Memorandum of Law To Exclude Prior Testimony of Michael Lyon [Doc. 301]. In that motion, the defendants sought to exclude the deposition and trial testimony of Michael

13

**JA699**

Lyon, alleging that this Court denied the defendants the opportunity to present the testimony of Michael Lyon at the May 9 hearing and that his testimony was hearsay. At the beginning of the May 9 hearing, this Court denied the Motion, noting that Michael Lyon was one of the nine witnesses listed by the defendants. When the defendants reduced their list of live witnesses to five, it was the defendants who determined not to include Michael Lyon among the live witnesses, opting instead to file his affidavit (which was not done). Defendants did, however, designate portions of Mr. Lyon's testimony for consideration [Doc. 321].

In addition, the argument that Mr. Lyon's prior testimony in deposition and trial in the *Brown* case is unavailing. Mr. Lyon was deposed and appeared as a 30(b)(6) witness on behalf of Quicken Loans in the *Brown* case. His statements are, therefore, the official position of Quicken.

II.    **Plaintiffs' Motion in Limine to Preclude Witnesses at Damages Hearing, and Memorandum in Support [Doc. 311]**

Also prior to the May 9 hearing, the plaintiffs filed Plaintiffs' Motion in Limine to Preclude Witnesses at Damages Hearing, and Memorandum in Support [Doc. 311]. This motion sought the exclusion of Phillip Alig as a live witness. According to the motion, after reducing the number of witnesses to five and specifically naming those witnesses, the defendants gave notice that they would also call Mr. Alig as a live witness. In light of the fact that the witness list was set and that the defendants did not seek leave to add Mr. Alig to the list and in light of the fact that this Court had previously ruled that damage to the plaintiffs was not a issue at the hearing, this Court ruled that the defendants could not call Mr. Alig as a live witness, but could designate any portions of his deposition that they

14

**JA700**

desired.

**III.  Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs'
Response to Defendants' Memorandum Regarding Classwide Penalty under
the WVCCPA [Doc. 312]**

In Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs' Response
to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc.
312], filed May 3, 2017, the defendants seek to exclude Plaintiffs' Response to
Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 300],
on the basis that at the  November 17, 2016, status conference, this Court directed that
such memoranda be limited to ten pages, while the challenged memorandum greatly
exceeds the page limit.  On May 5, the plaintiffs filed Plaintiffs' Motion for Leave to File an
Amended Response to Defendants' Memorandum Regarding Classwide Penalty under the
WVCCPA [Doc. 315], noting that they had inadvertently overlooked the Court's directive
and instead complied with this Court's Local Rules.  The motion sought leave to file
Plaintiffs' Amended Response to Defendants' Memorandum Regarding Classwide Penalty
under the WVCCPA [Doc. 315-1], in place of the challenged document.

This Court granted the motion on May 5, 2017, [Doc. 314], and the amended
response was docketed [Doc. 315], rendering the Defendants' Motion and Incorporated
Memorandum to Strike Plaintiffs' Response to Defendants' Memorandum Regarding
Classwide Penalty under the WVCCPA [Doc. 312] moot.

**IV.  Quicken Loans and Title Source's Combined Motions in Limine and
Memoranda of Law to Exclude Documents Cited in Plaintiffs' Summary
Judgment Briefing and Damages Briefing [Doc. 325]**

In this Motion, the defendants seek to exclude a number of items from consideration

15

by the Court in determining the amount of statutory damages to be awarded in this case for the violations of the WVCCPA.  Many of the items about which the defendants complain were not considered by the Court in determining the appropriate relief, and the Motion is moot with respect to those items.  It would appear that the cleanest way to resolve the Motion is to discuss the items which the Court did consider and the basis upon which the items were deemed admissible.

First this Court considered a number of governmental publications or directives, to which it would appear the defendants did not object, including (1) the Mortgagee Letter 96-26, authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner (May 21, 1996); (2) the letter from the Office of the Comptroller of the Currency to K. Kaiser, Chairman of The Appraisal Standards Board (July 28, 1999); (3) the 2005 "Interagency Statement" issued by the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration; and (4) the Home Valuation Code of Conduct.

The defendants object to this Court's consideration of Mortgagee Letter 2009–28, which is cited solely for the purpose of demonstrating that the letter reconfirmed the position taken in the 1996 letter concerning transmitting suggested values to an appraiser. For that purpose, the letter is certainly relevant.

In addition, the Court considered the 2007 Online Appraiser Petition, to which the defendants do object.  The Petition is not relevant for the purpose of proving that Quicken applied pressure.  Rather, the Petition is relevant to show that the appraisal industry deemed attempts to influence appraisers was inappropriate under industry standards

16

because it stripped appraisers of their independent judgment and resulted in a dishonest and potentially harmful process. Furthermore, the petition is relevant because it confirms that the practice of using target figures was widely, if not universally, condemned. For these reasons, the petition is both relevant and admissible, and defendants' motion will be denied with respect to this information.

The Court also considered the survey of appraisers referred to and considered by the United States District Court for the Southern District of New York in *Fed. Housing Agency v. Nomura Holding Amer., Inc.*, 104 F.Supp.3d 441, 461 (S.D. N.Y. 2015). Again, this survey is relevant to demonstrate the level of condemnation of the practice of providing suggested values to appraisers.

The Court also considered Judge Recht's order in *Brown v. Quicken Loans Inc.*, Civ. No. 08-C-36, Ohio County, W. Va., in which he found "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property." This order is certainly not hearsay and is relevant to show that other jurists share this Court's opinion of the propriety of sending values to an appraiser.

This Court also considered the deposition testimony of Michael Lyon, Jennifer Randle, and Jordan Petsovski. These depositions are clearly admissible under Fed.R.Civ. P. Rule 32(a)(4)(B). In fact, the only deposition to which the defendants object is that of Michael Lyon, which is discussed in Section III of this Order, *supra*.

Finally, this Court considered two emails among Quicken executives. As noted by the defendants, emails do present difficulties in connection with the business records

17

**JA703**

exception to the hearsay rule. "While properly authenticated e-mails may be admitted into evidence under the business records exception,. . . [a]n e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013) (internal quotations and citations omitted).

Rule 803(6)(B) allows for the introduction of records that are "kept in the course of a regularly conducted activity of a business." For a record to be admitted as a business record, it must be "(1) made by a regularly conducted business activity, (2) kept in the 'regular course' of that business, (3) 'the regular practice of that business to make the memorandum,'(4) and made by a person with knowledge or from information transmitted by a person with knowledge." *Id.* at 219.

In this case, the Court is considering the emails. These emails were uncovered by the Department of Justice in its investigation of Quicken. They represent a regularly conducted activity. They have been kept for years in the records of the Quicken. They deal with a subject matter clearly within the business of Quicken and TSI. They are made by high ranking executives with knowledge of the defendants' processes and procedures. Finally, the defendants have never questioned the authenticity of the emails.

Returning to the defendants' Motion, the following are sought to be excluded:

A.    Plaintiffs Should Be Precluded from Introducing Exhibits And Portions of the Record Related to Fees

This Court did not consider any such evidence in ruling on the award of statutory damages.

B.    Plaintiffs Should Be Precluded from Introducing Documents Related to Loans Outside the Scope of the Class

Defendants seek to exclude documents related to the Sheas' 2006 loan and the Aligs' 2011 loan, including trial testimony from ***Walters v. Quicken Loans, Inc.***, No. 11-C-1123 at 68-69 (April 19, 2015) [Doc. 293 Ex. D]; Brown Dep. at 168:18-169:10 (discussing Alig 2011 loan) [Doc. 199 Ex. EE]; Alig 2011 HUD-1 Settlement Statement [Doc. 199 Ex. P]; Alig Loan Files including 2011 HUD-1 Settlement Statement [Doc. 173 Ex. C]; and Shea 2006 HUD-1 Settlement Statements [Doc. 199 Ex. Q].

The Court did not consider any of these items in ruling on the award of statutory damages.

C.      Websites from after the Class Period Should Be Excluded

Defendants seek to exclude two articles from Quicken Loans' website from after the class period in this case—one from 2010 and the other from 2015. See Quicken Loans, Important Information You Should Know Regarding Appraisals, available at https://www.quickenloans.com/blog/important-information-appraisals (December 15, 2010) [Doc. 300 at 9]; Blog Post: Terms You Should Understand When Getting a Mortgage, available at http://www.quickenloans.com/blog/terms-you-should-understand-when-getting-a-mortgage (July 27, 2015) [Doc. 199 at 5, 22].  The Court did not consider any of these items in ruling on the award of statutory damages.

D.      Plaintiffs Should Be Precluded from Offering Regulatory Evidence Dated after the Class Period

Defendants seek to exclude Mortagee Letter 2009-28, discussed above.  This letter is relevant to show that it reconfirmed the prior opinion that suggested values should not be sent to appraisers and to dispel the argument that it was not until this letter came out that the defendants were aware of the problem.

19

**JA705**

E.    Plaintiffs Should Be Precluded from Introducing Deposition Testimony

Defendants seek to exclude the deposition testimony of the Aligs, Jody Hill, Philip Jackson, Troy Sneddon, and John Kelly, none of which was considered by the Court in ruling on the issue of statutory damages.

The persons whose deposition testimony was considered are or were Quicken and/or TSI employees who live more than 100 miles from the Courthouse.

F.    The Appraiser Petition Should Be Excluded

This issue is addressed above.

G.    Plaintiffs Should Be Precluded from Offering Quicken Loans' Employees' Emails

This issue is addressed above.

H.    Plaintiffs Should Be Precluded from Introducing Expert Reports

The defendants seek to exclude the expert reports of Jody Hill and Philip Jackson, neither of which were considered by the Court in ruling on the issue of statutory damages.

I.    Various Opinions by Third Parties about the Mortgage Industry Should Be Excluded

The defendants seek to exclude Michael Lewis, The Big Short: Inside the Doomsday Machine [Doc. 199 at 5 n.10] and National Community Reinvestment Coalition Executive Vice President David Berenbaum's testimony before the Senate Committee on Banking, Sub-Committee on Housing, Transportation and Community Development (June 26, 2007), available at http://www.banking.senate.gov/public/_files/berenbaum.pdf [Doc. 212 at 3 n. 4], neither of which were considered by the Court in ruling on the issue of statutory damages.

J.    Plaintiffs Should Be Precluded from Introducing Treatises And Industry Sources

The defendants seek the exclusion of several treatises and industry sources for the

20

**JA706**

truth of certain statements alleging that representations and warranties and the repurchase process did not deter improper conduct in the lending industry. See Fitch Ratings, The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS Performance, http://blenderlaw.umlaw.net/wpcontent/uploads/2007/11/fitchfraud1.pdf [Doc. 300 at 10]; Patricia McCoy & Susan Wachter, Representations and Warranties: Why They Did Not Stop the Crisis, Digital Commons @ Boston College Law School (June 2, 2016), available at http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=2044&context=lsfp [Doc. 300 at 11]; NCLC, Mortgage Lending §6.6.1 [Doc. 300 at 10].  This Court did not consider any such materials in reaching its statutory damage decision.

K.     Documents from Other Court Cases Should Be Excluded

This Court disagrees that the rulings and findings of courts with jurisdiction are hearsay.  This Court considered the findings of Judge Recht as noted above.  This Court also considered other cases for their legal findings.

L.     Michael Lyon's Testimony from Brown V. Quicken Loans and Nicewarner V. Quicken Loans Should Be Excluded

This issue is discussed above.

M.     Plaintiffs Should Be Precluded from Introducing Statements or Pleadings from Other Cases Against Quicken Loans

In this category, Quicken seeks to exclude plaintiffs' citation to case law involving Quicken.  Again, plaintiffs offer these cases as background and legal authority within a legal brief, for the Court to consider in making legal determinations as appropriate. The Court is able to take judicial notice of these sources, just as it took judicial notice of West Virginia statutes during the recent hearing.  It is wholly appropriate for the Court to review and rely on other decisions as it sees fit.  For example, this Court has repeatedly relied on

21

the decisions in the ***Brown v. Quicken*** litigation as support in this case. [Doc. 227 at 6-7, 10, 12, 17, 19-21].  In fact, this Court cited with approval Judge Recht's determination that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property." Nonetheless, the Court went on to independently come to the same conclusion. [Id. at 11].  Likewise, the Court may consider that the District Court for the Eastern District of Michigan found that it is plausible that lenders were on notice in 1996 that "[p]roviding to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower . . ." was prohibited by FHA regulations. *See, **United States v. Quicken***, 2017 WL 930039, at **7-8.

The case law cited may also be considered in testing the credibility of Quicken's testimony that it acted at all times in good faith and engaged in conservative lending practices.  The body of case law documents a series of complaints from consumers, the government and former employees relating to inflating appraisals and predatory lending. The very existence of the present DOJ action, which alleges pursuant to the False Claims Act that Quicken knowingly approved loans that violated the Fair Housing Act (FHA) while falsely certifying compliance with those rules and submitted claims for payment when those loans defaulted, undermines Quicken's unsupported testimony at the hearing that it "does the right thing"; is economically motivated to avoid predatory conduct; or utilizes conservative policies and procedures.  Through this action, the government alleged specifically that Quicken systematically sought to influence appraisers. *See **United States v. Quicken***, 2017 WL 930039, at **6-8.  The Court may of course consider the existence

22

**JA708**

of this action in weighing the evidence.  Indeed, the **Nicewarner** court similarly cited the DOJ action in denying Quicken's summary judgment motion.

The decisions in **Bishop v. Quicken Loans, Inc.**, 2011 WL 1321360 (S.D. W.Va. 2011); **O'Brien v. Quicken Loans, Inc.**, 2013 WL 2319248, at *6 (S.D. W.Va. May 28, 2013); and **Nicewarner v. Quicken Loans Inc.** (Cir. Ct. Kanawha Cty. W.Va. Jan. 13, 2016) all reflect consumer complaints that Quicken chose to utilize the higher of two available appraisals allegedly resulting in upside down loans.  Likewise, **Henry v. Quicken Loans Inc.**, 2009 WL 3270768 (E.D. Mich. July 16, 2009) reflects complaints by Quicken's employees regarding such things as training them to overcome consumers' objections. *See also,* **Brown I**, 230 W. Va. 306, at fn. 6 (quoting a script Quicken used to overcome objections).

The repeated complaints of this nature, which are indisputably reflected in the cited litigation, makes Quicken's self-serving overtures that it does "the right thing" difficult to believe and, therefore, may be considered for that non-hearsay purpose, as well as legal authority.

**V.     Defendant's (*sic*) Motion to Decertify the Class [Doc. 327]**

Almost one year since this Court certified the class in this case, new counsel for the defendants moves to decertify the class despite the fact that no new discovery has occurred.

"[D]istrict courts have an affirmative duty to reassess their class certification rulings as the case develops, and to decertify a class or otherwise alter a certification decision as appropriate in light of developments in the case."  **Moore's Federal Practice** § 23.87 at

23

**JA709**

23-405 (3d ed.).

However, "[i]n revisiting an earlier certification decision, a court may modify or decertify, but decertification is a drastic step, not to be taken lightly." 3 *Newberg on Class Actions* § 7:37 (5th ed. 2013). To be sure, an "order granting class certification is not an untouchable determination." *Minter v. Wells Fargo Bank*, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013). Indeed, "an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir. 1990). A motion to decertify is not, however, to be treated as another bite at the apple in the absence of changed circumstances. As the United States District Court for the District of Maryland recently observed, "[t]he breadth of this obligation [to reverse certification if necessary]. . . is tempered by commentary in the Advisory Committee Notes which provide that altering certification is appropriate 'upon fuller development of the facts.'" *Minter*, *2 (citing 1996 Amendment Advisory Committee Notes).

Courts thus consistently hold that "there must be some development or change in circumstances to merit revisiting a class certification decision." *In re J.P. Morgan Chase Cash Balance Litig.*, 255 F.R.D. 130, 133 (S.D. N.Y. 2009) (citing cases). As such, courts should be wary of motions to decertify which simply reargue certification "[i]n the absence of materially changed or clarified circumstances." 3 *Newberg on Class Actions* § 7:47 (4th ed. 2012). That new facts or law should support a motion is a widely recognized concept. *See Zimmerman v. Portfolio Recovery Assocs., LLC*, 2013 WL 1245552, at *5 (S.D. N.Y. March 27, 2013) (declining to decertify class when there was "no new

24

**JA710**

evidence concerning the nature of the class members' debts"); *Connor B. v. Patrick*, 278 F.R.D. 30, 35 (D. Mass. 2011) ("[a]llowing litigants to file a motion to decertify at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless."); *Schell v. OXY USA Inc.*, 2013 WL 4857686, at *4 (D. Kan. Sept. 11, 2013) (denying motion to decertify class after discussing arguments presented and finding "[a]ll of these circumstances were known by the parties at the time they briefed the motion for certification. [Defendant] has provided no new evidence or law on this element, so the court finds that the named plaintiffs still meet the adequacy of representation element."); *Kubiak v. S.W. Cowboy, Inc.*, 2015 WL 12859422 (M.D. Fla. Mar. 11, 2015) (same)*; J.S. v. Attica Cent. Sch.*, 2011 WL 4498369, *6 (W.D. N.Y. Sept. 27, 2011) (denying motion to decertify when defendant "fail[ed] to present new facts or legal argument"); *Elias v. Ungar's Food Prods., Inc.*, 2009 WL 2581502, *5 (D. N.J. Aug. 20, 2009) (no decertification because court already rejected proposition "that an individual inquiry would be necessary for each class member"); *Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 34, 36 (D. Mass. 2011) (denying decertification where defendants argued that plaintiffs failed to satisfy the commonality requirement because the argument was "largely identical to the argument this court rejected in its original certification order").

In addition, "[c]ourts faced with a motion to decertify must also take account of the progression of the litigation." *Jermyn v. Best Buy Stores*, 276 F.R.D. 167, 169 (S.D. N.Y. 2011); *see also Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984) (finding abuse of discretion where district court decertified the class after granting summary judgment in

25

part).  "Decertification is an 'extreme step,' particularly at a late stage in the litigation, 'where a potentially proper class exists and can easily be created." ***Gulino v. Bd. of Educ. of City School Dist.***, 2012 WL 6043803, at *8 (S.D. N.Y. Dec. 5, 2012) (quoting ***Woe***, 729 F.2d at 107; *see also* ***Easterling v. Conn. Dep't of Corr.***, 278 F.R.D. 41, 42 (D. Conn. 2011) ("[a] court should be wary of revoking a certification order completely at a late stage in the litigation process.").

Defendants seek to decertify the class, advancing the following arguments:

1.    The class includes borrowers with no injury and thus no standing;

2.    Numerous individual inquiries infect the contract claim;

3.    Statutory penalties cannot be awarded without individualized evidence; and

4.    Equitable tolling cannot be decided without individualized evidence.

Despite the re-assertion of these arguments, this Court remains convinced that the class certified in this case is appropriate and manageable.

