No. 22-2289

---

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

---

PHILLIP ALIG; SARA J. ALIG; ROXANNE SHEA; DANIEL V. SHEA,

*Plaintiffs-Appellees*,

v.

ROCKET MORTGAGE, LLC, f/k/a Quicken Loans Inc.; AMROCK, LLC, f/k/a Title Source, Inc., d/b/a Title Source Inc. of West Virginia, Inc.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of West Virginia, No. 5:12-cv-114, 5:12-cv-115 (Bailey, J.)

---

### APPELLANTS' REPLY BRIEF

---

Helgi C. Walker
Jesenka Mrdjenovic
Andrew G.I. Kilberg
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: +1 202 955 8500

Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.: +1 213 229 7000

June 8, 2023

William M. Jay
Thomas M. Hefferon
Brooks R. Brown
Jaime A. Santos
Keith Levenberg
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Tel.: +1 202 346 4000

Edwina B. Clarke
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: +1 617 570 1000

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................3

I.    *TransUnion* makes clear that a "risk of harm" cannot fill an evidentiary void to prove constitutional injury. ...................................3

II.    There is no record evidence to support Plaintiffs' supposed pocketbook injury...................................................................8

    A.    Paying money does not turn a statutory violation into an injury-in-fact. ...........................................................8

    B.    Calling a product worthless does not make it so. ....................12

    C.    Plaintiffs completely ignore the record....................................16

III.    "Assuming the merits" does not create standing. .............................22

IV.    Decertification is required on this evidentiary record.......................23

CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alig v. Quicken Loans Inc.*,
   990 F.3d 782 (4th Cir. 2021) ........................................5, 10, 11, 18, 23

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018)........................................................15, 24

*Baehr v. Creig Northrop Team, P.C.*,
   953 F.3d 244 (4th Cir. 2020) ........................................8, 9, 10, 11

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ...............................................17

*Cahen v. Toyota Motor Corp.*,
   717 F. App'x 720 (9th Cir. 2017) ......................................19

*Cottrell v. Alcon Labs.*,
   874 F.3d 154 (3d Cir. 2017) ........................................15, 16

*Equity in Athletics, Inc. v. Dep't of Educ.*,
   639 F.3d 91 (4th Cir. 2011) ................................................22

*In re Fruit Juice Prod. Mktg. & Sales Pracs. Litig.*,
   831 F. Supp. 2d 507 (D. Mass. 2011)..................................14

*George v. Omega Flex, Inc.*,
   874 F.3d 1031 (8th Cir. 2017) ....................................15, 16

*James v. Johnson & Johnson Consumer Companies, Inc.*,
   No. 10-cv-03049, 2011 WL 198026 (D.N.J. Jan. 20, 2011) ..............14

*Johannessohn v. Polaris Industries, Inc.*,
   9 F.4th 981 (8th Cir. 2021) ................................................24

*In re Johnson & Johnson Talcum Powder Prods. Litig.*,
   903 F.3d 278 (3d Cir. 2018) ........................................12, 13, 14, 21, 22

*Kennedy v. Allera*,
   612 F.3d 261 (4th Cir. 2010) ........................................21, 22

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992)...................................................................21, 22

*Parker v. District of Columbia*,
　478 F.3d 370 (D.C. Cir. 2007)..............................................................22

*Smith v. Catamaran Health Sols., LLC*,
　205 F. Supp. 3d 699 (D.S.C. 2016) ....................................................14

*Steel Co. v. Citizens for a Better Environment*,
　523 U.S. 83 (1998)................................................................................21

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
　980 F.3d 879 (3d Cir. 2020) ..........................................................13, 14

*TransUnion LLC v. Ramirez*,
　141 S. Ct. 2190 (2021)........................... 2, 4, 5, 7, 18, 19, 21, 22, 23, 25

*Wal-Mart Stores, Inc. v. Dukes*,
　564 U.S. 338 (2011)..............................................................................24

*Warth v. Seldin*,
　422 U.S. 490 (1975)..............................................................................22

**Statutes:**

15 U.S.C. § 7233(b) ....................................................................................20

W. Va. Code § 31-17-8(m)(8)..................................................................9, 20

**Other Authorities:**

American Cancer Society, *Getting a Second Opinion* (July 25, 2019),
　https://www.cancer.org/latest-news/getting-a-second-opinion.html.................21

Br. of Appellants, *Baehr v. Creig Northrop Team, P.C.*,
　No. 19-1024, 2019 WL 1790011 (4th Cir. Apr. 22, 2019)...................................9

**INTRODUCTION**

Plaintiffs' argument that every member of the class suffered a common constitutional injury depends on establishing—beyond factual dispute—that each of them paid for appraisals that turned out to be "worthless." But there is *no evidence* to support Plaintiffs' assertion that the appraisals were "worthless." As Defendants' opening brief explained, Plaintiffs presented no evidence to the district court that including the borrowers' own estimates on appraisal-request forms—the practice that Plaintiffs challenge as violating West Virginia law—had *any* adverse impact on borrowers or their appraisals. Plaintiffs instead argued below that they were not required to prove harm to class members to establish standing. And while class-action defendants have no burden of *disproving* absent-class-member standing, Defendants' opening brief did that in spades, by cataloguing all the evidence that sharing borrowers' estimates with appraisers had *no* impact on absent class members' appraisals, their loans, or their ability to refinance or sell in the future.

