No. 22-2289

---

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

PHILLIP ALIG; SARA J. ALIG; ROXANNE SHEA; DANIEL V. SHEA,

*Plaintiffs-Appellees*,

v.

ROCKET MORTGAGE, LLC, f/k/a Quicken Loans Inc.; AMROCK, LLC, f/k/a
Title Source, Inc., d/b/a Title Source Inc. of West Virginia, Inc.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of West Virginia, No. 5:12-cv-114, 5:12-cv-115 (Bailey, J.)

---

### APPELLANTS' OPENING BRIEF

---

Helgi C. Walker
Jesenka Mrdjenovic
Andrew G.I. Kilberg
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: +1 202 955 8500

Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.: +1 213 229 7000

June 8, 2023

William M. Jay
Thomas M. Hefferon
Brooks R. Brown
Jaime A. Santos
Keith Levenberg
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Tel.: +1 202 346 4000

Edwina B. Clarke
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: +1 617 570 1000

*Counsel for Defendants-Appellants*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND OTHER INTERESTS
## (ROCKET MORTGAGE, LLC, F/K/A QUICKEN LOANS INC.)

Pursuant to FRAP 26.1 and Local Rule 26.1, Rocket Mortgage, LLC, f/k/a Quicken Loans Inc., which is Appellant, makes the following disclosure:

1.      Rocket Mortgage, LLC, is not a publicly held corporation or other publicly held entity.

2.      Rocket Mortgage, LLC, does have a parent company.  The parent company is RKT Holdings, LLC.

3.      There is no publicly held corporation or other publicly held entity that holds more than 10% of the stock of Rocket Mortgage, LLC.

4.      There is no other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation.

5.      Rocket Mortgage, LLC, is not a trade association.

6.      This case does not arise out of a bankruptcy proceeding.

7.      This is not a criminal case in which there was an organizational victim.


*/s/ William M. Jay*
William M. Jay

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND OTHER INTERESTS
## (AMROCK, LLC F/K/A TITLE SOURCE, INC.)

Pursuant to FRAP 26.1 and Local Rule 26.1, Amrock, LLC, f/k/a Title Source, Inc., which is Appellant, makes the following disclosure:

1.      Amrock, LLC is not a publicly held corporation or other publicly held entity.

2.      Amrock, LLC, does have a parent company.  The parent company is Amrock Holdings, LLC.

3.      There is no publicly held corporation or other publicly held entity that holds more than 10% of the stock of Amrock, LLC.

4.      There is no other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation.

5.      Amrock, LLC, is not a trade association.

6.      This case does not arise out of a bankruptcy proceeding.

7.      This is not a criminal case in which there was an organizational victim.


*/s/ William M. Jay*
William M. Jay

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

JURISDICTION....................................................................................5

STATEMENT OF THE ISSUES.............................................................5

BACKGROUND ....................................................................................6

    I.    This case concerns Defendants' pre-2009 appraisal-ordering process. ........................................................................6

    II.    Plaintiffs sue, alleging that Quicken Loans and TSI sought to influence appraisers to provide inflated appraisal numbers and thereby increase the size of refinance loans. .........................................9

    III.    The district court certifies a class without regard to standing, grants summary judgment to the class, and awards $10 million in classwide damages. ........................................13

    IV.    This Court largely affirms, holding that the mere purchase of an appraisal requested through a process in which appraisers were "exposed" to BEVs was sufficient to establish Article III injury-in-fact....................................................19

    V.    The Supreme Court holds in *TransUnion* that an unrealized risk of future injury does not establish standing to seek money damages and GVRs this case for further consideration in light of *TransUnion*. ...................................................22

    VI.    This Court remands to the district court to consider *TransUnion*'s application to this case in the first instance. ...............23

    VII.    Seven days after receiving this Court's mandate, the district court holds that *TransUnion* changes nothing and that this Court should "reissue its prior opinion."............................................24

SUMMARY OF ARGUMENT ................................................................25

STANDARD OF REVIEW ....................................................................27

ARGUMENT ........................................................................................28

    I.    *TransUnion* makes clear that exposure to the risk of an inaccurate appraisal is not cognizable injury under Article III..........28

II.    The district court erred in holding that every plaintiff suffered a "pocketbook injury" based on the mere purchase of an appraisal that caused no harm. ............................................................... 33

III.   The district court's recharacterization of this case as a "fraud" case does not establish constitutional injury. ..................................... 45

IV.    Because Plaintiffs did not establish actual injury to any absent class members, the class must be decertified and the damages award vacated. .................................................................... 46

V.     Defendants incorporate their prior briefing on questions unrelated to standing. ........................................................ 53

CONCLUSION ........................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alig v. Quicken Loans Inc.*,
    990 F.3d 782 (4th Cir. 2021), *vacated*, 142 S. Ct. 748 (2022)................. *passim*

*Alig v. Rocket Mortgage, LLC*,
    52 F.4th 167 (4th Cir. 2022) ...................................................2, 23, 24

*Avritt v. Reliastar Life Ins.*,
    615 F.3d 1023 (8th Cir. 2010) ...........................................................48

*Baehr v. Creig Northrop Team, P.C.*,
    953 F.3d 244 (4th Cir. 2020) ..................................4, 26, 34, 35, 36, 37

*Bowen v. Energizer Holdings, Inc.*,
    2023 WL 1786731 (C.D. Cal. Jan. 5, 2023) ......................................40

*Branch v. GEICO*,
    323 F.R.D. 539 (E.D. Va. 2018) .........................................................49

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) .............................................................47

*Cahen v. Toyota Motor Corp.*,
    717 F. App'x 720 (9th Cir. 2017) ......................................................42

*Cordoba v. DIRECTV, LLC*,
    942 F.3d 1259 (11th Cir. 2019) ....................................................48, 49

*Core Commc'ns, Inc. v. Verizon Md. LLC*,
    744 F.3d 310 (4th Cir. 2014) ...............................................................6

*Debernardis v. IQ Formulations, LLC*,
    942 F.3d 1076 (11th Cir. 2019) ....................................................43, 44

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ..............................................................48

*Doss v. Gen. Mills, Inc.*,
    816 F. App'x 312 (11th Cir. 2020) ....................................................42

*Dozier v. Walmart Inc.*,
  2021 WL 1534973 (C.D. Cal. Mar. 5, 2021)................................40, 44

*Dreher v. Experian Info. Sols.*,
  856 F.3d 337 (4th Cir. 2017) ...............................................27

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ...............................................27

*Flecha v. Medicredit, Inc.*,
  946 F.3d 762 (5th Cir. 2020) ...............................................48

*Flynn v. FCA US LLC*,
  2020 WL 1492687 (S.D. Ill. Mar. 27, 2020) ..........................42

*In re Fruit Juice Prod. Litig.*,
  831 F. Supp. 2d 507 (D. Mass. 2011) ...................................42

*In re Gerber Prod. Co. Heavy Metals Baby Food Litig.*,
  2022 WL 10197651 (E.D. Va. Oct. 17, 2022)..........................40

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ...............................................46

*Huertas v. Bayer U.S., LLC*,
  2022 WL 3572818 (D.N.J. Aug. 19, 2022) ............................41

*Johannessohn v. Polaris Indus. Inc.*,
  9 F.4th 981 (8th Cir. 2021) ..................................................48

*In re Johnson & Johnson Talcum Powder Prods. Litig.*,
  903 F.3d 278 (3d Cir. 2018) ......................................39, 40, 41, 44

*Lewis v. Casey*,
  518 U.S. 343 (1996)............................................................47

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................47

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) .............................................42

*McFarland v. Wells Fargo Bank, N.A.*,
    810 F.3d 273 (4th Cir. 2016) ................................................................6

*McGee v. S-L Snacks Nat'l*,
    982 F.3d 700 (9th Cir. 2020) .............................................39, 40, 41

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ...............................................................49

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015) .................................................................49

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) ....................................................................48

*O'Leary v. TrustedID, Inc.*,
    60 F.4th 240 (4th Cir. 2023) ................................................................52

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (en banc) ...............................................49

*In re Plum Baby Food Litig.*,
    2022 WL 16552786 (D.N.J. Oct. 31, 2022) ........................................41

*Rivera v. Wyeth-Ayerst Lab'ys*,
    283 F.3d 315 (5th Cir. 2002) .............................................39, 40, 41

*Shields v. Alere Home Monitoring, Inc.*,
    2015 WL 7272672 (N.D. Cal. Nov. 18, 2015) ...................39, 40, 41

*Smith v. Catamaran Health Sols., LLC*,
    205 F. Supp. 3d 699 (D.S.C. 2016) .....................................................41

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..............................................................................14

*Thorn v. Jefferson-Pilot Life Ins.*,
    445 F.3d 311 (4th Cir. 2006) .......................................................27, 46

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
    980 F.3d 879 (3d Cir. 2020) ........................................................38, 39

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ................................................................*passim*

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................51

*White v. Nat'l Steel Corp.*,
   938 F.2d 474 (4th Cir. 1991) ....................................................46

*Williams v. Purdue Pharma Co.*,
   297 F. Supp. 2d 171 (D.D.C. 2003) ..........................................41

**Statutes:**

28 U.S.C. § 1291 ...........................................................................5

28 U.S.C. § 1332(d) ......................................................................5

28 U.S.C. § 1447 .........................................................................52

28 U.S.C. § 2072(b) .....................................................................47

W. Va. Code § 31-17-8(m)(8).................................................7, 44

W. Va. Code § 46A-5-101(1) (1996) ...........................................19

W. Va. Code § 46A-5-106 (1996) ................................................19

**Other Authorities:**

Freddie Mac, *Home Valuation Code of Conduct*, § I.B(6) (Dec. 2008),
   https://www.fhfa.gov/Media/PublicAffairs/Documents/HVCCFinal
   CODE122308_N508.pdf ..........................................................8

Restatement (Second) of Torts § 525 (1977)..............................46

Uniform Residential Loan Application, https://singlefamily.fanniemae.com/
   media/7896/display ...................................................................7

## INTRODUCTION

This is the third time the parties have been before this Court on the issue of constitutional standing.  Plaintiffs obtained class certification and won millions of dollars in statutory damages by claiming that a common practice in mortgage refinancing transactions—one expressly permitted by the applicable professional standards at the time—was nonetheless "unconscionable" under West Virginia law. But Plaintiffs proffered no evidence that the practice caused any actual injury to the class members, and the district court required none.  This Court initially affirmed, but the Supreme Court vacated that decision and directed this Court to reconsider in light of *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), which held that a mere risk of harm does not satisfy Article III.  This Court then remanded to the district court to evaluate standing under *TransUnion*.  The district court did not do that:  it entertained no briefing or argument and, just days after receiving the mandate, brushed aside the Supreme Court's decision as completely irrelevant.   Under *TransUnion*, the class certification cannot stand, and this Court should reverse.

