**No. 22-2289**

# In the United States Court of Appeals for the Fourth Circuit

───────────────

PHILLIP ALIG, SARA J. ALIG, ROXANNE SHEA, AND DANIEL V. SHEA,
*Plaintiffs-Appellees,*

v.

ROCKET MORTGAGE, LLC, F/K/A QUICKEN LOANS INC., AMROCK LLC, F/K/A TITLE SOURCE, INC., D/B/A TITLE SOURCE INC. OF WEST VIRGINIA, INC.,
*Defendants-Appellees.*

───────────────

Appeal from the United States District Court
for the Northern District of West Virginia
Case No. 5:12-cv-114, 5:12-cv-115 (The Hon. John P. Bailey)

───────────────

## BRIEF OF PLAINTIFFS-APPELLEES

───────────────

JONATHAN R. MARSHALL
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
jmarshall@baileyglasser.com

PATRICIA M. KIPNIS
BAILEY & GLASSER LLP
923 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002
pkipnis@baileyglasser.com

DEEPAK GUPTA
GREGORY A. BECK
LINNET DAVIS-STERMITZ
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

JASON E. CAUSEY
BORDAS & BORDAS, PLLC
1358 National Road
Wheeling, WV 26003
jcausey@bordaslaw.com

June 13, 2023                    *Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Table of authorities ........................................................................... ii

Introduction ....................................................................................... 1

Statement of the case ....................................................................... 3

Summary of the argument ............................................................. 11

Argument ........................................................................................ 12

      I.    This Court correctly concluded that the plaintiffs suffered financial harm by paying for independent appraisals that they never received—an unremarkable form of pocketbook injury that easily satisfies Article III. ............................... 12

      II.   The plaintiffs' theory of injury applies equally to every class member. ........................................................................... 21

      III.  The plaintiffs incorporate their prior briefing. ................................... 22

Conclusion ...................................................................................... 22

i

# TABLE OF AUTHORITIES

## Cases

*Air Evac EMS, Inc. v. Cheatham,*
    910 F.3d 751 (4th Cir. 2018)...................................................................13

*Alig v. Quicken Loans Inc.,*
    990 F.3d 782 (4th Cir. 2021) ...........................................................*passim*

*Alig v. Rocket Mortgage,*
    52 F.4th 167 (4th Cir. 2022) .............................................................. 10

*Baehr v. Creig Northrop Team P.C.,*
    953 F.3d 244 (4th Cir. 2020) ...............................................................18

*Brown v. Quicken Loans Inc.,*
    2010 WL 9597654 (W. Va. Cir. Ct. Mar. 2, 2010) .................................4

*Cottrell v. Alcon Laboratories,*
    874 F.3d 154 (3d Cir. 2017)..................................................................13

*Debernardis v. IQ Formulations, LLC,*
    942 F.3d 1076 (11th Cir. 2019) ............................................................ 19

*Equity in Athletics, Inc. v. Department of Education,*
    639 F.3d 91 (4th Cir. 2011) .................................................................20

*George v. Omega Flex, Inc.,*
    874 F.3d 1031 (8th Cir. 2017) ..............................................................13

*In re Asacol Antitrust Litigation,*
    907 F.3d 42 (1st Cir. 2018)................................................................. 14

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices & Liability Litigation,*
    903 F.3d 278 (3d Cir. 2018)................................................................ 19

*Krakauer v. Dish Network, L.L.C.,*
    925 F.3d 643 (4th Cir. 2019)............................................................... 21

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ........................................................ 13, 19

*McGee v. S-L Snacks National*,
    982 F.3d 700 (9th Cir. 2020) ................................................................. 19

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ............................................................... 20

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
    980 F.3d 879 (3d Cir. 2020) ........................................................... 16, 19

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................ 1, 9, 14, 15

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................ 20

## Other Authorities

Sara C. Benesh et al.,
    *Supreme Court GVRs and Lower-Court Reactions*, 35 Justice Sys. J. 162
    (2014) .................................................................................................. 13

Stephen M. Shapiro, et al.,
    *Supreme Court Practice* 5-42 (11th ed. 2019) ............................... 12, 13

## INTRODUCTION

In its prior published opinion, this Court correctly held that the plaintiffs suffered an injury in fact because they each "paid an average of $350" to Rocket Mortgage for independent appraisals that they "never received." *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 791–92 (4th Cir. 2021). "Of course," the Court explained, this sort of "financial harm is a classic and paradigmatic form of injury in fact." *Id.*

Rather than grappling with that injury, Rocket attacks a straw man. The plaintiffs' real theory of injury, the company claims (at 3–4), is that tainted appraisals caused them to take out inflated mortgages, which in turn caused them to suffer foreclosures and other forms of "downstream economic harm." It is these downstream injuries, Rocket argues, that presented a "mere risk of future harm" of the sort held inadequate in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2197 (2021).