Quicken's first argument is that some class members did not suffer a "concrete injury" and therefore lack standing under the Supreme Court's decision in ***Spokeo v. Robins***, 136 S.Ct. 1540 (2016).  This argument fails as a matter of law from the outset, as it is well settled that "if a class representative has standing, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing." ***Newberg on Class Actions*** § 2:3 (5th ed.); *see also* ***Dreher v. Experian Info. Solutions, Inc.***, 856 F.3d 337 (4th Cir. 2017) ("In a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiff"), quoting ***Beck v. McDonald***, 848 F.3d 262, 269-70 (4th Cir. 2017), in turn citing ***Doe v. Obama***, 631 F.3d

26

157, 160 (4th Cir. 2011); *see also* **Neale v. Volvo Cars of North Am., LLC**, 794 F.3d 353, 362 (3d Cir. 2015); **Kohen v. Pacific Inv. Mgmt. Co. LLC**, 571 F.3d 672, 676 (7th Cir. 2009); **Milbourne v. JRK Residential Am., LLC**, 2016 WL 1071564, at *6 (E.D. Va. Mar. 15, 2016) (Payne, J.); **Lewis v. Casey**, 518 U.S. 343, 395 (1996) (Souter, J., concurring).

There is no question that the Aligs have standing to redress the concrete injury incurred by Quicken's conduct. In **Spokeo**, the Supreme Court addressed the injury-in-fact requirement for Article III standing.  The Court's decision did not change the law of standing, and Quicken is wrong as to its application here.  Instead, the Court confirmed the long-established principle that "standing consists of three elements." **Spokeo v. Robins**, 136 S.Ct. 1540, 1547 (May 16, 2016) (citing **Lujan v. Defenders of Wildlife**, 504 U.S. 555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." **Id**.  The Court further confirmed that to establish injury in fact—the element primarily at issue in **Spokeo**—a plaintiff must "allege an injury that is both 'concrete' **and** 'particularized.'" **Id**. at 1545 (citing **Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.**, 528 U.S. 167, 180–81 (2000) (emphasis added in **Spokeo**)).  According to the Supreme Court, a "particularized" injury "must affect that plaintiff in a personal and individual way." **Spokeo**, 136 S.Ct. at 1548.  The Court agreed with the Ninth Circuit that the **Spokeo** plaintiff had suffered a particularized injury because he claimed that the defendant—an alleged credit-reporting agency that had reported false information about him— "violated his statutory rights," and his "interests in the handling of his credit information are individualized rather than collective." **Id**. (quotation omitted).

27

Further, **Spokeo** confirmed that a "concrete" injury "must actually exist." **Id**. However, a "concrete" injury may also be "intangible." **Id**. at 1549. **Spokeo** indicated two approaches for establishing that an intangible injury is "concrete." "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." **Id**. First, courts should consider whether an alleged intangible harm "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." **Id**. (citing **Vermont Agency of Nat'l Res. v. U.S. ex rel. Stevens**, 529 U.S. 765, 775–77 (2000)). A plaintiff may therefore demonstrate that she suffered a concrete injury by showing that her injury is analogous to a harm traditionally recognized at common law.

Second, Congress may identify and "elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate at law." **Id**. (citation and internal quotation marks omitted). Congress "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before" because Congress "is well positioned to identify intangible harms that meet minimum Arcticle III requirements." **Id**. Of course, state statutes may also serve to define these injuries. See **Gen. Tech. Applications, Inc. v. Exro Ltda**, 388 F.3d 114, 118 (4th Cir. 2004) ("In a diversity case, [the court] must consult state law to determine the nature of the litigant's rights and whether he is entitled to assert the claims he makes.").

Courts applying **Spokeo** in consumer credit cases have overwhelmingly found that violations of the Fair Debt Collection Practices Act ("FDCPA") provide for Article III standing even with violations far less serious than Quicken's conduct here. In **Church v. Accretive**

28

*Health, Inc.*, the Eleventh Circuit found Article III standing when a plaintiff alleged that defendant violated the FDCPA by not including in its debt collection letter certain disclosures required by the Act. 654 Fed. Appx. 990 (11th Cir. 2016). The plaintiff did not allege that she suffered actual damages, but the court found she had "alleged injury to her statutorily-created right to information pursuant to the FDCPA" because that Act "creates a private right of action, which Church seeks to enforce." *Id*. at 994. Importantly, while "the injury may not have resulted in tangible economic or physical harm that courts often expect, the Supreme Court has made clear that an injury need not be tangible to be concrete." *Id*., citing *Spokeo*, 136 S.Ct. at 1549. "Rather, this injury is one that Congress has elevated to the status of a legally cognizable injury through the FDCPA," and plaintiff therefore satisfied the injury-in-fact requirement. *Id*.

Courts around the country have been in accord when considering various violations of the FDCPA's debt collection provisions that did not necessarily give rise to actual damages. *See Linehan v. Allianceone Receivables Mgmt., Inc.*, 2016 WL 4765839, at *7 (W.D. Wash. Sept. 13, 2016) ("The goal of the FDCPA is to protect consumers from certain harmful practices; it logically follows that those practices would themselves constitute a concrete injury"); *Prindle v Carrington Mortg. Servs., LLC*, 2016 WL 4369424, at *9 (M.D. Fla. Aug. 16, 2016); *Larson v. Trans Union, LLC*, 201 F.Supp.2d 1103 (N.D. Cal. 2016); *Dickens v. GC Servs. Ltd. P'ship*, 2016 WL 3917530, at **1–2 (M.D. Fla. July 20, 2016); *Lane v. Bayview Loan Servicing, LLC*, 2016 WL 3671467, at **3–5 (N.D. Ill. July 11, 2016); *Macy v. GC Servs. Ltd. P'ship*, 2016 WL 5661525, at **2-4 (W.D. Ky. Sept. 29, 2016); *Daubert v. Nra Grp., LLC*, 2016 WL 4245560, at *4

29

**JA715**

(M.D. Pa. Aug. 11, 2016); *Quinn v. Specialized Loan Servicing, LLC*, 2016 WL 4264967, at *5 (N.D. Ill. Aug. 11, 2016); *Irvine v. I.C. Sys., Inc.*, 198 F.Supp.3d 1232, 1237 (D. Colo. 2016); *McCamis v. Servis One, Inc.*, 2016 WL 4063403 at *2 (M.D. Fla. July 29, 2016).

Post-*Spokeo* decisions issued within the Fourth Circuit interpreting other consumer protection statutes with statutory damage provisions are no different. For example, courts have found that the annoyance of receiving unwanted telemarketing calls is a sufficiently concrete injury to confer Article III standing. *Mey v. Got Warranty, Inc.*, 193 F.Supp.3d 641 (N.D. W.Va. 2016); *Krakauer v. Dish Network L.L.C.*, 168 F.Supp.3d 843 (M.D. N.C. 2016) (Eagles, J.) (declining to decertify classes upon finding class representative's allegations showed a "concrete injury to him and to each class member"). Courts have similarly recognized a right of privacy in one's consumer report under the Fair Credit Reporting Act. *Burke v. Fed. Nat'l Mortg. Assoc.*, 2016 WL 4249496, at *4 (E.D. Va. Aug. 9, 2016) (Hudson, J.), vacated upon parties' settlement and finding of no jurisdiction by 2016 WL 7451624 (Dec. 6, 2016); *Thomas v FTS USA, LLC*, 193 F.Supp.3d 623, 637 (E.D. Va. 2016) (Payne, J.)

The West Virginia legislature enacted the WVCCPA to "protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." *Bourne v. Mapother & Mapother, P.S.C.*, 998 F.Supp.2d 495, 501 (S.D. W.Va. 2014) (Faber, J.) (quoting *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516, 523 (1995)). The legislature created a private right

of action for violations. W. Va. Code § 46A-5-101.  This Court has found that defendants violated a section of the WVCCPA, § 46A-2-121, which prohibits unconscionable inducement of consumer loans, with respect to each class member's loan. [Doc. 227, p. 54].  In enacting this provision of the WVCCPA, the legislature recognized that West Virginia consumers have the right to consumer loans that are not unconscionably induced. Consistent with the authority above recognizing concrete, particularized harm created by statutory violations far less egregious than Quicken's conduct here, Quicken's violation of this statutorily-created, legally cognizable right creates a concrete harm to the Aligs as class representatives – and indeed as to each class member –sufficient to establish standing for each member of the class.

In addition, Quicken misinterprets this Court's findings when it represents that the Aligs' unconscionability claim relied on any individualized facts.  As this Court has already determined when it certified the class, the injury of receiving a tainted, unreliable loan as a result of Quicken's unconscionable conduct does not rely on any appraiser's individual testimony or the facts of any individual loan. Tellingly, Quicken does not cite a single case interpreting *Spokeo*, let alone one in a consumer statute case, alleging common class-wide conduct like that this Court has already found here, and where statutory damages are sought.  Instead, Quicken cites pre-*Spokeo* cases where plaintiffs' proof was individualized or where class members sought actual damages which necessarily depended on individualized facts.  Plaintiffs and all class members unquestionably have standing to redress Quicken's unconscionable conduct.

Next, defendants state, in direct contrast to their position throughout this litigation and to their executed stipulation on file with the Court, that not all class members had a

31

**JA717**

contract, and some signed a different agreement from the Deposit Agreement. [Doc. 324-3, at 8].  Yet the stipulation Quicken's counsel executed and filed on March 15, 2016, stated:

> Quicken Loans stipulates that the Interest Rate Disclosures and/or Deposit
> Agreements for the named Plaintiffs' loans (Quicken 15, 699, 1031, 1625)
> are representative of the standard deposit agreements used by Quicken
> Loans from 2002 to the present.

[Doc. 168].

This stipulation was submitted during the class certification briefing and Quicken has never before questioned whether the contracts were uniform. The declaration contradicting the stipulation filed in March 2016 will be stricken because it contradicts evidence Quicken has already submitted in this case.  While technically applicable to motions for summary judgment, defendants' conduct here is generally improper under the sham affidavit rule, a firmly established part of Fourth Circuit law.  *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990).  Under the "sham affidavit" rule, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

This Court will leave until later, if necessary, to determine whether there would exist an implied contract to receive a fair, untainted appraisal.

Defendants next argue, also for the first time, that class members' own performance under the contracts cannot be "presumed on a class basis".  Defendants speculate that, if any class member attempted to influence an appraiser, it would constitute a breach of

32

JA718

the agreement by the borrower.  This argument is frankly illogical. Putting aside the fact that Quicken has never before raised such a defense, there is no language in the Deposit Agreement obligating a borrower to provide a fair and accurate appraisal; that obligation falls solely on the part of the lender, Quicken.  Of course, this makes sense, as it is the lender, not the borrower, who is responsible for hiring the appraiser – and from whom the appraiser can expect repeat business if expectations are met.

Quicken's remaining contract arguments were already addressed by this Court at the March 30, 2017 hearing when the Court found that plaintiffs' request for equitable relief in the form of the return or disgorgement of payments is simply an equitable form of relief. [Doc. 277, Mar. 30, 2017 Transcript at 5-6].  The issue was also thoroughly briefed in conjunction with plaintiffs' motion for summary judgment on contract damages, discussed below.  The primary flaw in Quicken's argument is that the Deposit Agreement was a separate, stand-alone contract that was independent from the loan agreements.  The status of the loans is irrelevant to the separate contract duty that this Court explained required Quicken to obtain the fair, valid and reasonable appraisals that plaintiffs and class members bargained (and paid) for but did not receive.  Instead, they received unreliable, worthless appraisals and have all been damaged, making restitution appropriate.

In sum, Quicken's position that the Court may not award a refund of the contract fees on a class-wide basis is incorrect, and there are no individualized issues bearing on predominance because this relief may be readily awarded based on class-wide data already available.

Defendants next argue that class-wide statutory penalties cannot be awarded without individualized evidence.  However, as this Court has repeatedly recognized, the

33

amount of the award of statutory penalties is dependent on the level of egregiousness of **Quicken's conduct**. [Doc. 277, pp. 4-5]. ("[T]he amount of penalty to be imposed by the Court should have a relationship to the egregiousness of the violation. However, this Court believes that the egregiousness of the violation is something the Court considers based upon the actions of Quicken Loans and TSI"; see also [Doc. 336, May 9, 2017 Transcript at 6:22-25]; *Clements v. HSBC Auto Finance, Inc.*, 2011 WL 2976558, at \*7 (S.D. W.Va. July 21, 2011) ("The amount of a [WVCCPA] penalty should have a direct relationship to the egregiousness of the violation"). This Court has already considered and rejected defendants' argument – which is still, and has always been, about actual harm.

Statutory damages may be awarded on a class-wide basis here because Quicken's conduct was uniform as to the class. *Soutter v. Equifax Info. Servs., LLC*, 498 F.App'x 260 (4th Cir. 2012), a Fair Credit Reporting Act case, is readily distinguishable because that court recognized that the methods the defendant credit reporting agency used to collect credit information from the courts had a significant bearing on individual claims. For example, Equifax used "at least three different means of collecting general district court records during the class period," and Soutter's claims therefore "varie[d] from any potential class plaintiff with a circuit court judgment, and from many potential plaintiffs with general district court judgments," which made proof of whether Equifax's behavior was unreasonable vary case-by-case. In contrast, there is absolutely no difference in defendants' conduct here as to the members of the proposed classes, let alone a meaningful one. In such circumstances, where defendant's conduct is uniform as to the class, class certification is appropriate. *See Stillmock v. Weis Mkts., Inc.*, 385 Fed.App'x

34

**JA720**

267, 273 (4th Cir. 2010) (reversing denial of certification and finding questions of liability predominating because "the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner"); *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F.App'x 299, 305 (4th Cir. 2013) (same); *Ramirez v. Trans Union, LLC*, 301 F.R.D. 408, 420 (N.D. Cal. 2014) (finding typicality met and finding defendant's reliance on Soutter "misplaced" because the Soutter court found there were "meaningful differences between her claim and class claims" but that in present case the record showed that defendant's conduct was uniform as to the class). *See also Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006) (typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned.").

Quicken's argument that class members did not necessarily suffer identical harm – even if relevant as a matter of law to this WVCCPA case – would effectively preclude class certification in any consumer case. Instead, consumer statutes allow for, and courts award, uniform class-wide penalties in such cases. For example, the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA") is a federal consumer statute which restricts telephone solicitations and the use of automated telephone equipment. The "Do Not Call" provisions of the TCPA, like the WVCCPA, allow for statutory penalties. 47 U.S.C. § 227(b)(3)(B). In a recent class case, *Krakauer v. Dish Network L.L.C.*, a jury awarded $400 for each call that violated the Do Not Call provisions of the TCPA. 2017 WL 2242952, at *2 (M.D. N.C. May 22, 2017). The district court then trebled that award upon

35

**JA721**

finding that defendants had willfully and knowingly violated the TCPA. *Id.* at *12. In a prior order examining standing under Spokeo and denying defendants' motion to decertify the class, the *Krakauer* court recognized that not every class member's experience was the same: "While class members did not necessarily pick up or hear ringing every call at issue in this case, each call created, at a minimum, a risk of an invasion of a class member's privacy. *Spokeo* clarified that a "risk of real harm" was enough to show concrete injury." *Krakauer v. Dish Network L.L.C.*, 168 F.Supp.3d 843, 845 (M.D. N.C. 2016). Here, the Court's liability finding recognizes the class-wide risk that Quicken's unconscionable conduct created, and a class-wide award is consistent with that finding as well as expressly permitted by the statute.

Uniform statutory penalties are also frequently awarded under the WVCCPA, most often in a settlement class context. This Court has awarded class-wide statutory penalties not only in *Dijkstra v. Carenbauer*, 5:11-cv-152, where each class member was subject to the same unconscionable lending practice but not necessarily to the same actual harm, and in *Diloreti v. Countrywide Home Loans, Inc.*, No. 5:14-cv-00076, wherein it approved a class settlement that resolved identical allegations of appraiser influence to those here and wherein class members received the same penalty amount. [Doc. 341-1]; see also Final Orders approving settlements [Doc. 341-2], in *Archbold v. Wells Fargo Bank, N.A.*, 2015 WL 4276295 (S.D. W.Va. July 14, 2015) (approving settlement involving "per loan statutory penalty amount to settlement class members" whose loans were serviced by Wells Fargo and who were assessed and paid attorneys' fees); *Triplett v. Nationstar Mortgage, LLC*, No. 3:11-cv-238 (S.D. W.Va. Oct. 16, 2012) (approving

36

**JA722**

settlement involving class-wide statutory penalties awarded via pro rata distribution to class members charged unlawful late fees and to whom partial payments were returned); *Muhammad v. National City Mortgage, Inc.*, No. 2:07-0423 (S.D. W.Va. Dec. 19, 2008) (same).  Moreover, the *Vanderbilt* court itself approved a uniform penalty of $2,250 for each of the ten offensive phone calls at issue in that matter.  It did not require an individualized analysis of the harm resulting from each of the discrete calls, because it flatly rejected an effort to import the "reasonable relationship" analysis from punitive damages cases to civil penalties.  *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 512, 740 S.E.2d 562, 569 (2013).  Relying upon *Vanderbilt*, this Court has already found that any statutory penalty need not bear a reasonable relationship to the actual harm. [Doc. 277, at 5].

Courts frequently make the same class-wide penalty determinations in FDCPA cases, where statutory damages in class actions are awarded "as the court may allow" but not to exceed $500,000, or 1 per centum of the debt collector's net worth under 15 U.S.C. § 1692k(a)(2)(B).  *See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC*, 198 F.R.D. 503, 507 (N.D. Ill. 2001) (certifying FDCPA class, entering summary judgment on liability, and awarding the maximum allowable statutory damages to the class because defendant's "noncompliance here involved thousands of individual violations over several years: it was frequent and persistent.  The nature of the noncompliance was blatant."); *Weissman v. Gutworth*, 2015 WL 3384592 (D. N.J. May 26, 2015) (approving settlement fund in FDCPA case awarding pro rata share to each class member);   *Harlan v. Transworld Sys., Inc.*, 302 F.R.D. 319 (E.D. Pa. 2014) (same); *Stinson v. Delta Mgmt.*

37

**JA723**

*Assocs., Inc.*, 302 F.R.D. 160 (S.D. Ohio 2014) (same); *Garland v. Cohen & Krassner*, 2011 WL 6010211, at *8 (E.D. N.Y. Nov. 29, 2011) (same); *Bonett v. Educ. Debt Servs., Inc.*, 2003 WL 2165827 (E.D. Pa. May 9, 2003) (same). *See also Kemply v. Cashcall, Inc.*, 2016 WL 1055251, at *16 (N.D. Cal. Mar. 16, 2016) (finding members of certified class entitled to statutory penalty of $500,000 under Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1) because defendant's "noncompliance with the statute was frequent and persistent."). *See also Singleton v. Domino's Pizza, LLC*, 976 F.Supp.2d 665 (D. Md. 2013) (Chasanow, J.) (approving class action settlement agreement in FCRA case involving pro rata distribution of settlement fund).