Plaintiffs ignore all this evidence, and they ask this Court to ignore it too. They argue that it is "impossible to know" whether sharing borrowers' estimates ever resulted in inflated appraisals or inflated loan amounts, and so this Court should just assume that *every* appraisal—whether affected or unaffected—is "worthless." On that assumption, Plaintiffs say, every class member has a

-1-

pocketbook injury. But that argument fails, for multiple reasons. First, it cannot be squared with *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), which holds that class-action plaintiffs cannot use a "risk of harm" to fill the evidentiary gap between a statutory violation and an Article III injury. That is precisely how Plaintiffs use the *potential* for appraisal and loan inflation here. Second, as the extensive citations in Defendants' opening brief showed, Plaintiffs cannot just *declare* the appraisals "worthless"; "buyer's remorse" is no substitute for evidence of actual injury. Nor is an allegation sufficient: this is an appeal from a final monetary award after Plaintiffs won classwide summary judgment, so Plaintiffs need evidence that the class members' appraisals *actually were worthless* as a result of the conduct being challenged in the lawsuit. But they have none. There is no evidence that any class members did not get the benefit of their bargain from the appraisal that enabled them to refinance. Indeed, some appraisers never even *saw* borrowers' estimates.

There is no dispute that financial injury is constitutional injury. But financial injury must be proved. And because Plaintiffs cannot prove it for the class with common evidence, the judgment awarding each uninjured class member thousands of dollars must be reversed.

## ARGUMENT

This Court remanded for the district court to apply the Supreme Court's decision in *TransUnion* to the evidentiary record in this case. Instead, the district court just brushed *TransUnion* aside, and Plaintiffs try to follow suit. Their attempt to claim injury without resorting to risk of harm completely ignores the evidentiary record. The borrowers all received appraisals, and they all used them to obtain a refinance loan. Plaintiffs may have shown that they paid for the appraisals, but they have no evidence that the appraisals they received were actually "worthless." Plaintiffs won classwide summary judgment without ever substantiating that assertion. Proving that appraisals were actually worthless to particular class members requires the type of individualized evidence that precludes class certification. So Plaintiffs never tried to adduce it—and now they have no record evidence to cite.

## I.    *TransUnion* makes clear that a "risk of harm" cannot fill an evidentiary void to prove constitutional injury.

Plaintiffs argue that *TransUnion* is irrelevant to this case. As they tell it, this case involves an economic injury from paying money to receive a "worthless" appraisal, whereas in *TransUnion*, an unrealized risk of harm was the plaintiffs' "sole basis for standing." Plaintiffs' Br. 14-15. But this case does not involve an economic injury; it involves an unrealized risk of harm just like *TransUnion*.

In *TransUnion*, the plaintiffs had no evidence of *actual* harm to class members from the defendants' statutory violation—a failure to follow reasonable procedures to ensure that their credit files were accurate. 141 S. Ct. at 2208. The plaintiffs could not show that the inaccurate credit files had been disseminated to anyone, which would have caused real harm. *Id.* at 2211. Although they asked the Supreme Court to infer such dissemination, the Court declined because the "inferences" "[we]re too weak" to carry the plaintiffs' burden. *Id.* at 2212. So the plaintiffs relied on an unrealized risk of harm to fill the evidentiary gap. The Court rejected that argument, holding that the mere *risk* of harm was not enough to satisfy Article III without evidence that the risk of harm actually materialized or "evidence that the class members were independently harmed by their exposure to the risk itself." *Id.* at 2211.

Plaintiffs here are appealing to a risk of harm in precisely the way that *TransUnion* forbids—to make up for their inability to prove actual harm. Plaintiffs do not even attempt to argue that there was any evidence that including borrowers' estimates on appraisal-request forms *actually influenced* appraisers, *actually inflated* appraisal values, or *actually inflated* mortgage loan amounts—the risks Plaintiffs contend made this practice unconscionable under state law. Plaintiffs' Br. 4, 8, 15-16. To the contrary, they even concede that (as this Court previously acknowledged) "not all" appraisals or loans were affected by the purported defect

in the appraisal-request process that Plaintiffs' statutory claim challenged. Plaintiffs' Br. 8 n.2 (citing *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 804 (4th Cir. 2021)).