The class consists of borrowers who refinanced their home mortgage loans and submitted their own estimates of what their homes were worth as part of their refinance applications.  The claimed statutory violation arose from sharing the borrower's estimate with the appraisal company—a common practice that was entirely consistent with appraisal standards at the time.

Before *TransUnion*, this Court held the class members had standing because the appraisers had been "exposed" to "borrowers' estimates of value," which the Court said rendered the appraisals "tainted" despite the appraisers' sworn testimony that the estimates did not affect them. *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 791-92 (4th Cir. 2021). But in *TransUnion*, the Supreme Court held that an unrealized risk of harm—there, the plaintiffs' "expos[ure] … to a material risk" that creditors would see negative information in their credit files—was insufficient to establish standing to seek damages. 141 S. Ct. at 2210-2212. The Supreme Court vacated this Court's decision and ordered reconsideration in light of *TransUnion*.

On remand, this Court recognized that *TransUnion* "requir[ed] proof" that every class member "suffered concrete harm from the challenged conduct" and remanded to "the district court [to] apply *TransUnion* to the facts of this case." *Alig v. Rocket Mortgage, LLC*, 52 F.4th 167, 168 (4th Cir. 2022) (quotation marks omitted). But that is not what happened. Seven days after this Court's mandate issued, and without requesting or entertaining any briefing, the district court issued a short order that declared for the first time that all class members have standing. Instead of applying *TransUnion* to the facts of this case, the district court breezily compared a few passages from *TransUnion* to a few paragraphs from this Court's vacated 2021 decision, concluded that *TransUnion* changed nothing, and stated that this Court should "reissue its prior opinion, with the added clarification that nothing

in *TransUnion* alters" this Court's vacated pre-*TransUnion* decision. JA815. The district court also reinstated its prior judgment. JA816-817. Thus, this Court must decide whether Plaintiffs established standing classwide, as well as all the issues previously raised.

Plaintiffs' claim is that sharing borrowers' estimates of value *could* influence appraisers to appraise borrowers' homes for more than their actual value, which *could* lead to inflated loans, which *could* leave borrowers "upside down." But no classwide evidence supports that speculation about the risk of "taint," much less demonstrates that this risk actually materialized for anyone.

The actual evidence shows that: some appraisers did not even see borrowers' estimates before completing their appraisal; appraisers themselves confirmed that borrowers' estimates did not impact their appraisal valuations whatsoever; and, for the many borrowers who had significant equity in their homes and were borrowing a relatively small amount of money, the appraisal value was immaterial to the loan amount. The record also includes evidence that many class members' refinance loans allowed them to *save* money by lowering their interest rates, avoiding balloon payments, and consolidating debt at a lower interest rate. As this Court acknowledged in the prior appeal, "[t]he record is devoid of evidence" that the exposure to borrowers' estimates affected the accuracy of any unnamed class

member's appraisal, 990 F.3d at 803 n.22, much less inflated loan amounts or caused downstream economic harm to borrowers.

Against this evidence, Plaintiffs say that they paid for their appraisals and instead got something worthless. But as this Court's decision in *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020), makes clear, simply paying money for services does not create standing to assert a statutory violation where those services were in fact performed and caused the buyer no harm. And courts across the country have similarly held that litigants cannot turn an unrealized risk of harm into "economic injury" by simply labeling the purchased product "worthless."

This Court should reverse the class certification and vacate the damages award. Plaintiffs have no viable theory of injury for any of the absent class members, and even if Plaintiffs could show injury to some borrowers, they could not show it through classwide evidence that applies equally to all 2,769 loans in the class. Standing is an individualized injury that defeats predominance. Multiple circuits have recognized that a class with a large number of uninjured members cannot be certified; it certainly cannot be awarded $10 million in statutory damages.

For the additional reasons Defendants have previously urged, which this Court has allowed them to incorporate by reference, the Court should reverse *both* summary judgment and class certification. At a minimum, the Court should reinstate

the aspect of its vacated prior decision that set aside the judgment on the breach-of-contract claim.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1332(d).  The court entered final judgment on December 12, 2022.  JA816-817.  Defendants timely appealed on December 19, 2022.  JA818.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether, consistent with the Supreme Court's decision in *TransUnion*, Plaintiffs can establish Article III injury-in-fact based on evidence that appraisal companies were "exposed" to information that *could have* influenced appraisers, without classwide evidence that the information *actually did* influence appraisals and caused harm to class members as a result.

2.      Whether the class must be decertified and the $10 million judgment vacated where Plaintiffs provided no evidence that absent class members suffered injury-in-fact.

3.      Whether the breach-of-contract decision must be vacated for the reasons the Court previously stated, and the class certification vacated as to that claim.

4.    Whether the liability verdict must be vacated for all the non-standing related reasons stated in Defendants' original briefing in Case No. 19-1059.

## BACKGROUND

The district court resolved the issue of standing in Plaintiffs' favor as a matter of law, at summary judgment.  Accordingly, the record must be read in the light most favorable to Appellants.  *See Core Commc'ns, Inc. v. Verizon Md. LLC*, 744 F.3d 310, 320 (4th Cir. 2014).

## I.    This case concerns Defendants' pre-2009 appraisal-ordering process.

The class members refinanced their home mortgage loans with Quicken Loans Inc. ("Quicken Loans") prior to 2009.    This case concerns the process used by Quicken Loans and Title Source, Inc. ("TSI")[1] during the class period to order appraisals to underwrite those refinance loans.  Lenders use independent appraisals to assess the value of the property securing a loan.  This protects the lender:  if a borrower takes out a loan that exceeds her home's value, "it is not the borrower but the bank that typically is disadvantaged," because if the borrower defaults, the collateral would not adequately secure the loan.  *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 280 (4th Cir. 2016).

---

[1] Quicken Loans Inc. is now named Rocket Mortgage, LLC, and Title Source, Inc. is now named Amrock, LLC.  For the sake of consistency with the district court record, this brief uses the former names.

Independent appraisers are not employed by the lender. They are state-licensed professionals obliged to perform their work with "impartiality, objectivity, and independence." JA320. On every appraisal, the appraiser certifies (subject to federal criminal penalties) that the appraisal was based on the appraiser's "own personal, unbiased, and professional analysis"; not "conditioned on any agreement or understanding" about what value to return; and prepared "in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice" ("USPAP") issued by the Appraisal Standards Board. *E.g.*, JA266-267. Throughout the class period (and continuing through today), West Virginia law treated USPAP as the applicable professional standards, and provided a safe harbor for lenders if they relied on USPAP-compliant appraisals. *See* W. Va. Code § 31-17-8(m)(8).

When a homeowner seeks to refinance her mortgage loan, she includes her own estimate of her home's value on the Uniform Residential Loan Application ("URLA") created by Fannie Mae and used throughout the industry. JA253.[2] Before 2009, it was a common, industry-wide practice for lenders to include this "borrower's estimate of value" ("BEV") on appraisal-order forms sent to appraisal companies. JA423. Providing this information to appraisal companies helped them to price the appraisal job and match it with an appraiser who had the appropriate

---

[2] For an example of a URLA form, see https://singlefamily.fanniemae.com/media/7896/display.

licensure and experience. JA620-623; JA627; JA1126. USPAP expressly recognized throughout the class period that appraisers could learn the borrower's home-value estimate without violating the appraiser's duty to render impartial, objective, and independent appraisals. JA321. Indeed, for a home purchase (as opposed to a refinance), appraisers were *required* to learn the sale price, which likewise reflects a borrower's view of the property's market value. JA321.

In 2009, the rules changed. Market participants and regulators adopted the Home Valuation Code of Conduct, which for the first time prohibited lenders from providing borrowers' estimates to appraisers in connection with refinance loans. JA479-480. For purchase loans, however, appraisers are still permitted to receive the contract price.[3]

Defendants handled borrowers' estimates consistent with USPAP and applicable law. Before the 2009 rule change, Quicken Loans transmitted information from borrowers' loan applications—including the estimates the borrowers supplied on the uniform application—to TSI, an affiliated appraisal-management company, which then arranged for the appraisal. JA479. TSI automatically generated appraisal-order forms using that information, including

---

[3] *See* Freddie Mac, *Home Valuation Code of Conduct*, § I.B(6) (Dec. 2008), https://www.fhfa.gov/Media/PublicAffairs/Documents/HVCCFinalCODE122308_N508.pdf.

BEVs.  TSI sent those forms to appraisal companies, which assigned the appraisals to individual appraisers in the part of West Virginia where each property was located.  JA479; JA620-623; JA1128-1129.  Appraisal companies used estimates of value to price each job and assign it to an appraiser with the right licensure, JA423; JA620-623; JA1126.  The individual appraiser might not see the order form or the estimate.  JA1270; JA1277-1278.

Contemporaneously with the 2009 rule change, Defendants changed their practice nationwide and began omitting borrowers' estimates from appraisal request forms.  This case concerns only the period before the change, when providing the BEV to appraisal companies and appraisers was expressly authorized under USPAP and when West Virginia law expressly authorized lenders to rely on appraisals that were compliant with USPAP.

## II.    Plaintiffs sue, alleging that Quicken Loans and TSI sought to influence appraisers to provide inflated appraisal numbers and thereby increase the size of refinance loans.

After the rules changed in 2009, the named plaintiffs—two couples who had refinanced their home-mortgage loans with Quicken Loans in 2007 and 2008, respectively, to lower their monthly debt payments and interest rates—sued Quicken Loans and TSI, asserting several claims under West Virginia law.