No matter how many times the plaintiffs disclaim that theory of injury, Rocket continues to attribute it to them. But repetition does not make it true. Unlike *TransUnion*, this case isn't about the downstream *risks* to which Rocket's appraisal practices exposed the plaintiffs—or about some chain of "uncertain events" that might flow from those practices. It's about what actually befell each of the plaintiffs: Paying hundreds of dollars each for independent appraisals that they never received. That is not a mere "risk of future harm." The financial injury has already occurred.

Nothing in *TransUnion*—a case in which the plaintiffs never paid the defendant anything—undermines that settled basis for Article III standing.

Rocket's misunderstanding of the relevant injury also infects its argument against class certification. Again, Rocket assumes that the plaintiffs' injury is the risk of foreclosures or other downstream effects, which it says cannot be proven for all class members. There is no dispute, however, that the plaintiffs' actual theory of injury applies equally across the entire class: All class members paid "for independent appraisals that . . . they never received." *Alig*, 990 F.3d at 791.

Having devoted most of its argument to the wrong theory of injury, Rocket has little to say on the one that this Court adopted. It relies on a line of cases predating this Court's prior published opinion, which held that the purchase of a product is not an injury in fact when the product "operated as intended and caused [the plaintiffs] no harm." Rocket Br. 41. But Rocket's appraisals did *not* operate as intended or offer the plaintiffs what they paid for. Rather than the independent, impartial appraisals for which borrowers paid, the tainted appraisals they received could not be relied on, could not serve their intended purpose, and were therefore "worthless." *Alig*, 990 F.3d at 813. Rocket cannot identify any decision (from any circuit) that rejects standing when the plaintiffs' complaint is that they paid money for something they never received. Rocket would thus have this Court become the first to hold that the federal courts lack jurisdiction over the claims of plaintiffs who

2

have suffered hundreds of dollars in out-of-pocket damages. This Court should decline the invitation.

Because neither *TransUnion* nor the other cases on which Rocket relies casts doubt on the sufficiency of the plaintiffs' "paradigmatic" financial injury, this Court should reissue its published opinion with the added clarification that *TransUnion* does not alter its conclusion. The Court can and should do so immediately, without awaiting oral argument. This case has already gone through three rounds of briefing, two oral arguments, and a published opinion. There is no need for further delay in getting relief to the class.

## STATEMENT OF THE CASE

Although the background of this case is already accurately set forth in this Court's opinion, we provide a short overview here.

***Rocket's appraisal practices.*** This is a consumer class action arising out of the appraisal practices employed in West Virginia by Rocket Mortgage (then known as Quicken Loans) and its title-management company (then known as Title Source, Inc., or TSI) in the lead up to the financial crisis. At the time, when consumers applied to refinance a loan, Rocket told them that it would obtain an appraisal on their behalf and explained that it would charge them each about $350 for that appraisal. *Alig*, 990 F.3d at 787. Rocket told borrowers those appraisals were for their benefit, *see* JA406, and its appraisers' certifications told the borrowers that

they "may rely" on an "appraisal report as part of any mortgage finance transaction," JA915, 918.

The company's borrowers, this Court has explained, would have "assumed" that their appraisals "provided an unbiased valuation of their homes on which they could rely as they planned their financial futures." *Alig*, 990 F.3d at 807. But that isn't what Rocket gave them. Instead, it required borrowers to supply their own uninformed estimates of home value and, unbeknownst to them, treated those estimates as "requested value[s]"—relaying them to appraisers and even pressuring those who returned lower estimates for an increase. *Id.* at 787–88, 798.