Finally, Quicken attempts to use the overwhelming evidence of notice regarding the culpability of its conduct to contend that, because it arguably had less notice earlier in the class period, class members whose loans were closed earlier should be entitled to a smaller penalty and that this determination affects predominance. This argument rests on no legal support, and plaintiffs again note that this type of argument would effectively preclude any class action where a defendant naturally became more aware of a problem as time went on. As a practical matter, Quicken never changed its conduct during the class period.

The argument also ignores the Court's findings that indications in law and industry that passing on estimated values was wrong go back more than 20 years, long before the start of the class period in 2004, beginning with the FHC appraisal standards of 1996. [Doc. 227 at 13]. Quicken has still has not come forward with any authority demonstrating this practice ever served a bona fide purpose in the industry. The best it can do is cite two

38

sources – Advisory Opinion 19 of USPAP issued in 1999 (discussed by this Court in its Order Resolving all Motions [Doc. 227 at 14]) and the Ameriquest enforcement action by the states attorney generals both acknowledging the substantial problems with this practice and suggesting, at a minimum, a disclaimer, which Quicken never gave, is needed to lessen the potential for corruption. This Court finds that the defendants were unaware of the Ameriquest consent decree until long after the critical period of this action.

The oft cited finding from *Brown* that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property" may have been made in 2010, but it applied to a 2006 loan. The *Brown* court made that finding after listening to six days of trial testimony, including Quicken's executives and its loan level personnel.  This Court has reviewed even more testimony and made a similar finding for loans issued from 2004 through 2009.  The fact that enforcement and regulatory efforts continued throughout the class period is a distinction without a difference.

Quicken's final argument is that equitable tolling cannot be resolved on a class-wide basis.  To the extent that the burden has shifted to any class members to demonstrate that their claims were equitably tolled, this Court "can easily determine whether the discovery rule applies class-wide to toll class members' claims" and that "defendant's statute of limitations argument presents no barrier to certification." [Doc. 227 at 51-52], citing *In re Community Bank of N. Va. Mortg. Lending Prac. Litig.*, 795 F.3d 380 (3d Cir. 2015) (common issues predominated over individual issues as to whether applicable statutes of limitation on class members' claims were equitably tolled due to concealment); *In re*

*Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008); *Hamilton v. Pilgrim's Pride Corp.*, 314 F.Supp.2d 630 (N.D. W.Va. 2004); *Cohen v. Trump*, 303 F.R.D. 376 (S.D. Cal. 2014); *Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191 (S.D. Ohio 2002). This authority is consistent with the Fourth Circuit's decision in *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311 (4th Cir. 2006), holding that a statute of limitations defense may be resolved on a class-wide basis by looking to the record when the "defense is so dependent upon facts applicable to the entire class... that individual hearings would not be necessary." 445 F.3d at 327; *see also Minter v. Wells Fargo*, 279 F.R.D. 320 (D. Md. 2012); *Fangman v. Genuine Title*, 2016 WL 6600509, at *7 (D. Md. Nov. 8, 2016) (Bennett, J.); *Baker v. Castle & Cooke Homes Hawaii*, 2014 WL 1669158, at *14 (D. Haw. 2014); *Thurman v. CUNA*, 836 N.W.2d 611, 621 (So. Dak. 2013); *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *17 (D. Conn. 2011); *In re NASDAQ Market–Makers Antitrust Lit.*, 169 F.R.D. 493, 520 (S.D. N.Y. 1996).

Quicken is incorrect when it suggests that the Third Circuit's decision in *Cunningham v. M&T Bank Corp.*, 814 F.3d 156 (3d Cir. 2016) or the Fourth Circuit's decision in *EQT Prod. Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014) foreclose the potential to resolve equitable tolling on a class-wide basis. *Cunningham* was not a class certification decision but a summary judgment opinion wherein the court affirmed the district court's decision that a disclosure form received, signed and dated by each plaintiff had made them aware of their claims. It sheds no light whatsoever on the equitable tolling analysis as to class claims. The *Adair* court found that the district court had misapplied the doctrine of fraudulent concealment by wholly ignoring the plaintiff's knowledge and

40

JA726

actions.  764 F.3d at 370.  It cited **Thorn** for the proposition that this inquiry can require individual evidence; it is only fair to refer to **Thorn** for its holding that in cases like this one, where the statute of limitation defense relies on common facts applicable to the entire class, certification is appropriate.

Here, those common facts applicable to the entire class are that Quicken affirmatively kept its conduct hidden from class members, [Doc. 227 at 15-16], and that there is not a single shred of evidence in the record of any class member having actual knowledge about Quicken's practice of tipping off appraisers.

**VI.    Defendant's (*sic*) Motion for Summary Judgment on Certain Class Loans [Doc. 298-3]**

Defendants have also filed Defendant's (*sic*) Motion for Summary Judgment on Certain Class Loans [Doc. 298-3].  In that Motion, defendants move for summary judgment as to (1) all Class Loans where a borrower filed for bankruptcy and failed to disclose his or her West Virginia Consumer Credit and Protection Act ("WVCCPA") and breach of contract causes of action against Defendants in bankruptcy; (2) the WVCCPA claims on all Class Loans that were paid off or became fully due prior to December 27, 2010; and (3) the WVCCPA claims on all Class Loans obtained by a borrower who is deceased.

The defendants argue that those class members who filed bankruptcy and did not disclose their claims (of which they had no knowledge) in their bankruptcy cases must be dismissed.

The Third Circuit has rejected the argument that class members in bankruptcy must demonstrate standing, finding it "unpersuasive."  ***In re Comm. Bank***, 795 F.3d at 397.  The

41

**JA727**

court explained, consistent with Fourth Circuit precedent, that "only named plaintiffs, and not unnamed class members, need to establish standing." *Id*. Further, in *Community Bank*, the plaintiffs had "identified a reliable, repeatable process whereby members of the putative class may be identified: consult CBNV's business records and then follow a few steps to determine whether the borrower is the real party in interest." *Id*.

The bankruptcy issue is not a unique one in class actions, and it does not defeat class certification. *See Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347, 356 (N.D. Ill. 1998) (certifying class over objection that some class members' claims may have become part of a bankruptcy estate, noting that the issue does not preclude predominance because "determining whether they have exempted their claims against defendant should be a relatively straightforward matter); *Jordan v. Paul Fin.*, 285 F.R.D. 435, 464 (N.D. Cal. 2012) (same). As in *Community Bank*, a process has been identified here to determine the group of class members who filed for bankruptcy, in that Quicken has in fact already done so. The only issue that separates these class members from those who did not file bankruptcy is distribution, and the issue is not ripe. After the Court determines the amount of statutory penalties; whether class members are entitled to a refund of the appraisal fees; and whether any class members are entitled to recover actual damages, and after any appeals have been exhausted, this issue can indeed be addressed in a "straightforward" fashion. Plaintiffs' counsel indicate that they are already in contact with the Trustees regarding the most efficient and equitable way of approaching distribution.

Defendants also take the position that since the class members who filed for bankruptcy and did not list the claim in their petitions are estopped from being members

42

**JA728**

of the class, even though they were unaware of their claim at the time their petitions were
filed.

There is no evidence that the debtor class members knew of their claims when they
filed for bankruptcy.  As discussed further below, Quicken itself concealed the passing of
the estimated values.  Quicken has provided no evidence that any class member was
aware of Quicken's conduct or whether they had a legal claim arising from it.  In such
circumstances, courts refuse to apply judicial estoppel. *See Skrzecz v. Gibson Island
Corp.*, 2014 WL 3400614, at *6 (D. Md. July 11, 2014) (Bennett, J.) (debtor plaintiff was
not judicially estopped from asserting her civil claims because the "[p]laintiff did not have
sufficient knowledge of a potential claim to deliberately omit it from her petition" when the
plaintiff's "level of knowledge as to her claim for unpaid wages [was] in dispute"); *Sibert
v. Wells Fargo Bank*, 2015 WL 3946698 (E.D. Va. June 26, 2015) (Hudson, J.) (judicial
estoppel not applicable when "[p]laintiff did not intentionally mislead the bankruptcy court
regarding his claim" and plaintiff "testified that when he filed for bankruptcy in 2011, he was
unaware that he had a potential cause of action"); *Smith-Anthony v. Buckingham
Mortg. Corp.*, 2009 WL 2500445 (D. Md. Aug. 13, 2009) (Quarles, J.) (refusing to dismiss
case on judicial estoppel grounds when there was no evidence of intent in not including
claims in bankruptcy petition).  Defendants' argument that judicial estoppel may apply here
is wholly unsupported by the facts.

If these class members are found to be entitled to receive a distribution and do not
opt out of the class, they can petition to reopen their bankruptcy cases and allow the
trustee and the Bankruptcy Court to determine the distribution of the proceeds.

43

Quicken next argues that summary judgment should be entered as to a second category of class members, those whose loans were paid off or otherwise became fully due on or before December 27, 2010, one year before the lawsuit was filed. The statute of limitations is an affirmative defense which defendants bear the burden of demonstrating. *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829 (4th Cir. 2010). Quicken has not met its burden here. Instead of showing that particular class members' claims were time-barred, Quicken relies on pure conjecture, stating that "at least some" of the loans were time-barred but that it is "expensive and time-consuming for defendants to search the state and local government land records to determine if a Class Loan was paid off." [Doc. 298-4 14]. Such arguments are insufficient to shift the burden to plaintiffs.

The burden only shifts "once the defendant shows that the plaintiff has not filed his or her complaint within the applicable statute of limitations." *Smith v. Velotta*, 2016 WL 597743, at *3 (W.Va. Feb. 12, 2016). This Court has already stated that: "If the defendant can bring evidence that the class member had actual knowledge that the defendant sent an estimate of value to the appraiser and that no payments were made within one year before June 15, 2012, I'll boot them. In the absence of that evidence, it's not an issue." [Doc. 277 at 7].

This Court has already found that TSI's third-party software, Appraisal Port, "is designed to ensure that information exchanged between TSI and the appraiser is not accessible to any third party, including the lender." [Doc. 227 at 23]. The record also demonstrates that TSI discarded old appraisal order forms. [Doc. 199-3, Ex. L, Petkovski Dep. at 59:18-60:8]. This finding was confirmed at the recent evidentiary hearing through Amy Bishop's testimony:

44

**JA730**

Q.    And they did not -- and Quicken Loans, as part of its practice, did not keep appraisal order forms in its loan files?

A.    In the paper loan files?

Q.    In any. In the paper, electronic, anywhere.

A.    That is my understanding.

Q.    Right.  And TSI didn't even keep the appraisal order forms, did they?

A.    That is also my understanding.

[Doc. 336 at 76:10-17].

Ms. Bishop further testified that Quicken did not believe it was obligated to disclose to borrowers that estimated values were being shared with appraisers. [Id. at 29:15-19]. In fact, Ms. Bishop testified that this was not even "material" information that "should have been disclosed to a borrower" and is not something borrowers require as part and parcel of being what Quicken terms "very informed of the process." [Id. at 29:24:30:10].  There is no genuine dispute that Quicken concealed this practice from its customers and did so with knowledge that passing estimated values to an appraiser had been balked at by regulators and other authorities since at least 1996. [Doc. 227 at 13-14 ("Efforts to regulate this practice go back more than 20 years.")].  See also *United States v. Quicken*, 2017 WL 930039, at **7-8 (E.D. Mich. Mar. 9, 2017) (finding that lenders were on notice in 1996 that "[p]roviding to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower . . ." was prohibited by FHA regulations).

In addition, this Court has already recognized Quicken's admission that each borrower "has an expectation of a fair, unbiased, and reasonable [appraisal]." [Doc. 227

45

**JA731**

at 25, citing Doc. 206-1, Exh. B, Randall Dep. at 99:18-100:5].  This expectation would certainly also encompass an expectation that the appraisal was not based on the unconscionable and hidden practice of passing on estimated values.

In sum, the defendants have not identified a single shred of evidence in the record of any class member having actual knowledge about Quicken's practice of tipping off appraisers.  Instead, incredibly, Quicken speculates that class members should have known of their claims by reviewing case law, government investigations, or news sources about appraisal fraud generally. [Doc. 298-4 at 16-18].  Rather, it is clear that the only evidence relating to notice to class members of their potential claims is the fact, applicable to the entire class, that Quicken affirmatively kept its conduct hidden from class members.  Indeed, this Court has already found that Quicken "fail[ed] to disclose this conduct [to] plaintiffs." [Doc. 227 at 15-16].  Quicken's contention that class members' theoretical knowledge of their claims is "inherently individualized and fact dependent" is thus unavailing, and further is wholly unsupported by case law in the class action arena.

This Court has already specifically rejected this "individualized" argument when it found last year that "this Court can easily determine whether the discovery rule applies class-wide to toll class members' claims" and that "defendant's statute of limitations argument presents no barrier to certification." [Doc. 227 at 51-52], citing *Community Bank*, *supra* (common issues predominated over individual issues as to whether applicable statutes of limitation on class members' claims were equitably tolled due to concealment); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008) (predominance and superiority requirements met when fraudulent concealment susceptible to common proof

46

on a class-wide basis); *Hamilton v. Pilgrim's Pride Corp.*, 314 F.Supp.2d 630 (N.D. W.Va. 2004) (under West Virginia law, the discovery rule tolls the statute of limitation until a claimant knows or by reasonable diligence should know that he has been injured and who is responsible); *Cohen v. Trump*, 303 F.R.D. 376 (S.D. Cal. 2014) (granting class certification of fraud claims over defendant's arguments that individualized determinations on statute of limitations would be necessary); *Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191 (S.D. Ohio 2002) (certifying class when discovery of claim "may be amenable to a common proffer").

Consistent with the authority already cited by this Court above, Fourth Circuit law holds that a statute of limitations defense may be resolved on a class-wide basis by looking to the record when the "defense is so dependent upon facts applicable to the entire class... that individual hearings would not be necessary." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 327 (4th Cir. 2006). The *Thorn* court contemplated situations where a statute of limitations defense could be resolved on a class-wide basis, including: (1) where defendant relied on mailings that it sent to all of its insureds on a particular date to argue that the class received notice outside of the applicable statute of limitations period; and (2) where the class demonstrated that the statute of limitations defense was "so patently without merit that the district court could find that the defense was not even a real 'issue' in the case." *Id*. at 327 n. 19. This case falls squarely within the type of example (1), as there is common, class-wide evidence of concealment in Quicken's failure to maintain the appraisal forms or disclose its conduct to borrowers.

Like the *Thorn* court and the other authority already recognized by this Court, courts

47

confronting the statute of limitation and equitable tolling issues in class cases where there is common, class-wide evidence find that this issue may be resolved in one fell swoop as to the entire class.  For example, in *Minter v. Wells Fargo*, 279 F.R.D. 320 (D. Md. 2012), a case alleging that defendant lenders had developed a front organization ("Prosperity") to circumvent lending regulations, the court certified a class created specifically for the purpose of equitably tolling the statute of limitations.  In doing so, it recognized that the tolling analysis could be completed on a class-wide basis because all class members "rely on the same course of conduct perpetrated by Defendant when arguing the elements of equitable tolling, specifically that this conduct (1) concealed their claims and (2) lulled them into believing in the legitimacy of Prosperity without provoking them to make any inquiry into potential claims." *Id*. at 325-26.  In finding commonality and predominance met, the court recognized that the "test for equitable tolling relies on Prosperity's uniform and consistent course of conduct, so there is no need to inquire into transaction-specific details." *Id*. at 327.  The court rejected defendants' argument that each borrower's level of due diligence must be examined, because "due diligence is evaluated using an objective standard" and the court had already "determined that all borrowers went through generally the same uniform and consistent process when transacting with Prosperity."  *Id*.

Other courts are in accord with the *Minter* decision in recognizing the susceptibility of the equitable tolling issue to class-wide proof. *See Fangman v. Genuine Title*, 2016 WL 6600509, at *7 (D. Md. Nov. 8, 2016) (Bennett, J.) (certifying class upon finding that the "named Plaintiffs have provided sufficient evidence that their individual claims are entitled to equitable tolling to proceed as representatives of the proposed class" and "issues

48

**JA734**

surrounding equitable tolling in this case are susceptible to class-wide proof because the Plaintiffs have demonstrated that it was West Town's 'pattern of practice' to not disclose the alleged kickback scheme on any class members' HUD-1 form and it was a pattern among West Town agents to receive kickbacks in the manner discussed above"); *Baker v. Castle & Cooke Homes Hawaii*, 2014 WL 1669158, at *14 (D. Haw. 2014) ("When there is no reason to suspect that potential class members have or will discover product defects at significantly different times, the presence of a statute of limitations provision, by itself, is insufficient reason to compel all potential class members to pursue their claims individually"); *Thurman v. CUNA*, 836 N.W.2d 611, 621 (So. Dak. 2013) ("constructive notice of claims accrual can be determined on a class-wide basis because the test to determine constructive notice is objective, applying a reasonable person standard. … All of the borrowers and insureds in this case went through roughly the same process to obtain their loans and credit disability insurance.  Because BHFCU used a uniform process to sell credit disability insurance, changed the policy at the same time, sent out its newsletter to all of the borrowers, and sent statements to all borrowers, the claims regarding constructive notice may be decided by a jury applying the objective test to the circumstances in this case"); *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *17 (D. Conn. 2011) ("plaintiffs have produced common evidence showing that USF intended to conceal the VASPs and, therefore, it cannot reasonably be expected that the plaintiffs could have discovered the injury until they became more fully aware of VASPs existence and purpose.  Therefore, common issues regarding fraudulent concealment exist and the statute of limitations does not bar certification of the RICO class"); *In re NASDAQ*

49

JA735

*Market–Makers Antitrust Lit.*, 169 F.R.D. 493, 520 (S.D. N.Y. 1996) (finding defendant's misrepresentations to the market, which were relevant to fraudulent concealment analysis, to be susceptible to common proof).

**VII.    Plaintiffs' Motion for Summary Judgment on Class-wide Contract Damages [293-1]**

In Plaintiffs' Motion for Summary Judgment on Class-wide Contract Damages [293-1], the plaintiffs seek class-wide damages for breach of contract in the form of disgorgement of the amounts paid by the class members for their tainted appraisals.

Quicken argues that it is entitled to a jury trial addressing the amount of damages recoverable as a result of its breach of contract.  However, in their complaint plaintiffs specifically demanded a disgorgement and restitution of all illegal fees associated with their loans [Doc. 1-1].  It is well settled that equitable relief is appropriate in breach of contract cases in West Virginia. *See, e.g., Parker v. Sayre*, 2013 WL 6153063 (W.Va. Nov. 22, 2013) (affirming summary judgment on breach of contract claim in which court had ordered equitable remedy of specific performance).  In this particular case, the plaintiffs are seeking the disgorgement of fees that were illegally collected as part of the appraisal process.