Plaintiffs try to put an economic label on their theory, but the substance underneath that label is telling:  Plaintiffs argue that the risks of inflated appraisal values and loans were so "serious" that it was "impossible to know" whether those risks ever manifested, and so this Court should simply deem every absent class member's appraisal "worthless."  Plaintiffs' Br. 15-16.  Just as in *TransUnion*, then, the exposure to a risk of harm is the glue holding Plaintiffs' claim of constitutional injury together—and the record contains no evidence that this risk ever materialized.  That is anything but the "actual" and "concrete" injury in fact that Article III requires.  *TransUnion*, 141 S. Ct. at 2211.

Plaintiffs' premise is wrong in any event—it is not "impossible" to determine whether the supposed "serious risks" ever resulted in any harm.  To be sure, Plaintiffs *chose* not to present any evidence on this point, because it would have undermined their case for class certification.  They argued instead that no evidence of injury was required in the context of a statutory violation.  JA668-674.[1]  But nothing stopped Plaintiffs from proving that any of the "serious risks"

---

[1] Plaintiffs argue that their standing theory on appeal is the same one they have "argued throughout the case."  Plaintiffs' Br. 15.  But even a cursory review of the

they point to actually manifested by, for example, commissioning retrospective appraisals showing that absent class members' appraisals were inaccurate or resulted in an inflated loan amount.

And although Plaintiffs were silent, Defendants were not.   Defendants catalogued in detail the affirmative evidence showing a *lack* of harm from the challenged practice of including borrowers' estimates on appraisal-request forms, including:

- evidence that some appraisers completed appraisals that could not have been "worthless" even on Plaintiffs' theory, because the appraisers did not see the borrowers' estimates on the appraisal-request forms before doing the valuation (Opening Br. 14-15);

- testimony from every appraiser who testified that they disregarded borrowers' estimates (Opening Br. 15), just as they disregarded owners' frequent efforts to pressure them to reach higher values during onsite appraisal inspections (JA1271, JA1277);

- evidence that nearly half of the appraisals at issue came in *below* borrowers' estimates, and that Quicken Loans often denied borrowers'

record demonstrates that this is false.  Plaintiffs did not even mention economic injury in the district court and claimed that their harm was "intangible."  JA670. And the district court accepted those arguments wholesale.  JA712-717.

requests for re-appraisals in the hopes of obtaining a higher appraisal value and loan amount (Opening Br. 16-17);

- evidence that, for hundreds of absent class members who had significant home equity and were taking out relatively small refinance loans, the accuracy of the appraisals was wholly immaterial to whether the loans were approved or how much money was borrowed (Opening Br. 17-18, 33-34); and

- the complete *absence* of evidence that any class member was harmed by a higher loan amount caused by an inflated appraisal, coupled with the affirmative evidence that class members financially benefitted from refinancing by lowering their interest rates and monthly payments and improving their loan terms (Opening Br. 12, 18, 19).

Plaintiffs' response is telling—they ignore the vast majority of this evidence, apparently hoping that if they pretend it does not exist, this Court will too. Rather than grapple with the factual record, they simply assert that an evidentiary showing on injury is "impossible." Plaintiffs' Br. 16, 17. And that impossibility, they argue, requires this Court to *assume* that the risk of harm renders each appraisal "worthless," thereby supplying every absent class member with constitutional injury. That is precisely the type of "speculative," risk-based claim of injury that *TransUnion* forbids. 141 S. Ct. at 2212.

## II. There is no record evidence to support Plaintiffs' supposed pocketbook injury.

In order to reframe this case to get away from *TransUnion*, Plaintiffs backtrack on virtually every accusation they made in the prior appeal. Now they say it does not matter whether any appraisal was *actually* inaccurate, or whether any inaccurate appraisal even "influenced the plaintiffs' decision to take a mortgage." Plaintiffs' Br. 17. All of the extra-record musings and law-review citations about the "anchoring effect," or being "underwater"—in short, all of the "serious risks" Plaintiff identified—they now disavow. All that matters, they now say, is that borrowers paid money for their appraisals, and that their appraisals were worthless—by Plaintiffs' present-day say-so. But under this Court's precedent, payment alone does not create standing to sue over a statutory violation. And Plaintiffs cite *no evidence*—literally none, not a single page of the record—to substantiate their claim that *every* appraisal was worthless. At this stage, standing requires proof, and Plaintiffs do not have it.

### A. Paying money does not turn a statutory violation into an injury-in-fact.

To the extent Plaintiffs are arguing that the appraisals were somehow worthless because of a violation of the West Virginia Consumer Credit and Protection Act (WVCCPA), that argument is foreclosed. As Defendants explained, this Court squarely held in *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 258

(4th Cir. 2020), that the mere expenditure of money for services actually received is "insufficient for Article III standing" to assert a claimed statutory violation. Plaintiffs here actually received the services they paid for—appraisals fully compliant with the applicable professional standards (USPAP), which enabled them to obtain the refinance loans they were seeking. *See* W. Va. Code § 31-17-8(m)(8). Plaintiffs' two attempts to distinguish *Baehr* are unavailing.