Phillip and Sara Alig (the only class representatives) purchased their home in 2003 for $105,000.  JA1102.  In 2007, they decided to refinance and estimated their

home's value as $129,000 on the URLA they submitted to Quicken Loans. JA417. Roxanne and Daniel Shea purchased their home in 2006, for $149,350. JA247. In 2008, they estimated the value of their home as $175,000. JA1128. Because both couples refinanced in 2007 and 2008, before the rule change, their estimates were included on the appraisal-order forms that TSI sent to local appraisal companies. JA480.

Both couples' home appraisals came in below the borrowers' estimates. The Sheas' property appraised at $158,000—$17,000 below the Sheas' estimate. JA417; JA1128. The Aligs' appraiser initially valued their property at $122,500. JA336. TSI asked the appraiser to "revisit [the] appraisal" in light of recent "comps," which included nearby sales of homes for $124,000 and $132,000. JA858.[4] Based on the additional data, the appraiser raised his appraisal value $3,000, to $125,500—still thousands of dollars below the Aligs' estimate. JA858-859.

In connection with this lawsuit, Plaintiffs commissioned a retrospective appraisal of the 2007 value of the Aligs' home. Four years after the loan, and lacking the ability to observe the condition of the home as it stood at the time, Plaintiffs' two retrospective appraisers estimated that the 2007 value had been $99,500 or $105,000, respectively—less than or equal to the 2003 purchase price. *Alig*, 990 F.3d at 789.

---

[4] Such requests to revisit the appraisal were relatively rare. JA858. Plaintiffs did not base their claim on this request for reconsideration.

Defendants contested the accuracy of these retrospective appraisals; because this case was decided at the summary-judgment stage, the district court did not resolve this factual dispute and did not decide whether the Aligs' 2007 appraisal had been inflated.

In 2007, the Aligs obtained a refinance loan for $112,950 at a fixed interest rate of 6.25%. They used the proceeds to pay off two consumer loans with higher interest rates, thereby lowering their monthly debt payments by $480. JA248-249. Four years later, the Aligs again refinanced with Quicken Loans, further lowering their interest rate to 4.5%. JA338.

In 2008, the Sheas obtained a refinance loan for $155,548 at a fixed interest rate of 6.625%, which they used to avoid an approaching balloon payment on their primary mortgage loan from a different lender, and to pay off a second mortgage loan with a 12.4% interest rate, also from a different lender. JA247; JA336. The Sheas gave Quicken Loans "excellent" (5-out-of-5) ratings for its work in originating the refinance loan. JA336. Seven years later, the Sheas sold their home for $165,000. JA336.

Plaintiffs asserted several claims in their complaint. Those relevant here all related to the handling of borrowers' estimates.[5] Plaintiffs sought to certify a class of "[a]ll West Virginia citizens who refinanced mortgage loans with Quicken, and

---

[5] The remaining claims were resolved against Plaintiffs on their merits. JA801.

for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property." JA552.

Plaintiffs insisted that, at a general level, the practice was harmful. They claimed that Quicken Loans and TSI were attempting to "influence appraisers" to provide inflated appraisal values that would support loans in excess of the fair market value of borrowers' homes. JA62; JA77; Answering Brief in No. 19-1059 (ECF No. 48) ("19-1059 Answering Br.") 18-19, 40. As Plaintiffs previously informed this Court, their theory was that this practice was unconscionable because it "can leave buyers 'upside down'—owing more than the property is worth"—and therefore "trapped, unable to refinance to obtain better terms or sell [the] home to relocate," and sometimes resulting in "foreclosure." 19-1059 Answering Br. 7-8 (citations omitted).

But none of these things happened to either the Sheas or the Aligs. Indeed, Plaintiffs offered no evidence that a single absent class member was harmed by Defendants' practice. They developed no evidence that any class member's appraiser—let alone all of them—saw a borrower's estimate and was "influence[d]" by it; that a class member's appraisal value was inaccurate; or that a class member became underwater on a refinance loan, was unable to refinance or sell the home, or experienced foreclosure. And although Plaintiffs commissioned retrospective appraisals of the Aligs' home (supposedly showing that the actual value was lower

at the time of their refinancing than the appraised value), they did not commission

retrospective appraisals for any absent class member.

### III.    The district court certifies a class without regard to standing, grants summary judgment to the class, and awards $10 million in classwide damages.

The district court certified the class and, simultaneously, granted Plaintiffs'

motion for summary judgment on liability.  JA552-553.

The court first held that providing borrowers' estimates to appraisal

companies without disclosing that practice to borrowers constituted

"unconscionable inducement" to enter into a loan, in violation of the West Virginia

Consumer Credit Protection Act (WVCCPA), even where actual harm is "not

present."  JA512-514; JA544.  The court also held that the same conduct was a

breach of contract requiring disgorgement of the appraisal price, irrespective of

harm.  JA515-517; JA533; JA544.  The court concluded that these claims could be

resolved on a class basis because "[i]f Quicken [Loans] violated the law"—and the

court had already determined that sharing borrowers' estimates with appraisers was

a *per se* violation of the WVCCPA and a breach of contract, even when it harmed

no one—all that remained was "to award statutory damages and set an amount."

JA532.

At about the same time as the district court's decision, the Supreme Court

decided *Spokeo, Inc. v. Robins*, holding that "even in the context of a statutory

violation," plaintiffs must have "a concrete injury," which "must affect [them] in a personal and individual way."  578 U.S. 330, 339, 341 (2016) (citation omitted). Although the district court refused to allow Defendants to take targeted discovery about whether borrowers' appraisals were actually inflated or class members were actually harmed, JA586; JA598, Defendants developed evidence demonstrating that many class members had not suffered any concrete injury-in-fact.

Most starkly, some appraisers completed their valuations without even *seeing* the borrower's estimate that had been sent to their appraisal company.  JA1270; JA1277-1278.  Plaintiffs have never explained how an appraisal could be "tainted" by an estimate the appraiser did not see.

More broadly, each appraiser who testified—including Plaintiffs' experts— said that all their appraisals were developed independently and not based on borrowers' estimates.  JA441; JA444-445; JA451-452; JA456; JA463-464; JA473-475.  For example, appraiser Jody Hill testified that she was "not influenced by any numbers at all."  JA473-475.  And appraiser Phillip Jackson testified that he "probably wouldn't give … any credence at all" to a homeowner's valuation "based on his idea of what houses are worth in a different neighborhood."  JA463-464.  The Sheas' appraiser testified that borrowers' "assum[ptions]" of what their "house is

worth" were "irrelevant" to his appraisals.  JA441.  He said "[i]t didn't matter to [him] one inkling" whether his appraisal corresponded with the BEV.  JA444-445.[6]

This testimony confirmed what each appraiser had already certified on each appraisal (subject to federal criminal penalties):  that the appraisal is based on the appraiser's "own personal, unbiased, and professional analysis"; not "conditioned on any agreement or understanding" about what value to return; and prepared "in accordance with the requirements of the USPAP issued by the Appraisal Standards Board."  *E.g.*, JA266-267.  And that is what the actual appraisals show.  Nearly half the appraisals on class members' loans (1,360) came in *below* the borrowers' estimates, sometimes (as with the Sheas') well below.  JA1182; JA1188-1236.  For example, one property was appraised at $234,000 despite an owner's estimate of $600,000.  JA1182; JA1225 (Ziedman).  In numerous cases, when the appraisal did not support the requested amount, Quicken Loans reduced the loan amounts—and *denied* borrowers' requests for re-appraisals in hopes of getting higher values.  *See, e.g.*, JA1207 (Bane), JA1234 (Ensminger); JA1244, JA1246; JA1255-1261.  For

---

[6] The district court stated that the Aligs' appraiser characterized BEVs as a "tip-off," and this Court appeared to credit that assertion in its previous decision.  *See Alig*, 990 F.3d at 789.  But this assertion is at odds with the record evidence; the appraiser answered affirmatively when asked if *another* appraiser had characterized the BEV in that way in another case, *see* JA455-456, and that other appraiser's testimony is not evidence in this case, much less classwide evidence.  Even if it were, on Plaintiffs' motion for summary judgment, any conflicts in evidence must be resolved in favor of Defendants.

example, one couple closed on a \$146,700 refinancing on November 10, 2008. JA1234 (Ensminger). Their estimated value was \$200,000, but the appraiser valued the property at \$154,000. JA1234 (Ensminger). The borrowers requested a second opinion, but Quicken Loans determined that the "comps do not support the value needed and ordering a [second appraisal] wouldn't make sense" and restructured the loan to have a lower original principal amount. JA1256-1257.

The record also demonstrated that, for many loans, the appraisal value itself was immaterial to the size of the loan. That is because not all borrowers try to maximize their loan amount; many homeowners seeking to refinance have significant equity in their homes and borrow only small amounts (perhaps to complete a home-improvement project or improve the terms on a relatively small remaining loan balance). For example, one class member estimated his home's value at \$125,000, and it was appraised at \$128,000. But his total loan amount was only \$25,000. JA1188 (Woodruff). Even if there were some indication that his appraisal value was wrong—even, say, by tens of thousands of dollars—it would not have affected his loan amount, which was less than 20% of the appraised value. Likewise, another class member estimated his home's value as \$250,000. The home appraised for \$180,000, but his refinance loan was less than 8% of the appraised value—just \$13,240. JA1188 (Fowler). So too for a couple who estimated their home's value as \$215,000. The home appraised for \$225,000, but they took out a

refinance loan that was less than 12% of the appraised value—just $26,500.  JA1190 (Shields); *see also* JA1188 ($129,800 Metz loan, after borrowers estimated their home's value as $475,000 and it appraised for $450,000); JA1188 ($63,000 Stricker loan, after borrower estimated her home's value as $200,000 and it appraised for $185,000).

These loans were not an aberration—of the 2,769 total loans involved in this class action, 889 class members took out loans that were less than 70% of the appraised value, well below the 80% that is typically allowed for a conventional loan without changing the terms.  JA1182.  For borrowers like this, obtaining an appraisal was a necessary precondition to obtaining a loan, but their appraisals could have come in at far less and still supported their loan amounts.