This practice started out as controversial and wound up being universally condemned. In 1996, and again in 2005, federal regulators began to sound the alarm, instructing lenders that they should not "unduly influence the appraiser or in any way suggest the property's value." *Id.* at 787, 804. State regulators moved to ban the practice. *Id.* at 788; *see also id.* at 804. By 2009, amid concerns that estimate-sharing had contributed to the financial crisis by inflating home values, the Home Valuation Code of Conduct banned it too. *See id.* at 787. And West Virginia trial courts deemed it unconscionable. *See Brown v. Quicken Loans Inc.*, 2010 WL 9597654, at *5 (W. Va. Cir. Ct. Mar. 2, 2010), *aff'd in relevant part*, 737 S.E.2d 640, 657 (W. Va. 2012). Even Rocket began to describe efforts to influence appraisals as "illegal and unethical." *Alig*, 990 F.3d at 788.

4

***This case.*** But in 2007, Rocket had "no such qualms." *Id.* So when the class representatives applied for a refinance, they followed the company's preferred practice: They paid for independent appraisals, but Rocket secretly passed their uninformed estimates of home value onto their appraiser. *Id.* at 789. Upon discovering this practice, they then sued Rocket, TSI, and other related defendants. *Id.* Their theory was that the defendants had sought to influence appraisers by providing them with estimated values on appraisal request forms, thereby rendering its appraisals unreliable and worthless. *See id.* at 786.[1] Employing and concealing this practice, the plaintiffs asserted, amounted to a breach of contract and to unconscionable inducement under the West Virginia Consumer Credit and Protection Act. *Id.* at 786, 789. And the district court agreed, granting class certification and summary judgment and awarding damages as to both substantive claims. *Id.* at 789–90.

---

[1] A spreadsheet produced by Quicken shows that every appraisal order included an "owner's estimated value." ECF No. 173-Ex.M. Rocket cites two affidavits of appraisers offered nearly a year *after* the district court granted summary judgment and class certification for the proposition that appraisers may not have seen the communication of estimated value. But appraiser Rebecca Stephens and her firm did not perform a single class member appraisal and her testimony is thus irrelevant. *Compare* ECF No. 173-Ex.M, *with* ECF No. 324-2-App.4. The second appraiser's firm performed only 98 class member appraisals, only a fraction of which she performed herself. *Compare* ECF No. 173-Ex.M, *with* ECF No. 324-2-App.3. She acknowledges that the original order form was made available to the appraiser for each assignment. She states only that "she did not always review the order form when I did appraisals." ECF No. 324-2-App.3.

For unconscionable inducement, the court awarded each plaintiff an identical amount of statutory civil penalties, which under the WVCCPA do not require proof of actual damages. For breach of contract, the court awarded a refund of the appraisal fee paid by each plaintiff, the amount of which varied slightly but was easily determined with Rocket's class-wide records.

A divided panel of this Court affirmed in part and reversed in part.

***Standing.*** As to standing, the panel held that the class had suffered a "classic and paradigmatic form of injury in fact": They "paid an average of $350 for independent appraisals" that they "never received." *Id.* at 791–92. Instead, the appraisals they did get were "tainted": Rocket had "exposed the appraisers to the borrowers' estimates of value and pressured them to reach those values," compromising the appraisals' independence. *Id.*

The Court also easily rejected the argument that whatever benefits class members might have received from their loans could somehow offset their injury. *Id.* at 792. "[O]nce injury is shown," it explained, it is unnecessary "to ask whether the injury is outweighed" by some *other* benefits "the plaintiff has enjoyed" as part of its "relationship with the defendant." *Id.* And injury *was* shown here—this wasn't the sort of case in which "facts related to the same transaction demonstrate there was never an injury in the first place." *Id.* at 792 n.9.

***The merits.*** On the merits, however, the panel divided. To the panel majority, the district court's summary judgment on the breach-of-contract claim was premised on a misunderstanding of the parties' contract and required reversal and remand for further consideration. *See id.* at 794–98.

As to unconscionable inducement, the panel majority affirmed. Recent West Virginia caselaw, it explained, supported a clear *Erie* prediction. Unconscionable inducement required showing that the defendant engaged in "unconscionable" conduct and that that conduct "contributed to" the plaintiff's decision to enter a contract. *Id.* at 798–803. And the West Virginia Supreme Court of Appeals would conclude that Rocket's conduct fit the bill. *Id.* at 803–07.