The law in West Virginia, and elsewhere, clearly provides that an order requiring the return of any illegal or ill-gotten gains is restitution, which is an equitable remedy. *See, e.g., Prudential Ins. Co. of America v. Couch*, 180 W.Va. 210, 376 S.E.2d 104, 108 (1988) (restitution is available whenever "the party who received the money has no basis for retaining it ... [and] has received money...to which he was not entitled."); see also *Gerald M. Moore & Son, Inc. v. Drewry & Assocs. Inc.*, 945 F.Supp. 117, 120 (E.D. Va. 1996), citing *Arkadelphia Milling Co. v. St. Louis Southwester Ry. Co.*, 249 U.S. 134 (1919).

50

Because Plaintiffs are seeking disgorgement of the appraisal fees, they are seeking a remedy akin to equitable restitution. *See **Sivolella v. AXA Equitable Funds Mgmt., LLC**,* 2013 WL 4096239, at **5-6 (D. N.J. July 3, 2013) (finding that because plaintiffs were seeking disgorgement of the fees they were charged, they were not seeking "some funds" … "but rather the funds allegedly charged and retained by Defendants, and therefore, "Plaintiffs' claim is for equitable restitution and, as a result, not triable to a jury"), citing ***Nat'l Sec. Sys., Inc. v. Iola***, 700 F.3d 65, 101 (3d Cir. 2012) ("it is undisputed that restitution of ill-gotten commissions is an equitable remedy."); ***Hanwha Azdel, Inc. v. C & D Zodiac, Inc.***, 2013 WL 3989147, at *2 (W.D. Va. Aug. 2, 2013) (a claim for disgorgement of specific profits and to prevent unjust enrichment constitutes equitable restitution and would be a remedy imposed "if at all, by the court and no[t] by the jury.").

There is no right to a jury trial in equity. Equitable issues are, instead, addressed solely to the court. ***Barton v. Constellium Rolled Products-Ravenswood, LLC***, 2014 WL 3696646 (S.D. W.Va. July 23, 2014) (Goodwin, J.) ("if an action will resolve 'legal rights,' the courts must provide a trial by jury; however, if an action involves only equitable rights, a jury trial is not required"). The amount of damages is a simple, straightforward calculation. The appraisals were rendered worthless by Quicken's breach and, thus, plaintiffs are entitled to a restitution of the full amount of the appraisal fees. Indeed, independence is of foremost importance in the appraisal process. See 15 U.S.C. § 1639e (2010). Once an appraisal is tainted by the implication of influence over the appraiser especially by the party compensating the appraiser, the resulting appraisal cannot by any established standard be fair, valid and reasonable. Here, Plaintiffs failed to receive the

51

**JA737**

benefit of their bargain—a fair, valid and reasonable appraisal. This Court will enter judgment accordingly requiring restitution of the appraisal fees in the amount of $968,702.95. [See Doc. 293-9].

This Court may award summary judgment as to these damages.  Summary judgment is appropriate where there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). This same principle applies to damages: whenever the moving party has demonstrated that damages are undisputed and in an amount that does not require the jury or the court to resolve conflicting facts, summary judgment is proper.  *See Applied Capital, Inc. v. Gibson*, 558 F.Supp.2d 1189, 1208 (D. N.M. 2007) (in a fraud case, summary judgment was appropriate where "the defrauded amount [was] a sum certain"); *Branch Banking & Trust Co. v. Tractor Co., Inc.*, 2016 WL 3676744 at *5 (S.D. W.Va. July 7, 2016) (Berger, J.) (finding no genuine issue of material fact regarding amount of damages awardable for breach of contract, over defendant's objection that a dispute of fact existed);  *Mountain 1st Bank & Trust v. Holtzman*, 2012 WL 3126833, at *3 (D. S.C. 2012) (finding no genuine issue of material fact regarding amount of damages plaintiff suffered as a result of defendant's breach and awarding sum certain);  *Pin State Creamery Co. v. Land-O-Sun Dairies, Inc.*, 1998 WL 34304526, at *2 (E.D. N.C. Aug. 25, 1998) (Boyle, J.) ("summary judgment is appropriate if the Court may determine [plaintiff's] damages as a matter of law").  *See also Reedy River Ventures Ltd. P'ship v. Synoptics Communications, Inc.*, 38 F.3d 1213 (4th Cir. 1994) (affirming district court's award of summary judgment on amount of damages in conversion action).

52

**JA738**

With respect to the breach of contract claim, this Court made specific findings establishing a contractual duty, a breach of said duty, and causation resulting in the consumer receiving something less and different than what was bargained for. Specifically, the Court deemed each appraisal to be unfair, invalid and unreasonable on account of Quicken engaging in a scheme to circumvent established standards of appraiser independence [Doc. 227 at 25]. In such circumstances, the only way a consumer can be made whole is to throw out the contaminated appraisal and refund the cost or obtain another appraisal on the consumer's behalf. Of course, a second appraisal is not free and will have a similar cost, if not more due to the passage of time, to the original appraisal.

Quicken's liability for breaching its contract has already been established. The amount of the fees collected by Quicken as a result of its breach is a sum certain that is readily calculable from the undisputed facts in the record. The parties have agreed the amount is $968,702.95.

## VIII.   Order Awarding Statutory Damages

Based upon the evidence presented, both that in the record and that presented at the evidentiary hearing requested by the defendants, this Court must now determine the amount of the statutory penalty to be awarded the class members under the West Virginia Consumer Credit and Protection Act.

Plaintiffs bear the burden of proving damages, and must do so by a preponderance of the evidence. *See* Syl. Pt. 4, ***Taylor v. Elkins Home Show, Inc.***, 210 W.Va. 612, 614, 558 S.E.2d 611, 613 (2001); ***Dickens v. Sahley Realty Co., Inc.***, 233 W.Va. 150, 154

n.14, 756 S.E.2d 484, 488 n.14 (2014). As in other statutory penalty cases (e.g., False Claims Act), plaintiffs must prove that any penalty higher than the minimum is warranted. Cf. **United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.**, 2010 WL 3730894, at *6 (D. Colo. Sept. 16, 2010) ("[T]he evidence of misconduct by the Defendant was far from 'overwhelming.'. . . [T]he Court finds no particular reason to assess anything more than the minimum statutory penalty").

"The determination of the statutory penalties under the Consumer Protection Act does involve evidence of intent, knowledge and harm." Chan Decl. Ex. 15, at 4:23-25; see **Clements v. HSBC Auto Fin., Inc.**, 2011 WL 2976558, at *7 (S.D. W.Va. July 21, 2011) (Berger, J.) ("The amount of a penalty should have a direct relationship to the egregiousness of the violation."); **Kidd v. I.C. Sys., Inc.**, 2014 WL 847692, at *6 (W.Va. Cir. Ct. Jan. 30, 2014) (lower penalty for telephone calls that were placed, but not heard or received by plaintiffs); **Endicott v. Hager**, 2000 WL 35542409, at *2 (W.Va. Cir. Ct. Aug. 25, 2000) (lower penalty range because plaintiffs were not "unduly harmed" by defendant's conduct).

Courts have imposed higher penalties where the plaintiffs have proven that the defendants knew their conduct violated the law, but nevertheless proceeded in complete disregard of their legal obligations. See **Vanderbilt Mortg. & Fin., Inc.**, 2011 WL 9697521, at *3 (W.Va. Cir. Ct. Aug. 15, 2011) ("Vanderbilt I") (maximum penalty based on "complete disregard" for statutory rights, where attitude conveyed "disrespect, saying 'We know what the law is in the State of West Virginia, but we do not have to follow it'"); **Figgatt v. Green Tree Servicing, LLC**, 2012 WL 8895246, at *3 (W.Va. Cir. Ct. Aug. 23, 2012) (maximum

54

**JA740**

penalty where "[d]efendant was clearly aware of the prohibition"); *Dijkstra v. Carenbauer*,
2014 WL 12594132, at *2 (N.D. W.Va. July 16, 2014) (awarding mid-range penalty where
"defendant continued to engage in this practice" after decision prohibiting the practice).

     The defendants claim to have carefully researched the law of West Virginia to be
certain that the state law did not prohibit the transmission of an estimated value to an
appraiser.  The defendants note that "unlike other states, West Virginia never adopted a
specific law prohibiting the transmittal of values to appraisers." [Doc. 295-2, p. 9].
Defendants further indicate that had West Virginia adopted a specific prohibition against
such conduct, the defendants would have stopped.

     The fallacy with this argument is that the defendants confuse unlawful with
unconscionable.  The fact that an activity is not specifically outlawed does not prevent the
activity from being unconscionable.

     There was simply too much opinion and information condemning the practice of
telegraphing a value to an appraiser for the defendants to hide behind "It's not illegal."

     While Quicken has attempted to minimize or explain away the many sources this
Court relied on in issuing its summary judgment rulings, Quicken has to this day never
offered any legal or industry source that would indicate suggesting values to appraisers
was considered a best or even valid lending practice.  The best Quicken can do is show
that some other predatory lenders did the same.

     As early as 1996, the Federal Housing Commissioner issued appraisal standards
to be followed in all HUD-approved mortgage transactions.  Under these standards, the
appraiser was required to certify that the appraisal was not "based on a requested
minimum valuation, [or] a specific valuation or range of values." [Doc. 173-22, Mortgagee

55

**JA741**

Letter 96-26, authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner (May 21, 1996)]. The District Court for the Eastern District of Michigan recently relied on this letter as constituting notice and warning to mortgagees in 1996 regarding federal condemnation of the practice sufficient to withstand a motion to dismiss. *United States v. Quicken*, 2017 WL 930039, at **7-8. The court noted that the Government took the position that:

> Although the appraiser was the individual required to make the statement in the certification, this letter was sent to 'all approved mortgagees.' Thus, those mortgagees who received the letter were clearly aware, and sufficiently warned, that an appraisal could not be based on a requested or specific valuation.

> Furthermore, the Mortgagee Letter 2009–28 not only provides that 'new requirements set forth in this mortgagee letter will be effective for all case numbers assigned on or after January 1, 2010,' but that "existing requirements will remain in effect." Mortgagee Letter 2009–28 at 1. In the portion entitled "Affirming Existing Requirements," the letter expressly states:

> > FHA is reaffirming these requirements. Mortgagees and third parties working on behalf of mortgagees are prohibited from:

> > * * *

> > Providing to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower, except that a copy of the sales contract for purchase must be

56

**JA742**

provided.

**Id**. at 3. This language clearly contradicts Quicken's contention that this letter prohibited value appeals for the first time in 2009 with an effective date of 2010.

2017 WL 930039 at **7-8 (emphasis added).

Three years later, in 1999, the Comptroller of the Currency concluded that providing an "owner's estimate of value," "[a]t a minimum, . . . suggests to the appraiser the value conclusion that is needed to complete the transaction." [Doc. 173-23, Ltr. from OCC to K. Kaiser, Chairman of The Appraisal Standards Board (July 28, 1999)]

Then in 2005 all the major federal agencies with lending oversight, including the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration, expressly addressed the issue in an "Interagency Statement," advising in pertinent part: "the information provided [to the appraiser] should not unduly influence the appraiser or in any way suggest the property's value." Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions, March 22, 2005. Available at http://www.occ.gov/newsissuances/bulletins/2005/bulletin-2005-6a.pdf.

Because of subsequent litigation by the New York Attorney General, the industry later adopted the Home Valuation Code of Conduct, which prohibited lenders and their appraisal management companies from "providing to an appraiser an anticipated, estimated, encouraged, or desired value for a subject property or a proposed or target amount to be loaned to the borrower." (The Home Valuation Code of Conduct (HVCC) is

57

**JA743**

available at www.freddiemac.com/.../ docs/030308 valuationcodeofconduct.pdf.  HVCC is the result of a joint agreement between Fannie Mae, Freddie Mac, Federal Housing Finance Agency, and New York state attorney general Andrew Cuomo, to improve the quality and independence of the appraisal process.  Fannie Mae and Freddie Mac dictated that all major lenders and appraisal management companies must comply with HVCC.

HVVC was released for comment in March 2008 and became effective in May 2009.  Quicken continued its practice of sending estimated values to an appraiser through the comment period, after passage and until just before the effective date.

In 2007, an online petition signed by 11,000 appraisers from across the country was submitted to Congress and the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, copying "[o]ther state or federal agencies with authority in the… matter."[7]  In the petition, the signing appraisers acknowledge and condemn the fact that lenders regularly "apply pressure on appraisers to hit or exceed a predetermined value."  The signing appraisers agreed that the practice produced "adverse effects on our local and national economies."  There was, they warned, "the potential for great financial loss."

In a national survey of appraisers conducted in late 2006, 90% of the participating appraisers indicated that they felt some level of "uncomfortable pressure" to adjust property valuations.  This was an increase of 35% from a survey conducted three years earlier.

---

[7] The petition appears at the following website: http://appraiserspetition.com., and is discussed in the Southern District of New York's opinion in **Nomura**, infra, 104 F.Supp.3d at  461.

*Nomura*, 104 F.Supp.3d at 461.[8]

At the state level, West Virginia was also deterring these practices and protecting consumers. At least one West Virginia court specifically found the practice of providing an estimated value to an appraiser to be unlawful and indefensible. In ***Brown v. Quicken Loans Inc.***, Civ. No. 08-C-36, Ohio County, W. Va., the Honorable Judge Arthur Recht found "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property." [Doc. 173-24, at ¶ 50]. This finding supported several liability findings against Quicken, which (to the extent appealed) were affirmed by the West Virginia Supreme Court of Appeals ("WVSCA") in Quicken I.

Prior to Quicken I, the WVSCA condemned this very practice in ***Herrod v. First Republic Mortgage Corp.***, 218 W.Va. 611, 617-618, 625 S.E.2d 373, 379-380 (2005) by reversing a trial court's grant of summary judgment to a mortgage lender where the evidence demonstrated that its appraiser was influenced via an appraisal request form with target numbers, resulting in a consumer taking out an underwater loan. *See also **Fed. Housing Fin. Agency v. Nomura Holding Am. Inc.***, 104 F.Supp.3d 441, 461 (S.D. N.Y. 2015) (discussing the problem with lenders providing a target number to the appraiser in

---

[8] The 2007 National Appraisal Survey was composed of 33 questions presented to "a representative group of the nation's leading real estate appraisers." It was intended to give a comprehensive understanding of the real estate appraisal business in the second half of 2006 through 2007. Its predecessor, conducted in 2003, "shocked the industry when 55% of appraisers surveyed indicated that they felt uncomfortable pressure to overstate property values in greater than half of their appraisals." The component of the survey conducted in the last half of 2006 represented responses from 1,200 appraisers, and showed "an alarming increase" in the extent of pressure felt by real estate appraisers. *Id.* at fn. 12.

connection with the loan and acknowledging that "[a]ppraisers may inflate their appraisals because of pressure from loan officers.")

West Virginia's sister state of Ohio was also at the forefront. Ohio courts uniformly concluded that the act of providing the borrower's estimated value for a property in connection with a mortgage loan is unconscionable because it is an attempt to improperly influence the appraiser's independent judgment. *See, e.g.,* ***State ex rel. Dann v. Premiere Service Mortgage Corp.***, Case No. CV-2007-06-2173 (Butler Cty. Apr. 30, 2008); ***State ex rel. Rogers v. Ace Mortgage Funding, LLC***, Case No. A0705054 (Hamilton Cty. Sept. 23, 2008); ***State ex rel. Cordray v. First Ohio Banc & Lending, Inc.***, Case No. 07-CV-259 (Belmont Cty. Nov. 24, 2009); ***State ex rel. Cordray v. Apex Mortgage Services, LLC***, Case No. 07-CV-261 (Belmont Cty. Mar. 10, 2009) [collectively found as Doc. 212-3, Exh. 16]. Ohio has expressly defined unconscionable acts in connection with residential mortgages to include any attempt to corrupt or improperly influence the independent judgment of an appraiser. O.R.C. § 1345.031(10). This statute was amplified by Ohio Administrative Code 109:4-3-24, which as of January 7, 2007 deems "[i]n the case of any refinance loan …, [the act of including] on the appraisal order form … either the loan amount or any other express or implied statement of the anticipated or desired appraisal valuation of the dwelling subject to the appraisal" to be an unconscionable practice.

By Order entered June 2, 2016, this Court found that Quicken's uniform practice of providing estimated home values to appraisers constituted unconscionable conduct under the West Virginia Consumer Credit and Protection Act ("WVCCPA"). The Court found that

60

Quicken did so while failing to disclose the practice to plaintiffs. [Doc. 227 at 19]. The Court recognized that, by "concealing these facts, Quicken meant to 'deceive or trick' the plaintiffs" as understood by the Fourth Circuit in *McFarland v. Wells Fargo Bank*, 810 F.3d 273 (4th Cir. 2016). Moreover, the Court found "ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs' loans." This Court rejected defendants' argument that appraisals are obtained for the benefit of the lender, not the borrower [Doc. 227 at 22], explaining that Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater."

The Court also made findings as to intent: "To repeat, Quicken had full knowledge of its practice of providing estimated values to its appraisers for purposes of influencing their appraisals. Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers. Quicken knew these facts. The plaintiffs did not. Under the analytical framework of both *McFarland* and *Brown*, this constituted unconscionable inducement." [Doc. 227 at 20-21]. The Court went on to find that:

> "A borrower's estimated value is not materially or logically distinguishable from a 'target appraisal value' or 'predetermined value.'" [Doc. 27 at 11].
>
> "No matter who supplied the estimated value, this Court cannot imagine any logical basis for sending an estimated value to the appraiser other than to influence his or her opinion." [Id.].
>
> "Quicken influenced the appraisers to meet a passed on value, and it did so while failing to disclose the practice to plaintiffs." [Id. at 19].

61

**JA747**

> "As it did in the **Brown** case, Quicken possessed knowledge of the true facts
> of the Aligs' loan, namely that it was actively attempting to compromise the
> appraisal process.  Specifically, pressure was being brought to bear on the
> appraiser, who was expected to meet or exceed a target figure that Quicken
> itself had provided not once but twice (in the case of the Aligs)." [Id. at 20].

This Court has already made findings regarding the borrower's right to a fair and unbiased appraisal, and the fact that no genuine purpose is served by providing the estimated value to the appraiser.  It recognized that, "Quicken has admitted that the borrower has an expectation of a fair, unbiased, and reasonable [appraisal].  [Doc. 227 at 25].

In addition, this Court in its Order denying Quicken's motion to dismiss:

> What is clear is that the plaintiffs each deposited a sum of money with
> Quicken, and, in turn, Quicken agreed to obtain an appraisal of the property
> and process the loan application.  This Court finds that it was a necessary
> corollary of obtaining an appraisal that the defendant would obtain a fair,
> valid and reasonable appraisal of the property.

[Doc. 107 at 7].

The testimony in this case was consistent with Judge Recht's conclusion that there is no legitimate purpose to passing on an estimated value.  As this Court found, "the testifying appraisers distanced themselves from [estimated value] figures as taboo and all agreed that this information is in no way necessary to performing an appraisal." [Doc. 227 at 15].  The Court further observed that Quicken executive and corporate designee Michael Lyon agreed in deposition testimony offered in July of 2008 in the **Brown** litigation that

62

**JA748**

estimated values were in no way necessary to complete the appraisal process. [Id.].