First, they argue that the plaintiffs in *Baehr* did not assert "pocketbook injury," but rather only a "bare procedural violation." Plaintiffs' Br. 18. That is simply incorrect. The Baehrs expressly argued that they had paid money for fair and impartial settlement services "that they did not receive," because the defendants' RESPA violation (payment of a kickback for referring the Baehrs) compromised the impartiality, and that "this financial loss is a concrete, particularized injury." Br. of Appellants, *Baehr v. Creig Northrop Team, P.C.*, No. 19-1024, 2019 WL 1790011, at *23 (4th Cir. Apr. 22, 2019); *see also id.* at *25 ("[T]he Baehr Class paid for a service that they did not receive—untainted advocacy and advice."). This Court recognized what the plaintiffs were arguing: "that they suffered a concrete injury by paying for settlement services provided in contravention of RESPA." 953 F.3d at 253, 258. Although, as Plaintiffs note (at 18), the Baehrs did not claim an *overcharge*, *id.* at 254-55, that is because they claimed that the entire amount they paid was injury.

The Court rejected those arguments. It emphasized that the Baehrs "received settlement services for which they paid a reasonable rate." 953 F.3d at 258. Simply "paying for settlement services provided in contravention of RESPA" was not sufficient to establish anything more than a "bare procedural violation" that is "insufficient for Article III standing." *Id.* Even if there was a violation of the statute, there was no evidence that the Baehrs had paid a premium for impartiality—or "that impartial and fair competition between settlement services providers was even relevant to their decision to obtain settlement services from the Lakeview Title Company." *Id.* at 255-56.

Plaintiffs' assertions of economic harm here—and the factual record to support them—are indistinguishable from *Baehr*. As this Court previously observed, here too "[t]he record is devoid of evidence" that exposing appraisers to borrowers' estimates on appraisal-request forms affected the accuracy of any unnamed class member's appraisal, 990 F.3d at 803 n.22, much less inflated loan amounts or caused economic harm to borrowers. Thus, as in *Baehr*, "[o]n this record," the harm suffered by Plaintiffs is simply a "bare procedural violation" that is "insufficient for Article III standing." 953 F.3d at 258.

Second, Plaintiffs argue that the factual context in *Baehr* is inapposite, because "*Baehr* … was about a defective *process*, while this case is about a defective *product*." Plaintiffs' Br. 18. As an initial matter, that contention is

-10-

particularly brazen, because it is *exactly the opposite* of what Plaintiffs argued last year on remand from the Supreme Court. At that time, Plaintiffs were attempting to avoid the consistent line of authority holding that a plaintiff who purchases a product must do more to establish standing than offer a conclusory assertion that the product she purchased was "worthless." So Plaintiffs argued that those cases were distinguishable because they involved the purchase "of a product," whereas "[h]ere, the product the plaintiffs bought was a *process*." 19-1059, Dkt. No. 152, at 16. It bears repeating: now they assert precisely the opposite, that "*Baehr* … was about a defective *process*, while this case is about a defective *product*." Plaintiffs' Br. 18. By Plaintiffs' own past description, *Baehr* dooms their case. And while they now seek to claim that the "bare procedural violation" (*Baehr*, 953 F.3d at 258) harmed the end product—the appraisal—the record is "devoid of evidence" that the procedure impacted any class member's appraisal, much less rendered it unreliable or inaccurate. *Alig*, 990 F.3d at 803 n.22.

More fundamentally, any distinction between purchasing a product and purchasing a process is immaterial to the standing inquiry. What matters, as this Court said in *Baehr*, is whether absent class members "suffer[ed] any real-world harm" from the statutory violation Plaintiffs assert. 953 F.3d at 256. And as discussed below, Plaintiffs did not show that they suffered any real-world harm.

**B.    Calling a product worthless does not make it so.**

Establishing real-world *economic* harm requires more than rhetoric. Plaintiffs would have to demonstrate that a statutory violation caused the borrowers not to get what they paid for—what they now say is a "product." The opening brief demonstrated that a litigant cannot consume a product, suffer no harm, but then label the fully consumed product "worthless" because it *could* have been harmful. Opening Br. 39-43, 45-46. Instead, as courts across the country agree, a litigant asserting "economic injury" from a purchase must support that theory with *evidence* (or, at the pleading stage, specific factual allegations) showing that the product or service she received was in fact "worthless" or "worth less" than she paid for it as a result of the defendants' unlawful conduct. Opening Br. 43-45. Plaintiffs respond to almost none of this precedent, and their limited response is telling.