Even if there actually were any evidence that any unnamed class member's appraisal *and* loan amount were both inflated as a result of an appraiser seeing a BEV, Plaintiffs developed no evidence that receiving a higher loan harmed any absent class member.  To the contrary, class members *benefitted* from refinancing, by paying off debt, consolidating loans, and obtaining lower mortgage interest rates. The Sheas are an example:  the refinancing allowed them to avoid an approaching balloon payment and to pay off a second mortgage loan with a much higher interest rate.  *See* p. 11, *supra*.

Finally, for class members whose properties had been sold or listed in the year preceding the loan or refinancing, the appraisal was not used if the sales or listing price was lower than the appraised value. In that circumstance, the sales or listing price was used instead. JA1249-1251. For properties that had been sold within three years prior to the appraisals, the prior sales price was known to the appraiser, and in many cases it was evident that this price, not the estimated value, dictated the valuation. JA1249-1251, JA1253. For example, one property with a BEV of $337,500 had recently sold for $259,000, and the appraisal came in at $259,000. JA1192 (Collins-Dalton); JA1253. For these class members, too, the BEV plainly could have had no material impact on the appraised value.

The lack of real-world injury from the statutory violation Plaintiffs alleged was also evident from the dearth of class members who sought actual damages, which they all had a right to do after judgment on the statutory-damages claim. Only two class members besides the Aligs did so (out of nearly 3,000).[7] One class member not only declined to pursue actual damages, he opted out of the class *after* summary judgment and declined statutory damages, explaining that "[t]he new loan terms saved [him] a significant amount of money," and it would not be "fair to

---

[7] The claims for actual damages were resolved and dismissed by stipulation. JA781-782; JA787-788; JA793.

punish Quicken Loans," which "had been a pleasure to work with" and "saved [him] so much money." JA645-647.

Given this record, and in light of the Supreme Court's decision in *Spokeo*, Defendants moved to decertify the class, arguing that the class improperly included many absent class members with no injury and therefore no standing.

Plaintiffs did not meaningfully dispute any of the facts described above. Instead, they maintained that whether class members had suffered any actual damage was immaterial because (a) only the named plaintiffs' standing had to be established, and (b) the alleged statutory violation itself was sufficient to establish standing. JA669-673. Adopting Plaintiffs' arguments, the district court refused to decertify the class. *See* JA668-674; JA712-717. The district court awarded each class member $3,500 per loan in statutory damages.[8] JA760. It also awarded a refund of the entire appraisal fee as "restitution" on Plaintiffs' contract claim. JA738-739. The judgment totaled more than $10 million.

## IV. This Court largely affirms, holding that the mere purchase of an appraisal requested through a process in which appraisers were "exposed" to BEVs was sufficient to establish Article III injury-in-fact.

On appeal, Plaintiffs abandoned the standing arguments they had maintained in the district court. Instead, they fashioned an entirely new standing theory. They

---

[8] At the time, the statute specified a civil penalty of $100 to $1000, but the range was indexed for inflation. W. Va. Code §§ 46A-5-101(1), -106 (1996).

-19-

argued that the entire class had standing because all class members suffered an "out of pocket" injury by paying for appraisals that were "tainted, and therefore worthless," meaning that they that did not get "the benefit of their bargain." 19-1059 Answering Br. 49-51. But because Plaintiffs had taken the position in the district court that they *need not* establish any injury-in-fact for absent class members, they had no evidence to support these arguments, let alone classwide evidence.[9]

This Court affirmed the district court's decision certifying the class and granting Plaintiffs summary judgment on the WVCCPA claim, but vacated the decision granting Plaintiffs summary judgment on the contract claim and remanded that claim to the district court. *Alig*, 990 F.3d at 786.

Throughout its opinion, this Court acknowledged the lack of evidence that Quicken Loans' appraisal request process caused any classwide injury. The Court acknowledged the appraisers' testimony that BEVs did *not* influence them. *Id.* at 787, 803. The Court also stated that even if BEVs *had* influenced appraisers "some of the time" (*id.* at 804), there may have been no damages if, "for example," a "borrower's estimate of value was accurate," *id.* at 793, 796. And the Court stated that the record was "devoid of evidence" about "whether the appraisals for most class members were inflated." *Id.* at 803 n.22. The Court also acknowledged that

---

[9] Plaintiffs also argued that all class members had suffered an "informational injury," a theory they dropped after *TransUnion* (which reiterated that an informational injury requires proof of some downstream harm from not getting the information).

refinancing might have benefitted, not harmed, class members. *Id.* at 792. But it nonetheless held that the lack of harm created no barrier to recovery under the WVCCPA. *Id.* at 793, 805.

The Court also recognized the lack of harm to many class members in remanding the contract claim. The Court found a contractual duty to "obtain a fair, valid and reasonable appraisal of the property," but determined that Plaintiffs needed to show damages as well as a breach of that duty. *Id.* at 797-798. It recognized that class members might have suffered no damages if their "appraisals would have been the same whether or not the appraisers were aware of the borrowers' estimates of value." *Id.* at 796.

The Court nonetheless rejected Defendants' argument that many class members lacked standing. The Court reasoned that paying money to obtain appraisals that were "tainted when [Quicken Loans] exposed the appraisers to the borrowers' estimates of value" was sufficient to establish Article III injury. *Id.* at 791-792 & n.9. Thus, even though the borrowers' estimates may not have affected the appraisers or the appraisals at all, the Court held that the appraisers' potential "expos[ure]" to those estimates was enough to establish that paying for the appraisal was "financial harm," giving every class member standing. *Id.* (citation omitted).

As for the contract claim, the Court held that Plaintiffs would need to proceed on a different theory, and that Plaintiffs had not yet established the necessary

elements of breach or damages. *Id.* at 797-99 & n.17. It therefore vacated the summary judgment and remanded. *Id.* at 794.

The Court denied rehearing but, at Defendants' request, stayed the mandate pending certiorari. No. 19-1059, Dkt. No. 122.

**V.      The Supreme Court holds in *TransUnion* that an unrealized risk of future injury does not establish standing to seek money damages and GVRs this case for further consideration in light of *TransUnion*.**

Shortly after this Court stayed the mandate, the Supreme Court issued its decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). The Court held that in a money-damages case, an unrealized risk of future injury does not satisfy Article III. Rather, standing to seek damages must be based on *actually experienced* injury. *Id.* at 2211.

Defendants petitioned the Supreme Court for a writ of certiorari. They argued that this Court's decision was irreconcilable with *TransUnion*. *See* Petition for Writ of Certiorari at 18-22, *Rocket Mortgage, LLC v. Alig*, No. 21-428 (filed Sept. 17, 2021).[10] In particular, Defendants contended that this Court's holding that all unnamed class members satisfied Article III's injury-in-fact requirement because all appraisers were "*exposed … to the borrowers' estimates*" could not be reconciled with *TransUnion*'s central holding that standing must be based on concrete past

---

[10]   https://www.supremecourt.gov/DocketPDF/21/21-428/192855/2021091721023
1767_Rocket%20Mortgage%20Cert%20Petition%20Final.pdf.

injury, not a risk of future injury that goes unrealized.  *Id.* at 16-17.  Plaintiffs opposed vacatur, insisting that *TransUnion* had no bearing on their standing.

The Supreme Court granted certiorari, vacated this Court's decision, and remanded the case for further consideration in light of *TransUnion*.  142 S. Ct. 748 (2022).

## VI.    This Court remands to the district court to consider *TransUnion*'s application to this case in the first instance.

This Court ordered supplemental briefing and held oral argument, which focused on the class members' standing in light of *TransUnion*.  On October 28, 2022, the Court entered a *per curiam* decision remanding the case to the district court.  *Alig v. Rocket Mortgage, LLC*, 52 F.4th 167.

In its decision, the Court noted that it had previously concluded that class members had standing because they "received appraisals that were tainted when Defendants exposed the appraisers to the borrowers' estimates of value and pressured them to reach those values."  *Id.* at 168 (quotations omitted).  The Court acknowledged that *TransUnion* made "clear that, to recover damages from Quicken Loans, '[e]very class member must have Article III standing' 'for each claim that they press,' requiring proof that they 'suffered concrete harm' from the challenged conduct."  *Id.* (quoting *TransUnion*, 141 S. Ct. at 2208).  The Court "conclude[d] that the district court should apply *TransUnion* to the facts of this case in the first

instance.   Accordingly, [the Court] vacate[d] and remand[ed] for further proceedings." *Id.*

## VII.   Seven days after receiving this Court's mandate, the district court holds that *TransUnion* changes nothing and that this Court should "reissue its prior opinion."

The mandate issued on November 21.  Seven days later, without affording the parties any opportunity to submit supplemental briefing, the district court issued a 10-page order purporting to resolve the standing issue.  The court held that *TransUnion* changed nothing, and that all class members have Article III standing to sue and collect damages.  *See* JA810-815.  The district court repeated verbatim portions of the post-*TransUnion* brief Plaintiffs had submitted to this Court.[11]

The district court did not apply the standing principles discussed in *TransUnion* to the factual record, as this Court instructed.  Nor did the court acknowledge the gap in that factual record that resulted from its prior holdings that only *named* plaintiffs need to show injury and that absent class members had standing due to the mere existence of a statutory cause of action.  *See* pp. 20-21, *supra*.  Instead, the court simply compared some passages of *TransUnion* to portions of this Court's vacated, pre-*TransUnion* opinion.  The court concluded that "nothing in *TransUnion*" changed this Court's prior "findings" on standing.  JA815.  Consequently, the district court concluded that this Court "should therefore reissue

---

[11] *Compare* JA808-809, *with* No. 19-1059, ECF 152, at 5-6.

-24-

its prior opinion" with the added clarification that *TransUnion* is irrelevant to this case. *Id.* In other words, the district court effectively remanded the case back to this Court.

The district court then reinstated its 2018 final judgment, which finally certified the class and awarded Plaintiffs classwide statutory damages and restitution. JA816-817.

## SUMMARY OF ARGUMENT

As this Court recognized in remanding this case, the district court never examined the record for proof of absent class members' injury-in-fact because it erroneously thought no such proof was required. But the district court again failed to do that work on remand. It did not seriously assess the impact of *TransUnion* or identify evidence amounting to *classwide* proof of injury consistent with *TransUnion*. As the record shows, Plaintiffs have no such evidence. As a result, the class must be decertified and the damages award vacated.