Rocket, the panel majority had already recognized, had a duty to "obtain a fair, valid and reasonable appraisal" of each borrower's property. *Id.* at 796. All the more so in the refinance context. After all, the panel majority explained, "[a]ppraisal procedures" are "particularly important in refinancing agreements." *Id.* at 806. Unlike home purchases, where "adversarial parties represented by competing real estate agents" temper one another's evaluation of home value, in the refinancing context, borrowers and lenders—at least lenders planning to securitize their loans—have a shared incentive to reach a high loan value. *Id.* "Amidst these various dangers and incentives—and stepping into the middle of a transaction between parties with

unequal bargaining power—the impartial appraiser [is] the only trained professional available to objectively evaluate the value of the home." *Id.*

Yet the evidence showed that Rocket had deliberately "tainted" this appraisal process. *Id.* at 798. It "sought to pressure appraisers to inflate their appraisals" in two distinct ways—(1) sharing estimates to engender an inevitable "anchoring effect" that "subconsciously" increased appraisers' estimates, and then (2) imposing explicit pressure on appraisers whose estimates fell short. *Id.* at 798, 803–06. Given the significance of the appraisal, the panel majority explained, it was unconscionable for Rocket to conceal from its borrowers the fact that it had influenced its appraisers' estimates in these ways. *Id.* at 806. And doing so amounted to unconscionable inducement: There was "no genuine dispute" that the company's appraisals—"and, more importantly, their guise of impartiality"—contributed to the decision to refinance. *Id.*[2]

But this was, the panel majority cautioned, a "circumscribed" holding. *Id.* at 806–07. It was driven by the "particularly questionable character" of Rocket's

---

[2] Rocket, this Court observed, appeared to be quite successful in this scheme. Its appraisers' estimates "closely tracked the borrowers' estimates of value," even though those estimates were provided by uninformed laypeople. *Alig*, 990 F.3d at 804. But that not *all* of these efforts succeeded did not undermine the majority's logic. *Id.* at 805. Under West Virginia law, in the majority's view, unconscionable inducement turned on whether a defendant's conduct was unconscionable and whether that conduct contributed to the formation of the loan—not on the substantive terms of the loan itself. *Id.*; *see also id.* at 803 n.22.

practices—and the fact that they "pertained to" a "particularly essential" aspect of the loan process. *Id.* at 807.

In dissent, Judge Niemeyer took a different view of West Virginia law. As to unconscionable inducement, for instance, he explained that he predicted that the West Virginia Supreme Court of Appeal would interpret "inducement" to require that unconscionable conduct either "was material" or "would have been material" to "the other party's decision to enter" an agreement. *Id.* at 813 (Niemeyer, J., dissenting). And he interpreted West Virginia law to "equate[] conduct that is unconscionable with fraudulent conduct." *Id.* at 816. Applying these standards, Judge Niemeyer would have reversed the district court's summary judgment on the unconscionable-inducement claim. In his view, Rocket's conduct was consistent with the industry standard. *Id.* at 816–17. It thus "was neither unscrupulous nor fraudulent," and there was no evidence that "disclosure of it would . . . have changed a thing." *Id.* at 817; *see also id.* at 815–16.

The Court denied Rocket's petition for rehearing en banc.

***Rocket's petition for certiorari.*** Rocket filed a petition for certiorari with the United States Supreme Court, asking for two forms of relief. It began by urging the Court to grant its petition, vacate this Court's earlier opinion, and remand for further consideration in light of the Court's recent decision in *TransUnion*, 141 S. Ct. 2190. *See* Pet. 18–22. It also sought plenary review on the ground that this case allegedly

implicates two circuit splits. *First*, it insisted that this Court's decision opened up a split about what constitutes a "financial injury" cognizable under Article III. Pet. 23–27. And *second*, because in its view many—or maybe all—of the class members suffered no injury at all, it asked the Court to use this case to resolve the circuit split concerning whether a class may be certified when some absent class members lack standing. *Id.* at 27–33. The Supreme Court showed no interest in Rocket's second or third request. But it granted the first, bringing the parties back here.