As the Court noted, this case was "not the first time it had an opportunity to study appraisal influence." [Id. at 33].  In *Diloreti v. Countrywide Home Loans, Inc.*, the Court "recognized the plausible inference created when a bank provides appraisers with suggested or estimated values of homes":

> Taken as true, these allegations create an inference that [lenders'] practice
> of providing estimated values of homes was for the purpose of influencing
> the appraiser's independent judgment.  It certainly is plausible that an
> appraiser would seek to meet a client's suggested outcome in order to
> receive future business from the client.

[Id. citing Doc. 169-12, *Diloreti v. Countrywide Home Loans, Inc.*, No. 5:14-cv-76 (N.D. W.Va. Nov. 14, 2014), Order Granting Bank Defendants' Motion in Part and Denying in Part and Denying Funari's Motion for Judgment on the Pleadings, at 7.)

This Court is not alone among West Virginia district or state courts in recognizing Quicken's rampant problem with appraisal valuation, which was happening via a number of mechanisms, and in recognizing the importance of a fair and unbiased appraisal.  Other federal district courts in West Virginia have acknowledged the severity of Quicken's appraisal-related conduct by denying summary judgment to Quicken on its appraisal practices.  For example, in *Bishop v. Quicken Loans, Inc.*, 2011 WL 1321360, at *6 (S.D. W.Va. 2011), Judge Copenhaver found that the plaintiffs had raised a question of fact as to whether their mortgage "was the product of an inflated appraisal" after Quicken issued a loan based on an appraisal that came in 36% higher than another recent

63

appraisal.  The **Bishop** court further noted that "Quicken Loans' reliance on the 2006 appraisals is even more suspect in light of the sister-corporation relationship between [the appraiser's] employer (TSI) and Quicken Loans."  **Id**.  *See also* **O'Brien v. Quicken Loans, Inc.**, 2013 WL 2319248, at *6 (S.D. W.Va. May 28, 2013) (Copenhaver, J.) (denying motion to dismiss unconscionability claim when plaintiff "alleged that inflated appraisals led him unwittingly to take out loans in excess of the value of his home and rendered him unable to refinance or sell his home.)  As the **O'Brien** court recognized, Quicken's conduct with respect to inflated appraisals "implicate[s] the onesidedness and public policy concerns that are the subject of substantive unconscionability."  **Id**.

Judge Kaufman's order in **Nicewarner v. Quicken Loans Inc.** (Cir. Ct. Kanawha Cty. W.Va. Jan. 13, 2016), provides another condemnation of Quicken's appraisal practices.  As in this case, when ordering an appraisal for Ms. Nicewarner, Quicken "communicated a target value for the home to the appraiser." (Order at 2). In denying Quicken's motion for summary judgment on Ms. Nicewarner's claim for fraud, the court found that plaintiff had presented evidence of each element of the tort, in that:

Defendant represented to Plaintiff- including by placing the appraisals at issue in her closing packages – that in 2007 her home had a value of $141,000, and that in 2008 and 2009, her home had a value of $125,000. Defendant was responsible for reviewing the appraisal and ensuring that it met all applicable standards; however it was clear that the appraisal did not meet said standards. .. Plaintiff has further presented evidence, through her retrospective appraisals, that the misrepresentations were false.  Plaintiff

64

**JA750**

further testified that she relied on Defendant's representation as to value, and would not have entered the loans but for Defendant's representations. The appraisal itself notes that the borrower may rely on it, and such reliance is reasonable.

[Doc. 293-3 at 11-12].

Similarly, in *Robinson v. Quicken Loans Inc.*, 988 F.Supp.2d 615 (S.D. W.Va. 2013), Chief Judge Chambers found that a factual issue precluded summary judgment on plaintiff's fraud claim stemming from Quicken's misrepresentation of the value of the borrower's home. In *Robinson*, the plaintiff alleged that Quicken had misrepresented her home's value as $84,350 when in fact its value was only $33,500. 988 F.Supp.2d at 633.

Quicken's highest level executives knew that it was passing on estimated values to appraisers, in accordance with Quicken's policies and procedures. [Doc. 293-7, Hughes Dep. at 69:5-70:1, explaining that Quicken corporate officer and designee Michael Lee Lyon told her to include estimated values in order forms while working at Quicken Loans before joining TSI in July 2007]. In addition, Jennifer Randall stated in this case that Quicken was aware that estimated values were being provided to appraisers by TSI on order forms. [Doc. 212-2, Exh. 12]. Quicken's true motive in sending estimated values to appraisers was confirmed by Mr. Lyon, who during the *Brown v. Quicken* trial (discussed infra) conceded that the practice was meant to "give an appraiser an ability to see what they are going to potentially look at the property at." [Doc. 173-5, Lyon Trial Testimony Vol. 5 (Oct. 9, 2009) at 69-70].

Similarly, TSI executive and chief appraiser Jordan Petkovski acknowledged the

practice but could not provide a reasonable basis for it in his June 2014 testimony – "I wouldn't be able to say it does or does not assist [an appraiser]." [Doc. 212-5, Petkovski Dep. at 120:7-17 & 120:24-121:6) (from *Cline v. Quicken Loans Inc.*, Marshall County Civil Action No. 11-C-38].

A more revealing picture of Quicken's motives is provided by e-mails written by Quicken's executives that were uncovered by the Department of Justice in a recent investigation of Quicken, one of which stated: "I don't think the media and any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers questioning their appraised values." [Doc. 173-10, Exh. I, Email from C. Bonkowski to H. Lovier, cc: M. Lyon (Dec. 13, 2007)]. The e-mail goes on to confirm that Quicken was well aware of the crackdown on appraisal influence in the state of Ohio in 2007 and its management predicted the same would spread to other states. In another e-mail uncovered by the Department of Justice, senior management at Quicken acknowledged in November of 2007 that its sister company, TSI, was receiving "a lot of calls from appraisers stating that they can't reach our requested value." Senior management's directive was to simply ask the appraisers "for the max increase available." [Doc. 206-J, Exh. J, Email from D. Thomas to E. Czyzak, et. al., cc: D. Wright (Nov. 27, 2007)].

Lenders who violate the WVCCPA's prohibitions on the "collection of excess charges… illegal, fraudulent or unconscionable conduct, [or] any prohibited debt collection practice," are subject to statutory penalties and actual damages. W. Va. Code § 46A-5-101(1); see also Syl. Pt. 2, *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 740 S.E.2d 562 (W. Va. 2013) ("Under W. Va. Code § 46A-5-101(1) (1996), an award of

66

**JA752**

civil penalties is not conditioned on an award of actual damages."). Each violation of the CCPA creates a single cause for recovery of a single penalty under § 46A-5-101. *Stover v. Fingerhut Direct Mktg.*, 2010 WL 1050426, *8 (S.D. W.Va. Mar. 17, 2010).

For violations that occurred before 2015, which covers all of the class members' appraisals, the Court has discretion to award penalties in an amount "not less than one hundred dollars or more than one thousand dollars." W. Va. Code § 46A-5-101(1). A civil penalty imposed by the court may be adjusted for inflation since September 1, 1974, in an amount equal to the consumer price index. § 46A-5-106; *Mallory v. Mortgage Am., Inc.*, 67 F.Supp.2d 601, 609, n.5 (S.D. W.Va. 1999) (Copenhaver, J.). The penalty of $100 in 1974 adjusted for inflation to 2017 dollars is $494.12, and for $1000 is $4941.24. See Bureau of Labor Statistics CPI Inflation Calculator at http://www.bls.gov/data/inflation_calculator.htm (last visited March 28, 2017). Imposition of the maximum penalty for each class member loan does not violate the due process and excessive fines clauses of the West Virginia and United States Constitution, absent an abuse of discretion by the court awarding the penalty. *Vanderbilt*, 230 W.Va. at 514, 740 S.E.2d at 571.

The WVCCPA does not provide specific instructions as to the variables to consider in assessing the penalty amount, but guidance may be found in case law interpretation of the WVCCPA as well as in the language of the federal corollary statute, the FDCPA, and in cases interpreting it.

In *Dijkstra*, 2014 WL 12594132 (N.D. W.Va. July 16, 2014), this Court found that lender's disregard for prudent lending practices deprived class members of the opportunity

67

JA753

to ask questions or clarify issues at closing.  This court was unpersuaded by any argument

that in some particular cases a class member may not have had questions or required the

assistance of an attorney at closing; it was the fact that "LendingTree's use of a notary

foreclosed the opportunity to ask questions about the documents or the terms of the loan

for these class members, matters which have the potential to affect that is likely the largest

investment of their lives," *id.*, that constituted the CCPA violation and gave rise to the

$2000 per violation penalty.  The lender's conduct in *Dijkstra*, while wrong, was less

egregious than Quicken's conduct here, which deprived class members of a fair and valid

appraisal in every single loan.  Quicken's conduct has corrupted the appraisal process,

which rests as the foundation of any valid loan.  No class member had the opportunity to

obtain a meaningful and fair appraisal when the underwriting process had these polluted

the appraisals.  An unreliable appraisal can result in severe financial harm to borrowers

stuck with the prospect of paying off loans on Quicken's terms or losing their homes.  And

as in *Dijkstra*, it makes no difference that in some particular instances a class member

may not have suffered actual  damages. [Doc. 227 at 24].

  Other WVCCPA cases are also instructive.  In *Vanderbilt*, the Supreme Court

upheld the circuit court's award of statutory penalties under § 46A-5-101(1) after a jury

found defendant liable for several CCPA violations arising from numerous unlawful debt

collection practices, including refusing to provide account records and placing numerous

unsolicited calls to plaintiff's mother and third parties.  230 W.Va. at 509, 740 S.E.2d at

566.  Although the jury did not find that the plaintiff had suffered any actual damages, the

circuit court awarded: (i) the maximum civil penalty of $4,583.45 for defendant's failure to

68

JA754

provide a statement of account upon written request, conduct the court considered
"reprehensib[le]"; (ii) ten mid-range civil penalties at $2,250.00 each for the placement of
repeated and unsolicited calls to plaintiff's mother and third parties despite specific
requests to cease; (iii) one civil penalty of $458.34 for the use of language intended to
unreasonably abuse the hearer; and (iv) an additional maximum civil penalty of $4,583.45
for unreasonable publication of indebtedness to a third party. *Id*.

On appeal, the Court found that the statutory penalty award need not be
preconditioned on an award of actual damages, and that no constitutional limitation on the
awardable amount of penalties within the limits of § 46A-5-101(1) applied, ultimately
concluding that the total award of civil penalties of $32,125.24 was not an abuse of
discretion. 230 W.Va. at 514, 740 S.E.2d at 571. *See also* ***Clements v. HSBC Auto
Finance, Inc.***, 2011 WL 2976558, at *7 (S.D. W.Va. July 21, 2011) ("The amount of a
penalty should have a direct relationship to the egregiousness of the violation").

The ***Vanderbilt*** Court looked to Fair Debt Collection Practices Act (FDCPA) to assist
it in analyzing due process concerns relative to the WVCCPA penalties. The Supreme
Court of Appeals recognizes the FDCPA as the "federal equivalent to the WVCCPA, and
like the WVCCPA, it also allows consumers to seek actual damages and civil penalties
from creditors." ***Vanderbilt***, 230 W. Va. at 511, 740 S.E.2d at 568.

Under that statute, the court may award up to $1,000 in statutory damages per
plaintiff and, as under the WVCCPA, the specific amount of statutory damages falls within
the court's discretion. ***Savino v. Computer Credit, Inc.***, 164 F.3d 81, 86 (2d Cir. 1998).
The statute itself states that, in determining liability in a class action, the court shall

69

**JA755**

consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional." 15 U.S.C. § 1692k(b)(2); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 578 (2010) (the court must consider the provisions of § 1692k(b) in awarding statutory damages). Therefore, awards of the statutory maximum are "typically granted in cases where the defendants' violations are particularly egregious or intimidating." *Fuentes v. Audubon Fin. Bureau, LLC*, 2013 WL 4780119, at *2 (W.D .N.Y. Sept. 5, 2013). A high award is also appropriate if plaintiffs show that the conduct was "repeated and persistent". *Manopla v. Bryant, Hodge & Assocs., LLC*, 2014 WL 793555, at *6 (D. N.J. Feb. 26, 2014), citing *Edwards v. Niagara Credit Solutions, Inc.*, 586 F.Supp.2d 1346, 1354 (N.D. Ga. 2008) (granting $1000 statutory damages where violation was repeated and there was evidence of a policy and practice of violation). *See also, Hutchens v. West Asset Management*, 2013 WL 1337178, at *3 (S.D. W.Va. Mar. 29, 2013) (Faber, J.) (awarding plaintiffs the maximum penalty of $1000 for only two calls).

The defendants seek to minimize their liability by arguing (1) that what they were doing was not specifically prohibited by West Virginia law; (2) that the Ameriquest consent decree shows that what they were doing was permissible; and (3) the appraisal results dispel the notion that the appraisers were affected by their actions.

This Court has already addressed the issue of illegality vs. unconscionability. With respect to the Ameriquest action, Quicken states -for the very first time in this litigation or

70

**JA756**

any other of which the undersigned are aware - that it believed its behavior acceptable because of a settlement agreement entered into between another mortgagor, Ameriquest, and certain states represented by their respective State Attorneys General.   The agreement supported a Permanent Injunction and Final Judgment in *State of W. Va. ex rel. McGraw v. Ameriquest Mortg. Co.*, No. 06-C-519 (W. Va. Cir. Ct., Kanawha Cnty., March 23, 2006).  But Quicken has no evidence that it was even *aware* of this Judgment in a case where it was not a party.  If they were aware, one would think that they would have mentioned it before in the almost five years before now.  Amy Bishop was the *only* attorney doing compliance work for Quicken during the 2004-2009 time frame, and she was entirely unaware of this Ameriquest defense as recently as a few weeks ago when she was asked whether Ameriquest engaged in the passing on of estimated values to appraisers; Ms. Bishop testified that she "wouldn't know what Ameriquest did." [Doc. 316-3, Bishop Dep. at 14:2-11; 101:18-l02:22].

The 44 page agreement was negotiated by a steering committee, not the attorneys general, and covered a myriad of lending practices under scrutiny after complaints and investigations.   The terms of the settlement agreement themselves require any estimated value to be "accompanied by a statement it is being provided solely to assist the appraiser in determining the relative complexity of the Appraisal and that it is not a target or expected value." [Doc. 295-14 at 26].  *Quicken therefore would have been noncompliant even with this separate negotiated agreement*.  Beyond the disclaimer, Ameriquest was required to make extensive changes going forward in virtually all aspects of lending.  In addition, the Judgment itself disclaimed that it had any bearing on the conduct of others,

71

JA757

in that it stated it "may only be enforced by the parties" and did not confer rights to third party beneficiaries. [Doc. 295-14 at 40]. The Judgment also stated that West Virginia consumer law - which would of course include the unconscionability statute that this Court found Quicken violated - governed over any terms of the Judgment where . . . greater consumer protections" are provided. *Id.* at 39. The only takeaway from the Ameriquest settlement for any prudent West Virginia lender (were it paying any attention at all to this deal), should have been that the passing on of estimated values could cause them to be sued for violating the law.

Finally, the defendants argue that more than 30% of the loans had an appraisal value that deviated from the borrowers estimated value by more than 10%, which they claim would tend to show that the transmission of estimated values had no effect on the appraisers. This argument overlooks the fact that hundreds of loans were second mortgage loans where Quicken did not make the underlying loan. This argument also overlooks the fact that in many occasions the appraisers told the defendants that they were unable to reach the level that Quicken wanted and were told to provide "the max increase available." The average difference between the estimated value and the appraisal value for all loans was within 5%.

Quicken ignored the overwhelming and uniform guidance of the industry when it provided appraisers with estimated home values. This conduct was truly egregious, in that it flew in the face of prudent lending practices for the benefit of Quicken's bottom line, and at the expense of each borrower's right to a fair and unbiased appraisal. Quicken did so for years and in conjunction with thousands of loans, and only stopped when the HVCC went into effect and Fannie Mae and Freddie Mac announced they would no longer buy

72

**JA758**

loans from those who continued with it the practice.  The nature of the conduct is deceit in the origination of what is typically the most important loan in the average consumers' lifetime – their home mortgage.

This case does not involve mere phone calls or technical violations of statute. Quicken's conduct jeopardizes the American dream of homeownership.  This conduct was frequent – it occurred on nearly every refinancing loan and was repeated as necessary with value appeals.  Quicken was also persistent in that it continued with this practice amongst ever growing industry scrutiny by regulators, appraisers, investors, consumer advocates and lawmakers.  As discussed above, this practice was fostered and condoned by the highest levels of management and motivated by greed.

Quicken's enormous wealth further weighs in favor of a higher penalty.  In *Dijkstra*, this Court recognized the reprehensibility of another lender's conduct when it failed to have attorneys present at loan closings by imposing a $2000 per loan penalty; in *Vanderbilt*, the Court affirmed the award of low-mid-max range penalties for each of the discrete debt-collection violations.  In several FDCPA cases, courts awarded the highest amount permitted to remedy phone call violations.  *See, e.g., Hutchens, supra.*  By comparison, Quicken deprived borrowers of fair and trustworthy appraisals during their loan application process via a mechanism universally condemned.  It did so repeatedly and without remorse, despite all indications that it would improperly influence appraisers' judgment. A substantial penalty will fulfill the purpose of the CCPA, which is to "protect consumers from unfair, illegal, and deceptive acts or practices."  *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 777, 461 S.E.2d 516, 523 (1995) (internal

73

quotations omitted).

Based upon all the foregoing, this Court will impose a statutory penalty of $ 3,500.00

per violation on the defendants, jointly and severally, with prejudgment interest from and

after June 15, 2012.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

**DATED:** July 11, 2017.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

74

**JA760**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**WHEELING DIVISION**

**PHILLIP ALIG, SARA J. ALIG,
ROXANNE SHEA, and
DANIEL V. SHEA, individually and on
behalf of a class of persons,**

      **Plaintiffs,**

**v.**                                                         **Civil Action No. 5:12-CV-114**
                                                              **Civil Action No. 5:12-CV-115**
**QUICKEN LOANS, INC. and
TITLE SOURCE, INC.,**

      **Defendants.**

**Joint Motion for Approval of Proposed Class Notice**

      Plaintiffs Phillip and Sara Alig, on behalf of themselves and the certified class and by class counsel, and Defendants Quicken Loans Inc. and Title Source, Inc., by counsel (collectively the "Parties"), jointly move the Court to approve the proposed Class Notice, attached as Exhibit A and authorize its dissemination by the class administrator. The parties have agreed upon the content of the proposed Class Notice, and hereby submit same for approval consistent with the Court's Order of July 21, 2017 (ECF No. 357).[1]

      Respectfully submitted,

                            **PLAINTIFFS**

                            *s/ Patricia M. Kipnis*
                            Patricia M. Kipnis (WVSB #12896)
                            Bailey & Glasser LLP
                            923 Haddonfield Road
                            Suite 300
                            Cherry Hill, New Jersey 08002

---

[1] Defendants' agreement to the form of notice is without waiver or prejudice to its right to appeal the summary judgment, class certification and any other prior orders or rulings of the Court in this action. Defendants intend to appeal such orders and rulings at the appropriate time.