Plaintiffs claim that the caselaw Defendants cited addressed a different question—"[h]ow to disentangle the value of the portion of a product that is defective from the portion that provides value," where "'detailed economic models' might … be required" to prove the extent of the injury. Plaintiffs' Br. 18-19 (quoting *In re Johnson & Johnson Talcum Powder Prods. Litig.*, 903 F.3d 278, 287 (3d Cir. 2018)).

-12-

It is unclear from where Plaintiffs are divining this principle—certainly not from any of the opinions cited in Defendants' brief. None of these cases have anything to do with dividing up a product into component parts and crafting "detailed economic models" to establish a value for the non-defective pieces. In fact, the case that Plaintiffs cite for this proposition, *Johnson & Johnson*, says exactly the opposite—in the portion of the opinion Plaintiffs cite, the court said that "a plaintiff *need not develop* detailed economic models at the pleading stage to establish that she has standing." 903 F.3d at 287 (emphasis added). But, the court held, she must do "more than simply pair a conclusory assertion of money lost with a request that a defendant pay up." *Id.* at 288. That sort of conclusory pairing is all Plaintiffs have here. And of course, even more is required at summary judgment (and *much* more to prevail on final judgment, which is the posture of Plaintiffs' case on appeal here).

Plaintiffs' discussion of *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879 (3d Cir. 2020), is even more dubious. Plaintiffs hypothesize a scenario in which Ms. Thorne had paid a separate $100 fee for tire registration that she did not receive. Plaintiffs' Br. 19. But here, borrowers did not pay separate fees for the appraisal *product* and the appraisal *process*, nor did they get one but not the other. They paid one fee, just like the tire purchase in *Thorne*. They received the services they paid for. And they successfully refinanced their loans. That is why, under the

economic-injury line of cases, Plaintiffs had the burden to prove that the appraisal services the borrowers indisputably received were in fact worth less than the amount they paid.  Plaintiffs did not do so.

What these cases actually say—using express language quoted in Defendants' brief that Plaintiffs carefully ignore—is that simply labeling a product or service or process "worthless" does not make it so for standing purposes.  *See, e.g.*, *Johnson & Johnson*, 903 F.3d at 287 (stating that the court's discussion of "economic theories" was included not "to sound pedantic" but "because Article III *requires* us to ensure that plaintiffs present more than merely conjectural assertions of injury"); *Thorne*, 980 F.3d at 889 (rejecting assertions of "economic injury" where plaintiff "supported her benefit-of-the-bargain theory of injury with only speculative allegations that the tires she received from Pep Boys were worth less than what she paid for them").[2]

---

[2] *See also, e.g.*, *In re Fruit Juice Prod. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 512 (D. Mass. 2011) ("Because Plaintiffs are unable to show that *any* actual harm resulted from consumption of the fruit juice products [they purchased], their allegation of 'economic' injury lacks substance"); *Smith v. Catamaran Health Sols., LLC*, 205 F. Supp. 3d 699, 708 (D.S.C. 2016) (rejecting conclusory assertion that insurance policy was "virtually worthless" and therefore that its purchase created an "economic" injury); *James v. Johnson & Johnson Consumer Companies, Inc.*, No. 10-cv-03049, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011) (no standing based on conclusory assertion that product was "tainted" and therefore created an economic injury "at the moment of purchase," even if the product later performed as expected and caused no harm).

Plaintiffs cite *no* cases standing for a contrary proposition—and the cases Plaintiffs affirmatively offer to support their claims of injury support Defendants, not Plaintiffs. For example, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018); *Cottrell v. Alcon Labs.*, 874 F.3d 154, 167-70 (3d Cir. 2017); and *George v. Omega Flex, Inc.*, 874 F.3d 1031, 1032 (8th Cir. 2017), held that plaintiffs had alleged economic injury at the pleading stage. *See* Plaintiffs' Br. 13, 14. In the portion of *Asacol* that Plaintiffs cite, the court held that it was "indisputabl[e]" that the *named* plaintiffs had standing, because they had offered specific factual allegations that the defendants' misconduct eliminated generic competition and they would have paid less for a generic substitute. 907 F.3d at 47. But read on: the court held that simply paying for the brand-name drug was *not* enough to establish injury, and "thousands" of class members—those who would have paid for the brand-name drug anyway—"in fact suffered no injury." *Id.* at 53-54. Even though they had all paid for the brand-name drug, they paid no more than they would have paid otherwise. That is why the First Circuit decertified the class. Here, no one has even alleged (much less proved) that they would have paid less for their appraisals or backed out of refinancing altogether if the challenged practice had been disclosed. Indeed, the record contains evidence of the opposite—one borrower declined to pursue statutory damages because "[t]he new loan terms saved [him] a significant amount of money." JA647.