*First*, *TransUnion* forecloses the district court's conclusion that standing somehow exists because some appraisers may have been *exposed* to borrowers' estimates, and that the exposure *may have* affected the appraisals. *TransUnion* held that a risk of harm is not enough; a plaintiff must show actual injury to satisfy Article III. To do so under the summary-judgment standard, Plaintiffs must make that showing beyond dispute. And there is no proof of actual injury here. In fact, the

-25-

record shows the opposite:  all appraisers who submitted testimony—including Plaintiffs' experts—said they were not affected by borrowers' estimates.  In some cases, the appraisers never even saw the estimates.  There is no evidence that any absent class members' appraisals were inaccurate.  There is no evidence that absent class members' loan sizes were increased as a result of appraisal values—and plenty of evidence that, for many loans, any imprecision in the appraisal was demonstrably immaterial given the loan size.  There also is no evidence that any class members were harmed by the refinancing transaction into which they were supposedly "induced," and considerable evidence that they financially *benefited* from refinancing.  As a natural result of Plaintiffs' position below that they were not required to establish any harm to absent class members, there is simply no evidence that a single absent class member was harmed by Quicken Loans' process for ordering appraisals.

*Second*, as courts across the country have repeatedly concluded, Plaintiffs cannot circumvent Article III's injury-in-fact requirement by recasting an unrealized risk of harm as a pocketbook injury, and the district court erred in crediting that argument.  This Court has already held that the expenditure of money for a service is not alone enough to establish economic injury to seek damages for a claimed statutory violation.  *See Baehr*, 953 F.3d at 257-258. And as extensive precedent confirms, the purchase of a product or service that functions as intended and causes

no harm does not confer standing to sue over alleged process failures. Rather, purchasers must provide *evidence* that the product they bought actually was defective or worth less than they paid, rather than simply offer conjecture or label the product "tainted" or "worthless," as Plaintiffs do here. The district court therefore erred when it held that the entire class suffered a "financial harm."

Because Plaintiffs have no viable theory of Article III injury suffered by absent class members, this Court must both vacate the damages award and direct the district court to decertify the class. A federal court lacks jurisdiction to award damages to uninjured plaintiffs, and using the class-action device to do so violates Article III and the Rules Enabling Act.

As the Court permitted, Defendants incorporate their prior arguments on summary judgment, damages, and class certification.

## STANDARD OF REVIEW

Class certification is reviewed for abuse of discretion. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). A district court abuses its discretion when it "materially misapplies the requirements of Rule 23," *id.*, or "when it makes an error of law or clearly errs in its factual findings." *Thorn v. Jefferson-Pilot Life Ins.*, 445 F.3d 311, 317 (4th Cir. 2006). Summary judgment and "legal questions concerning standing" are reviewed de novo. *Dreher v. Experian Info. Sols.*, 856 F.3d 337, 343 (4th Cir. 2017).

## ARGUMENT

**I.** **_TransUnion_ makes clear that exposure to the risk of an inaccurate appraisal is not cognizable injury under Article III.**

Plaintiffs have premised their claims on the theory that Defendants sought to "influence" appraisers to provide "inflated" appraisal numbers, which in turn risked borrowers entering into larger refinance loans than they would otherwise qualify for. *See, e.g.*, 19-1059 Answering Br. 10, 18, 19, 39-40, 50-51. Plaintiffs claim that this "can leave buyers 'upside down'—owing more than the property is worth" and therefore "trapped, unable to refinance to obtain better terms or sell [the] home to relocate," sometimes resulting in "foreclosure." *Id.* at 7-8 (citations omitted). But Plaintiffs were unable to deliver any facts showing that appraisals were *actually* inflated as a result of sharing borrowers' estimates, or that any borrowers were *actually* left "upside down" and trapped, unable to refinance, unable to sell, or foreclosed upon as a result. So Plaintiffs contend that they have standing because they received "worthless" and "meaningless" appraisals—and that their appraisals were "worthless" and "meaningless" solely because appraisal *companies* were exposed to information that *created a risk* that appraisals could be inaccurate. *E.g.*, No. 19-1059, Dkt. No. 111, at 13.

This Court credited this argument in its original decision, effectively holding that because borrowers had paid for the appraisals, the appraisers' mere "expos[ure]" to BEVs satisfied Article III, without requiring proof of any effect on the appraisers

-28-

or the appraisals. *Alig*, 990 F.3d at 791-92. The district court adopted that exact reasoning on remand. *See* JA813-814. But this theory of harm was and remains irreconcilable with *TransUnion*.

A. The plaintiff class in *TransUnion* sued under the Fair Credit Reporting Act, alleging failure "to use reasonable procedures to ensure the accuracy of their credit files." 141 S. Ct. at 2200. All 8,185 class members had information in their TransUnion credit files wrongly suggesting that they might be on a watch list of national-security threats. But for 6,332 of the class members, TransUnion apparently did not send the misleading credit reports to any potential creditors during the class period. *Id.* at 2200-2202, 2209-2210. The Ninth Circuit upheld class certification, ruling that all 8,185 class members had standing, and the Supreme Court reversed.

The Supreme Court held that the 6,332 class members for whom TransUnion did not send misleading credit reports lacked standing to recover statutory damages for TransUnion's procedural violation. *Id.* at 2214. The plaintiffs contended that these class members had standing because they were "exposed … to a material risk that the information would be disseminated … and [would] thereby cause them harm"; indeed, they claimed "that TransUnion could have divulged their misleading credit information to a third party at any moment." *Id.* at 2210, 2212. The Court rejected that argument, holding that standing to seek *damages*—as opposed to an

-29-

injunction—cannot be based on a risk of harm that never materialized. *Id.* at 2210-2211. The Court noted that sometimes exposure to risk will itself cause injury, such as emotional distress. *Id.* at 2211. But a plaintiff cannot claim injury from the never-realized risk "when the plaintiff did not even know that there was a risk of future harm." *Id.* at 2212. As the Court explained, someone who drives home near a recklessly swerving motorist faces a *risk* of harm. But if she arrives safely at home without incident—the risk of harm never having *materialized*—she has no standing to sue the dangerous driver for damages. *Id.* at 2211. The Court held that the 6,332 class members were like the driver who arrived at home safely: they were not injured by exposure to risk and had no standing. *Id.*

B. Plaintiffs' claims in this case are strikingly similar to those of the uninjured plaintiffs in *TransUnion*. Plaintiffs have repeatedly argued that class members suffered injury because Quicken Loans used procedures for ordering appraisals that *created a risk* that the appraisals would be inaccurate. Plaintiffs have argued that "[t]here is no way to know for sure how a particular appraiser was (perhaps unconsciously) influenced by an estimated value," but that "[t]he mere *possibility*" that the appraiser may have been influenced is sufficient to show Article III injury. No. 19-1059, Dkt. No. 111, at 13. In its original decision, the panel credited this argument, holding that by "expos[ing]" appraisers to borrowers' estimates without specifically disclosing the practice to borrowers, Quicken Loans "tainted the

appraisal process." *Alig*, 990 F.3d at 791-792, 798.  The Court also later noted the "risks" that "an inflated home value pose[s]" to borrowers and lenders.  *Id.* at 806. The district court quoted the same reasoning on remand, repeating this Court's statement that the "appraisals were tainted when Defendants exposed the appraisers to the borrowers' estimates of value." JA813.  But the same could have been said in *TransUnion*:  the credit file was "tainted" and *could* lead to harm, if the credit file were actually disseminated.

Moreover, like the uninjured plaintiffs in *TransUnion*, Plaintiffs had *no* evidence that any of these "risks" actually materialized for *any* unnamed class members, much less all of them.  Every appraiser denied being influenced by borrowers' estimates.  *See* pp. 14-16, *supra*.  Some did not even *see* the borrower's estimate before performing an appraisal.  JA1270; JA1277-1278.  And nearly half of the appraisals came in below the borrower's estimate—sometimes *well* below. JA1182; JA1188-1236.

This Court assumed that at least "some of the time" appraisers could have been "subconsciously" influenced "without [their] realization."  *Alig*, 990 F.3d at 804, 806.  But there was (and remains) no evidence in the record to support such an assumption.  Indeed, this Court also acknowledged that the record was "devoid of evidence" about the actual home values for absent class members.  *Id.* at 803 n.22. It also recognized, in remanding the contract claim, that even if *some* appraisers

-31-

treated borrowers' estimates as targets, that would cause no harm to borrowers if their "appraisals would have been the same whether or not the appraisers were aware of the borrowers' estimates of value—which one might expect, for example, if a borrower's estimate of value was accurate." *Id.* at 793, 796. Plaintiffs offered a (disputed) retrospective appraisal for the Aligs' home, but failed to offer similar evidence as to *any* unnamed class member's home. They made no attempt to show that any unnamed class member's appraisal was even *inaccurate*, much less that the inaccuracy was caused by the BEV—presumably because they recognize that relying on such individualized evidence would preclude class certification.

And for many borrowers, the accuracy of the appraisal was wholly immaterial to the loan and the loan amount. More than 30% of the class consisted of borrowers whose loans were less than 70% of their appraised value—some borrowed less than $30,000 even though their home was worth five or ten times that amount. *See, e.g.*, JA1188-1190 (Rows 7, 31, 38, 55, 58, 65, 91, 110, 119, 124); *see also, e.g.*, JA1188-1190 (Rows 1, 57, 112, 113, 122), JA1215-1218 (Rows 1566, 1573, 1641, 1687, 1731), JA1221 (Row 1928), JA1223 (Row 2022) (additional examples of borrowers who borrowed significantly less than the appraised value); p. 17, *supra*. For these borrowers, an inflated appraisal could not have had any impact on their loan amount, nor could it have resulted in them being "upside down" on their mortgage.

Moreover, even if there were evidence that BEVs did influence some appraisers, that some appraisal values were inflated, *and* that those inflated appraisals inflated some loan amounts, there is no evidence that any economic harm actually *materialized* for any absent class member. Plaintiffs have no evidence of any absent class member who was unable to sell or refinance because she was "upside down" on her mortgage. The Sheas, for example, sold their home for a value *above* the 2008 appraisal. JA336.