*Proceedings on remand.* On remand from the Supreme Court, this Court ordered supplemental briefing and held oral argument. On October 28, 2022, the Court entered a per curiam decision vacating and remanding the case to the district court. *Alig v. Rocket Mortg.*, 52 F.4th 167 (4th Cir. 2022). The Court noted its prior holding that the plaintiffs "had standing because all of the class members had paid for *independent* appraisals that they never received." *Id.* at 168. But the Court "conclude[d] that the district court should apply *TransUnion* to the facts of this case in the first instance." *Id.*

In doing so, the district court found nothing in *TransUnion* affecting the plaintiffs' theory of injury. "Each of the plaintiffs and class members," it wrote, "paid up front for a fair, valid and reasonable appraisal of the property." JA814. "Due to the actions of the defendants," however, "they did not receive fair, valid and reasonable appraisals." *Id.* That "financial harm," the court concluded, is a "classic"

10

injury in fact. *Id.* It therefore recommended that this Court "reissue its prior opinion, with the added clarification that nothing in TransUnion alters this settled basis for Article III standing." *Id.* at 10.

## SUMMARY OF THE ARGUMENT

This Court was correct the first time around when it held that the plaintiffs suffered "financial harm" by paying a fee for something that wasn't what it was supposed to be. The plaintiffs paid for an independent appraisal—the central premise of which was the independence of the appraiser valuing their homes. Without that independence, the appraisal is meaningless. So it is straightforward to price the loss: It's what the plaintiffs would have to pay to get a truly impartial appraisal.

*TransUnion* says nothing to undermine the sufficiency of this kind of ordinary out-of-pocket injury. Unlike the plaintiffs in *TransUnion*, the plaintiffs here have never argued that their injury-in-fact is based on a "risk of future harm." The plaintiffs' claims have always been based on their concrete pocketbook injury—not on the uncertain future risks that followed. That was the theory of injury that the panel credited when it held that each plaintiff in this case suffered a "classic and paradigmatic form of injury in fact." And it remains sound now for the same reasons it was then.

Rocket's challenge to class certification fails for the same reasons. Although foreclosures and other downstream effects of tainted appraisals may be difficult to predict, the plaintiffs' financial injury is not. Because there is no dispute that all class members paid for an independent appraisal that they did not receive, that injury applies equally to the entire class.

As the Court permitted, the plaintiffs incorporate their prior arguments on other issues in the case.

## ARGUMENT

## I.    This Court correctly concluded that the plaintiffs suffered financial harm by paying for independent appraisals that they never received—an unremarkable form of pocketbook injury that easily satisfies Article III.

This case comes back to this Court on a single, narrow question: Should anything in this Court's prior published opinion be modified in light of the Supreme Court's decision last term in *TransUnion*? The answer is no. This case never involved the sort of mere-risk-of-future-harm theory that *TransUnion* disapproved. That the Supreme Court returned the case on a summary-reconsideration order (also known as a grant-vacate-remand or GVR order) does not complicate this otherwise straightforward analysis. A GVR order is "not," and should not be mistaken for, "a summary reversal order." Stephen M. Shapiro, et al., *Supreme Court Practice* 5-42 (11th ed. 2019). When the Court wants to summarily reverse, it says so. A GVR order, by contrast, asks the circuit court "merely to reconsider" its opinion "in light of the

intervening precedent—which *may or may not* compel a different result." *Id.* (emphasis added). And it frequently does not: Courts more often than not reach exactly the same decision they did before. *See* Sara C. Benesh et al., *Supreme Court GVRs and Lower-Court Reactions*, 35 Justice Sys. J. 162, 169– 70 (2014); *see also* Shapiro, *Supreme Court Practice*, at 5-42 & n.108 (observing that, historically, "in a substantial number of the remanded cases the courts of appeals adhered to the original ruling, and that very few of these judgments were reversed by the Supreme Court"). That same result is warranted here.

The plaintiffs' Article III injury is straightforward: They each suffered financial harm by paying Rocket hundreds of dollars "for independent appraisals that . . . they never received." *Alig*, 990 F.3d at 791. That sort of immediate and concrete "financial harm," this Court held, "is a classic and paradigmatic form of injury in fact." *Id.* The Court noted a long line of authority holding that the harm of "[p]aying more than [a product] is worth" is unquestionably an "economic injury sufficient to establish Article III standing." *George v. Omega Flex, Inc.*, 874 F.3d 1031, 1032 (8th Cir. 2017); *see also, e.g.*, *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018); *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 163 (3d Cir. 2017); *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011).