(856) 324-8219

John W. Barrett (WVSB #7289)
Jonathan R. Marshall (WVSB #10580)
Sandra Henson Kinney (WVSB #6329)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile

- and-

Jason E. Causey (WBSB #9482)
James G. Bordas, Jr. (WVSB #409)
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
(304) 242-8410


**QUICKEN LOANS INC. and
TITLE SOURCE, INC.**


By: */s/ Joseph F. Savage, Jr.* _____

Joseph F. Savage, Jr. (W.V. Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
*Counsel for Defendants Quicken Loans Inc.
and Title Source, Inc.*
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, Mass. 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
jsavage@goodwinlaw.com
ychan@goodwinlaw.com


Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Defendants Quicken Loans Inc. and
Title Source, Inc.*
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, D.C. 20001-4432

**JA762**

Tel.: (202) 346-2000
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com

Carrie Goodwin Fenwick (W.V. Bar No. 7164)
Richard D. Owen (W.V. Bar No. 2794)
*Counsel for Defendants Quicken Loans Inc. and
Title Source, Inc.*
GOODWIN & GOODWIN, LLP
300 Summers St., Ste. 1500
Charleston, W.V. 25301
Tel.: (304) 346-7000
Fax: (304) 344-9692
cgf@goodwingoodwin.com
rdo@goodwingoodwin.com

John C. Lynch (W.V. Bar No. 6627)
Jason E. Manning (W.V. Bar No. 11277)
*Counsel for Defendants Quicken Loans Inc. and
Title Source, Inc.*
TROUTMAN SANDERS LLP
222 Central Park Ave., Ste. 2000
Virginia Beach, Va. 23462
Tel.: (757) 687-7564
Fax: (757) 687-1524
john.lynch@troutmansanders.com
jason.manning@troutmansanders.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

### WHEELING DIVISION

**PHILLIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA, and**
**DANIEL V. SHEA, individually and on**
**behalf of a class of persons,**

      **Plaintiffs,**

**v.**                                                  **Civil Action No. 5:12-CV-114**
                                                        **Civil Action No. 5:12-CV-115**
**QUICKEN LOANS, INC. and**
**TITLE SOURCE, INC.,**

      **Defendants.**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of August, 2017, **Joint Motion for Approval of Proposed Class Notice** was served on counsel of record through the CM/ECF system, which will notify the following CM/ECF participants:

Carrie G. Fenwick
Joseph M. Ward
Goodwin & Goodwin LLP
300 Summers Street, Suite 1500
Charleston, WV 25301

Joseph F. Savage
Yvonne W. Chan *pro hac vice*
Goodwin Proctor LLP
100 Northern Ave.
Boston, MA 02210

Brooks R. Brown *pro hac vice*
Thomas M. Hefferon *pro hac vice*
Goodwin Proctor LLP
901 New York Ave., N. W.
Washington, D.C. 20001
*Counsel for Quicken Loans, Inc. and Title Source, Inc.*

**JA764**

John C. Lynch
Jason E. Manning
Troutman Sanders LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
*Counsel for Defendants, Quicken Loans Inc.*

*s/ Patricia M. Kipnis*
Patricia M. Kipnis (WVSB #12896)

# EXHIBIT

# A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING, DIVISION

Philip Alig, et al., individually
and on behalf of a class of persons,

       Plaintiffs,

    v.                                Civil Action No.: 5:12-CV-114

Quicken Loans Inc., et al.,

       Defendants.

## NOTICE TO CLASS MEMBERS

To:    All West Virginia citizens who refinanced mortgage loans with Quicken Loans prior to April 10, 2009, and for whom Quicken Loans obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

**This is a court notice.  Please read this notice carefully as it may affect your legal rights.  This is NOT a notice of lawsuit against you or solicitation from a lawyer.**

### I.      What is the purpose of this Notice?

You are receiving this Notice to provide you with an update about the *Alig v. Quicken Loans Inc. and Title Source, Inc.* case pending in federal court in Wheeling, West Virginia.  You were previously sent a notice about this case informing you that you are a class member.  You remain a part of the class.

### II.      What is the update?

Since the time of the first notice sent to you, there have been two main developments.

First, in an Order entered on July 11, 2017, the court ruled that each member of the class should receive: (1) a civil penalty from Defendants in amount of $3,500 per loan, and (2) a refund of the amount the class member paid for the appraisal fee.  The average appraisal fee paid by each class member was $350.

The court's order does not guarantee that you will be paid these amounts at the conclusion of the case. Defendants disagree with the Court's rulings and will appeal them.  That appeal could take months or even a year or more to resolve.  No payments will be made to class members while Defendants pursue their appeal.  If Defendants' appeal is successful, then it is possible no payments will be made to class members at all or the amount to be paid could be reduced.

Second, the court has directed that, if there are any class members who think they have actual damages related to their refinance loans from Quicken Loans, then those class members must come forward now with evidence of those damages.

If you think that you have such actual damages, and if you want to try to prove those damages in court, you **MUST** contact class counsel, Jonathan Marshall, no later than **November 30, 2017** by calling the

**JA767**

toll-free number (877) 852-0342 or sending an email to amason@baileyglasser.com.  Class counsel will consult with you free-of-charge about your potential actual damages.  If you decide to seek actual damages from Defendants, then class counsel will work with you to develop your claim, which you will have to prove at a later proceeding, including possibly a trial, to determine whether you will receive an award of actual damages in addition to the penalty and refund discussed above.

You may believe you have actual damages but do not want to pursue any such claim in court. You can choose not to seek actual damages, and you will still receive the penalty and refund if they are ultimately upheld on appeal.  If you do not seek actual damages from Defendants related to your refinance loan at this time, then you will be barred from doing so in the future.

### III.    What do you need to do to remain in the class?

Nothing.  You do not need to call or email class counsel or do anything else to remain a class member in this case.  But you may call or email class counsel if you have any questions.

Dated: August 31, 2017                    /s/ The Honorable John Preston Bailey
                                          United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE
SHEA** and **DANIEL V. SHEA**, individually
and on behalf of a class of persons,

               Plaintiffs,

        v.                             **Civil Action No. 5:12-CV-114**
                                             Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE,
INC.**, dba Title Source Inc. of West Virginia,
Incorporated,

               Defendants.

**ORDER DENYING DEFENDANTS' MOTION TO AMEND
ORDER AWARDING CLASS-WIDE STATUTORY DAMAGES**

Pending before this Court is defendants' Motion to Amend Order Awarding Class-

Wide Statutory Damages [Doc. 360].

The gist of this action was succinctly summarized by the United States Court of

Appeals for the Fourth Circuit as follows:

Plaintiffs complain that Quicken Loans originated unlawful loans in West

Virginia and that Defendant Appraisers, which includes both the named

appraisers and the unnamed class of appraisers, were complicit in the

scheme. Plaintiffs allege that, before Defendant Appraisers conducted an

appraisal, Quicken Loans would furnish them with a suggested appraisal

value. Then, after purportedly conducting the appraisal, Defendant

1

**JA769**

Appraisers arrived at the same appraisal value as the suggested appraisal value.  The problem with that scheme, according to Plaintiffs, is that the borrower would then close on a loan that was underwater from the beginning. *Quicken Loans v. Alig*, 737 F.3d 960, 963 (4th Cir. 2013).

In this Court's Second Order Resolving Motions and Awarding Class-Wide Statutory Damages [Doc. 353], this Court, *inter alia*, awarded statutory damages in the amount of $3,500.00 per violation of the West Virginia Consumer Credit and Protection Act. Defendants now seek amendment or reconsideration of that Order on two grounds: first, that the plaintiffs suffered no harm as a result of the violations, therefore making the awards violative of due process; and second, that the Court should not have adjusted the award range for violations under the act for inflation and as well granted pre-judgment interest.

A party may file a motion to alter or amend a judgment within 28 days after the entry of the judgment. *See* Fed. R. Civ. P. 59(e).  As this Court noted in *Schoene v. McElroy Coal Company*, 2016 WL 676449 at *1(N.D. W.Va. Feb. 18, 2016), "[a] district court has some discretion when ruling upon a motion to alter or amend a judgment pursuant to Rule 59(e) because the rule does not list specific grounds (*citing* Fed. R. Civ. P. 59(e))."  The Fourth Circuit Court of Appeals has outlined three grounds upon which a Fed. R. Civ. P. 59(e) motion may be granted: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pettis v. Nottoway County School Bd.*, 592 Fed.Appx. 158, 161 (4th Cir. 2014);  *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 411 (4th

Cir. 2010).[1]    Additionally, such "motions may not be used ... to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." **Robinson**, 599 F.3d at 411; *see also* **Medicus Ins. Co. v. Cross**, 2015 WL 2090019, at *1 (N.D. W.Va. May 5, 2015) (Stamp, J.).  A Fed. R. Civ. P. 59(e) motion may also not be used to re-litigate old matters.  **Id**.  It is likely improper to use such a motion to ask the court to "rethink what the court has already thought through-rightly or wrongly." **Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,** 99 F.R.D. 99, 101 (E.D. Va. 1983).[2]

"Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance. *See* **Russell [v. Delco Remy Div. of Gen. Motors Corp.**], 51 F.3d 746, 749 [(7th Cir. 1995)]; **Concordia College Corp. v. W.R. Grace & Co.,** 999 F.2d 326, 330 (8th Cir. 1993); **FDIC v. World Univ., Inc.,** 978 F.2d 10, 16 (1st Cir. 1992); **Simon v. United States,** 891 F.2d 1154, 1159 (5th Cir. 1990); *see also* **In re: Reese,** 91 F.3d 37, 39 (7th Cir. 1996) ('A motion under Rule 59(e) is not authorized "to enable a party to complete

---

[1]This Court outlined substantively the same grounds for relief in **Schoene**: "(1) it is necessary to correct manifest errors of law or fact upon which the judgment is based, (2) there is newly discovered evidence, (3) it is necessary to prevent manifest injustice, or (4) there has been an intervening change in controlling law."  2016 WL 676449 at *1 (*citing* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, **Federal Practice and Procedure** § 2810.1 (2d. ed. 1995)).

[2] As Magistrate Judge James E. Seibert often intones, "there is a special place in Hell for lawyers who file motions to reconsider."

3
**JA771**

presenting his case after the court has ruled against him.'") (quoting *Frietsch v. Refco, Inc.,* 56 F.3d 825, 828 (7th Cir. 1995));  11 Wright et al., *Federal Practice and Procedure* § 2810.1, at 127–28 (2d ed. 1995) ("The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.').'"  *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).

> "In the words of the Honorable William H. Steele of the Southern District of Alabama: Far too often, litigants operate under the flawed assumption that any adverse ruling on a dispositive motion confers upon them license to move for reconsideration, vacatur, alteration or amendment as a matter of course, and to utilize that motion as a platform to criticize the judge's reasoning, to relitigate issues that have already been decided, to champion new arguments that could have been made before, and otherwise to attempt a "do-over" to erase a disappointing outcome. This is improper."

*Bashir's Inc. v. Sharif*, 2012 WL 3637582, at *1–2 (N.D. Ala. Aug. 22, 2012) (quoting *Garrett v. Stanton*, 2010 WL 320492, *2 (S.D. Ala. Jan. 18, 2010)).

Granting a motion for reconsideration is "an extraordinary remedy which should be used sparingly." *Pac. Ins. Co. v. Am. Nat'l Fire Ins., Co.,* 148 F.3d 396, 403 (4th Cir. 1998).

With respect to the first argument made by defendants, while harm is not necessary to support damages for a violation of the WVCCPA, in this case the plaintiffs were harmed by receiving an "appraisal" that is tainted and upon which they could not rely.   This

4

**JA772**

argument has been advanced numerous times by defendants and rejected each time.  As noted above, a motion to alter or amend is not the vehicle for a do-over.

The second argument made by defendants may be properly advanced.  Even so, this Court cannot agree with the rationale.  The application of the inflation factor merely establishes the range in which a court may award damages for WVCCPA violations.  This Court did not determine a damage award and then apply an inflation factor.  Accordingly, there is no due process violation in awarding pre-judgment interest.

For the reasons stated above, defendants' Motion to Amend Order Awarding Class-Wide Statutory Damages [**Doc. 360**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit a copy of this Order to counsel of record herein.

**DATED:** August 21, 2017.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

JA773

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,

        Plaintiffs,

      v.                                Civil Action No. 5:12cv114 (lead)
                                        Civil Action No. 5:12cv115
QUICKEN LOANS INC., and          Honorable John Preston Bailey
TITLE SOURCE, INC.

        Defendants.

REPORT ON DISCOVERY AND SCHEDULING MATTERS

      Pursuant to this Court's January 3, 2018 Order, Plaintiffs Phillip and Sara Alig, Michael and Karen Fairless, Christopher Zajicek, Ronald and Jennifer Bender, Michael McClung, Richard and Alice Friends, Delores Carr, Karen and Dana Early, and Sharon (Unger) Kerns (together, "Plaintiffs") and Defendants Quicken Loans Inc. ("Quicken Loans") and Title Source, Inc. ("Title Source") (together, "Defendants") hereby submit this report regarding discovery and scheduling for matters relating to (a) Phillip and Sara Alig's remaining individual claims; and (b) individual claims for damages under the WVCCPA by identified class members.

I.      <u>BACKGROUND</u>

      This Report sets forth the parties' scheduling proposal for the completion of discovery and trial on the Aligs' remaining individual claims and the claims for damages on Plaintiffs' WVCCPA claim by the nine class members identified below.

A.    **Plaintiffs' Position**

On November 30, 2017, Plaintiffs notified this Court that the following class members intend to pursue individual claims for damages  in connection with Plaintiffs' claim for violation of the WVCCPA (Count Four):

1. Michael and Karen Fairless

2. Christopher Zajicek

3. Ronald and Jennifer Bender

4. Michael McClung

5. Richard and Alice Friends

6. Delores Carr

7. Karen and Dana Early

8. Sharon (Under) Kerns

9. Phillip and Sara Alig

*See* ECF No. 364.

B.    **Defendants' Position**

Defendants agree that Plaintiffs have notified the Court that the class members identified above intend to pursue individual claims for actual damages.  However, Dana Early was not part of the class list and does not appear to be a class member.  As a result, Defendants reserve the right to raise this issue at a later date if Plaintiffs continue to pursue actual damages for Mr. Early in this matter.

In addition, Plaintiffs have informed Defendants that the Aligs have three additional individual claims that remain to be resolved on the merits—unconscionable contract (Count Four), fraud (Count Nine), and illegal loan (Count Ten)—and that the Aligs are asserting these claims for both their 2007 loan and their 2011 loan.  Plaintiffs have also confirmed that Daniel

and Roxanne Shea—former named plaintiffs in this action—are no longer asserting any individual claims in this matter and are proceeding only as class members who are not seeking actual damages.

## II.     SEQUENCE AND TIMING OF DISCOVERY AND DISPOSITIVE MOTIONS

The Court's January 3 Order notes that trial will conclude by March 31, 2018. The parties recognize the importance of proceeding to trial promptly and will diligently prepare for trial on the schedule that the Court ultimately sets. Nonetheless, the parties respectfully submit that a pretrial period of five months rather than three months would allow for a more efficient and orderly trial. This longer period would allow the parties to conduct limited additional discovery and to undertake preparation that will make trial quicker and more orderly.  In addition, this longer period would allow the parties adequate time to prepare for trial in light of pre-existing time commitments in other matters. Accordingly, the parties respectfully propose the following deadlines for the completion of discovery, which will allow the damages claims to be tried in June of 2018.[1]

| Commencement of discovery | January 10, 2018 |
| Parties to provide Rule 26 initial disclosures | January 22, 2018 |
| Expert disclosures by Plaintiffs, if any | March 23, 2018 |
| Expert disclosures by Defendants, if any | April 20, 2018 |
| Close of discovery | April 30, 2018 |

The parties have not reached agreement on whether Defendants may file summary judgment motions regarding the damages claims asserted by the eight additional class members.

---

[1]     If this schedule is not acceptable to the Court, the parties request that they be permitted 48 hours in which to submit an alternative proposal that suits the Court's schedule.

Defendants' position is that summary judgment motions may be warranted depending on what information is learned during discovery, and that they should be permitted to file any such motions within seven days after the close of discovery.

## III.   **TRIAL**

The Plaintiffs propose a single trial for damages claims by all Plaintiffs (including the Aligs), and that the Aligs' remaining individual claims for fraud, illegal loan, and unconscionable contract (except for actual damages caused by unconscionable inducement) be tried separately. They anticipate that the actual damages claims will be ready for trial by June 4, 2018, and that trial will require 5 to 7 days.

Defendants agree that the Aligs' individual claims for fraud, illegal loan, and unconscionable contract should be tried separately from the claims for actual damages under the WVCCPA.  Defendants also submit that each plaintiff's actual damages claim should be tried separately, and will be filing a motion setting forth the basis for their position in more detail shortly.


Respectfully submitted,

By: */s/ Jonathan R. Marshall*
Jonathan R. Marshall (WVSB #10580)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile
jmarshall@baileyglasser.com

Patricia M. Kipnis (WVSB #12896)
Bailey & Glasser LLP
923 Haddonfield Road
Suite 300
Cherry Hill, New Jersey 08002
(856) 324-8219

pkipnis@baileyglasser.com

- and-

Jason E. Causey (WBSB #9482)
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
(304) 242-8410
jcausey@bordaslaw.com

**QUICKEN LOANS INC. and
TITLE SOURCE, INC.**

By: */s/ Joseph F. Savage, Jr.*
Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com

Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone:  (202) 346-2000
Facsimile:   (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com

Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
Goodwin & Goodwin, LLP

300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
*Counsel for Quicken Loans Inc. and Title Source, Inc.*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com


Dated: January 10, 2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,**

       **Plaintiffs,**

      **v.**                  **Civil Action No. 5:12cv114 (lead)**
                                   **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**      **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

       **Defendants.**

**<u>CERTIFICATE OF SERVICE</u>**

    I hereby certify that on this 10th day of January, 2018, I electronically filed this Certificate of Service for the foregoing Report on Discovery and Scheduling Matters using the CM/ECF system, which will notify the following CM/ECF participants:

**<u>Counsel for Plaintiffs</u>**
Jason E. Causey
James G. Bordas, Jr.
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
E-mail: jbordas@bordaslaw.com
E-mail: jason@bordaslaw.com

John W. Barrett
Jonathan R. Marshall
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com

                              */s/ Joseph F. Savage, Jr.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,**

        **Plaintiffs,**

    **v.**                           **Civil Action No. 5:12cv114 (lead)**
                                           **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**         **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

        **Defendants.**

<u>**JOINT STATUS REPORT**</u>

      Plaintiffs and Defendants, by and through their respective counsel, provide this Joint Status Report to advise this Court of recent developments obviating the need for the pre-trial conference and mediation currently scheduled for March 16, 2018 and the trials currently scheduled for March 20 and March 27, 2018, respectively.