-15-

Likewise in *Cottrell*, the plaintiffs offered specific factual allegations that the plaintiffs had purchased medication that was "impossible for them to use" because of the design of the medication bottle. 874 F.3d at 165. Unsurprisingly, the court concluded that these allegations were sufficient to sustain the plaintiffs' standing at the pleading stage, because they were not based on speculation or presumptions of harm. *Id.* at 168-69. And in *George*, the plaintiffs alleged that installing a defective product in their homes had made their homes less valuable and in need of repair. 874 F.3d at 1031-32. But unlike durable goods, like homes, appraisals have no resale value. They simply provide a snapshot opinion of the home's approximate worth at a particular time. Plaintiffs offered no evidence showing that the borrowers' appraisals were ineffective for the purpose for which they bought them—enabling the refinancing. These cases simply offer no assistance to Plaintiffs—this is not a pleading-stage case, and Plaintiffs' assertions of economic injury are based on labels and assumptions, rather than evidence.

**C.     Plaintiffs completely ignore the record.**

Plaintiffs eventually acknowledge that they "must show," not merely *assert*, that the product was in fact defective or worthless. Plaintiffs' Br. 19. They maintain that this "is exactly what the plaintiffs showed here when they showed

that tainted appraisals are unreliable and worthless." *Id.* at 20.[3] What is missing, however, is any *factual support* for this assertion. Not a single record citation appears after this sentence—nor after the five other times Plaintiffs make this assertion in their brief, each time without a shred of evidence to back it up. Plaintiffs' Br. 2, 14, 16, 17, 20.

As a threshold matter, even on Plaintiffs' theory, an appraisal cannot have been "worthless" or lost its "independence" if the appraiser valued the house without seeing the borrower's estimate. And as the opening brief explains, multiple appraisers testified that they did just that. Plaintiffs' response is a footnote that just quibbles that *a specific appraiser declarant* did not do all the appraisals in the class. Plaintiffs' Br. 5 n.1. But that misses the point—this

---

[3] Only once does Plaintiffs' brief even refer to what "the evidence showed" (at 8), but that reference is as inaccurate as it is revealing: Plaintiffs claim that there was "evidence" of an "anchoring effect," *but there was no such evidence in the record*—only academic articles and books cited for the first time in Plaintiffs' answering brief on appeal. No. 19-1059, Dkt. No. 48, at 11-12. Plaintiffs also claim there was "evidence" of "explicit pressure" imposed on appraisers. That is a red herring: there was no evidence (or even allegation) that this happened on a classwide basis—to the contrary, there was evidence that even simple requests to revisit appraisals in light of recent comparators were relatively rare, JA858, and there was also evidence that Quicken Loans *refused borrowers'* requests to revisit appraisals in order to increase loan amounts, JA1207, JA1234 (Bane, Ensminger); JA1244, JA1246; JA1255-1261. Pressure to change appraisals was not Plaintiffs' merits theory below, nor is it their standing theory on appeal. Plaintiffs' invocation of it now, without evidence that it occurred classwide, is a classic example of what this court has forbidden: trying "to litigate not on behalf of themselves but on behalf of a 'perfect plaintiff' pieced together for litigation." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998).

testimony underscores why one cannot *assume* that borrowers' estimates even reached appraisers, much less that seeing those estimates influenced the appraisers' valuations. *See TransUnion*, 141 S. Ct. at 2212. This evidence also underscores why class certification is inappropriate—for each of the absent class members' appraisals, Plaintiffs would have to prove (and Defendants would be entitled to present contrary evidence) that listing the borrower's estimate on the appraisal-request form was not akin to the swerving motorist from *TransUnion*—who hit no one, and so created risk but no injury. 141 S. Ct. at 2211.

Moreover, Plaintiffs ultimately appear to recognize that even their conclusory assertion that every appraisal was "worthless" goes too far—they acknowledge that the appraisals *did* enable the refinance loans that were the reason for their purchase. Plaintiffs' Br. 20. They argue, however, that the appraisals were ineffective in serving any *other* purpose, such as providing "independent assessments of a home's value" to purchasers. *Id.* But they never explain how lacking this putative bonus feature—one that has nothing to do with the WVCCPA cause of action—could make an appraisal worthless.[4]

---

[4] The claim that the appraisals were all worthless also makes no sense in light of this Court's ruling on the breach of contract claim. This Court vacated the judgment on Plaintiffs' breach of contract claim specifically because Plaintiffs and class members could prevail only if they suffered damages due to the alleged breach and the record contained no evidence that they had. *Alig*, 990 F.3d at 797-98, 803 n.22.