In short, there is no evidence that the appraisals in this case were inflated or inaccurate, nor is there any evidence that an inaccurate appraisal caused a borrower any harm. At most, there was merely a *risk* that including BEVs on appraisal order forms could influence appraisal values; there is no evidence that any such risk ever became a reality for any class member. And *TransUnion* confirms that a past risk of harm is not enough for standing to seek damages. Here, nobody was hit by the equivalent of *TransUnion*'s swerving motorist. 141 S. Ct. at 2211. *TransUnion* thus requires this Court to reject Plaintiffs' theory of Article III injury.

## II.    The district court erred in holding that every plaintiff suffered a "pocketbook injury" based on the mere purchase of an appraisal that caused no harm.

Plaintiffs have offered two arguments for why *TransUnion* is irrelevant. First, they say, they paid money for appraisal services, whereas the plaintiffs in *TransUnion* "didn't pay any money at all," and so, they argue, they have a

pocketbook injury that did not exist in *TransUnion*.  No. 19-1059, Dkt. No. 152, at 10.  Second, they argue that the payment of an appraisal fee for an appraisal that was "worthless" constitutes the economic harm of "paying for a service they never received." *Id.*

The first argument is a nonstarter.  This Court has already held that the mere expenditure of money for services actually rendered is "insufficient for Article III standing." *Baehr*, 953 F.3d at 258.   And the second argument is factually unsupported.  While economic injury is, of course, a "paradigmatic form of injury in fact," JA814, it is well-settled that plaintiffs who wish to claim economic injury from the purchase of a supposedly "worthless" product must demonstrate *with evidence* that the product *actually was "worthless"* as to *them*.  Simply labeling a product worthless is not enough.  But that is all Plaintiffs have done here.

A.    Plaintiffs cannot distinguish *TransUnion* by pointing to the class members' payment of appraisal fees.  As this Court has already held, paying money for services actually provided, even if allegedly "in contravention" of statutory requirements, is "insufficient for Article III standing." *Baehr*, 953 F.3d at 258.

*Baehr* involved plaintiffs who could establish a technical violation of the law but no injury to themselves.  There, the plaintiffs were seeking statutory damages for alleged violations of the Real Estate Settlement Procedures Act (RESPA), which prohibits giving or receiving money in exchange for referring homebuyers to

settlement service providers. *Id.* at 254. The *Baehr* plaintiffs, who paid a title company for settlement services, alleged that their real estate brokerage firm and title company engaged in a "kickback scheme" that violated that provision. They did not, however, allege that the scheme caused them any financial injury—*e.g.*, that there was anything wrong with the settlement services they received or that they were overcharged for those services. Instead, they argued that they had concrete injury simply because they paid money for settlement services provided "in contravention of RESPA." *Id.* at 255-258.

This Court rejected plaintiffs' payment-equals-standing argument, holding that their harm "reduces to the type of 'bare procedural violation'" that is insufficient to establish Article III standing. *Id.* at 258 (citation omitted). As the Court explained, "[t]he Baehrs received settlement services for which they paid a reasonable rate." *Id.* Thus, their claim of economic injury from paying money for services that they actually received was not sufficient to establish an economic injury.[12]

*Baehr* forecloses any argument by Plaintiffs that the mere payment of an appraisal fee is sufficient to render *TransUnion* inapplicable. The class members all received appraisal services; paying for those services does not establish economic

---

[12] The Baehrs also contended that they "were deprived of an impartial and fair competition" for settlement service providers, but this Court rejected that theory because the record was "devoid of evidence" to substantiate it. 953 F.3d at 258.

injury-in-fact. Plaintiffs' WVCCPA claim, much like the *Baehr* plaintiffs' RESPA claim, "reduces to the type of 'bare procedural violation'" that is "insufficient for Article III standing." *Id.*

B.    The district court tried to distinguish *TransUnion* by holding that this case involves the purchase of a "tainted" appraisal—not just a risk of future injury. *See* JA809, JA814. But this "financial harm" theory is question-begging. It is premised on the unsupported assumption that because a step in the appraisal-ordering *process*—sharing BEVs with appraisal companies—*could* result in an inaccurate appraisal, it necessarily ruined every appraisal across the class. Respondents' Brief in Opposition at 8, *Alig*, No. 21-428 (U.S. filed Dec. 8, 2021) ("[B]ecause Rocket tried to influence the result, what [Plaintiffs] got could not be trusted as an impartial measure of home value."). That assumption is spurious. Every appraisal served the stated purpose—supporting the refinance loan. In some cases, appraisals led Quicken Loans to lend *less* money than the borrower had wanted. *See* pp. 15-16, *supra*. For many class members, the precise accuracy of the appraisal was not even material to the loan decision, because the loan value was such a small percentage of the home value. *See* pp. 16-17, *supra*. And there is no evidence that unnamed class members *subjectively* distrusted their appraisals or refused to rely on them.

This Court acknowledged that many appraisals may have been entirely accurate—if borrowers' estimates were accurate or did not actually influence appraisers. *Alig*, 990 F.3d at 793, 796. And some appraisers concededly *did not even see* the estimates that were transmitted to their appraisal companies. JA1270; JA1277-1278.[13] Put simply, there is no evidence that exposure to BEVs *actually* rendered any absent class member's appraisal inaccurate. Indeed, throughout the class period, USPAP recognized that appraisers could learn the borrower's BEV without violating the appraiser's duty to render an impartial appraisal. JA321. Plaintiffs cannot backfill the evidentiary void by simply labeling the appraisals "tainted."

Indeed, *Baehr* recognizes that simply labeling a product or service unfair or invalid is not enough to demonstrate a "real-world harm, much less a concrete injury." 953 F.3d at 256. The *Baehr* plaintiffs alleged that the defendants' kickback scheme "deprived [them] of impartial and fair competition among settlement services providers." *Id.* at 255. This Court did not simply take their word for it and

---

[13] Plaintiffs have claimed that the influence on appraisers is "[i]nevitabl[e]," relying on a theoretical "anchoring effect." 19-1059 Answering Br. 10-11; No. 19-1059, Dkt. No. 152, at 6. However, they have never cited any record evidence in support of this contention, because there is none. *See* 19-1059 Answering Br. 11-12 (citing law review articles). They did not even cite in the trial court the same sources they cite on appeal. Indeed, estimates *that no appraisers ever even saw* could not possibly have acted as an "anchor."

-37-

accept these characterizations as evidence—instead, the Court examined whether those contentions were supported with evidence. But the record was "devoid of evidence" to support their theory.

Other courts have taken a similar approach—rejecting attempts to sue over a product that *could have* caused harm, but in fact did not, by claiming present-day "financial" or "economic" injury from having bought the product. As the Third Circuit succinctly put it, combining "a conclusory assertion of money lost with a request that a defendant pay up … doesn't suffice." *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 886 (3d Cir. 2020) (citation omitted). There, the defendant tire dealer allegedly failed to help register customers' new tires with the manufacturer, as required by federal law. *Id.* at 883. But that procedural failure caused Thorne no injury, so she tried to "characterize[] her tire purchase as an economic injury" to satisfy Article III. The Third Circuit rejected that argument. In substance, Thorne was alleging potential harm based on "uncertain future events": *if* there were a manufacturing defect, and *if* the manufacturer contacted registered customers, then the manufacturer's inability to contact her *could* lead to her continuing to drive on recalled tires, which *could* lead to a crash. *Id.* at 886-887, 893. But those "uncertain future events do not make her Pep Boys tires worth less at the time of purchase than equivalent registered tires." *Id.* at 887. Just because Thorne paid for the tires does not mean that the dealer's *procedural* failure to follow

the registration requirement was an economic injury. It was Thorne's burden to show some impact on the price other than "pure conjecture." *Id.* (citation omitted).

Plaintiffs have suggested that these economic-injury cases are limited to a few "marginal" opinions authored by one judge. No. 19-1059, 9/13/2022 Oral Arg. 34:55-36:10. That is wrong. This same theory of "economic" injury has been rejected by courts across the country, in cases involving purchases of allegedly defective baby powder that could lead to an increased risk of cancer,[14] allegedly defective popcorn that contained ingredients that could increase the risk of heart disease,[15] an allegedly defective drug that could cause liver damage if taken incorrectly,[16] and an allegedly defective medical device that could produce inaccurate results in some situations, just to name a few.[17] In each of those cases, the consumers who brought suit did not claim that the product had actually been defective *as to them* or had caused them any injury. To the contrary, they claimed that even if they had already successfully used the product and it had operated as intended and caused them no harm, they had "economic" or "financial" standing

---

[14] *In re Johnson & Johnson Talcum Powder Prods. Litig.*, 903 F.3d 278, 290-91 (3d Cir. 2018).

[15] *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 709-10 (9th Cir. 2020).

[16] *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 316-317 (5th Cir. 2002).

[17] *Shields v. Alere Home Monitoring, Inc.*, 2015 WL 7272672, at *1 (N.D. Cal. Nov. 18, 2015).

because the potential defect itself rendered their product "worthless" or "valueless" (or worth less than they had paid for it). *See Johnson & Johnson*, 903 F.3d at 290; *McGee*, 982 F.3d at 705; *Rivera*, 283 F.3d at 320; *Shields*, 2015 WL 7272672, at *3.

The universe of cases reaching this correct conclusion has only expanded since this Court last heard this case, with even more courts rejecting unsupported theories and labels like "worthless" in favor of requiring *actual evidence* of harm, often while citing *TransUnion*'s prohibition on speculative claims of injury arising from an unmaterialized risk of harm. For example, the Eastern District of Virginia recently rejected a theory of economic injury premised solely on the "purchase of a product" that the plaintiffs proclaimed was "'worthless or worth less' than the purchase price" "not because they failed to perform as intended or were otherwise defective, but because they contained or were at risk of containing Heavy Metals"— an economic-injury theory that the court held was, at bottom, impermissibly premised on "a threat of future harm." *In re Gerber Prod. Co. Heavy Metals Baby Food Litig.*, 2022 WL 10197651, at *5 (E.D. Va. Oct. 17, 2022); *see also Dozier v. Walmart Inc.*, 2021 WL 1534973, at *1, *5 (C.D. Cal. Mar. 5, 2021) (rejecting assertion that tire retailer's statutory violation rendered plaintiff's tires "inherently defective" and therefore "worth less than what he paid"); *Bowen v. Energizer Holdings, Inc.*, 2023 WL 1786731, at *7, *9 (C.D. Cal. Jan. 5, 2023) ("[A]n economic harm premised on speculative risks cannot establish Article III

standing."); *In re Plum Baby Food Litig.*, 2022 WL 16552786, at *8 (D.N.J. Oct. 31, 2022) ("Without the factual support of adverse health consequences or plausible allegations of future risk, Plaintiffs cannot assert that the products are valueless."); *Huertas v. Bayer U.S., LLC*, 2022 WL 3572818, at *6 (D.N.J. Aug. 19, 2022) ("Plaintiffs do not allege that the Products did not work as intended ….; thus Plaintiffs have not demonstrated cognizable economic harm, and their allegation of the 'worthless' Products amounts to speculative loss.").