**A.** Rocket's lead argument is that the plaintiffs' injury is based on a "mere risk of future harm" of the sort that the Supreme Court found inadequate for standing

13

in *TransUnion*. But this case is nothing like *TransUnion*. There, a credit-reporting agency erroneously flagged each of the class members as a potential terrorist, drug trafficker, or serious criminal. *TransUnion*, 141 S. Ct. at 2201–02. It did not, however, send those erroneous files to any potential creditors. *Id.* The plaintiffs nevertheless argued that they had suffered an Article III injury because there was a "material risk" that their files could be disseminated sometime in the future and would "thereby cause them harm." *Id.* at 2210. The Supreme Court disagreed. In a damages action like the plaintiffs', it explained, the mere "exposure to the risk of future harm" was insufficiently "concrete" to support Article III standing—at least when unaccompanied by some "*separate* concrete harm." *Id.* at 2211.

Notwithstanding Rocket's repeated attempts to recharacterize the plaintiffs' theory of injury, the plaintiffs have never argued that their injury-in-fact is based on a "risk of future harm." Rather, they argued that they suffered "an injury in the form of lost money." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018). The company's borrowers, as this Court has explained, would have "assumed" that their appraisals "provided an unbiased valuation of their homes on which they could rely as they planned their financial futures." *Alig*, 990 F.3d at 807. But because Rocket had tried to influence the result by passing on each borrower's estimate of home value, what the plaintiffs got *wasn't* independent—indeed, as an impartial measure of home value, it was "worthless." *Id.* at 812.

14

Far from being "strikingly similar" to the claim in *TransUnion*, this straightforward basis for standing does not implicate *TransUnion* at all. Rocket Br. 31. The plaintiffs in *TransUnion* didn't pay for a product that they never received. They didn't pay any money at all. That is why they were forced to rely, unlike the plaintiffs here, on an unrealized risk of future harm as their sole basis for standing. By contrast, even if the plaintiffs' claims did implicate a future risk—from the possibility of an inflated appraisal to the danger that they could end up in an underwater mortgage or face foreclosure—their financial injury supplied the "separate concrete harm" that was missing in *TransUnion*. 141 S.Ct. at 2210–11.

**B.** Rocket refuses to come to grips with the injury that the plaintiffs claimed in their complaint and argued throughout the case. *See* JA769–73. It insists (at 12–13) that the plaintiffs' standing theory isn't really about the financial harm of paying for a product that they didn't get. Instead, according to Rocket, the injury the plaintiffs claimed was the potential that the company's tainted appraisals would cause them *further* harm—whether by causing an appraisal to end up inflated, or by causing a class member to borrow more than their home was worth. And because whether *those* harms "actually materialized" for a given borrower was uncertain, Rocket's logic goes, this Court's reasoning is "irreconcilable with *TransUnion*." Rocket Br. 23, 32.

The plaintiffs advanced—and this Court decided—no such theory of injury. It is true that Rocket's appraisal practices created serious risks for the company's

customers. As this Court explained, by deliberately sharing its borrowers' uninformed home value estimates with its appraisers, Rocket aimed to pump up appraisal values and to originate larger loans. *See Alig*, 990 F.3d at 787–90, 803–04. But far from defeating standing, that just reinforces the plaintiffs'—and this Court's— point: It is *because* it is impossible to know whether Rocket's efforts to inflate its appraisals were successful that those appraisals are worthless as an impartial estimate of home value, and thereby gave rise to the class's financial injury-in-fact.[3]

Regardless, this case isn't about the *risks* to which Rocket's appraisal practices exposed the plaintiffs—or about the long chain of "uncertain [] events" that might flow from those practices. *See Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 887 (3d Cir. 2020). It's about the harm that actually befell each of the plaintiffs: Paying hundreds of dollars for an appraisal that was meaningless.