      The parties jointly state as follows:

      1.     By Order dated August 4, 2017 (Dkt. No. 359), this Court approved and directed Class Counsel to provide notice to the approximately 2,700 class members advising them that, if they believed they had suffered actual damages relating to refinance loans from Quicken Loans and wanted to try to prove those damages in court, then the class members had to identify themselves to Class Counsel by November 30, 2017. Consistent with the Order, Class Counsel provided the court-approved notice to the class members on August 30, 2017.

      2.     Thereafter, on November 30, 2017, Class Counsel identified the named-plaintiffs (Philip and Sara Alig) and eight other class members – Michael and Karen Fairless, Christopher Zajicek, Ronald and Jennifer Bender, Michael McClung, Richard and Alice Friends, Delores

JA781

Carr, Karen and Dana Early, and Sharon (Unger) Kearns – as the only persons pursuing actual damages with regard to the class claims certified in this matter.  See Dkt. No. 364.

3.      In addition, as part of the Joint Report on Discovery and Scheduling Matters submitted to this Court on January 10, 2018 (Dkt. No. 370), Class Counsel advised this Court that Philip and Sara Alig also intended to pursue their remaining individual claims against Defendants for fraud, illegal loan, and unconscionable contract (the "Remaining Alig Claims").

4.      By Order dated January 12, 2018 (Dkt. No. 374), this Court set March 20, 2018 as the date for trial on the Aligs' and eight other class members' claims for actual damages.  In that same Order, this Court set March 27, 2018 as the date for trial on the Remaining Alig Claims.

5.      In addition, by separate Order dated January 24, 2018 (Dkt. No. 379), this Court set a pre-trial conference in this matter for March 16, 2018 at 9:30 AM and a mediation with Magistrate Judge Seibert for March 16, 2018 at 10:30 AM.

6.      These remaining claims no longer need to be resolved by the Court, as (a) Michael McClung, Richard and Alice Friends, Delores Carr, Karen and Dana Early, and Sharon (Unger) Kerns have elected to forgo pursuing actual damages, and (b) the parties have reached resolutions with respect to the Aligs, Michael and Karen Fairless, Christopher Zajicek, and Ronald and Jennifer Bender.

**7.**      In light of the foregoing, the parties respectfully request that this Court vacate the mediation, pre-trial, and trial proceedings currently scheduled in this matter, and direct them to file a Joint Status Report by March 28, 2018 concerning the status of any additional proceedings.

Respectfully submitted,

By: */s/ Jonathan R. Marshall*
Jonathan R. Marshall (WVSB #10580)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile
jmarshall@baileyglasser.com

Patricia M. Kipnis (WVSB #12896)
Bailey & Glasser LLP
923 Haddonfield Road
Suite 300
Cherry Hill, New Jersey 08002
(856) 324-8219
pkipnis@baileyglasser.com

- and-

Jason E. Causey (WBSB #9482)
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
(304) 242-8410
jcausey@bordaslaw.com


**QUICKEN LOANS INC. and
TITLE SOURCE, INC.**


By: */s/ Joseph F. Savage, Jr.*

Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
Katherine G. McKenney (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone:  (617) 570-1000
Facsimile:  (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com

E-mail: kmckenney@goodwinlaw.com

Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone:  (202) 346-2000
Facsimile:   (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com

Anne E. Railton (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Telephone:  (212) 459-7434
Facsimile:   (646) 558-4174
E-mail: arailton@goodwinlaw.com

Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

Dated:  March 12, 2018

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### Wheeling Division

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

       **Plaintiffs,**

       **v.**                                                          **Civil Action No. 5:12cv114**
                                                                        **The Honorable John Preston Bailey**

**QUICKEN LOANS INC., and**
**TITLE SOURCE, INC.**

       **Defendants.**

### CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of March, 2018, I electronically filed the foregoing Joint Status Report with the Clerk of the Court using the CM/ECF system, which will notify the following CM/ECF participants:

**Counsel for Plaintiffs**
Jason E. Causey
James G. Bordas, Jr.
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
E-mail: jbordas@bordaslaw.com
E-mail: jason@bordaslaw.com

John W. Barrett
Jonathan R. Marshall
Victor S. Woods
Steven R. Ruby
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com
E-mail: vwoods@baileyglasser.com
E-mail: sruby@baileyglasser.com

**JA785**

Patricia M. Kipnis
Bailey & Glasser, LLP
923 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
E-mail: pkipnis@baileyglasser.com


    /s/ *Joseph F. Savage, Jr.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,

        Plaintiffs,

    v.                          Civil Action No. 5:12cv114 (lead)
                                      Civil Action No. 5:12cv115
QUICKEN LOANS INC., and           Honorable John Preston Bailey
TITLE SOURCE, INC.

        Defendants.

**JOINT STATUS REPORT**

      Further to the parties' Joint Status Report dated August 31, 2018 (Dkt. No. 423), Plaintiffs and Defendants, by and through their respective counsel, provide this updated Joint Status Report:

      1.    Since the August 31 Status Report, Plaintiffs and Defendants have made substantial progress in addressing the outstanding matters in this Court.

      2.    First, Plaintiffs and Defendants have prepared and filed a joint motion (Dkt. No. 425) requesting that this Court approve a corrective notice to 114 borrowers advising them that are not class members.  That joint motion is pending before the Court.

      3.    Second, Plaintiffs and Defendants have reached agreements in principle to resolve (a) certain of the Alig's remaining individual claims; and (b) the actual damages claims of the Aligs and the three class members who elected to pursue such damages (collectively, the "subject claims").  Those agreements have been reduced to formal settlement documents, and are out for final review, approval and execution by the Aligs, the three class members and Defendants.  Once those settlement documents are executed, the parties will file stipulations of

JA787

dismissal with prejudice with respect to the subject claims.  The parties intend to file those stipulations next week.

4.      Finally, Plaintiffs and Defendants have negotiated and reached agreement upon nearly all of the terms of a proposed final judgment and continue to meet and confer to resolve the small number of areas of disagreement.  As such, once the forthcoming stipulations of dismissal with prejudice as to the subject claims are filed and approved by this Court, Plaintiffs and Defendants are prepared to file an agreed-upon form of proposed final judgment or, in event they cannot reach agreement upon the outstanding issues, their respective forms of proposed final judgment.


Respectfully submitted,

By: /s/ Jonathan R. Marshall
Jonathan R. Marshall (WVSB #10580)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile
jmarshall@baileyglasser.com

Patricia M. Kipnis (WVSB #12896)
Bailey & Glasser LLP
923 Haddonfield Road
Suite 300
Cherry Hill, New Jersey 08002
(856) 324-8219
pkipnis@baileyglasser.com

- and-

Jason E. Causey (WBSB #9482)
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
(304) 242-8410
jcausey@bordaslaw.com

**QUICKEN LOANS INC. and AMROCK INC.**
**(f/k/a TITLE SOURCE, INC.)**


By: /s/ *Joseph F. Savage, Jr.*
Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
Katherine G. McKenney (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com
E-mail: kmckenney@goodwinlaw.com


Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone: (202) 346-2000
Facsimile: (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com


Anne E. Railton (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 459-7434
Facsimile: (646) 558-4174
E-mail: arailton@goodwinlaw.com

Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
Goodwin & Goodwin, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

Dated:  September 21, 2018

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

      **Plaintiffs,**

    **v.**                          **Civil Action No. 5:12cv114**
                                             **The Honorable John Preston Bailey**

**QUICKEN LOANS INC., and**
**TITLE SOURCE, INC.**

      **Defendants.**

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on this 21st day of September 2018, the foregoing Joint Status
Report was served on the following counsel of record via email:

<u>**Counsel for Plaintiffs**</u>
Jason E. Causey
James G. Bordas, Jr.
Bordas & Bordas, PLLC
1358 National Road
Wheeling, WV 26003
E-mail: jbordas@bordaslaw.com
E-mail: jason@bordaslaw.com

John W. Barrett
Jonathan R. Marshall
Victor S. Woods
Steven R. Ruby
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com
E-mail: vwoods@baileyglasser.com
E-mail: sruby@baileyglasser.com

Patricia M. Kipnis
Bailey & Glasser, LLP
923 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
E-mail: pkipnis@baileyglasser.com

_/s/ Joseph F. Savage, Jr._

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

      **Plaintiffs,**

      **v.**

**QUICKEN LOANS INC., and**
**TITLE SOURCE, INC.,**

      **Defendants.**

          **Civil Action No. 5:12cv114 (lead)**
          **Civil Action No. 5:12cv115**
          **Honorable John Preston Bailey**

**JOINT STATUS REPORT**

By way of a Joint Status Report, Plaintiffs and Defendants, by and through their respective counsel, state as follows:

1.     Since the last Joint Status Report (Dkt. No. 426), the parties have filed four stipulations of dismissal (Dkt. Nos. 428, 429, 430, and 431) pertaining to certain individual claims of Plaintiffs and other specific class members.  The parties are in agreement that, after this Court approves those stipulations and dismisses the claims as to which the stipulations are addressed, there are no claims in this matter that have not been resolved by the Court or otherwise.

2.     With that in mind, Plaintiffs have attached a proposed form of final judgment for review by this Court. See Exhibit A.

3.     While expressly reserving all rights and objections, Defendants do not intend to submit a proposed form of final judgment.  Further, for all the reasons set forth in the record, Defendants continue to object to the entry of judgment in any form against them on any claim in any amount in this action and nothing in this Joint Statement is intended or shall be construed to suggest otherwise.  Defendants expressly reserve all rights to appeal from all aspects of this Court's

**JA793**

holdings in this case and any final judgment entered by this Court, and will appeal once final

judgment is entered.   Consistent with these objections and reservations, Defendants expressly

object to the substance of Plaintiff's proposed final judgment and note that it is not a consent

judgment, stipulated judgment, or settlement agreement.

   4.  The notices to non-class members approved by this Court's Order Approving Form

of Notice to Non-Class Members Order (Dkt. No. 427) were mailed to the affected persons on or

about November 15, 2018.

         Respectfully submitted,

<u>*/s/ Jonathan R. Marshall*_____</u>
Jonathan R. Marshall (WVSB #10580)
Victor S. Woods (WVSB #6894)
Steven R. Ruby (WVSB #10752)
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 facsimile
jmarshall@baileyglasser.com
vwoods@baileyglasser.com
sruby@baileyglasser.com

Patricia M. Kipnis (WVSB #12896)
BAILEY & GLASSER LLP
923 Haddonfield Road
Suite 300
Cherry Hill, New Jersey 08002
(856) 324-8219
pkipnis@baileyglasser.com

- and-

Jason E. Causey (WBSB #9482)
BORDAS & BORDAS, PLLC
1358 National Road
Wheeling, WV 26003
(304) 242-8410
jcausey@bordaslaw.com

**QUICKEN LOANS INC. and AMROCK INC.
(f/k/a TITLE SOURCE, INC.)**


By: /s/ *Joseph F. Savage, Jr.*
Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
Katherine G. McKenney (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com
E-mail: kmckenney@goodwinlaw.com


Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone: (202) 346-2000
Facsimile: (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com


Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

- and -

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
*Counsel for Quicken Loans Inc. and Amrock Inc.*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

Dated:  December 10, 2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,**

      **Plaintiffs,**

      **v.**                                 **Civil Action No. 5:12cv114 (lead)**
                                           **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**             **Honorable John Preston Bailey**
**TITLE SOURCE, INC.,**

      **Defendants.**         <u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on this 10th day of December 2018, the foregoing Joint Status Report & Submission Concerning Proposed Final Judgment was served on counsel of record through the CM/ECF system, which will notify the following CM/ECF participants:

Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
Katherine G. McKenney (*Pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com
E-mail: kmckenney@goodwinlaw.com

Thomas M. Hefferon (*Pro hac vice*)
Brooks R. Brown (*Pro hac vice*)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4432
Telephone: (202) 346-2000
Facsimile: (202) 346-4444
E-mail: thefferon@goodwinlaw.com
E-mail: bbrown@goodwinlaw.com

**JA797**

Anne E. Railton (*Pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 459-7434
Facsimile: (646) 558-4174

Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

*/s/ Jonathan R. Marshall*_____
Jonathan R. Marshall (WVSB #10580)

**JA798**

USCA4 Appeal: 22-2289    Doc: 34-2    Filed: 05/17/2023    Pg: 352 of 374

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division

PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,

      Plaintiffs,

v.

QUICKEN LOANS INC., and
TITLE SOURCE, INC.,

      Defendants.

Civil Action No. 5:12cv114 (lead)
Civil Action No. 5:12cv115
Honorable John Preston Bailey

████████ JUDGMENT

      As all claims in this matter have been resolved, either by this Court or otherwise, this Court enters final judgment as follows:

      1.     Count 2 of Plaintiffs' First Amended Complaint [Doc. 1-1] (the "Amended Complaint") is **DISMISSED**, with prejudice, as to all Defendants.

      2.     Count 3 of the Amended Complaint is **DISMISSED**, with prejudice, as to all Defendants.

      3.     By Order dated June 2, 2016 [Doc. 227], this Court conditionally certified a class with respect to Counts 1, 4, and 7 of the Amended Complaint defined as follows:

      All West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

Following this Order, the Court approved notice of this action and the opportunity to opt-out to the members of the class (the "Class Notice"). The Class Notice was mailed to the class members in December 2017 and, in response, William C. Clark, Delia L. Clark, David A. Smith and Beth A. Smith opted-out of the class. In addition, by Order dated September 24, 2018 [Doc. 427], the

USCA4 Appeal: 22-2289      Doc: 34-2      Filed: 05/17/2023      Pg: 353 of 374

Court approved a notice to certain individuals advising them that, although they were previously sent the Class Notice, they were later determined not to be members of the class. This notice was mailed to the affected persons on November 15, 2018. The final class consists of the borrowers on 2,769 West Virginia loans.

4.      In its June 2, 2016 Order, this Court also granted, in part, Plaintiffs' motion for partial summary judgment with respect certain aspects of Counts 1, 4, and 7 and granted, in part, Defendants' motion for partial summary judgment with respect to other aspects of the same counts. Consistent with that Order, the Court finally **CERTIFIES** the above class with respect to Counts 1, 4, and 7, **GRANTS** judgment in favor of Plaintiffs and the class in the manner described in its June 2, 2016 Order, and **GRANTS** judgment in favor of Defendants in the manner described in its June 2, 2016 Order.

5.      For Count 4, by Order dated July 11, 2017 [Doc. 353], this Court awarded $3,500.00 in statutory damages to Plaintiffs and the borrower(s) on each of the 2,769 class loans for an aggregate statutory damages award of $9,691,500.00, payable by Defendants jointly and severally. For Count 7, in the same Order, the Court awarded Plaintiffs and the borrower(s) on each of the class loans the appraisal fees paid by them in an aggregate amount of $968,702.95, payable by Defendants jointly and severally. No separate damages were awarded for Count 1.

6.      Thereafter, this Court directed the Plaintiffs to provide notice to the class of the opportunity to seek actual damages on Count 4, and set a deadline of November 30, 2017 for Plaintiffs and any class members seeking such damages to identify themselves to the Court. That notice was provided and class counsel advised the Court that Plaintiffs and eight other class members were the only persons pursuing actual damages with regard to the class claims certified in this matter. [Doc. 364.] Thereafter, the parties advised the Court that (a) five of the eight class

2

**JA800**

members had elected to forego pursuing actual damages in connection with the class claims, and (b) resolutions had been reached with respect to actual damages claims of Plaintiffs and the three remaining class members. [Doc. 414.]

7.      Except as described above, Count 1 of the Amended Complaint is **DISMISSED** in all other respects, with prejudice, as to all Defendants.

8.      Except as described above, Count 4 of the Amended Complaint is **DISMISSED** in all other respects, with prejudice, as to all Defendants.

9.      Except as described above, Count 7 of the Amended Complaint is **DISMISSED** in all other respects, with prejudice, as to all Defendants.

10.     Count 5 of the Amended Complaint is **DISMISSED**, with prejudice, as to all Defendants.

11.     Count 6 of the Amended Complaint is **DISMISSED**, with prejudice, as to all Defendants.

12.     Count 8 of the Amended Complaint is **DISMISSED**, with prejudice, as to all Defendants.

13.     Count 9 of the Amended Complaint is **DISMISSED**, with prejudice, as to all Defendants.

14.     Count 10 of the Amended Complaint is **DISMISSED**, with prejudice, as to all Defendants.

15.     Judgment is entered in favor of Plaintiffs and the class in the amount of **$10,660,202.95**.

16.     Post-judgment interest shall accrue in accordance with 28 U.S.C. § 1961.

Pg: 354 of 374        Filed: 05/17/2023        Doc: 34-2        USCA4 Appeal: 22-2289

**JA801**

17.     Class counsel may file a petition for attorneys' fees and costs within thirty (30) days

following the issuance of the mandate in any appeal(s) taken in this matter or, if no timely appeal

is filed, within thirty (30) days of the deadline to file a timely appeal.

It is so **ORDERED**.

Dated: _December 14, 2018_          
                                        _____
                                        Hon. John Preston Bailey
                                        United States District Judge

Pg: 355 of 374     Filed: 05/17/2023     Doc: 34-2     USCA4 Appeal: 22-2289

**JA802**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,**

        **Plaintiffs,**

      **v.**                            **Civil Action No. 5:12cv114 (lead)
Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**          **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

        **Defendants.**

**DEFENDANTS' NOTICE OF APPEAL**

Notice is hereby given that Defendants Quicken Loans Inc. and Amrock Inc. f/k/a Title

Source, Inc., appeal to the United States Court of Appeals for the Fourth Circuit from the final

judgment entered in this action on December 14, 2018 (ECF No. 433), and from all other

interlocutory orders, rulings, and decisions decided adversely to any Defendant and entered by

the District Court in this case before the final judgment.