Regardless, Plaintiffs cite no evidence establishing that *all* absent class members purchased appraisals as an "independent assessment"—separate from facilitating a refinance loan—*and* were unable to use it for that purpose. *See supra* pp. 16-18. There is no record evidence that *any* absent class members distrusted their appraisals, or had any reason to do so, since the appraisers all certified to their compliance with the appraisal standards, including for independence. *See Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723 (9th Cir. 2017) (no economic injury where plaintiffs failed to allege "a demonstrable effect on the market for their [purchased vehicles] … [or] a risk so immediate that they were forced to replace or discontinue using their vehicles, thus incurring out-of-pocket damages"). Indeed, recall that Plaintiffs at one point attempted to argue that they had all suffered a form of "informational injury." No. 19-1059, Dkt. No. 48, at 51. The Supreme Court in *TransUnion* held that a defendant's failure to give the plaintiff information is not enough for standing to sue for damages—there must be some "adverse effects" or "downstream consequences" from the failure to get the information. 141 S. Ct. at 2214 (citation omitted). Since *TransUnion*, Plaintiffs have never mentioned their supposed informational injury again.

The lack of evidence that any absent class member's appraisal was not fit for its intended purpose contrasts this case with Plaintiffs' strained analogy—again, supported by no evidence—to accountants performing an audit. Accounting firms

-19-

that audit the financial statements for public companies are required to meet highly specific independence standards set by a federal agency. *See* 15 U.S.C. § 7233(b). Firms that can meet those standards may well be able to charge more for their services, and their clients may well be deprived of the benefit of their bargain if an accounting firm claims to be in compliance with those specific standards but is not. But that would require factual proof—exactly what Plaintiffs do not have here.

Plaintiffs' hypothetical is not analogous to this case in any event. For starters, it is undisputed that Plaintiffs' appraisals *complied* with the relevant professional and regulatory standards allowing the refinance transaction. W. Va. Code § 31-17-8(m)(8); JA321; JA266-267. And if the client pays for and receives a successful audit, performed in accordance with all professional standards, and is therefore able to report its financials, the client could not just assert that the accounting firm's services were worthless because some potential conflict of interest *could have* affected the accuracy of the financials. In short, the standing question in Plaintiffs' audit analogy would unsurprisingly depend on the evidence—which Plaintiffs offer none of here.

Notably, Plaintiffs appear to have abandoned their prior analogy to a patient who obtains a second medical opinion—which, Plaintiffs claimed, would lack independence if the doctor reviews the first opinion. No. 19-1059, Dkt. No. 152, at 17. That evidence-free supposition was just as ill-conceived, because real doctors

-20-

*do* review prior medical records and treatment plans when providing a second opinion.[5]

The flaw in all of these analogies (and in Plaintiffs' standing arguments here) is the same—in each instance, Plaintiffs simply *assume* a lack of independence by professionals who are duty-bound to act independently. But just as no one assumes that reading a district court's decision renders an appellate court incapable of exercising *de novo* review, there is no reason to assume that the judgment of other trained professionals—doctors, appraisers, or auditors—will be substantively "tainted" by learning the views of someone else. And for purposes of evaluating standing, that type of an assumption cannot substitute for *evidence*— evidence that simply does not exist in this record. *See supra* pp. 16-19; *Kennedy v. Allera*, 612 F.3d 261, 270 n.3 (4th Cir. 2010) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95 (1998)); *TransUnion*, 141 S. Ct. at 2207-08 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *Johnson & Johnson*, 903 F.3d at 288 (presuming economic injury "would turn the standing question on its head").[6]

---

[5] *See, e.g.*, American Cancer Society, *Getting a Second Opinion* (July 25, 2019), https://www.cancer.org/latest-news/getting-a-second-opinion.html.

[6] Plaintiffs notably offer no defense of the district court's *sua sponte* standing-by-fraud theory. Opening Br. 47-48. They do not even mention it in their brief.

## III.    "Assuming the merits" does not create standing.

Toward the very end of their brief, Plaintiffs offer a Hail Mary—they argue that because economic injury is their "theory" of standing, this Court must take it "as a given," even if Defendants "might disagree."  Plaintiffs' Br. 20.   That is wrong:  injury-in-fact, like all aspects of standing, must be *proved*, not assumed. *See Kennedy*, 612 F.3d at 270 n.3; *TransUnion*, 141 S. Ct. at 2207-08; *Johnson & Johnson*, 903 F.3d at 288.

The cases Plaintiffs cite—*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91 (4th Cir. 2011), *Warth v. Seldin*, 422 U.S. 490 (1975), and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)—do not help them.   Those cases recite the uncontroversial rule that when a court evaluates standing *at the pleading stage*, it must assume that the plaintiffs' allegations are true and that the plaintiffs will succeed on the merits of their claims.   *Equity*, 639 F.3d at 99 (rule applies "at the pleading stage"); *Warth*, 422 U.S. at 501-02 (rule applies "[f]or purposes of ruling on a motion to dismiss for want of standing"); *Parker*, 478 F.3d at 377 (appeal of motion to dismiss).   That standard does not apply here.   This case was not decided at the pleading stage; it was decided in Plaintiffs' favor on summary judgment, where allegations are no longer taken as true and plaintiffs must support their allegations of injury with real evidence.   *Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."); *TransUnion*, 141 S. Ct. at 2207-08.