An uninjured plaintiff cannot sue for statutory damages in federal court by simply asserting "economic" or "financial" or "pocketbook" injury from purchasing a product or service.[18]  "[I]n order to seek monetary damages" based on the purchase of a product that caused no harm and functioned as intended, a plaintiff must "do more than simply characterize her purchases as economic injuries."  *Johnson & Johnson*, 903 F.3d at 291.[19]

---

[18] *See Rivera*, 283 F.3d at 319 (rejecting "economic injury" theory, because merely asking for "money back" from purchasing an allegedly defective drug that performed as intended and caused no harm "does not establish an injury in fact"); *McGee*, 982 F.3d at 706-707 (similar); *Shields*, 2015 WL 7272672, at *5 (no standing despite plaintiff describing as "worthless" allegedly defective product that "*may* produce inaccurate results in *some* situations" but did not malfunction or cause plaintiff any harm).

[19] *See, e.g.*, *Smith v. Catamaran Health Sols., LLC*, 205 F. Supp. 3d 699, 702-703 (D.S.C. 2016) (labeling insurance policy "worthless" was insufficient to establish concrete injury-in-fact, where insurer never denied coverage and plaintiffs never made claim under policy); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171,

Instead, claims of "economic injury" must be based on evidence (or, at the pleading stage, specific allegations) that the product *actually was less valuable* as a result of a defect or the defendants' unlawful conduct. *Compare Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 723-724 (9th Cir. 2017) (plaintiffs did not establish "economic injury" to complain that vehicles' security systems made owners more vulnerable to hacking, because "overpay[ment]" theory was "conclusory and unsupported by any facts," such as "a demonstrable effect on the market for their specific vehicles"), *and Flynn v. FCA US LLC*, 2020 WL 1492687, at *3, *5 (S.D. Ill. Mar. 27, 2020) (without actual *evidence* that vehicles were "worth substantially less" than what plaintiffs paid, plaintiffs could not establish standing based on supposed "economic" harm theory), *with Maya v. Centex Corp.*, 658 F.3d 1060, 1064-1065 (9th Cir. 2011) (homeowners had standing to challenge builder's misrepresentations that allegedly caused high-risk buyers to purchase homes at inflated prices, ultimately resulting in foreclosures and loss in value of plaintiffs' neighboring homes).

---

172-173 (D.D.C. 2003) (rejecting contention that plaintiffs established economic injury from mere drug purchase when they "personally suffered no ill effects or lack of efficacy"); *Doss v. Gen. Mills, Inc.*, 816 F. App'x 312, 314 (11th Cir. 2020) (rejecting economic-injury theory based on assertion that potential presence of glyphosate rendered Cheerios "valueless"); *In re Fruit Juice Prod. Litig.*, 831 F. Supp. 2d 507, 510, 512 (D. Mass. 2011) (rejecting economic-injury theory based on purchase of juice that was consumed and caused no harm despite assertion that products were "valueless" given potential presence of lead).

For example, *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019), involved dietary supplements that were allegedly considered "adulterated" because the manufacturer had failed to provide the FDA with appropriate premarket notices. *Id.* at 1082. The court accepted "at the motion to dismiss stage" that the plaintiffs had plausibly *alleged* an "economic injury" under a theory that purchase of a product with significant defects that has virtually no value is a cognizable injury. *Id.* at 1084-1085. But as Judge Sutton explained in his concurrence, given the plaintiffs' failure to allege any "traditional injuries from buying or using" the dietary supplements—such as allegations "that the products made them sick or did not work as advertised"—merely labeling the product "worthless" would not suffice at later stages in the litigation. *Id.* at 1090. "At summary judgment, each claimant will need evidence to back the point up. Why was the product worthless to each of them? … The answers to these questions and others will determine whether the case may proceed further and, if so, how." *Id.*

In short, simply labeling a product "worthless" or "valueless" or "meaningless," as Plaintiffs tried to do for the appraisals here, is not sufficient to establish economic injury from its purchase, when the product performs as intended and causes no harm. And at the summary-judgment stage and later phases of litigation, mere *allegations* (however well-pleaded) that a purchased product is "worthless" will not establish injury-in-fact under Article III—there must actually

be "evidence to back the point up." *Id.* Here, Plaintiffs offered no evidence that sharing BEVs *actually rendered* absent class members' appraisals worthless or less valuable or that the appraisals did not function as intended. The reason is simple: they could not. The appraisals accomplished exactly what they were supposed to— they complied with USPAP and therefore enabled the refinance that each class member sought and received as a matter of West Virginia law. *See* W. Va. Code § 31-17-8(m)(8). And while Plaintiffs have argued that "[t]o obtain the independent appraisal they expected, they would have had" to "[b]uy a new one," that argument does not establish economic injury either—Plaintiffs have provided no evidence that even a single absent class member purchased another appraisal (which would have been a strange thing to do after already securing the refinance that the original appraisal was obtained to facilitate). "[U]nperformed tasks" that would have cost money if they *had been* performed cannot support concrete "pecuniary" injuries that "actually exist." *Dozier*, 2021 WL 1534973, at *4.

As the Third Circuit framed the issue in *Johnson & Johnson*, "Has a plaintiff—who has entirely consumed a product that has functioned for her as expected—suffered an economic injury solely because she now sincerely wishes that she had not purchased that product?" 903 F.3d at 280. The answer was a resounding no—"buyer's remorse, without more, is not a cognizable injury under Article III." *Id.* at 281. Here, Plaintiffs offer even less. Even if Plaintiffs could establish that the

appraisals were obtained for the borrowers' benefit *at all*, as opposed to the lender's, there is no evidence that the borrowers did not get what they paid for. Absent class members "entirely consumed" the appraisals they purchased, along with the benefits that those appraisals afforded them (a refinanced loan). Not one class member has even suggested (let alone offered any evidence) that she would have forgone refinancing or been able to pay less for her appraisal had she known of petitioners' BEV-sharing practice. To the contrary, the only record evidence on the point favors Defendants: one borrower stated, in opting-out of the class, that he would have proceeded with his refinance loan regardless, because he wanted the benefits it provided. JA645-647.

## III. The district court's recharacterization of this case as a "fraud" case does not establish constitutional injury.

At the very end of its short decision, the district court stated that Defendants' appraisal-ordering procedures amounted to "fraud, which is a close historical or common-law analogue for their asserted injury." JA814 (citation omitted). Not only is the factual premise wildly inaccurate—Plaintiffs do not even *claim* fraud—the court appears to have misunderstood the relevant inquiry for standing purposes. The reference to "historical or common-law analogue[s]" in *TransUnion* does not ask whether a statutory *cause of action* has an analogue in a common-law *cause of action*. It asks whether a statutory-damages plaintiff has offered an "asserted injury"

that would have historically provided "a basis for a lawsuit in American courts." 141 S. Ct. at 2204.

That is demonstrably not the situation here. A fraud plaintiff must establish detrimental reliance and pecuniary damages. *See* Restatement (Second) of Torts § 525 (1977); *White v. Nat'l Steel Corp.*, 938 F.2d 474, 490 (4th Cir. 1991). But Plaintiffs have pointed to no such thing—no doubt because it would be impossible on a classwide basis. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 435 (4th Cir. 2003) (reliance is "not readily susceptible to class-wide proof"); *Thorn v. Jefferson-Pilot Life Ins.*, 445 F.3d 311, 321 (4th Cir. 2006) ("[I]ndividual hearings are required."). Recharacterizing Plaintiffs' claims as "fraud" cannot give them a constitutionally adequate injury-in-fact, and Plaintiffs themselves do not try that gambit. The district court's judgment cannot be sustained on this basis.

## IV. Because Plaintiffs did not establish actual injury to any absent class members, the class must be decertified and the damages award vacated.

The district court awarded $10 million in damages to absent class members who suffered no harm at all. This Court must vacate the damages award and reverse the district court's decision certifying the class, because a class cannot be certified and damages cannot be awarded on a classwide basis where a large number of absent class members—here, thousands of absent class members—established no Article III injury.

A plaintiff who lacks standing can receive no relief in federal court. And because the elements of standing—injury, causation, and redressability—"are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

These fundamental rules apply equally to class actions. The Supreme Court has held that, whether "in individual or class actions," Article III limits "the role of courts to provid[ing] relief to claimants … who have suffered, or will imminently suffer, actual harm." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). Accordingly, plaintiffs who cannot win relief in "individual … actions" likewise cannot win relief in "class actions." *Id.*; *accord TransUnion*, 141 S. Ct. at 2208 ("Every class member must have Article III standing in order to recover individual damages").

This Court has similarly called it "axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members": under the Rules Enabling Act, 28 U.S.C. § 2072(b), the procedural provisions of Rule 23 cannot "enlarge or modify" any "substantive right[s]," so they cannot confer standing where it is missing or allow a monetary recovery that would otherwise be unavailable. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345

(4th Cir. 1998). Thus, at a minimum, a final judgment awarding money damages to uninjured class members must be reversed on that basis alone. *See, e.g.*, *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019) (courts must "determine whether each of the absent class members has standing before they could be granted any relief."); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19-21, 32 (1st Cir. 2015) (requiring that district court "distinguish[] the injured from the uninjured class members" prior to judgment).