---

[3] In observing that Rocket's appraisers were "exposed" to the borrower's estimates of value, the Court's point was not that exposure "may have" led to an inflated home value or other problems—or that that risk alone sufficed to establish Article III injury. *See* Rocket. Br. 26. It was that the exposure *itself* meant that the appraisals were not independent, and the plaintiffs thus didn't get what they paid for. *Alig*, 990 F.3d at 791–92 & n.9. And in explaining that the record was "devoid" of evidence regarding each class member's actual home value, *see id.* at 803 n.22, the Court was not suggesting that the plaintiffs suffered no injury in fact. It wasn't talking about standing at all. It was explaining its *Erie* prediction that, under West Virginia law, unconscionable inducement could be shown without proving that there was anything "*substantive[ly]* unconscionab[le]" about the plaintiffs' ultimate loan terms. *Id.* That merits determination should not be conflated with Article III standing.

That conclusion does not, as Quicken asserts, turn on whether particular appraisals were in fact inflated. There is no way to know for sure how a particular appraiser was (perhaps unconsciously) influenced by an estimated value, and it is for that reason that the appraisals are untrustworthy and—in the words of the district court—"worthless." Consider other services that, like appraisals, are built on a premise of independence. Suppose a plaintiff paid an accounting firm a $1,000 fee to conduct an independent audit of a company's books. If the audit was not in fact independent, the plaintiff is out of pocket $1,000 for services that it never rendered. So too here. Regardless of whether other harms might later ensue, the financial injury is incurred by paying for a service that has not been received.

Nor does it matter for standing purposes how the biased appraisals influenced the plaintiffs' decision to take a mortgage. The plaintiffs paid an average of $350 to Quicken to obtain impartial appraisals that they never received. That is true regardless of the subsequent effect of the tainted appraisals on their mortgage decisions. The only question here is whether the plaintiffs' payment of that $350 charge was enough for Article III standing. And that question—which is not a difficult one—has nothing to do with *TransUnion*.

**C.** When Rocket finally turns (at 35) to this Court's holding that the plaintiffs suffered a financial injury, it has little to say. It concedes that the plaintiffs each paid a fee for their appraisals. And it does not argue that *TransUnion* changed anything on

this point. Instead, it relies on this Court's conclusion in *Baehr v. Creig Northrop Team, P.C.* that the expenditure of money for a service did not alone establish economic injury. 953 F.3d 244 (4th Cir. 2020). The plaintiffs in *Baehr* claimed that an undisclosed kickback scheme undermined fair competition among settlement service providers in the abstract, but they did not argue that they had been overcharged or received deficient services.

Unlike *Baehr*, this is not a case about a "bare procedural violation." *Id.* at 252. The plaintiffs here *did* argue that the appraisal services they received were deficient. The plaintiffs did not get what they paid for: While they paid for an independent appraisal, they instead got a tainted one. *Baehr*, in other words, was about a defective *process*, while this case is about a defective *product*. Moreover, the plaintiffs in *Baehr* disclaimed any pocketbook injury, and the court "emphasize[d]" that the record was "devoid of evidence that the Baehrs were actually deprived of impartial and fair competition among settlement services providers." *Id.* at 255; *see id.* at 254 ("[T]he Baehrs do not contend that they were harmed by being overcharged for settlement services.").

The court of appeals decisions that Rocket cites don't say otherwise. These cases deal with a different problem: How to disentangle the value of the portion of a product that is defective from the portion that provides value. "Ordinarily, when a plaintiff purchases a product with a defect, the product retains some value, meaning

her benefit-of-the-bargain damages are less than the entire purchase price of the product." *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019). As these cases explain, "detailed economic models" might therefore be required to accurately price the injury. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 287 (3d Cir. 2018). In *Thorne*, for example, a Pep Boys store sold tires to the plaintiff but failed to comply with federal regulations requiring that the tires be registered. 980 F.3d at 884. One of the plaintiff's theories of Article III injury was that her unregistered tires weren't worth as much as registered ones. But that theory "require[d] speculation" about what the tire company's "prices would be if it sold its tires differently." *Id.* at 887. The case would have been very different, however, if Pep Boys had charged the plaintiff a $100 tire-registration fee. That would have made registration a service for which the plaintiff paid—and would have made it easy to value the company's failure to live up to its end of the bargain.