                         Respectfully submitted,

                         **QUICKEN LOANS INC. and AMROCK INC.**

                         By: /s/ Joseph F. Savage, Jr._____

                         Thomas M. Hefferon (*Pro hac vice*)
                         Brooks R. Brown (*Pro hac vice*)
                         GOODWIN PROCTER LLP
                         901 New York Avenue, N.W.
                         Washington, D.C. 20001-4432
                         Telephone: (202) 346-2000
                         Facsimile: (202) 346-4444
                         E-mail: thefferon@goodwinlaw.com
                         E-mail: bbrown@goodwinlaw.com

Joseph F. Savage, Jr. (WV Bar No. 3265)
Yvonne W. Chan (*Pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone:  (617) 570-1000
Facsimile:  (617) 523-1231
E-mail: jsavage@goodwinlaw.com
E-mail: ychan@goodwinlaw.com

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7564
Facsimile: (757) 687-1524
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com

Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

Dated:  January 10, 2018          *Counsel for Quicken Loans Inc. and Amrock Inc.*

2

**JA804**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**


**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

        **Plaintiffs,**

      **v.**                             **Civil Action No. 5:12cv114**
                                        **The Honorable John Preston Bailey**

**QUICKEN LOANS INC., and**
**TITLE SOURCE, INC.**

        **Defendants.**

## CERTIFICATE OF SERVICE


    I hereby certify that on this 10th day of January, 2018, I electronically filed this Defendants' Notice of Appeal using the CM/ECF system, which will notify the following CM/ECF participants:


| **Counsel for Plaintiffs** | |
|---|---|
| Jason E. Causey | Patricia M. Kipnis |
| James G. Bordas, Jr. | Bailey & Glasser, LLP |
| Bordas & Bordas, PLLC | 923 Haddonfield Road |
| 1358 National Road | Suite 300 |
| Wheeling, WV 26003 | Cherry Hill, NJ 08002 |
| E-mail: jbordas@bordaslaw.com | E-mail: pkipnis@baileyglasser.com |
| E-mail: jason@bordaslaw.com | |

John W. Barrett
Jonathan R. Marshall
Victor S. Woods
Steven R. Ruby
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
E-mail: jbarrett@baileyglasser.com
E-mail: jmarshall@baileyglasser.com
E-mail: vwoods@baileyglasser.com
E-mail: sruby@baileyglasser.com                */s/ Joseph F. Savage, Jr.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE
SHEA** and **DANIEL V. SHEA**, individually
and on behalf of a class of persons,

Plaintiffs,

v.                                                   **Civil Action No. 5:12-CV-114**
                                                     Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE,
INC.**, d/b/a Title Source Inc. of West Virginia,
Incorporated,

Defendants.

## <u>ORDER ON THE ISSUE OF STANDING</u>

Pending before this Court is the issue of whether the plaintiffs and class members have

Article III standing to pursue this action.

### Procedural Background

Plaintiffs Phillip Alig, Sara J. Alig, Roxanne Shea, and Daniel V. Shea (Plaintiffs) filed

this lawsuit in West Virginia state court, both individually and on behalf of a class of West

Virginia citizens.  They subsequently filed an amended complaint. In the amended complaint,

the plaintiff class is defined as follows:

> All West Virginia citizens at the time of the filing of this action who, within the
>
> applicable statute of limitations preceding the filing of this action through the
>
> date of class certification, obtained mortgage loans from Defendant Quicken,

1

and (a) were provided unsigned loan documents at closing, (b) were assessed

loan discount, courier, or notary fees, or (c) for whom Quicken obtained

appraisals through an appraisal request form that included an estimate of value

of the subject property.

[Doc. 1-1 at 15].  Plaintiffs brought their lawsuit against defendant Quicken Loans and

defendant Title Source, Inc., d/b/a Title Source Inc. of West Virginia, and a class of defendant

appraisers.

After plaintiffs filed the amended complaint, Quicken Loans filed a notice of removal

in the United States District Court for the Northern District of West Virginia, claiming that the

district court had jurisdiction pursuant to the Class Action Fairness Act ("CAFA").  Thereafter,

plaintiffs filed a motion to remand, arguing that the local controversy exception applied.  The

district court agreed with plaintiffs and remanded the case to state court.  Quicken Loans then

filed a petition for permission to appeal with this Court.

On appeal, the United States Court of Appeals for the Fourth Circuit vacated the

decision remanding the case and remanded the case to this Court for a determination as to

whether the named defendant appraisers satisfied the "at least one defendant" requirement

for the local controversy exception to CAFA.  *Quicken Loans Incorporated v. Alig*, 737 F.3d

960 (4th Cir. 2013).  Thereafter, plaintiffs withdrew their motion to remand.

This case proceeded in due course, and, ultimately this Court conditionally certified

plaintiffs' class and granted in part and denied in part each of the parties' motions for

summary judgment.  The court then held an evidentiary hearing on damages, after which it

imposed a statutory penalty of $3,500 as to unconscionability for each of the 2,769 violations,

for a total of $9,691,500. The court also awarded plaintiffs the appraisal fees they had paid as damages for breach of contract, for a total of $968,702.95. The court did not award separate damages for conspiracy.

The defendants appealed the decisions of this Court to the Fourth Circuit, which, in a published split decision, affirmed in part and reversed in part. The majority found that the district court's summary judgment on the breach-of-contract claim was premised on a misunderstanding of the parties' contract and required reversal and remand for further consideration. *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 794–98 (4th Cir. 2021).

As to unconscionable inducement, the panel majority affirmed. Recent West Virginia case law, it explained, supported a clear *Erie* prediction. Unconscionable inducement required showing that the defendant engaged in "unconscionable" conduct and that that conduct "contributed to" the plaintiff's decision to enter a contract. *Id*. at 798–803. And the West Virginia Supreme Court of Appeals would conclude that Rocket's conduct fit the bill. *Id*. at 803–07.

Rocket, the panel majority had already recognized, had a duty to "obtain a fair, valid and reasonable appraisal" of each borrower's property. *Id*. at 796. All the more so in the refinance context. After all, the panel majority explained, "[a]ppraisal procedures" are "particularly important in refinancing agreements." *Id*. at 806. Unlike home purchases, where "adversarial parties represented by competing real estate agents" temper one another's evaluation of home value, in the refinancing context, borrowers and lenders—at least lenders planning to securitize their loans—have a shared incentive to reach a high loan value. *Id*. "Amidst these various dangers and incentives—and stepping into the middle of a transaction

3
**JA808**

between parties with unequal bargaining power—the impartial appraiser [is] the only trained professional available to objectively evaluate the value of the home." *Id*.

Yet the evidence showed that Rocket had deliberately "tainted" this appraisal process. *Id*. at 798. It "sought to pressure appraisers to inflate their appraisals" in two distinct ways—(1) sharing estimates[1] to engender an inevitable "anchoring effect" that "subconsciously" increased appraisers' estimates, and then (2) imposing explicit pressure on appraisers whose estimates fell short. *Id*. at 798, 803–06. Given the significance of the appraisal, the panel majority explained, it was unconscionable for Rocket to conceal from its borrowers the fact that it had sought to influence its appraisers' estimates in these ways. *Id*. at 806. And doing so amounted to unconscionable inducement: There was "no genuine dispute" that the company's appraisals—"and, more importantly, their guise of impartiality"—contributed to the decision to refinance. *Id*.

The defendants next petitioned the United States Supreme Court for a ***writ of certiorari***. The Supreme Court granted the writ, vacated the judgment and remanded the case to the United States Court of Appeals for the Fourth Circuit for further consideration in

---

[1] While the defendants refer to these value estimates as "owner's estimates," it is actually unclear who really provided the estimated value. For example, both the Aligs and Sheas denied having provided such a figure to the lender. [Docs. 206-1, Exh. D., Alig Dep. & Exh. E, Shea Dep.]; *see also* [Doc. 206-2, Exh. F., Mem. of Op. & Order in ***Brown v. Quicken Loans*** (Findings of Fact & Conclusions of Law) (Feb. 25, 2010) at ¶ 18 ("It is unclear as to who provided the Anticipated Property Value."); [Doc. 206-2, Exh. G, Lyon Trial Testimony Vol. 5 (Oct. 9, 2009) at 84:15-85:4 ("I do not know if [the applicant's estimated value] came from [the consumer] or came from [Quicken's mortgage banker])].

light of **TransUnion LLC v. Ramirez**, 594 U.S. ——, 141 S.Ct. 2190 (2021). **Rocket Mortg., LLC v. Alig**, 142 S. Ct. 748 (2022).

The Fourth Circuit heard argument on the remand and ultimately determined to remand the issue of standing under **TransUnion** to this Court.

**Discussion**

In **TransUnion**, the Supreme Court held that under Article III, only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court. **TransUnion LLC v. Ramirez**, 141 S.Ct. 2190 (2021).

Justice Kavanaugh, writing for a 5-4 majority, wrote that "[t]o have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing. Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including (as relevant here) reputational harm." **Id**. at 2200 (citing **Spokeo, Inc. v. Robins**, 578 U.S. 330, 340–341 (2016)).

Justice Kavanaugh added:

Article III confines the federal judicial power to the resolution of "Cases" and "Controversies." For there to be a case or controversy under Article III, the plaintiff must have a "'personal stake'" in the case—in other words, standing. **Raines** [**v. Byrd**, 521 U.S. 811, 819 (1997)].

\*        \*        \*

5

**JA810**

To answer that question in a way sufficient to establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.).

\*        \*        \*

In sum, under Article III, a federal court may resolve only "a real controversy with real impact on real persons." *American Legion v. American Humanist Assn.*, 588 U. S. ——, ——, 139 S.Ct. 2067, 2103 (2019).

\*        \*        \*

What makes a harm concrete for purposes of Article III? As a general matter, the Court has explained that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 274 (2008); *see also* *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 102 (1998). And with respect to the concrete-harm requirement in particular, this Court's opinion in *Spokeo v. Robins* indicated that courts should assess whether the alleged injury to the plaintiff has a "close relationship" to a harm

"traditionally" recognized as providing a basis for a lawsuit in American courts. 578 U.S. at 341. That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury. *Spokeo* does not require an exact duplicate in American history and tradition. But *Spokeo* is not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts.

> As *Spokeo* explained, certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.

*Id*. at 2203.

Let us now compare the *TransUnion* requirements for standing with the majority opinion in the Fourth Circuit:

First, Defendants argue that a significant number of the class members are uninjured and therefore lack standing. The question of class members' standing "can be seen as implicating either the jurisdiction of the court under Article III or the procedural issues embedded within Rule 23's requirements for class certification." *Krakauer*, 925 F.3d at 652. While we review class-certification questions for abuse of discretion, our review of our Article III

jurisdiction is de novo. *See Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019).

Defendants argue that there are class members who have not suffered any injury. Accordingly, in Defendants' view, the district court lacked Article III power to award damages to those class members. And moreover, they argue, the district court should not have certified a class containing uninjured members. But whether framed through Article III or Rule 23, Defendants' arguments lack merit.

Plaintiffs paid an average of $350 for independent appraisals that, as we conclude below, they never received. Instead, they received appraisals that were tainted when Defendants exposed the appraisers to the borrowers' estimates of value and pressured them to reach those values. Of course, **"financial harm is a classic and paradigmatic form of injury in fact,"** *Air Evac EMS, Inc., v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 163 (3rd Cir. 2017)), and "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury,'" *Czyzewski v. Jevic Holding Corp.*, —— U.S. ——, 137 S. Ct. 973, 983 (2017) (citing *McGowan v. Maryland*, 366 U.S. 420, 430–431 (1961), in which the Court concluded that "appellants fined $5 plus costs had standing").

Defendants argue that Plaintiffs were not injured because they benefitted from obtaining the loans. Even if that is true, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has

8

JA813

enjoyed from the relationship with the defendant. Standing is recognized to complain that *some particular aspect* of the relationship is unlawful and has caused injury." 13A Charles Alan Wright & Arthur R. Miller, ***Federal Practice and Procedure*** § 3531.4 (3d ed. 2008 & Supp. 2020) (emphasis added); *see, e.g.,* ***Allco Fin. Ltd. v. Klee***, 861 F.3d 82, 95 n.10 (2d Cir. 2017) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.") (quoting ***Ross v. Bank of Am., N.A. (USA)***, 524 F.3d 217, 222 (2d Cir. 2008))).  In sum, "there is simply not a large number of uninjured persons included within the plaintiffs' class." ***Krakauer***, 925 F.3d at 658.

***Alig v. Quicken Loans Inc.***, 990 F.3d 782, 791–92 (4th Cir. 2021), *cert. granted, judgment vacated sub nom.* ***Rocket Mortg., LLC v. Alig***, 142 S. Ct. 748 (2022).

Each of the plaintiffs and class members paid up front for a fair, valid and reasonable appraisal of the property.  Due to the actions of the defendants, they did not receive fair, valid and reasonable appraisals.  The actions of the defendants in tampering with the valuations and the fact that the appraisals were not fair, valid and reasonable were concealed from the plaintiffs and class members. This was fraud, *see* ***Gaddy Engineering Co. v. Bowles Rice McDavid***, 231 W.Va. 577, 746 S.E.2d 568 (2013), which is a close historical or common-law analogue for their asserted injury.

As noted by the Judge Wynn in the Fourth Circuit opinion "financial harm is a classic and paradigmatic form of injury in fact."

This Court finds that nothing in *TransUnion* changes the findings of the majority of the Fourth Circuit panel.  The Fourth Circuit panel should therefore reissue its prior opinion, with the added clarification that nothing in *TransUnion* alters this settled basis for Article III standing.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** November 28, 2022.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

PHILIP ALIG, SARA J. ALIG,
ROXANNE SHEA and DANIEL V. SHEA,
Individually and on behalf of a class of persons,

        Plaintiffs,

v.                                                      Civil Action No. 5:12cv114 (lead)
                                                        Civil Action No. 5:12cv115
QUICKEN LOANS INC., and                                 Honorable John Preston Bailey
TITLE SOURCE, INC.

        Defendants.

## ~~PROPOSED~~ ORDER

Having reconsidered this case in light of *TransUnion LLC v. Ramirez*, 594 U.S. __, 141 S. Ct. 2190 (2021), the Court hereby reinstates its judgment of December 14, 2018. The Court does so for the reasons explained in its Order of November 28, 2022: Each member of the class suffered the same concrete harm and accordingly had Article III standing to pursue their claims. Each member of the class suffered the same pocketbook injury: They paid an average of $350 for an independent appraisal that they never received. That sort of financial harm is an ordinary economic injury for which there has long been a common-law analogue. On application to this case, *TransUnion* thus does not impede the class's showing on standing. The Court

accordingly reinstates the original judgment, with post-judgment interest continuing to

accrue since ~~that~~ the date. of this Order.

**SO ORDERED.**

The Clerk is directed to transmit copies of this Order to all counsel of record.

Dated: __December 12__, 2022    _____
                                  Hon. John Preston Bailey
                                  United States District Judge

**JA817**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling Division


**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

        **Plaintiffs,**

      **v.**                    **Civil Action No. 5:12cv114 (lead)**
                                     **Civil Action No. 5:12cv115**
**QUICKEN LOANS INC., and**         **Honorable John Preston Bailey**
**TITLE SOURCE, INC.**

        **Defendants.**


## DEFENDANTS' NOTICE OF APPEAL

Notice is hereby given that Defendants Rocket Mortgage, LLC f/k/a Quicken Loans Inc. and Amrock, LLC f/k/a Title Source, Inc. appeal to the United States Court of Appeals for the Fourth Circuit from the final judgment entered in this action on December 12, 2022 (ECF No. 456), which reinstated the court's judgment of December 14, 2018 (ECF No. 433), and from all other interlocutory orders, rulings, and decisions decided adversely to any Defendant and entered by the District Court in this case before the final judgment.

                           Respectfully submitted,


                           By: /s/ *Richard D. Owen*

                           Thomas M. Hefferon (*Pro hac vice*)
                           Brooks R. Brown (*Pro hac vice*)
                           GOODWIN PROCTER LLP
                           1900 N Street NW
                           Washington, D.C. 20036
                           Telephone: (202) 346-4000
                           Facsimile: (202) 346-4444
                           E-mail: thefferon@goodwinlaw.com
                           E-mail: bbrown@goodwinlaw.com

ACTIVE/120396548.3

Carrie Goodwin Fenwick (WV Bar No. 7164)
Richard D. Owen (WV Bar No. 2794)
GOODWIN & GOODWIN, LLP
300 Summers Street, Suite 1500
Charleston, WV 25301
Telephone: (304) 346-7000
Facsimile: (304) 344-9692
E-mail: cgf@goodwingoodwin.com
E-mail: rdo@goodwingoodwin.com

Dated:  December 19, 2022          ***Counsel for Defendants***

ACTIVE/120396548.3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling Division**

**PHILIP ALIG, SARA J. ALIG,**
**ROXANNE SHEA and DANIEL V. SHEA,**
**Individually and on behalf of a class of persons,**

        **Plaintiffs,**

      **v.**                                                    **Civil Action No. 5:12cv114**
                                              **The Honorable John Preston Bailey**
**QUICKEN LOANS INC., and**
**TITLE SOURCE, INC.**

        **Defendants.**

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on this 19th day of December, 2022, I electronically filed this Defendants' Notice of Appeal using the CM/ECF system, which will notify the following CM/ECF participants:

<u>**Counsel for Plaintiffs**</u>

| | |
|---|---|
| Jason E. Causey | John W. Barrett |
| James G. Bordas, Jr. | Jonathan R. Marshall |
| Bordas & Bordas, PLLC | Steven R. Ruby |
| 1358 National Road | Tony Lee Clackler, II |
| Wheeling, WV 26003 | Victor S. Woods |
| E-mail: jcausey@bordaslaw.com | Bailey & Glasser, LLP |
| E-mail: jbordas@bordaslaw.com | 209 Capitol Street |
| | Charleston, WV 25301 |
| Patricia M. Kipnis | E-mail: jbarrett@baileyglasser.com |
| Bailey & Glasser, LLP | E-mail: jmarshall@baileyglasser.com |
| 923 Haddonfield Road | E-mail: sruby@baileyglasser.com |
| Suite 300 | E-mail: tclackler@baileyglasser.com |
| Cherry Hill, NJ 08002 | E-mail: vwoods@baileyglasser.com |
| E-mail: pkipnis@baileyglasser.com | |

                                              <u>/s/ Richard D. Owen</u>

ACTIVE/120396548.3

**JA820**

## CERTIFICATE OF SERVICE

I, William M. Jay, hereby certify pursuant to Fed. R. App. P. 25(d) that on May 17, 2023, the foregoing Joint Appendix (Volumes I, II, and III, with Volume III being filed under seal) was filed through the CM/ECF system. I further certify that, pursuant to Local Rule 30(b)(5)(B), one copy of the sealed appendix (Volume III) was served electronically on counsel for the appellees with the prior written consent of the parties to be served:

Deepak Gupta
Gregory A. Beck
Linnet Davis-Stermitz
GUPTA WESSLER PLLC
2001 K. St. NW, Suite 850 N.
Washington, DC 20006
deepak@guptawessler.com
greg@guptawessler.com
linnet@guptawessler.com

Jonathan R. Marshall
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
jmarshall@baileyglasser.com

Patricia M. Kipnis
BAILEY & GLASSER LLP
923 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002
pkipnis@baileyglasser.com

Jason E. Causey
BORDAS & BORDAS, PLLC
1358 National Road
Wheeling, WV 26003
jcausey@bordaslaw.com

*Counsel for Plaintiffs-Appellees*

/s/ William M. Jay
William M. Jay