Nor could Plaintiffs establish standing even if the Court did assume that the merits *of Plaintiffs' statutory claim* would be resolved in Plaintiffs' favor. As Plaintiffs concede repeatedly through their brief, proving the merits of their statutory claim required *no showing* of harm—indeed, all that was required on this Court's interpretation was evidence of appraisers' exposure to borrowers' estimates on appraisal-request forms. Plaintiffs' Br. 6, 8 n.2, 16 n.3. Indeed, this Court affirmed classwide statutory damages precisely for this reason—because, it held, the WVCCPA permits an award of civil penalties "even for those who have suffered no quantifiable harm." *Alig*, 990 F.3d at 794 (quotation marks omitted). It is precisely *because* the statutory claim required no proof of injury that Plaintiffs must allege some *independent* harm to satisfy the Constitution's jurisdictional requirement. Thus, this "assume the merits" principle cannot be used to fill the evidentiary gap here.

## IV.  Decertification is required on this evidentiary record.

Plaintiffs contend (for the first time) that even if Defendants are correct about what is required to prove standing, that would still not defeat class

certification, because the entire class's standing would necessarily "rise or fall together." Plaintiffs' Br. 22. That is incorrect for multiple reasons.

First, Plaintiffs simply assume (and once again ask this Court to assume) that Plaintiffs could prove their case by relying only on common proof. But Defendants have explained why Plaintiffs cannot establish in one stroke that *all* the appraisals were worthless. Some appraisers may not have seen the borrower's estimate at all; some appraisal values were based on a recent sale of the same property, refuting any lack of objectivity; some borrowers had so much equity in their home that the precise appraisal value plainly was not material to their decision to take out the loan or to the loan amount. And, of course, there is no evidence whatsoever that *any* appraisal was in fact inaccurate; proving that would require retrospective appraisals on each property, of the sort the Aligs performed. Standing is an element of Plaintiffs' case, and Defendants are entitled to challenge it on individual bases like these. *Asacol*, 907 F.3d at 52-53; *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 2561 (2011) ("[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate" any "defenses to individual claims"). That need for individualized proof—potentially requiring testimony from every one of the nearly 2,000 class borrowers and every appraiser—precludes certification. *Id.*; *Johannessohn v. Polaris Industries, Inc.*, 9 F.4th 981, 987-88 (8th Cir. 2021).

Second, this is an appeal from a final judgment awarding damages, and "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion*, 141 S. Ct. at 2208. Even if a class could ever include uninjured members *at the time of certification* (and the better view is that it cannot), the Supreme Court has made clear that uninjured plaintiffs cannot recover damages. The district court did nothing in between certification and judgment to separate out the uninjured class members—nor could that be done without decertification, because the necessary facts would require individual evidentiary proof.

But the problem with Plaintiffs' case is not their *theory* of standing; the problem is their lack of *evidence*. Economic injury is not inherently uncertain or speculative—Defendants do not dispute that financial injury is injury in fact, or that spending money on a product or service that one does not receive can constitute an economic injury. But that injury must *actually be proved for each absent class member* before he or she can obtain a money judgment. And Plaintiffs have offered no way to establish that injury on a classwide basis here, which is why the judgment must be vacated and the class must be decertified.

## CONCLUSION

This Court should reverse the judgment of the district court certifying the class and vacate the damages award.

Respectfully submitted,

*/s/William M. Jay*

|  |  |
|---|---|
| Helgi C. Walker | William M. Jay |
| Jesenka Mrdjenovic | Thomas M. Hefferon |
| Andrew G.I. Kilberg | Brooks R. Brown |
| GIBSON, DUNN & CRUTCHER LLP | Jaime A. Santos |
| 1050 Connecticut Avenue, N.W. | Keith Levenberg |
| Washington, D.C. 20036 | Rohiniyurie Tashima* |
| Tel.: +1 202 955 8500 | GOODWIN PROCTER LLP |
|  | 1900 N Street, N.W. |
|  | Washington, D.C. 20036 |
| Theodore J. Boutrous, Jr. | Tel.: +1 202 346 4000 |
| GIBSON, DUNN & CRUTCHER LLP |  |
| 333 South Grand Avenue |  |
| Los Angeles, CA 90071 | Edwina B. Clarke |
| Tel.: +1 213 229 7000 | GOODWIN PROCTER LLP |
|  | 100 Northern Ave. |
|  | Boston, MA 02210 |
|  | Tel.: +1 617 570 1000 |

*Admitted only in New York and Virginia; not admitted in the District of Columbia. Practicing under the supervision of counsel admitted in the District of Columbia.*

*Counsel for Defendants-Appellants*

Dated: June 8, 2023

## CERTIFICATE OF SERVICE

I, William M. Jay, hereby certify that on June 8, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ William M. Jay*
William M. Jay

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 5,972 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2010.

*/s/ William M. Jay*
William M. Jay