Class members' lack of standing is also a bar to certification in the first place. As the Second Circuit has held, "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). So too in the Eighth Circuit. *See Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("[A] class cannot be certified if it contains members who lack standing …. Or, to put it another way, a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves."); *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987-988 (8th Cir. 2021).[20] Other courts have reached the same conclusion as a matter of Rule 23, holding that "a properly

---

[20] The Fifth Circuit, which has not yet settled on a position, recently noted the significance of the rule the Second and Eighth Circuits follow. *See Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020); *id.* at 770-771 (Oldham, J., concurring) (arguing that fact that "countless unnamed class members lack standing" requires reversal of class certification under Article III) (brackets omitted).

formulated Rule 23 class should not raise standing issues." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 368 (3d Cir. 2015) (directing courts to resolve issue of uninjured class members winning relief through Rule 23, not Article III); *accord, e.g.*, *Branch v. GEICO*, 323 F.R.D. 539, 551-552 & n.9 (E.D. Va. 2018) (finding no need to "resolve the separate question of whether [plaintiff] has violated the Rules Enabling Act," because Article III standing problem "prevent[s] [plaintiff] from satisfying the predominance requirement").

While a few courts have allowed a class to proceed where *some* absent class members lack standing, even those courts have balked where, as here, all or a large number of absent class members lack standing.  For example, the Seventh Circuit has held that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (citation omitted).  *Accord, e.g.*, *Cordoba*, 942 F.3d at 1275-1276.[21]

---

[21] The Ninth Circuit recently declined to hold categorically that a class "that potentially includes more than a de minimis number of uninjured class members" may never be certified. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc).  The court acknowledged, however, that Rule 23 "requires that the court determine whether individualized inquiries" into "the injury status of class members" "would predominate over common questions."  *Id.* at 668-69 & n.12 (citing *TransUnion* and *Cordoba*). The court concluded that all class members had demonstrated standing, at least at the certification stage.  *Id.* at 682.

Under any of these approaches, the class here must be decertified. Plaintiffs were required to prove through admissible evidence that *each* class member was injured, and Defendants were allowed to challenge and rebut that evidence. Resolving those disputes—which the district court twice avoided, first by holding that the standing of unnamed class members did not matter, and then by holding that *all* class members were harmed by the mere possibility that their appraisers were exposed to borrowers' estimates—would require individualized submissions, which would predominate heavily over any common evidence. Indeed, the proof of actual damages that this Court has already ordered as an element of the contract case is exactly the kind of individualized submission that precludes certification of a class action under Rule 23(b)(3). *See Alig*, 990 F.3d at 796.[22]

---

[22] The Court previously stated that measuring damages could be done through "the ministerial exercise of comparing actual home values to estimates of value" to determine whether the estimates were inflated. *Alig*, 990 F.3d at 793-794. That is incorrect for several reasons. First, Plaintiffs have no evidence of class members' "actual home values" during the 2004-2009 class period, except a single retrospective appraisal of the Aligs' home (the accuracy of which is contested). *See* pp. 10-13, *supra*. Amassing and ruling on such individualized evidence of the past value of every class member's home would be far from "ministerial." And even if a particular home's appraised value during the class period correlated with the BEV, this does not mean there was any influence at all—for example, if the appraiser independently came to the same number as the borrower without even *seeing* the borrower's estimate, or (as the Court acknowledged elsewhere in its opinion) "if a borrower's estimate of value was accurate." *Alig*, 990 F.3d at 793, 796. Nor would even an inflated appraisal be sufficient to show injury—Plaintiffs would have to go further and establish an actual effect on the loan amount (which would not be the case for class members borrowing much less than the appraised value, pp. 16-17,

The Sheas, who are named class members but not class representatives, are illustrative. The Sheas' own appraiser testified that the Sheas' estimate had no effect on him. JA444-445. This testimony, coupled with the undisputed fact that his appraisal was below the Sheas' estimate, demonstrates the Sheas' lack of injury. And the Sheas' individual circumstances after refinancing further reinforce the point: their refinance loan lowered their interest rate, and they sold their home a few years later for more than enough money to pay off the loan.

At a trial, Defendants would be entitled to present similar evidence as to every single loan in the class. "[A] class cannot be certified on the premise that [a defendant] will not be entitled to litigate its [constitutional] defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). No class member's standing can be adjudicated with common evidence, and as a result, individualized issues strongly predominate over any common ones.

*** 

This Court has already agreed that the record is "devoid of evidence" that any unnamed class member's appraisal was inaccurate. *Alig*, 990 F.3d at 803 n.22. Given that, *TransUnion* tells this Court exactly what it must now do: it must reject the district court's holding that Plaintiffs could establish classwide standing through

---

*supra*) as well as a negative economic impact on the borrower. Yet the district court granted Plaintiffs summary judgment without considering any of these individualized, disputed facts.

a claim of "risk," "exposure," or "taint."  As in *TransUnion*, the class here is replete with people who suffered no injury and for whom the statutory-damages award (here, $3,500) is a windfall, not a remedy, when they got the loans they wanted and were never underwater on their loans.  Neither Article III nor Rule 23 allows a court to award them damages without evidence of harm.

The absence of classwide standing on the statutory-damages claim does not mean the case should be remanded to state court, however.  Unlike in cases where this Court has vacated with instructions to remand to state court,[23] the district court certainly had jurisdiction *over this case*.  It had jurisdiction over Plaintiffs' other claims (*e.g.*, those alleging unlawful fees), which it resolved in Defendants' favor, JA799, JA801; it had jurisdiction over the breach-of-contract claim and would retain jurisdiction if the Court again remands that claim; and the removal statute contains no mechanism for a federal court to remand only *part* of a properly removed diversity case.  *See* 28 U.S.C. § 1447.  The district court also had jurisdiction over the *named* plaintiffs' WVCCPA claims at the time of removal, because they alleged detrimental reliance and actual harm, JA66-69, and the Aligs continued to assert actual economic injury and seek actual damages even outside the certified class (a claim that was resolved by stipulation).  JA781-782.  The fact that *absent class*

---

[23] *See, e.g.*, *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 242 (4th Cir. 2023) (plaintiff questioned his own Article III standing).

*members* lack standing does not defeat the federal courts' jurisdiction: once the class is decertified because standing defeats the necessary predominance, those absent class members are no longer before the federal court at all.

## V. Defendants incorporate their prior briefing on questions unrelated to standing.

The district court's final judgment, JA816-817, reinstated its prior final judgment in full, *see* JA799-802, and therefore all issues in the original appeal, No. 19-1059, are live again. This includes whether the district court erred in entering summary judgment for Plaintiffs, certifying the class, and awarding restitution for breach of contract. These issues were fully briefed in the prior appeal. Accordingly, this Court has permitted the parties to incorporate by reference portions of the briefing previously filed in No. 19-1059 and limit the new briefing in this appeal to the standing issue that this Court had remanded to the district court. Dkt. No. 23.

Defendants accordingly incorporate by reference all the arguments they made in their initial briefing on appeal in No. 19-1059. *See* Opening Brief in No. 19-1059 (ECF No. 60) ("19-1059 Opening Brief"); Reply Brief in No. 19-1059 (ECF No. 61) ("19-1059 Reply Brief").

Two of those arguments bear particular mention here. First, the district court's certification of the class with respect to the breach-of-contract claim depended on the notion that every plaintiff's damages would be restitution of the appraisal fee. That was incorrect. 19-1059 Opening Brief 54-58; 19-1059 Reply Brief 17-20. The

Court's prior opinion did not reach the issue. 990 F.3d at 798 n.17. But that issue bears on certification as well: establishing expectancy damages (an element of the claim) would require individualized proof, defeating predominance. Opening Br. 51; Reply Br. 26. As already explained, that would not be a "ministerial" exercise. Note 22, *supra*. That is an independent reason for decertification.

Second, this Court previously agreed with Defendants that the district court erred in granting Plaintiffs summary judgment on the breach-of-contract claim. 990 F.3d at 794-98. The supposed contract term on which the court relied does not exist, and the district court erred when it held the appraisals not acceptable as a matter of law. *Id.*; 19-1059 Opening Brief 32-37; 19-1059 Reply Brief 15-17. The Court should (at a minimum) reinstate that holding, as the district court reinstated its prior judgment without change.

Defendants also specifically incorporate the following arguments:

- The district court erred in granting Plaintiffs summary judgment on the unconscionable inducement claim under the WVCCPA, because Plaintiffs proved neither inducement nor unconscionable conduct. 19-1059 Opening Brief 20-32; 19-1059 Reply Brief 6-14.

- Defendants were entitled to summary judgment on the contract claim. 19-1059 Opening Brief 31-36; 19-1059 Reply Brief 15-17.

- The district court's class-certification orders rested on multiple legal errors and abuses of discretion besides the standing issue. 19-1059 Opening Brief 37-54; 19-1059 Reply Brief 20-28.

- Restitution could not be awarded without trial. 19-1059 Opening Brief 54-58; 19-1059 Reply Brief 17-20.

- To support the district court's decisions, Plaintiffs rely on new justifications that the district court never adopted and new factual contentions from outside the record. 19-1059 Reply Brief 2-4.

## CONCLUSION

This Court should reverse the judgment of the district court certifying the class and vacate the damages award.

Respectfully submitted,

*/s/William M. Jay*

Helgi C. Walker
Jesenka Mrdjenovic
Andrew G.I. Kilberg
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel.: +1 202 955 8500

Theodore J. Boutrous, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.: +1 213 229 7000

William M. Jay
Thomas M. Hefferon
Brooks R. Brown
Jaime A. Santos
Keith Levenberg
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Tel.: +1 202 346 4000

Edwina B. Clarke
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: +1 617 570 1000

*Admitted only in New York and Virginia; not admitted in the District of Columbia. Practicing under the supervision of counsel admitted in the District of Columbia.*

*Counsel for Defendants-Appellants*

Dated: June 8, 2023

## CERTIFICATE OF SERVICE

I, William M. Jay, hereby certify that on June 8, 2023, I electronically
transmitted the foregoing document to the Clerk's Office using the CM/ECF System.
I certify that all participants in this case are registered CM/ECF users and that service
will be accomplished by the CM/ECF system.


*/s/ William M. Jay*
William M. Jay

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 12,963 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2010.

*/s/ William M. Jay*

William M. Jay