All these cases hold is that a plaintiff must show that a product "failed to work for its intended purpose" or was "worth objectively less than what one could reasonably expect." *Johnson & Johnson*, 903 F.3d at 290 n.15; *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 707 (9th Cir. 2020) (plaintiff had failed to allege that she was injured by paying for a product that either contained a hidden defect or was worth objectively less than what she paid for it); *see also Maya*, 658 F.3d at 1069 (plaintiffs' paying "more

for their homes than the homes were worth at the time of sale" was an "actual and concrete" economic injury). That is exactly what the plaintiffs showed here when they showed that tainted appraisals are unreliable and worthless.

Rocket's argument (at 45) to the contrary—its defense on the merits—is that the appraisals "accomplished exactly what they were supposed to" because they "complied with" the appraisal rules in place at the time and "enabled the refinance that each class member sought and received." But that is not all that the appraisals were intended to accomplish. Appraisals are not merely instruments to secure a loan—otherwise, why would they be conducted by independent third parties, and why would borrowers pay a separate fee for them? They are also supposed to be independent assessments of a home's value.[4]

In any event, however strenuously Rocket might disagree with the plaintiffs' theory, that disagreement plays no role in the analysis of Article III standing. It is a basic maxim of standing law that courts must take the plaintiff's legal theory as a given, "assum[ing]" that the "merits" of the dispute would "be resolved in favor of" the party invoking jurisdiction. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011); *see also Warth v. Seldin*, 422 U.S. 490, 502 (1975) ("assum[ing]" a violation); *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (same). Here, that means

---

[4] This Court discussed the appraisal rules at length in its prior published opinion, concluding that the rules did not support Rocket's position and that Rocket's arguments based on them were waived. *Alig*, 990 F.3d at 805.

20

taking the plaintiffs' view of West Virginia law—specifically, that charging an average of $350 for an appraisal that couldn't be trusted as a measure of home value, and then concealing that fact, stated a claim for unconscionable inducement under the WVCCPA. That is just what this Court did. And having done so, it faced only the question whether paying that $350 charge was the sort of out-of-pocket injury that could support Article III standing. That question is an easy one—and it doesn't implicate *TransUnion* at all.

## II.   The plaintiffs' theory of injury applies equally to every class member.

Rocket's challenge to class certification is also rooted in its misunderstanding of the relevant injury. It argues that the district court erred by certifying a class with many uninjured class members. But, again, Rocket assumes that the plaintiff's injury is the risk of foreclosures or other downstream effects, which it says the plaintiffs cannot prove for absent class members. As already explained, the plaintiffs' theory of injury turns not on downstream effects, but on Rocket's use of tainted appraisals—a fact that is identical as to each class member and for which the plaintiffs "can rely largely on common proof." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019). Moreover, the WVCCPA provides each class member with an identical amount of statutory civil penalties, without requiring proof of reliance or actual damages. In short, "[t]he problems that so often plague class actions under Rule 23(b)(3)" were "wholly absent" here. *Id.* at 655.

Even Rocket's theory of injury would not defeat certification. If Rocket is correct that the downstream effects are too uncertain to serve as an injury in fact, the *entire class* would lose standing on this basis. *See, e.g.*, Rocket Br. 3 (no evidence that the risk "actually materialized for anyone"). So the borrowers' standing—including the standing of the named plaintiffs—would rise or fall together. Whether or not Rocket is correct—and as explained above, it is not—this case has nothing to do with the question whether a court may certify a class with uninjured class members.

## III. The plaintiffs incorporate their prior briefing.

Because the other issues in the case were briefed in prior rounds of briefing, this Court has allowed the parties to incorporate those briefs by reference, limiting the new briefing in this appeal to the standing issue that this Court remanded to the district court. ECF No. 23. The plaintiffs accordingly incorporate their prior briefs by reference. The Court should have no need to reach those issues, which it already decided in its prior published opinion.

**CONCLUSION**

This Court should reissue its published opinion with the added clarification that *TransUnion* does not alter its conclusion.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
GREGORY A. BECK
LINNET DAVIS-STERMITZ
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

JASON E. CAUSEY
BORDAS & BORDAS, PLLC
1358 National Road
Wheeling, WV 26003
*jcausey@bordaslaw.com*

JONATHAN R. MARSHALL
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
*jmarshall@baileyglasser.com*

PATRICIA M. KIPNIS
BAILEY & GLASSER LLP
923 Haddonfield Road, Suite 300
Cherry Hill, New Jersey 08002
*pkipnis@baileyglasser.com*

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 5,598 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta